GDE&T   GREENBERG DAUBER EPSTEIN & TUCKER   |   COUNSELLORS AT LAW

A PROFESSIONAL CORPORATION

RUSSELL S. BURNSIDE
ADMITTED IN NJ, NY, PA, DC

August 21, 2013

*Via Electronic Filing and Federal Express*

Hon. Cathy L. Waldor, U.S.M.J.
United States District Court District of New Jersey
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street, Courtroom 4C
Newark, New Jersey 07101

Re:   *Nite Glow Industries, Inc. v. Central Garden & Pet Company*
      **Civil Action No. 2:12-cv-04047-KSH-CLW**

      **Opposition to Plaintiff's Motion For Leave To Amend Complaint**

Dear Judge Waldor:

This office represents Defendants Central Garden & Pet Company ("Central") and its wholly owned subsidiary Four Paws Pet Company ("Four Paws").  Defendants submit this letter brief in opposition to Plaintiffs' pending Motion for Leave to File a Second Amended Complaint.

Plaintiffs' proposed Second Amended Complaint would add four new baseless and unsupported counts against Defendants, all pertaining to U.S. Patents Number 7,204,206 entitled "Abrasion Resistant Omnidirectionally Reflective Pet Leash" ("the '206 Patent) and 7,549,399 entitled "Abrasion Resistant Omnidirectionally Reflective Retractable Pet Leash" ("the '399 Patent").  Specifically, the proposed futile new counts are: (1) Count II for infringement of the '206 Patent; (2) Count III for infringement of the '399 Patent; (3) Count X for false marking of the '206 Patent; and (4) Count XI for false marking of the '399 Patent.

Plaintiffs' proposed counts are not supported in either law or fact.  The proposed amendments are futile and Plaintiffs' motion for leave to amend should be denied.  As the Third Circuit has held, leave to amend should be denied when the "amendment would cause undue delay or prejudice, or th[e] amendment would be futile." *Oran v. Stafford*, 226 F.3d 275, 291 (3d Cir. 2000).  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1998).  "In assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Id.*; *see F.D.I.C. v. Bathgate*, 27 F.3d 850 (3d Cir. 1994) (denying motion for leave to amend where proposed amendment failed to state legal cause of action under New Jersey law); *Arab African Intern. Bank v. Epstein*, 10 F.3d 168 (3d Cir.

Hon. Cathy L. Waldor, U.S.M.J.
August 21, 2013
Page | 2

1993) (denying motion for leave to amend to add RICO count when such count was barred by statute of limitations).

    This Court should deny Plaintiffs' motion for leave to file their Second Amended Complaint, which would only be dismissed by a motion in lieu of an Answer anyway. Counts II and X (pertaining to alleged infringement and false marking of the '206 Patent, respectively) are rendered futile - and indeed frivolous - by the fact that the parties have a license agreement in place for the '206 Patent. Paragraph 26 of the Amended Complaint alleges that Plaintiffs gave Defendant Four Paws a presentation on the Plaintiffs' direct delivery applicator on August 27, 2008. ECF Doc. No. 42-4 at ¶ 26. Further, this paragraph alleges that Plaintiffs later presented the '206 and '399 Patents' reflective leash concepts to Defendant Four Paws at a later meeting on May 5, 2009. *Id.* While the allegations in the Amended Complaint do not mention the entering of a licensing agreement, on pages 5 and 6 of Plaintiffs' brief in support of its motion for leave to amend the Complaint, Plaintiffs make the unsworn statement that "as with the Direct Delivery Applicator, a license agreement was never executed and I Did It, Inc. heard nothing further from Defendants" with respect to the '206 and '399 Patents. *See* ECF Doc. No. 42-1 at 5-6.

    Plaintiff's statement is demonstrably false. Plaintiff I Did It, Inc. did indeed enter a license agreement with Defendant Four Paws for its reflective leash concepts. Attached hereto as **Exhibit A** is the License Agreement, effective January 1, 2009, between I Did It, Inc. and Four Paws. Exhibit A to the Agreement indicates that the intellectual property being licensed is the '206 Patent. Paragraph 2.1 and 3.1 expressly permit "affiliates" of Four Paws to engage in the licensed activity as well, which would necessarily include Defendant Central, being Four Paws's parent company.

    Clearly, Count II of the Amended Complaint alleging infringement of the '206 Patent is frivolous in the face of the January 1, 2009 License Agreement. "An express or implied license is a defense to infringement." *Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*, 424 Fed. Appx. 931, 933 (Fed. Cir. 2011) (citing *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995). On its face, Count II has no basis in fact or law and must be withdrawn.

    Plaintiffs' proposed Count X for false marking of the '206 Patent is similarly futile in light of the executed License Agreement. Count X alleges that Defendants marked their products with the '206 Patent without the consent of Plaintiffs. ECF Doc. No. 42-4 at ¶ 116. Plaintiffs ignore the fact that they entered the Licensing Agreement with Defendant Four Paws, vitiating this false marking claim. *See* Ex. A. The License Agreement is silent as to Defendants' rights and responsibilities pertaining to marking with Plaintiff's '206 Patent. *Id.* However, Plaintiff's Count X (and XI pertaining to the '399 Patent) cannot stand as currently styled. If the Plaintiffs believe that Defendants wrongly marked their product with the '206 Patent under the indisputable License Agreement, then Plaintiffs perhaps could state a colorable claim for breach of contract, but not for false marking. Plaintiffs' proposed Second Amended Complaint ignores these facts, however, and leave to file the futile, baseless counts should be denied.

Hon. Cathy L. Waldor, U.S.M.J.
August 21, 2013
Page | 3

As noted, the January 2009 License Agreement only expressly licenses the '206 Patent to Four Paws and its affiliates, including its parent company Central. However, the course of dealing among Plaintiff Hurwitz and Four Paws indicates that there was an implied license with respect to the '399 Patent's reflective retractable leash as well. On April 29, 2011, Four Paws employee John Cummings sent Plaintiff Hurwitz an email in which Mr. Cummings stated: "I am sending you a sample of the reflective retractable leash sample [sic] today to review. We are finalizing the packaging now in China." A true copy of this correspondence, as well as additional correspondence between the parties from November 2011 discussing the retractable reflective leash, is attached hereto as **Exhibit B**.

In their baseless motion for leave to amend, Plaintiffs erroneously allege that Plaintiffs first learned of Defendants' marketing of a reflective retractable pet leash in February 2012. *See* ECF Doc. No. 42-1 at 6; 42-2 at ¶ 2. This is disingenuous at best, considering the indisputable facts that: (a) the parties had an express License Agreement effective January 2009 for non-retractable reflective leashes, Ex. A.; and (b) the parties openly discussed Defendant Four Paws' development of a reflective retractable leash, <u>a sample of which Four Paws apparently sent to Plaintiffs for review</u>, in April 2011, Ex. B. Thus, Plaintiffs' proposed new Counts III and XI pertaining to the '399 Patent are similarly futile, if not frivolous, and should be rejected as well.

Moreover, from virtually the outset of this litigation, Plaintiffs have argued that a licensing agreement existed and royalties were owed. At the January 31, 2013 initial conference with Magistrate Shwartz, Plaintiffs claimed that royalties were owed and threatened a motion to amend the complaint to add a breach of contract claim. Subsequently, Plaintiff's counsel reiterated this position in an e-mail to counsel, even referencing an alleged oral licensing agreement as to retractable reflective leashes. *See* **Exhibit C**. At the June 12, 2013 settlement conference, Plaintiff again raised the issue of overdue royalties and Defendants agreed to investigate the issue and calculate what was due and owing. Plaintiffs' sudden and inexplicable position that a License Agreement, written and/or implied, somehow does not exists is contrary to what Plaintiffs have said all along in this litigation. At best, Plaintiffs may have a breach of contract claim, but certainly not additional infringement claims or false marking claims.[1]

For these reasons, Defendants respectfully request that Your Honor deny Plaintiffs' motion for leave to file a Second Amended Complaint.

Respectfully submitted,

Russell S. Burnside

---

[1] As promised at the settlement conference, Defendants are calculating the royalty payments due to Plaintiffs and plan to offer full payment shortly. Based on Defendants' very preliminary analysis, the amount in question is relatively small, perhaps as low as in the range of $10,000. If Your Honor is not inclined to deny Plaintiffs' baseless motion for leave to amend outright, and is considering granting a revised motion to amend for breach of contract claims, then Defendants request that the motion be stayed for thirty days so that Defendants can complete their accounting, which will resolve the contract issues.

Hon. Cathy L. Waldor, U.S.M.J.
August 21, 2013
Page | 4


RSB/tbs
Enclos.

cc:      Ernest D. Buff, Esq. *(Via ECF and Email)*

Exhibit A

## LICENSE AGREEMENT

Effective January 1, 2009 ("**Effective Date**") FOUR PAWS PRODUCTS LTD., a New York corporation with principal offices at 50 Wireless Blvd., Hauppauge, New York 11788 ("**Licensee**"), and IDIDIT, INC., a New Jersey Corporation d/b/a Nite Glow Industries, with principal offices at 81 Mosle Road, Far Hills, New Jersey 07931 ("**Licensor**"), either of which may also be referred to individually as a "**Party**", or collectively as "**Parties**", agree as follows:

## ARTICLE 1.    BACKGROUND

1.1    Licensor represents that it is the sole owner-assignee of the Patents listed in Exhibit A (the "**Licensed Patents**") and the improvements and inventions described therein, said improvements directed toward an omnidirectionally reflective pet leash and/or collar.

**1.2**    Licensee is engaged in development and commercialization of products for the care of companion animals.

**1.3**    Licensee desires to develop and commercialize the improvements described in the Licensed Patents, and Licensor desires to have Licensee develop and commercialize the improvements described in the Licensed Patents.

**1.4**    In view of these mutual desires of Licensee and Licensor, they have jointly concluded that their respective needs and interests will be served by a license under the terms and conditions set forth in this Agreement.

## ARTICLE 2.    DEFINITIONS

Capitalized Terms used, but not defined, in the various Sections of this Agreement shall have the meanings ascribed to them below.

**2.1**    "**Affiliates**" means any division, corporation, parent company, or other legal entity controlling, controlled by, or under common control with Licensee.  As used herein, "control means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Party, whether through the ownership of voting securities, by contract, or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect more than fifty (50) percent of the board of directors or similar body governing the affairs of such Party.

**2.2**    "**Agreement**" means this License Agreement, together with any modifications or amendments hereto as provided herein, and shall include any Exhibits or Schedules attached hereto.

**2.3**    "**Calendar Year**" means for purposes of this Agreement, the twelve month (12) period beginning on January 1st and extending through December 31st.

**2.4**    "**Earned Royalties**" means royalties paid on the sale of Royalty-Base Products.

1

**2.5** "**First Commercial Sale**" means the initial transfer of Royalty-Base Products by Licensee and its Affiliates to third parties for compensation.

**2.6** "**Improvements**" means any modification or derivative of a Licensed Product.

**2.7** "**Intellectual Property Rights**" means the Licensed Patent Rights and Know-How.

**2.8** "**Know-How**" means Licensor's patented or unpatented inventions, discoveries, technical data, trade secrets, methods, processes, apparatus and techniques, relating to the manufacture and use of the improvements described in the Licensed Patents, any continuations, and a continuation-in-part application directed to a protective coating.

**2.9** "**Licensed Patent Rights**" means (a) current and future patent rights to any subject matter described in the Licensed Patents; and (b) all divisions, continuations, continuations-in-part and foreign counterparts thereof directed to leashes, collars and slip leads for household pets, such as dogs, cats, ferrets and the like, but excluding barn animals such as horses, llamas, cattle and the like; patents of addition, substitutions, registrations, reissues, reexaminations or extensions of any kind with respect to a patent or patent application described in clause (a) and (b) above.

**2.10** "**Licensed Products**" shall have the meaning set forth in Section 3.1.

**2.11** "**Licensed Territory**" shall mean all countries of the world.

**2.12** "**Net Sales**" means with respect to all Royalty-Base Products sold by Licensee and its Affiliates and Sublicensees, the invoice sales value of Royalty-Base Products sold in arm's length transactions to its or their customers, less the following:

    (i)    Freight allowances and any special handling costs which are separately billed or identified on invoices;

    (ii)    Allowances for lost or damaged goods;

    (iii)    Allowances for returns or rejections, discounts and/or rebates as actually granted to the customer on account of quantity purchase and discounts granted for promptness of payment as actually granted to customer;

    (iv)    All taxes levied, directly or indirectly, on the sales of Royalty-Base Products by any government or government agency, except for general income taxes; and

    (v)    Allowances for prior unpaid invoices as a result of bankruptcy of any customer.

A sale of Royalty-Base Products shall be deemed to have occurred upon shipment of the Royalty-Base Product to a customer. For the purpose of computing Net Sales, the foregoing deductions shall not in the aggregate exceed ten percent (10%) of the gross sales in any year

during which royalties are calculated. Where Royalty-Base Products are not sold in an arm's length transaction but are used or otherwise transferred or sold, then Net Sales for purposes of computing royalties shall be the selling price of such Royalty-Base Products of similar kind that are sold or offered for sale by Licensee in the particular country in question.

**2.13** "**Royalty-Base Products**" means those products, which in the absence of a license, would infringe at least one Valid Claim of the Licensed Patent Rights.

**2.14** "**Valid Claim**" means a claim of an issued and unexpired patent which has not been held invalid or unenforceable by a final unappealable or unappealed judgment or order of a court or other government agency of jurisdiction and has not been admitted to be invalid or unenforceable through reissue, re-examination, disclaimer or otherwise.

## ARTICLE 3.    LICENSE GRANTS

**3.1 Patent and Know-How License**.  Subject to the terms and conditions set forth herein, Licensor hereby grants to Licensee together with its Affiliates a personal, non-transferable (except as otherwise provided hereinbelow) non-exclusive license in the Licensed Territory under the Licensed Patent Rights to make, have made, use, sell, offer to sell, import and export any product, or good of any kind whatsoever, including without limitation, any product, or good that incorporates the Know-How or is described or claimed in any Licensed Patent (collectively, "**Licensed Products**"), and create and make Improvements.  Subject to the terms and conditions set forth herein, Licensor hereby grants to Licensee together with its Affiliates a personal, non-transferable (except as otherwise provided hereinbelow) non-exclusive license within the Territory to use and practice the Know-How to make, have made, use, sell, offer to sell, import and export Licensed Products, and create and make Improvements.

**3.2** The foregoing License shall become an exclusive License on Notice to Licensee by Licensor and Termination of any and all non-exclusive licenses for the Licensed Patents existing as of the date of Entry of this Agreement.

**3.3 No Other Rights Granted.**  No license, either express or implied, is granted by Licensor hereunder with respect to any patent, patent application, know-how or other intellectual property right except as specifically stated herein.

## ARTICLE 4.    OWNERSHIP OF INTELLECTUAL PROPERTY

**4.1 Licensor**.  Subject to an assignment pursuant to ARTICLE 7 hereof, Licensor shall retain exclusive ownership of all inventions, developments, and improvements which (i) were its property as of or prior to the date of this Agreement, or (ii) which are conceived, made and developed by Licensor during the term of the Agreement.

**4.2 Licensee.**    Licensee shall retain exclusive ownership of all inventions, developments, improvements, including, but not limited to Improvements, which were its property as of or prior to the date of this Agreement, or which are conceived, made and developed by Licensee during the term of the Agreement.

3

## ARTICLE 5.  LICENSE FEE AND ROYALTIES

**5.1 License Fee**.  In consideration of the rights and licenses granted to Licensee pursuant to this Agreement, and subject to Section 5.4 and 5.5 hereof, Licensee shall pay Earned Royalties to Licensor as follows:

(a)  Licensee will pay to Licensor as Earned Royalties ten (10) percent of Net Sales of Royalty-Base Products that are sold or otherwise disposed of by Licensee or its Affiliates from the date of the First Commercial Sale.

(b)  Only one royalty shall be due and payable to Licensor by Licensee regardless of the number of patents practiced by Licensee or by its Affiliates in connection with the production and commercialization of a particular Royalty-Base Product.

(c)  If any, only one Earned Royalty hereunder shall be due and payable to Licensor on any Royalty-Base Product regardless of the number of transfers between entities that such Royalty-Base Product undergoes in the course of its commercialization.  By way of example and not limitation, where Licensee or its Affiliates sells Royalty-Base Products to a distributor or retailer who in turn resells such product to end-users, the Earned Royalty payable hereunder will be paid solely on such first sale of the Royalty-Base Product by Licensee or its Affiliates.

**5.2.1  License Fee Payment**. Payment of the License Fee under Sections 5.1 and 5.2 shall be made by check to Licensor or to an account specified by Licensor

**5.2 Calculation and Payment of Earned Royalties**.  Earned Royalties shall be calculated and paid quarterly.  Earned Royalties shall be payable from the date of the First Commercial Sale and continue for all sales that occur from such date until the expiration or termination of this Agreement.  Earned Royalties payable under Section 5.2 shall be due and payable within forty-five (45) days following the end of each calendar quarter for all sales made during such calendar quarter.

**5.3 Limitations**.  The Parties acknowledge and agree that no Earned Royalties shall be payable by Licensee to Licensor on sales of Licensed Products by Licensee and its Affiliates that are not Royalty-Base Products.

**5.4 US Dollars**.  All payments due by either Party under this Agreement shall be made in U.S. Dollars (if the amount payable is mentioned in U.S. Dollars or in any other currency in this Agreement).  Net Sales which are received in a foreign currency shall be converted into U.S. Dollars as of the date that payment is due, using the exchange rate published in *The Wall Street Journal* for that date.

4

**5.5 Interest on Late Payments**. Licensee shall pay interest to Licensor at the prime lending rate for commercial transactions, as printed in *The Wall Street Journal*, on the last day of the month of the quarter for which royalties are due, plus two (2) percent, on any and all royalty amounts that are at any time overdue and payable to Licensor under this Agreement. The payment of such interest shall not replace any of Licensor's other rights under this Agreement resulting from Licensee's default by failure to pay any amounts due hereunder. The acceptance of any overdue royalty payments by Licensor at any time does not foreclose or impair Licensor's ability to collect owed interest on such royalties pursuant to this Section.

## ARTICLE 6.    RECORDS AND REPORTS.

**6.1 Records**.    Licensee shall keep full complete and accurate books of account containing all particulars that may be reasonably necessary for determining the royalties payable to Licensor for a period of two (2) years following each calendar year in sufficient detail to enable the accurate determination of royalties hereunder by Licensee. Said books of account shall be kept at Licensee's principal place of business.

**6.2 Audit**.    Said records as described in <u>Section 6.1</u> of each calendar year shall be available during normal business hours at Licensee's offices, upon reasonable notice and no more than once per year, during the term of this Agreement and for two (2) years following the end of such calendar year, for an independent certified public accountant retained by Licensor at Licensor's expense, for the purpose of verifying Licensee's royalty statements.    Licensee shall fully cooperate with such accountant in the course of such audit and permit such accountant to make copies of such records.    The accountant shall be allowed to disclose the information obtained to Licensor.    In the event that the audit reveals a discrepancy in the amount of royalty owed Licensor from what was actually paid, Licensee shall pay such discrepancy, plus interest, calculated at the rate equal to the prime lending rate for commercial transactions, as printed in *The Wall Street* Journal on the first day of such audit, plus two (2) percent.    In the event that such discrepancy is in excess of seven and one-half percent (7.5%), then Licensee shall also reimburse Licensor for the reasonable cost of such audit, including any reasonable attorney's fees incurred in connection therewith.

**6.3 Reports**.    Concurrently with the payments required by <u>Section 5.3</u> hereof, Licensee shall deliver true and accurate royalty and revenue reports to Licensor, giving such particulars of the business conducted by Licensee during the preceding quarter as are pertinent to a royalty accounting under this Agreement.    These reports shall include at least the following:

    **(a)**    The quantity and types of Royalty-Base Products sold on a country-by-country basis;

    **(b)**    Any and all deductions taken as permitted hereunder; and

    **(c)**    Total Earned Royalties due.

Royalty reports must be submitted for each period per this Agreement, even when there is no payment due, unless Licensee has ceased sale of the Licensed Products for more than two consecutive quarters and has not continued sales of the Licensed Products.

## ARTICLE 7.    PATENT PROSECUTION AND MAINTENANCE

**7.1 General.**  Licensor, at Licensor's expense shall continue to apply for and seek prompt issuance of patents with respect to the Licensed Product, and upon issuance, maintain during the term of this Agreement such patents and any others licensed under this Agreement. The Parties shall take all actions reasonably necessary to cooperate with and assist one another in the filing, prosecution and maintenance of Licensed Patents and patents issuing therefrom. Licensor shall keep Licensee informed as to the status of Licensed Patents.  On the failure of Licensor to pay maintenance fees on any of the Licensed Patents, licensor shall provide Licensee with the option of paying the maintenance fees and receiving ownership of such Licensed Patent without further compensation.

## ARTICLE 8.    REPRESENTATIONS AND WARRANTIES

**8.1 Organization and Good Standing.**  Each Party represents and warrants to the other Party that it is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation, and has all necessary corporate powers to own, use and transfer its properties and assets, and to carry on its business as now owned and operated.

**8.2 No Conflicts.**  Each Party represents and warrants to the other that the entering into by such Party of this Agreement and the consummation by such Party of the matters contemplated hereby, does not and shall not violate any agreement with or obligation to (whether express, implied or by operation of law) any other person, company or entity to which such Party is a party or subject, and, that this Agreement is binding upon such Party pursuant to the laws of such Party's domicile.

**8.3 Corporate Authority.**  Licensee represents and warrants to Licensor that it has the full corporate power and authority to enter into this Agreement and perform its obligations hereunder.

**8.4 Intellectual Property.**

    **(a)**    Licensor represents and warrants that to its knowledge Licensor is the sole owner of the Intellectual Property Rights and that it has good title to the Intellectual Property Rights, free and clear of any lien, claim or other encumbrance of any nature whatsoever.

    **(b)**    Licensor represents and warrants that it has not granted and will not grant any license or right under the Intellectual Property Rights to any third party inconsistent with or in derogation of the rights granted to Licensee hereunder.

    **(c)**    Licensor represents and warrants that to its knowledge there is no infringement or misappropriation or anticipated infringement or misappropriation by a third party or any pending or threatened claim or litigation, or any allegation of infringement or misappropriation or contested administrative proceedings with respect to the Intellectual Property Rights.  To Licensor's knowledge the manufacture, use and sale of Licensed Products do not infringe upon any patent rights or other intellectual property rights of others extant as of the Effective Date. However, Licensor does not

6

warrant that the practice by Licensee and its Affiliates of the rights granted herein is free of infringement of any intellectual property rights of any third party. Licensor does not warrant the validity of the Licensed Intellectual Property Rights

    **(d)**    Licensor represents and warrants that: there are no outstanding orders, judgments, injunctions, awards or decrees of any court, governmental or regulatory body or arbitration tribunal against or involving Licensor which are reasonably likely to adversely affect Licensee's rights to the Intellectual Property Rights as specifically set forth in this Agreement, or any of the transactions contemplated hereunder; there are no actions, suits or claims or legal, administrative (other than patent office proceedings not involving third parties) or arbitral proceedings or governmental investigations (whether or not the defense thereof or liabilities in respect thereof are covered by insurance) pending or threatened against or involving Licensor which are reasonably likely to adversely affect Licensee's rights to the Intellectual Property Rights as specifically set forth in this Agreement, or any of the transactions contemplated hereunder.

## ARTICLE 9.    LITIGATION

    **9.1 Notice of Infringement**.  Each Party shall promptly notify the other Party in writing of any suspected infringement(s) or misappropriation(s) of the Intellectual Property Rights and shall inform the other Party of any evidence of such infringement(s) or misappropriation(s).

    **9.2 Rights to Bring Suit**.  Licensor shall have the first right to institute and prosecute at its own expense suit for infringement(s) of the Intellectual Property Rights. Licensee agrees to join as a party plaintiff in any such lawsuit initiated by Licensor, if requested by Licensor, with all costs, attorneys' fees and expenses of the Licensee to be paid by Licensee. However, if Licensor does not institute suit for material infringement(s) within sixty (60) days of receipt of written notice from Licensee of Licensee's desire to bring suit for infringement of the Intellectual Property Rights in its own name and on its own behalf, then Licensee may, at its own expense, after good faith negotiations with Licensee regarding the appropriateness of such a suit, bring suit or take any other appropriate action. Licensor agrees to cooperate with Licensee to the extent necessary, including being the named plaintiff in such action. In such an instance, Licensee shall have sole control over the direction of the action even though Licensor is the named plaintiff.

    **9.3 Damages**.  Licensor and Licensee shall each be entitled to any recovery of damages resulting from a lawsuit brought by it, respectively, to enforce the Intellectual Property Rights pursuant to Section 9.2; provided, however, that Licensor shall be entitled to receive twenty percent (20%) of any excess of such recovery received by Licensee over Licensee's litigation costs and expenses.

## ARTICLE 10.    INDEMNIFICATION

    **10.1 Indemnification of Licensor**.  Licensee shall hold Licensor, its successors and assigns, the directors, officers, consultants and employees of any of the foregoing (collectively, the "**Licensor Indemnitees**") harmless against any loss, cost, liability and expense (including

7

settlement costs, court costs, and the reasonable fees of attorneys and other professionals) arising out of or resulting from, (a) any and all claims brought by third parties alleging personal injury or property damage in conjunction with, or arising out of the manufacture, distribution or use of Licensed Products by Licensee or its Affiliates, (b) any claimed breach of the representations and warranties made by Licensee under this Agreement, and (c) Licensee's gross negligence or willful misconduct.

**10.2 Indemnification of Licensee**.   Licensor shall hold Licensee, its Affiliates, successors and assigns, the directors, officers, consultants and employees of any of the foregoing (collectively, the "**Licensee Indemnitees**") harmless against any loss, cost, liability and expense (including settlement costs, court costs, and the reasonable fees of attorneys and other professionals) arising out of or resulting from, (a) any claimed breach of the representations and warranties made by Licensor under this Agreement and (b) Licensor's gross negligence or willful misconduct; provided that Licensor's indemnity obligation hereunder is limited to the amount of royalties paid to Licensor by Licensee under Article 6 and Licensor shall, at all times, be accorded the right to select and retain its own counsel.

**10.3 Cooperation**.   Each Party agrees to cooperate with the Indemnifying Party as may be deemed reasonably necessary or desirable by the Indemnifying Party, but shall be reimbursed for reasonable out of pocket expenses incurred in connection with such cooperation.

**10.4 Consultation**.   In view of the potential impact of the Indemnifying Party's defense and disposition of claims pursuant to this <u>ARTICLE 10</u> on the other Party's business, operations and marketing and sales of products, the Indemnifying Party shall at all times consult with and keep the other Party apprised of the status of all claims and of all proposed strategies and decisions with respect to the defense and disposition thereof.

## ARTICLE 11.   INSURANCE

**11.1 Insurance**. Licensee will, at its own expense, purchase and maintain at all times during the performance of this Agreement, the following insurance coverage:

    **(a)**    Workers' Compensation Insurance and Employer's Liability Insurance as required by applicable laws, statutes, and regulations;

    **(b)**    Comprehensive General Liability Insurance (including completed operations liability coverage and broad form contractual liability coverage) with a combined single limit for bodily injury (including death) and property damage liability of not less than $1,000,000 per occurrence, and $1,000,000 in the aggregate.

**11.2** All insurance required pursuant to <u>Section 11.1</u> hereof will contain waivers of subrogation against Licensor and its Affiliates. All insurance required pursuant to <u>Section 11.1(b)</u> hereof will name Licensor and its Affiliates as additional insureds thereunder, and will be primary and not seek contribution from any other insurance available to such entities as insureds or otherwise. It is further agreed that by naming and/or waiving Licensor and its Affiliates hereunder, none of such entities will be precluded from bringing a claim or claims against Licensor as if it had not been so named and/or waived.

**11.3**  The foregoing insurance coverage will be effected under valid and enforceable policies which will (i) provide that no cancellation or reduction in such insurance will be effected without giving Licensor at least thirty (30) days prior written notice; and (ii) be issued by insurers reasonably acceptable to Licensor. Certificates of such insurance will be delivered to Licensor as evidence of specified insurance coverage upon execution of this Agreement, and thereafter as may be required by Licensor.

## ARTICLE 12.   TRANSFERABILITY OF RIGHTS AND OBLIGATIONS

**12.1  Successors**.  This Agreement by Licensor shall be binding upon and inure to the benefit of any successor of Licensor in ownership and control of the Intellectual Property Rights.

**12.2  Assigns**.  This Agreement shall pass to any assigns for the benefit of creditors of Licensee, and to any receiver of its assets or to any person or corporation succeeding to its entire business in Licensed Products as a result of sale, consolidation, reorganization or otherwise, provided as such assignee, receiver, person or legal entity shall, without delay, accept in writing the provisions of this Agreement and agree to become in all respects bound thereby in the place and stead of Licensee.  Licensee shall be permitted to assign this Agreement to any Affiliate of Licensee without the prior consent of Licensor, but shall not otherwise assign this Agreement (except as specifically permitted under this Agreement) without the prior written consent of Licensor, such consent not to be unreasonably withheld, conditioned or delayed.

## ARTICLE 13.   TERM AND TERMINATION

**13.1  Term**.  This Agreement shall, unless sooner terminated as provided herein, run for a period of five (5) years from the Effective Date, and shall thereafter be renegotiated in good faith upon terms agreeable to both parties.

### 13.2  Termination.

(a)  A Party (the "**Non-Breaching Party**") shall provide the other Party (the "**Breaching Party**") with written notice of such default, breach or failure in the event that the Breaching Party is in material breach of any provision of this Agreement.  If the Breaching Party fails to remedy any such default, breach or failure within thirty (30) days after written notice thereof by the Non-Breaching Party, the Non-Breaching Party, subject to Section 13.3, may, at its option and in addition to any other remedies it may have at law or in equity, terminate this Agreement by sending notice of termination in writing to the Breaching Party and such termination shall be effective as of the date of receipt of such notice.

(b)  Licensee shall have the right to terminate this Agreement after January 1, 2013 at any time upon ninety (90) days' written notice to Licensor.

**13.3 Survival**.    After termination or expiration of this Agreement all provisions relating to payment shall survive until completion of required payments. In addition to those provisions and to any provisions which specifically provide for survival beyond termination, ARTICLE 10, ARTICLE 14, ARTICLE 15 and ARTICLE 18 shall survive indefinitely or until the expiration of any time period specified elsewhere in this Agreement with respect to the provision in question.

## ARTICLE 14.    CONFIDENTIAL INFORMATION

**14.1 Confidential Information**.    As used herein, the term "**Confidential Information**" shall mean all information disclosed by a disclosing Party to the receiving Party pertaining to the products and operations of the disclosing Party, including but not limited to, any present or potential business opportunities, pricing, production techniques, application knowledge, samples, materials, compositions, methods, research and product development, processing information, technical data, operational information, trade secrets, proprietary information and customers, and which (i) if in tangible form or other media that can be converted to readable form, is clearly marked as confidential when disclosed, or (ii) if oral or visual, is identified as confidential on disclosure.

**14.2 Nondisclosure; Standard of Care**.    For a period of five (5) years from the date of disclosure of each portion of the Confidential Information of the other Party, each Party shall:

    **(a)**    safeguard and protect such Confidential Information from disclosure to third parties by the exercise of the same degree of care as the receiving Party employs with respect to preserving and safeguarding information of its own which it desires to maintain proprietary to it; and

    **(b)**    not reproduce such Confidential Information, in whole or in part, without identifying such whole or partial reproduction on its face as being Confidential Information of the disclosing Party.

**14.3 Exclusions**.  Information disclosed to the receiving Party shall not be considered to be Confidential Information, and the receiving Party shall have no obligations respecting, nor be liable for, the use or disclosure thereof, if the receiving Party can prove that  such information:

    **(a)**    was not, at the time of disclosure, marked or identified as Confidential Information in the manner required as set forth in Section 14.1 of this Agreement; or

    **(b)**    as shown by cogent written records, was known to the receiving Party prior to receipt from the disclosing Party; or

    **(c)**    is or becomes part of the general public knowledge otherwise than as a consequence of breach of obligations under this Agreement; or

    **(d)**    was received by the receiving Party from a third party that, in the reasonable judgment of the receiving Party, was rightfully in possession of the same and

not in breach of any agreement or any confidential relationship with the Disclosing Party; or

      **(e)**    as shown by written records, is independently generated by employees of the receiving Party, or on its behalf by its agents, contractors or consultants who did not have access to the Confidential Information of the disclosing Party; or

      **(f)**    is provided by the disclosing Party to a third party without restrictions as to use or disclosure of the kind provided for by this Agreement.

    **14.4 <u>Exceptions</u>.**  Notwithstanding anything to the contrary in this Agreement, the receiving Party shall have no obligation respecting, nor be liable for, use or disclosure of Confidential Information where:

      **(a)**    such disclosure is made despite the exercise of the same degree of care as the receiving Party employs to preserve and safeguard information of its own which it desires to maintain proprietary; or

      **(b)**    such disclosure is compelled by judicial or other governmental action provided that the receiving Party promptly notifies the other Party of such action and cooperates with the other Party (at its expense) in obtaining any available protective order or the equivalent; or

      **(c)**    such disclosure is made as part of a public submission that is necessary to proceed with the commercial development of Licensed Products, including, but not limited to, for example, regulatory submissions and governmental product approvals; provided, that such disclosure is made only after exhausting all reasonable protective measures and is only made to the extent necessary to comply with such regulatory or approval process; or

      **(d)**    such disclosure is reasonably necessary as an incident of a sale of the Licensed Product; or

      **(e)**    such disclosure is made to third parties that are bound by written confidentiality agreements including terms no less stringent than those set forth herein.

    **14.5 <u>Sole Obligations</u>.**  The obligations of the receiving Party expressly set forth in this Agreement are the sole and only obligations which the receiving Party has, and the receiving Party shall be conclusively deemed to have no other obligations arising by implication or otherwise, to protect, safeguard and refrain from using Confidential Information. Upon the expiration of the period of confidentiality set forth in <u>Section 14.2</u> above, the receiving Party shall have no obligation to safeguard, protect or refrain from using Confidential Information.

    **14.6 <u>Other Information</u>.**  Information, other than Confidential Information, disclosed during the term of this Agreement, shall, unless otherwise agreed to in a writing signed by duly authorized representatives of both Parties, be conclusively deemed to have been disclosed

without any restriction regarding its use or disclosure and the receiving Party may freely disclose and use such information without obligation to the disclosing Party.

## ARTICLE 15.    NOTICES

All notices provided for in this Agreement shall be given in writing and shall be effective when either (1) served by personal delivery or overnight courier service, or (2) deposited, postage prepaid in the United States registered or certified mails addressed to the Parties respectively at the following addresses, or to such other address as a Party may designate by written notice, or (3) is transmitted by facsimile with receipt acknowledgement:

        If to Licensee:    FOUR PAWS PRODUCTS LTD.
                            50 Wireless Blvd.
                            Hauppauge, NY  11788
                            Attn:   President

        If to Licensor:    Nite Glow Industries, Inc.
                            81 Mosle Road
                            Far Hills, NJ 07931
                            Attn:   President

        With copy to:    Ernest D. Buff, Esq.
                            Ernest D. Buff & Associates
                            231 Somerville Road
                            Bedminster, NJ 07921

## ARTICLE 16.    GENERAL PROVISIONS

**16.1 Applicable Law and Venue**. This Agreement shall be governed in all respects by the laws of the State of New Jersey excluding its rules governing conflicts of law.  The Parties consent that any action arising out of this Agreement shall be brought appropriate state or federal courts in the State of New Jersey, and that such courts shall have personal jurisdiction over the parties with respect to any such action.

**16.2 Negation of Agency**.  It is agreed and understood by the Parties hereto that each of Licensor and Licensee, in its performance of its obligations and responsibilities under this Agreement, is an independent contractor and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the Parties.

**16.3 Failure to enforce**.  The failure of either Party to enforce at any time or for any period of time the provisions hereof in accordance with its terms shall not be construed to be a waiver of such provisions or of the right of such Party thereafter to enforce each and every provision.

12

**16.4 Bankruptcy**.  The Parties hereby acknowledge that in the event that this Agreement is terminated or rejected by a Party or its receiver or trustee under applicable bankruptcy laws due to such Party's bankruptcy, then all rights and licenses granted under or pursuant to this Agreement by such Party to the other Party are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the U.S. Bankruptcy Code ("**Code**") and any similar Laws in any other country, licenses of rights to "intellectual property" as defined under the Code subject to the protections afforded the non-terminating Party under Section 365(n) of the Code, and any similar law or regulation in any other country.  Licensor further acknowledges that in the event that this Agreement is terminated or rejected by Licensor or its receiver or trustee under applicable bankruptcy laws, Licensee hereby elects, pursuant to Section 365(n) or any applicable foreign equivalent, to retain all rights granted to it under this Agreement to the extent permitted by the law.

**16.5 Amendment and Modification**.  No modification, renewal, extension, amendment or waiver of this Agreement or any of its provisions shall be binding upon the Party against whom enforcement of such modification, renewal, extension, amendment or waiver is sought, unless made in writing and signed on behalf of such Party by one of its duly authorized representatives.

**16.6 Injunctive Relief**.  The Parties agree that an impending or existing material violation of any provision of this Agreement would cause the other Party irreparable injury for which it would have no adequate remedy at law, and agree that the injured Party shall be entitled to obtain immediate injunctive relief prohibiting such violation, in addition to any other rights and remedies available to it.

**16.7 Construction**.  This Agreement shall not be construed more strictly against one Party than against another Party merely by virtue of the fact that this Agreement may have been physically prepared by such Party, or such Party's counsel. it being agreed that all Parties, and their respective counsel, have mutually participated in the negotiation and preparation of this Agreement.   Unless the context of this Agreement clearly requires otherwise: (i) references to the plural include the singular and vice versa; (ii) references to any person include such person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement; (iii) references to one gender include all genders; (iv) "including" is not limiting; (v) "or" has the inclusive meaning represented by the phrase "and/or"; (vi) the words "hereof", "herein", "hereby", "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (vii) article, section, subsection, clause, exhibit and schedule references are to this Agreement unless otherwise specified; (viii) reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof; and (ix) general or specific references to any requirement of law means such requirement of law as amended, modified, codified or re-enacted, in whole or in part, and in effect from time to time.

**16.8 Severability**.  If any clause, provision, Section or subsection of this Agreement, shall, for any reason, be held illegal, invalid or unenforceable, the Parties shall negotiate in good faith and in accordance with reasonable standards of fair dealing, a valid, legal, and

13

enforceable substitute provision or provisions that most nearly reflect the original intent of the Parties under this Agreement in a manner that is commensurate in magnitude and degree with the changes arising as a result of any such substitute provision or provisions. All other provisions in this Agreement shall remain in full force and effect and shall be construed in order to carry out the original intent of the Parties as nearly as possible (consistent with the necessary reallocation of benefits) and as if such invalid, illegal, or unenforceable provision had never been contained herein.

**16.9** **Entire Agreement**. This Agreement contains the entire and only agreement between the Parties and supersedes all pre-existing agreements, negotiations and discussions between them respecting its subject matter. Any representation, promise or condition in connection with such subject matter which is not incorporated in this Agreement shall not be binding upon either Party.

**16.10** **Captions**. The captions, headings or titles of the various sections of this Agreement are for convenience of reference only, and shall not be deemed or construed to limit or expand the substantive provisions of such sections.

**16.11** **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall constitute an original, but all of which together shall constitute a single agreement.

*Signature Page Follows*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement in duplicate originals by their duly authorized officers or representatives.

**FOUR PAWS PRODUCTS LTD.**                    **IDIDIT, INC.**
                                               **d/b/a NITE GLOW INDUSTRIES**

"Licensee"                                     "Licensor"


By: _____                 By: _____

Name: Allen Simon                              Name: Marni Markell Hurwitz

Title: President, CEO                          Title: President / Founder


15

## EXHIBIT A

## United States

USP 7,204,206

## Europe

European Patent Application No.: 04 822 266.5

# ERNEST D. BUFF & ASSOCIATES, LLC

## Intellectual Property Solutions

### 231 Somerville Road
### Bedminster, NJ 07921

Ernest D. Buff, Esq.

*Facsimile Mail*
*(908) 901-0330*

*Direct Dial Number*
*(908) 901-0220*

*E-Mail*
*EBuff@EDBuff.Com*

January 30, 2009

**UNITED PARCEL SERVICE**

Allen Simon
President
Four Paws Products Ltd.
50 Wireless Blvd.
Hauppauge, NY 11788

Re: License Agreement
Four Paws Products Ltd. from Nite Glow Industries, Inc.
**Omnidirectionally Reflective Pet Leash and Collar**
Matter No.: 0200-136

Dear Allen:

Enclosed is a fully executed copy of the subject License Agreement.

We look forward to the successful implementation of this Agreement.

Sincerely,

Ernest D. Buff

**Enclosures**

**CC:**

Marni Markell
Nite Glow Industries, Inc.

Exhibit B

From:      mm@niteglowindustries.com
Sent:      Friday, April 29, 2011 8:50 AM
To:        John Cummings; Allen Simon; Barry Askin
Subject:   Re: Reflective Collar

John,
Also...the "TOOTH PASTE TABS" encapsulated in a gelatin, flavored...used for cleaning teeth, enhancing good breath, and stimulating the gums because of the granular texture, have been priced for me.

$5,000 for 300,000, made in the US. I thought they were priced reasonably.
However, I'm sure you can do better at bargaining than I can!

I can give you all the particulars.

The "TOOTH PASTE TABS" also surpassed everything displayed at the Global.
Yes, I am convinced we should do them.
Allen and Barry both loved them...remember?

Step by step!

Regards,
Marni

Sent via BlackBerry by AT&T

---

**From:** John Cummings <jcummings@fourpaws.com>
**Date:** Fri, 29 Apr 2011 08:18:37 -0700
**To:** mm@niteglowindustries.com<mm@niteglowindustries.com>
**Subject:** FW: Reflective Collar

Hi Marnie,

RE: Reflective Collar and leashes

1.  I received the adjustable collar samples and they look good (See picture) I am waiting on leash samples and pricing to review.

2.  Also, I am sending you a sample reflective retractable leash sample today to review. We are finalizing the packaging now in China. China use a light weight board on the box and it was ripping. They have to redo the print run with a heavier board quality.

Have a great weekend

JOHN

---

**From:** Courtney Bartel
**Sent:** Friday, April 29, 2011 9:56 AM

1

**To:** John Cummings
**Subject:** Reflective Collar

Here's the images of the two sizes of collars against black dogs.

Disclaimer: This communication and any attachments contain private, confidential, privileged and/or proprietary information intended solely for the Recipient(s) named above. If you are not the intended Recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If received in error, we apologize and ask that you please notify the Sender by returning this e-mail and permanently deleting this communication from your computer, including destruction of any printed copies. Any views expressed herein are not necessarily those of the Company represented by this e-mail source. No contracts, agreements or legally binding understandings may be entered into solely by an e-mail communication

Ernest D. Buff

From:        Marni Markell [mm@niteglowindustries.com]
Sent:        Saturday, April 13, 2013 11:39 AM
To:          Ernest D. Buff
Subject:     Fwd: flat reflective leash patent info / FOUR PAWS / CENTRAL GARDEN & PET

Begin forwarded message:

**From:** John Cummings <jcummings@fourpaws.com>
**Date:** November 17, 2011 3:05:08 PM EST
**To:** Marni Markell <mm@niteglowindustries.com>
**Subject: RE: flat reflective leash patent info**

Hi Marni,

We only started selling the RETRACTABLE REFLECTIVE LEASH line at the end of July. Please
confirm all outstanding contract details with Barry.

Have a great day

JOHN

**From:** Marni Markell [mailto:mm@niteglowindustries.com]
**Sent:** Thursday, November 17, 2011 2:33 PM
**To:** John Cummings
**Subject:** Re: flat reflective leash patent info

John,

Good to hear from you.

What about the "rope" RETRACTABLE REFLECTIVE LEASH".. what is the story with that??

Thanks,
Marni

On Nov 17, 2011, at 2:29 PM, John Cummings wrote:

1

Nite Glow et al. v. Central Garden et al.
000323

**From:** Marni Markell [mailto:mm@niteglowindustries.com]
**Sent:** Thursday, November 17, 2011 2:05 PM
**To:** John Cummings
**Subject:** Re: flat reflective leash patent info

Hi John,
Sorry for the neglect in getting back to you... my life was interrupted for a while... but, back functioning now!

Please inform me about the merger with TFH.

Hope this email message finds you doing well.

Warm regards,
Marni


On Oct 13, 2011, at 3:23 PM, John Cummings wrote:



Hi Marni,

- I hope everything good with you!

- CENTRAL GARDEN & PET wants TFH & FOUR PAWS to combined warehouses. FP warehouse is closing JAN 31th and all items will be warehoused in NEW JERSEY at a joint warehouse for FOUR PAWS, ADAM,s, TFH & CENTRAL ALGONA dist. FP is going to have a satellite office on LONG ISLAND.

- All patent information on the flat reflective leashes is needed ASAP. The TFH's people needs to review the patents before we move forward with anything. Please confirm what can be sent me this info.


Have a great day & talk to you soon!

JOHN


**From:** Marni Markell [mailto:mm@niteglowindustries.com]
**Sent:** Monday, November 29, 2010 2:32 PM
**To:** John Cummings
**Subject:** Re: Oct. meeting

John,
Should be receiving the "THREE IN ONE BRUSH" CAD drawings shortly... as soon as I do, I'll send them off to you!

Thanks for the help John.

2

Nite Glow et al. v. Central Garden et al.
000324

Enjoy!

Marni

On Nov 29, 2010, at 1:14 PM, John Cummings wrote:



Hi Marni,

      Once you get all the info together we can start moving with the (4) projects.

Have a great day!

JOHN

---

**From:** mm@niteglowindustries.com [mailto:mm@niteglowindustries.com]
**Sent:** Monday, November 22, 2010 1:26 PM
**To:** John Cummings
**Subject:** Re: Oct. meeting

I'm ready now.... Great!

I'll send you the info...thought you were preoccupied with other "stuff".
Glad to hear it's time to move onto the next group!

Should have sample collars and leashes by Dec 1 for you. OK

The "Toothpaste Tabs" are in development!...fabulous...wait until you see! OK

John, can you send me the "REFLECTIVE RETRACTABLE" leash in the 3 sizes? Sorry do not have samples yet.

Yes, I'm excited to see the finished product.
Can you blame me!?

Thanks John,
Marni

Sent via BlackBerry by AT&T

---

**From:** John Cummings <jcummings@fourpaws.com>
**Date:** Mon, 22 Nov 2010 09:26:04 -0800
**To:** mm@niteglowindustries.com<mm@niteglowindustries.com>
**Subject:** RE: Oct. meeting

3

Hi Marni,

How are you doing on the following project information? Once we start getting the info we can start moving with the projects.

Have a great day!

JOHN

---

**From:** John Cummings
**Sent:** Thursday, November 11, 2010 1:52 PM
**To:** mm@niteglowindustries.com
**Subject:** RE: Oct. meeting

Hi Marni,

Sorry I missed your call but we are doing some company computer training this month. Let me know when information on the following projects will be sent.

Have a great day!

JOHN

---

**From:** John Cummings
**Sent:** Monday, October 18, 2010 10:38 AM
**To:** mm@niteglowindustries.com
**Subject:** Oct. meeting

Dear Marni,

It is always fun seeing you! Please see a few comments below from the meeting.

Shampooing brush

- Need a hard copy on the shampooing brush patents
- Need all CAD drawings on the shampooing brush (Emailed over & on a DISC)

New reflective flat leash & collars

- Need hard copy on the flat reflective leash patents
- Need sample made on the flat reflective leash & adjustable collar like we discussed.

New breath treats

- Need pricing on New breath treats
- Need samples made on the New breath treats
- Need ingredients and Guaranteed Analysis on the New breath treats

New Dry shampoo brush dispenser

- Need a hard copy on the Dry shampoo brush dispenser patents if you have one
- Need all CAD drawings on the Dry shampoo brush dispenser (Emailed over & on a DISC)

2

Nite Glow et al. v. Central Garden et al.
000326

Have a great day!

JOHN

-----Original Message-----
From: mm@niteglowindustries.com [mailto:mm@niteglowindustries.com]
Sent: Saturday, October 16, 2010 10:00 AM
To: John Cummings
Subject: IMPORTANT!

Hello John,
Always good seeing you....and knowing you're my counterpart!

Everything discussed and suggested at the meeting prior to the meeting this week on
Thursday, October 14, 2010....was incorporated into the "THREE IN ONE BRUSH"....as you
can see.

Both Allen and Barry finally gave the go ahead...actually excited about the piece...wish
you had been in the room to experience their enthusiasm. Thrilling!

This email is sent as a reminder.... IMPORTANT to treat the prototype carefully, it's a
functioning prototype, yes....but, still NOT a PRODUCTION piece....so, a delicate
approach is necessary!
Yes, I am neurotic about it remaining in tact.

Have a good weekend...."wash" your dog with care! OK

Regards,
Marni
Sent via BlackBerry by AT&T

This e-mail communication and any attachments contain private, confidential, privileged and/or proprietary information, intended solely for the Recipient(s) named above. If you are not the intended Recipient, any use, dissemination, distribution or copying of the communication is strictly prohibited. If received in error, we apologize and ask that you please notify the Sender by returning this e-mail and permanently deleting this communication from your computer, including destruction of any printed copies. Any views expressed herein are not necessarily those of the Company represented by this e-mail source. No contracts, agreements or legally binding understandings may be entered into solely by an e-mail communication.

Marni Markell
Founder
Nite Glow Industries
81 Mosle Road
Far Hills, NJ 07931

Studio 908.901.0283
Fax    908.901.0284
www.niteglowindustries.com

Marni Markell
Founder
Nite Glow Industries
81 Mosle Road
Far Hills, NJ 07931

Studio 908.901.0283
Fax    908.901.0284
www.niteglowindustries.com

Marni Markell

Founder
Nite Glow Industries
81 Mosle Road
Far Hills, NJ 07931

Studio 908.901.0283
Fax     908.901.0284
www.niteglowindustries.com


*Marni Markell*
*Founder*


*Nite Glow Industries*
*81 Mosle Road*
*Far Hills, NJ 07931*

*Mobile: 973 723 4821*
*Studio: 908 901 0283*
*Fax:     908 901 0284*

*www.niteglowindustries.com*

6

Exhibit C

## Thomas B. Slocum

From:           Ernest D. Buff [EBuff@edbuff.com]
Sent:           Wednesday, April 03, 2013 2:44 PM
To:             Russell S. Burnside
Cc:             Barbara Weingarten; Thomas B. Slocum
Subject:        RE: Nite Glow
Attachments:    0200-177-Retractable Leash Display-Global Pet Expo.pdf; 0200-177-Retractable Leash
                Package-Back-Marked.pdf; 0200-177-.Four Paws Royalty Reports-04 2009 to 07 2012pdf.pdf;
                0200-177-4 Paws Retractable-Show.pdf; 0200-177-4 Paws-Retractable Leash.pdf; 0200-
                Retractable Back.pdf; 0200-177-4 Paws-Retractable Leash.pdf; 0200-177-Global Pet Expo-
                Retractable Leash Package-component parts.pdf

Russell,

    In accordance with your request, attached are Royalty Reports for Four Paws sales of Nite Brite leashes covering the period April 2009 through July 2012.

    We have no record of royalties paid on Four Paws sales of retractable leashes.

    Photos of Retractable Leashes displayed by Four Paws earlier this year at the Global Pet Expo in Orlando, Florida, are attached. The Retractable Reflective leashes have been displayed at the Global Pet Expo show in Orlando Florida for the past three years. Please note that the back of the package containing each Retractable Leash is marked with U.S. Patent Nos. 7,204,206 and 7,549,399. Each of these patents is assigned to Nite Glow Industries, Inc. However, Nite Glow Industries has received no royalty payments for Four Paws sales of retractable leashes. Nite Glow disclosed the retractable leash design to Four Paws nearly 4 years ago. At the time of disclosure, Nite Glow gave Four Paws a prototype which is the same design as the design of the Retractable Reflective leash currently being sold by Four Paws. Even though a licensing arrangement was not formalized, it was understood by Four Paws and Nite Glow, that Nite Glow would be paid a royalty of 10% based on sales of the Retractable Reflective leashes.

    Our Client is concerned that she has not received royalties for sales by Four Paws, or Central, of the Retractable Reflective leashes. It would be appreciated if you would provide us with whatever documents and information your clients have with respect to sales, royalty calculations and payments pertaining to the Retractable Reflective leashes.


Ernie Buff

*********************
Ernest D. Buff & Associates, LLC
231 Somerville Road
Bedminster, NJ 07921

Phone:   (908) 901-0220
  Fax:   (908) 901-0330
Email:   EBuff@EDBuff.Com


**From:** Russell S. Burnside [mailto:rburnside@greenbergdauber.com]
**Sent:** Monday, February 04, 2013 11:30 AM

**To:** Ernest D. Buff
**Cc:** Barbara Weingarten; Thomas B. Slocum
**Subject:** Nite Glow

Ernie,

I have confirmed my client's availability to appear for the settlement conference on May 16th.  Please confirm your client's availability so that we can confirm the date with the Magistrate.

Regarding royalties on the leash products, I do not understand there to be a dispute as to the underlying agreement and, as I noted at the conference, most of the Four Paws people are no longer employed with the Company.  Therefore, I am not certain as to the status of sales, royalty calculations and payments.  I will have to investigate.  It would be helpful if you could provide me with whatever documents and information your client has with respect to sales, royalty calculations and payments.

Thank you.

Russ

Russell S. Burnside, Esq.
Greenberg, Dauber, Epstein & Tucker, P.C.
One Gateway Center--6th Floor
Newark, New Jersey 07102
Telephone:  973.643.3700 ext. 30
Facsimile:  973.643.1218
E-Mail:  rburnside@greenbergdauber.com
Website:  www.greenbergdauber.com