1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2                   CIVIL NO. 12-04047
    NITE GLOW INDUSTRIES INC. et al     :
 3                     Plaintiffs, :
    -vs-                             :
 4                                   :
    CENTRAL GARDEN & PET COMPANY et al :
 5                                   :
                                     : MARKMAN HEARING
 6                     Defendants. :
    - - - - - - - - - - - - _ _ _ _ _ _:
 7                     Newark, New Jersey
                       February 8, 2016 10:30 a.m. & 2 p.m.
 8  B E F O R E:

 9         THE HONORABLE KATHARINE S. HAYDEN, U.S.D.J.

10  A p p e a r a n c e s:

11  THOMPSON COBURN LLP
    Attorneys for Plaintiffs
12  One US Bank Plaza
    St. Louis, Missouri 63101
13  BY: ALAN H. NORMAN, ESQ.
        STEVEN E. GARLOCK, ESQ.
14      DAVID B. JINKINS, ESQ.
        KATHERINE E. COLVIN, ESQ.
15
    GREENBERG DAUBER EPSTEIN & TUCKER
16  Attorneys for Defendants
    Suite 600, One Gateway Center
17  Newark, New Jersey 07102
    BY: RUSSELL S. BURNSIDE, ESQ.
18      THOMAS B. SLOCUM ESQ.

19

20

21
```

_____
```
            Pursuant to Section 753 Title 28 United States Code,
22  the following transcript is certified to be an accurate
    record as taken stenographically in the above-entitled
23  proceedings.

24                      s\ RALPH F. FLORIO
                        Official Court Reporter
25
```

            U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

```
 1   ERNEST D. BUFF & ASSOCIATES, LLC

 2   Attorneys for Plaintiff

 3   231 Somerville Road

 4   Bedminster, New Jersey 07921

 5   BY: ERNEST D. BUFF, ESQ.

 6

 7

 8   ALSO PRESENT

 9   JAMES COONS, ESQ.

10

11   MARRI MARKELL

12

13   NORMAN NORTON

14

15

16

17

18

19

20

21

22

23

24

25
```

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

3

```
 1              I N D E X

 2

 3  WITNESSES:                        PAGES:

 4  NONE                              NONE

 5

 6

 7

 8         E X H I B I T S

 9  NUMBER         DESCRIPTION        PAGE

10  SEE ATTACHED INDEXING

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1              THE COURT:  Good morning.  You may all be seated.
 2  Thank you.  I am putting names with faces.  Mr. Norman, will
 3  you be presenting argument?
 4              MR. NORMAN:  I will, your Honor.
 5              THE COURT:  Ms. Colvin?
 6              MS. COLVIN:  Yes.
 7              THE COURT:  Mr. Garlock?
 8              MR. GARLOCK:  Yes, your Honor.
 9              THE COURT:  And Mr. Jinkins.
10              MR. JINKINS:  Good morning.
11              THE COURT:  Good morning.  For the defendant, Mr.
12  Burnside.
13              MR. BURNSIDE:  Good morning, your Honor.
14              THE COURT:  Will you be arguing?
15              MR. BURNSIDE:  I will be in part.
16              THE COURT:  You are the other part, Mr. Slocum?
17              MR. SLOCUM:  Yes, your Honor.
18              THE COURT:  And who else is in the gallery?
19              MR. COONS: James Coons, local counsel for the
20  plaintiffs.
21              THE COURT:  Okay.
22              MR. GARLOCK:  Your Honor, this is the plaintiff
23  inventor, Marni Markell.  Norm Norton is with her as a
24  guest.
25              Ernest D. Buff, who is representing the plaintiff
```

1  also.

2          THE COURT:  Okay.  Thank you.

3          I received, I guess, the Power Point from

4  plaintiffs.  I think it's probably best, since we are talking

5  about construing the terms, if we begin with your

6  presentation then, Mr. Norman.

7          MR. BURNSIDE:  Before we do that, if I could be

8  heard on this.

9          THE COURT:  Sure.

10          MR. BURNSIDE:  Your Honor, if you recall, the

11  plaintiffs submitted a letter roughly a week ago advising

12  that they were going to do a Power Point presentation, asking

13  for availability of technological equipment.

14          THE COURT:  Do we have a copy of the letter?  Give

15  me a chance, Mr. Burnside.  I'm going to pull up on my screen

16  and get myself organized here, that way I will jump on to the

17  docket.  So you may be seated while I do that.

18          MR. BURNSIDE:  Thank you, your Honor.

19          THE COURT:  Okay.

20          MR. BURNSIDE:  Your Honor, I think it was an

21  email.  I don't think it was filed, your Honor, if it's any

22  help.

23          THE COURT:  Okay.

24          Back on the record.  I have a letter of February 1,

25  Mr. Burnside, kind of noticing that Ms. Colvin would be

1    bringing a laptop and an elmo LCD projector.  And a

2    projection screen requested.

3              THE COURT: Is that the email we are speaking of?

4              MR. BURNSIDE:  Yes, your Honor, it is.

5              THE COURT:  Come up to the podium then.

6              MR. BURNSIDE:  So, your Honor, clearly a week or so

7    ago, the defendant was -- I'm sorry -- the plaintiffs were

8    prepared to present this.  And rather than give us a copy at

9    that time, or even a few days ago, we literally received this

10   five or ten minutes before we walked in.  I haven't had a

11   chance to look at it. I did peruse the first several pages.

12   I could tell you there is new material and citation of case

13   law we have not seen before.  As best as I can tell from my

14   quick review.  So in effect it actually constitutes or is

15   akin to a reply Markman brief, which I don't think is fair.

16   It's also-- also not fair to me to not get this ahead of

17   time.

18              Putting that aside for a moment, There's also some

19   what I'll call drawings.  Maybe they are artist renders.  I

20   am not sure what they are, which we haven't seen before,

21   which I am not sure are accurate.  So I'm going to object to

22   any use of any portion of this Power Point that is not simply

23   a copy of what's in the Markman papers that have already been

24   submitted.

25              I don't object if they want to put up on the screen

1   an excerpt from their brief or an exhibit that they already

2   provided to both the court and us.  But to the extent that

3   they want to get into case law that we have not had a chance

4   to review and critique, or if they want to show your Honor

5   artist renderings or schematics or diagrams that do not

6   appear in any Markman papers, I would object to all of that

7   because essentially it is a reply to the Markman brief.

8           And certainly if they are going to do that, they

9   should have asked for leave and give us a chance to weigh in

10  and given us a chance to respond as well, which of course

11  they haven't.

12          For those reasons I would object.  And if your

13  Honor wants us to take a few minutes to go through every page

14  so I can tell you which ones we object to, I am certainly

15  happy to do that.  I could tell you at the outset that what

16  I've been referring to appears on page 4 and page 5.

17          And it looks also to be that there's another patent

18  they are now referring to on page 19.  I am sure there's

19  more.  But that's what caught my eye in the few minutes I had

20  to review it.

21          THE COURT:  Page 4 caught my eye too.

22          The procedure will follow this.  It's not the first

23  time that I have been presented with the wherewithal for

24  Markman presentation on the day of.  And while I agree, it's

25  easier on me and on everybody if there was some effort to

8

1   pass it by your eyes earlier, I am not going to exclude it or

2   go through objections before I entertain it.  I'll let the

3   plaintiff make the presentation.

4           But to the extent that you have objections and feel

5   that -- let's do two things.  Let the record reflect your

6   objection at the time that page 4 -- we know you are

7   objecting to.  When we get to page 4, I'll hear why and we'll

8   go from there so that you have a record of why you are

9   objecting.

10          And to the extent that I feel that there needs to

11  be some kind of a back and forth, I'll permit you to do it.

12  Or you could incorporate what you noted at the time that you

13  make your presentation.  Makes sense?

14          MR. BURNSIDE:  Thank you, your Honor.  And your

15  Honor, perhaps if there's anything material, if we might have

16  an opportunity to submit a short written response within a

17  few days, a week or so.

18          THE COURT:  We will see what's left over.

19          MR. BURNSIDE:  All right.

20          THE COURT:  We will embark on this with our usual

21  resolve.  And after a couple of hours, tattered and torn,

22  we'll see where we are at.  Okay?

23          MR. BURNSIDE:  Thank you, your Honor.

24          THE COURT:  Okay.  Good.  We are going to have to

25  make a little bit of a break so I could get hook up with

1  Ralph on the Live Note.  Mr. Norman, come up.

2          MR. NORMAN:  Good morning, your Honor.

3          THE COURT:  Good morning.

4          MR. NORMAN:  This morning we will be discussing

5  disputed terms in the claims of the patent in suit.  The

6  patent in suit is U.S. Patent 8,057,445.  Page 1 of that is

7  on the screen.

8          Now the patent is directed to an applicator for

9  direct delivery of a solution such as flea, tick insect

10  repellant to an animal's skin and to also avoid having that

11  solution contact the user's skin, because this is not the

12  type of medicine that you want on the human skin.

13          Figure 3 is actually a figure from 1a from the '445

14  Patent.  We have highlighted this to make the discussion

15  easier.

16          Generally speaking, I have put this on as an

17  embodiment, because this is an embodiment of the '445 Patent

18  to give the court a little bit of an understanding as to how

19  the invention works, what the invention is.

20          Generally speaking, the invention of '445 Patent is

21  an applicator, comprising an applicator base.  That's going

22  to be the portion shown in pink.  The applicator base has a

23  chamber.  The chamber is shown in blue.  And the purpose of

24  the chamber is the chamber receives a solution cartridge.

25  And the solution cartridge is shown in yellow.


                U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

10

1           The applicator also includes at least one prong

2   member.  This particular embodiment has 4 prong members.

3   Those are the green members on the left end of the device.

4           Now in use, the cartridge is placed in the chamber

5   where the user squeezes the applicator, solution is squeezed

6   from the cartridge, it flows through at least one prong

7   member on to the skin of the animal.  The prong member can be

8   placed against the skin of the animal so the solution is

9   applied directly to the skin rather than on the fur and so

10  that it doesn't get on the person.

11          Your Honor, in connection with construing the

12  disputed claim terms, knowledge of the accused product

13  provides meaningful context.

14          As the Fed Circuit said in the Wilson Sporting

15  Goods case:  In reviewing claim construction in the context

16  of infringement, the legal function of giving meaning to

17  claim terms always takes place in the context of a specific

18  accused infringing device or process.  While a trial court

19  should not prejudge, the ultimate infringement analysis

20  construes claims with an aim to include or exclude an accused

21  product or process, knowledge of that product or process

22  provides meaningful context for the first step of the

23  infringement analysis claim construction.

24          So your Honor, what we would like to do is show you

25  one of the accused products.  There are several different

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  ones.  If I -- I might hand you one.  I've got an actual

2  sample.  May I approach to hand --

3          THE COURT:  Is there an objection?

4          MR. BURNSIDE:  Your Honor, this is the screen that

5  was just on, that counsel read from, is one of the ones I

6  object to.  I think you wanted me to pipe up every time I

7  have an objection on the record.  And the point of the that

8  is--

9          THE COURT:  Yes.

10         MR. BURNSIDE:  -- this I do not believe, as best I

11 can tell, I am sure if I am wrong, one counsel would jump

12 up.  This was one of the citations that was not in the

13 Markman briefing.  If it's so elementary, it begs the

14 question why.  Which makes me a little suspicious.  I would

15 like the opportunity to go into this and respond.  Obviously

16 not today, whenever your Honor permits me, a week or so if

17 possible.

18         THE COURT:  Are you objecting to the exemplar that

19 Mr. Norman has in his hands?  Have you shown your adversary?

20         MR. BURNSIDE:  I'm not objecting to the exemplar.

21 Again, it would be nice if I was told it was going to be used

22 today.  But putting that aside, I want to make sure I am

23 registering my objecting to the use of page 4, which we just

24 passed, apparently.

25         And now I have an objection to page 5 as well

1  because that was not in any of the exhibits.  And to the

2  extent that the pictorial part or artist's rendering part

3  hasn't been produced at all in discovery, I doubt various

4  labels have been produced on that very one.  And again I

5  object to that.

6            I don't know how accurate this -- I would expect to

7  have issues with some of descriptions or titles that appear

8  on this document.  Had I had the time to look into to it,

9  then I'd be prepared to do that.

10            MR. NORMAN:  These are photographs of the used

11  products that we have here.

12            THE COURT:  Taken apart in other words?

13            MR. NORMAN:  No. I could explain it.

14            MR. JINKINS:  Your Honor, be careful with that.

15  There is solution in there. If you do break it--

16            THE COURT:  I don't intend to do that.  Off the

17  record.

18            (PAUSE).

19            THE COURT:  Back on the record.

20            THE COURT:  Mr. Norman, you may continue.  I have

21  the exemplar here.

22            MR. NORMAN:  Now the accused product is an

23  applicator for directing -- for directly delivering a

24  solution such as flea tick or insect repellant to an animal's

25  skin.

1          Now the applicator comprises of two primary

2    components.  It's going to have the applicator base.  That's

3    the purple and dark gray item and it has the solution

4    cartridge.  That's the pink.

5          Now in the photo, you see we have two pictures of

6    the cartridge.  One is just the bottom view and one of the

7    top view.  The accused product doesn't have three items.  It

8    has only the two items.

9          The applicator base has a chamber in it for

10   receiving the solution cartridge.  So that would go in like

11   so (indicating).  But I don't want to close the lid.  Because

12   if I close the lid, the lid will break off the tip and expose

13   the end of the prong.  So the user sticks it in and closes

14   the lid, that will break off this prong -- that's in there.

15   And then the user squeezes the solution cartridge.  I'm

16   sorry.  The user squeezes the applicator base, that will

17   squeeze the cartridge and cause solution to squirt out the

18   prong member.

19          In this case, Nite Glow accuses defendants of

20   infringing Claims 1 and 16.  Claim 1 is an independent

21   claim--

22          MR. BURNSIDE:  Excuse me, your Honor.  Did you want

23   me to address 5 before we move on to 6?

24          THE COURT:  Are you talking about the page 5?

25          MR. BURNSIDE:  Yes, page 5.

1          THE COURT:  So you have objections to the rendering

2  on page 5?

3          MR. BURNSIDE:  Well, your Honor I have three

4  separate objections.

5          THE COURT:  Okay.

6          MR. BURNSIDE:  One is again, we were not provided

7  in advance.  I just want to make that clear.

8          Two, this is not an evidentiary hearing with

9  respect to infringement.  So why we are even discussing the

10  accused products is improper?  That's number two.

11          And number 3, I completely disagree with some of

12  the characterizations and some of the titles that appear on

13  here, because they are completely inaccurate.  And again,

14  this is an attempt to affect the Markman hearing with

15  infringement issues, which I think is improper.

16          I can respond to some of the titles that I think

17  are improper or inaccurate now, later, at your, whatever you

18  feel is appropriate.

19          THE COURT:  Yes.

20          MR. NORMAN:  Your Honor--

21          THE COURT:  Mr. Norman, let me just ask you. How is

22  this any different than you would be presenting an

23  infringement case?

24          MR. NORMAN:  Your Honor, I am not talking any more

25  about the accused product.  I just wanted to give the court

1    the context.  And that is what slide 4 says.

2              Slide 4 said that this is a Federal Circuit saying

3    that in the context of claim construction, it is good for the

4    court to be knowledgeable of the accused product.

5              Now, also says that a trial court should certainly

6    not prejudge the ultimate infringement analysis by construing

7    claims with an aim to include or exclude an accused product

8    or process.  Nevertheless, knowledge of that product or

9    process provides meaningful context.  I just wanted to

10   provide that context.  But I have already done so.  So I am

11   not going to -- I don't need to further discuss, nor what was

12   I further planning to discuss the accused product.

13             MR. BURNSIDE:  Your Honor, my problem, my concern

14   is had I known in advance that we were all going to give our

15   sort of views on the accused product and our take on it, I

16   would have prepared my own an analysis that would have been

17   in conflict with some of what you just heard already.

18             I do strenuously disagree with not only the

19   description but also the labels that have appeared.

20             THE COURT:  Let me -- this is going to be in the

21   nature of pure torture, not of animals but of humans, if I

22   don't put some context in this.

23             I want to see what the context for that context

24   quote is, whether or not this is an-oh-by-the-way, whether or

25   not, this is whether or not some obtuse argument came out.


                   U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  Because if it were this fundamental, this is how you would

2  have had your whole argument.  I would have had little

3  exemplar as to infringement -- but not that -- we are doing

4  claim construction and I want to take time out and look at

5  the particular cases you are relying on and let's see how

6  important it is.

7         If I rule that we have had enough, then we're going

8  to go into the claim construction and I'm going to want to

9  know from you, Mr. Norman, what pages or the actual claim

10  terms anticipated argument you're going to be using in your

11  spiral binder.  And I'm going to ask you to give those page

12  numbers to your adversary and then we could see whether or

13  not we have one continuing objection to untimeliness in Mr.

14  Burnside's estimation of having shared this.  Or if he has a

15  specific extra one.  So ten minutes.  I will review the

16  case.  Thank you.

17         MR. BURNSIDE:  Thank you.

18         MR. NORMAN:  Thank you.

19         THE COURT:  I do expect you to confer with each

20  other about this document.  Right?  Like I just said.

21         MR. NORMAN:  Yes.

22         MR. BURNSIDE:  Yes.

23         THE COURT:  Counsel, see me in the robing room

24  please.

25         (Off the record).

 1          THE COURT:  Back on the record.

 2          I have had an opportunity to review the case that

 3  was cited on page 4 at the plaintiffs' presentation, Wilson

 4  Sporting and Goods Company v. Hillerich & Bradsby Company, a

 5  decision by the Federal Circuit in 2006.

 6          And as I thought, the context of -- the context

 7  remark that is cited on page 4 lends a little bit of, or is

 8  important in how much weight to give that particular quote.

 9          The quote is: While a trial court should certainly

10  not prejudge the ultimate infringement analysis by construing

11  claims with an aim to include or exclude an accused product

12  or process, knowledge of that product or process provides

13  meaningful context for the first step of the infringement

14  analysis.  And cites to a case.

15          Then the Federal Circuit in the next paragraph

16  addresses the problem before it in the Wilson Sporting Goods

17  case.  Quote: In this case, meaning Wilson Sporting Goods,

18  despite entry of a final judgment, neither of the trial court

19  nor the parties supplied this court with any information

20  about the accused products.  Thus, this record affords this

21  court, meaning the Federal Court, no opportunity to compare

22  the accused products to the asserted claims.  Accordingly,

23  this court cannot assess the accuracy of any infringement or

24  valid determination.  Furthermore, this sparse record lacks

25  the complete context for accurate claim constructions.

1          What happened there, there was claim construction

2    and then almost on the heals of that, a final judgment

3    entered by the district court that there was no

4    infringement.  And so the Federal Circuit is complaining

5    about this sparseness of the record.

6          And in that context says, hey, some idea of what

7    the accused product is-- is a necessary part of it, because

8    every claim construction happens not because people feel like

9    construing claims, but because there is an overall litigation

10   on infringement.

11          Then finally, and this is what's important here to

12   me.  While asking for the additional context of what the

13   accused product was, and saying because we don't have it, we,

14   the Federal Circuit, cannot fully and confidently review the

15   infringement judgment, not the Markman construction, but the

16   infringement judgment, including the claim construction

17   component.  So that's very secondary to the observation.

18          The court comes back to this important principle,

19   which we are all familiar with.  Quote: This Court of course

20   repeats its rule that claims may not be construed with

21   reference to the accused device.

22          So I think that that was your point, Mr. Burnside.

23   That is the fundamental law.  And to the extent that page 4

24   gives us an interesting bit of broadening, it doesn't apply

25   to what we're doing here.  We are not moving to

1  infringement.  It's a fair objection to say it sounds like we
2  are getting there and it's a fair answer.
3        Mr. Norman says, that's it, where I'm going, I have
4  done it, I have kind of given you as context.  Let's keep it
5  as context and let's leap into the claims that we are dealing
6  with, otherwise we will be here until the animals come home.
7  Since we are not dealing with a cows.
8        Now, I think on page 8, we have the claim terms to
9  be construed?
10        MR. NORMAN:  Yes, your Honor.
11        THE COURT:  Okay.
12        MR. NORMAN:  Your Honor--
13        MR. BURNSIDE:  Your Honor, I note, however, page 8
14  does not include all of the page terms.
15        THE COURT:  When we were preparing for this, it was
16  apparently, there is some question about whether or not the
17  defense has abandoned some of the claimed terms or what?
18        MR. NORMAN:  Your Honor, we are asserting claims,
19  only claims 1 and 16.  So the only disputed claim terms that
20  are in claims 1 and 16 are these listed.
21        THE COURT:  All right.  And Mr. Burnside, you are
22  saying there's more that we will be finding out about?
23        MR. BURNSIDE:  Your Honor, the parties had
24  originally identified three additional --  at least three.  I
25  think there's also a commingling of a couple of claims.  I'll

1  put that aside for the moment.

2          But there are three that we had originally agreed

3  to that needed to be construed.  And they are flat, which I

4  concede does appear in Claim 18.  Angle tip which appears in

5  Claim 6.  Just like -- well, angle tip and elongated

6  cylindrical shape, which appears in Claim 7.

7          MR. NORMAN:  And we are not asserting any of those

8  three claims.  So it's unnecessary for the court to construe

9  those terms.

10          MR. BURNSIDE:  However, your Honor, some of the

11  definitions provided and some of the rationale provided for

12  some of those now dropped claims terms are relevant.  For

13  example, flap.

14          THE COURT:  Let me ask you something, Mr.

15  Burnside.  Did you raise the apparent omission of these three

16  terms in any papers before me, or what?

17          MR. BURNSIDE:  Well, they weren't omitted in the

18  opening Markman briefs from either party.

19          MR. NORMAN:  Your Honor--

20          THE COURT:  Wait.

21          MR. BURNSIDE:  Your Honor, they choose not to

22  address them in a subsequent filing.  And in fact, we make

23  known in footnote 2 of our response brief this very issue.

24          So we have not consented to the sudden dropping

25  without any explanation of these three claims terms.  And I

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  will again reiterate that one of those claim terms flap is

2  very relevant because of how the plaintiff defined it with

3  respect to the other claim terms.  So I don't want it to be

4  construed that we how somehow agreed with omission.

5         I might agree as we get through these claim terms

6  that perhaps we don't have to construe all three of these now

7  omitted on their side claim terms.  But I don't want it to be

8  construed that we could just ignore them completely, because

9  you're going see that flap is a very relevant claim term when

10  we get to some other claim terms that are listed on the

11  screen.

12         THE COURT:  I think it may be right.  Let's wait

13  and see what happens then.

14         MR. BURNSIDE:  Thank you, your Honor.

15         THE COURT:  Go ahead.

16         MR. NORMAN:  One point from a procedural

17  standpoint.  The parties had discussed this earlier, that we

18  will be -- if the court is okay with this procedure, we will

19  do this on a term-by-term basis.  So after I explain the case

20  law that I am going to be addressing and stuff, and we hit

21  the first claim term, then counsel for the defendant will

22  give the arguments on that and then we'll move on

23  term-by-term basis.

24         THE COURT:  That's fine.  Sounds good to me.

25         MR. NORMAN:  So, your Honor, here are Claims 1 and

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  16.  We have the disputed -- there are nine disputed claim

2  terms that in Claim 1.  There is one disputed claim term in

3  Claim 16.  And we have highlighted the disputed claim terms.

4           Claim 16 is a dependent claim, depending from Claim

5  1, and as such Claim 16 contains all of the limitations of

6  Claim 1, plus the additional limitation recited in Claim 16.

7           When we do begin to address the terms, we will

8  address the terms in the order in which they appear in the

9  claims.

10          The principles of claim construction are set forth

11  in the Phillips decision.  That's going to be Phillips v. AWH

12  Corp. 415 F.3d 1303.  That's Fed Circuit 2005, En Banc

13  decision.  In Phillips, an En Banc Federal Circuit stated,

14  words of a claim are generally given, their ordinary and

15  customary meaning.

16          The ordinary and customary meaning of a claim term

17  is the meaning that the term would have to a person of

18  ordinary skill in the art in question at the time of the

19  invention, i.e., as of the effective filing date of the

20  patent application.

21          The court explained that a person of ordinary skill

22  in the art is going to have knowledge of any special meaning

23  and usage in the field.

24          The meaning of the disputed claim term is to be

25  ascertained from the intrinsic record.  The intrinsic record

1    is the patent itself and the prosecution history.

2         The Federal Circuit said that claims must be read

3    in view of the specification of which they are apart.  And

4    specification includes the written descriptions, plus the

5    claims.

6         Now, if the disputed claim term is not a term of

7    art, then the disputed term is going to have the same meaning

8    to a lay person as it does to a person of ordinary skill in

9    the art.

10        A Federal Circuit said that in those cases, in

11   those cases in which the term in dispute is not a term of

12   art, then general purpose dictionaries may be helpful.

13        In many cases -- but then goes on to say, in many

14   cases that give rise to litigation, however determining the

15   ordinary and customary meaning of the claim requires

16   examination of terms that have a particular meaning in a

17   field of art.

18        In the present case, none of the disputed terms are

19   terms of art.  So general purpose dictionary may be helpful

20   to the court.

21        In Phillips, the Federal Circuit recognized two

22   circumstances in which a term may have a definition different

23   from the plain and ordinary meaning.

24        Lexicography and disavowal.  A lexicography occurs

25   where the inventor explicitly sets forth a definition in the

1  specifications.  And disavowal occurs when the inventor

2  specifically disavows a meaning.

3          Under Federal Circuit precedent, claim terms are to

4  be given their plain and ordinary meaning unless lexicography

5  and disavowal apply.

6          Now after the disputed claim terms in this case,

7  defendants argue for definitions that are not ordinary.

8          Given the facts of the present case, adopting a non

9  ordinary definition would violate the principles set forth in

10  Federal Circuit precedent.

11          I want to direct the court's attention to GE

12  Lighting Solutions, LLC v. A-G-I-L-I-G-H-T, 750 F.3d 1304 Fed

13  Circuit 2014.  GE Lighting cases are certainly cited in our

14  briefs.

15          In GE Lighting, the Federal Circuit reversed the

16  claim construction proposed by the defendant and adopted by

17  the district court.  The claim construction approach that was

18  rejected by the Federal Circuit in GE Lighting is the same

19  approach proposed by defendants in our case.

20          Now the disputed claim term in GE Lighting was IDC

21  connector.  An IDC connector is an electrical connector which

22  pushes insulation away from the end of the wire when the wire

23  is inserted in the connector.

24          The district court recognized that an IDC connector

25  is commonly used in electrical engineering to connote a range

1  of the devises, but found that the patents in suit were

2  limited to a more specialized IDC connector.

3          The district court relied on the embodiment

4  disclosed in the specification to conclude that the term IDC

5  connector was limited to the particular type of IDC connector

6  that was shown in the patent specification.

7          The Federal Circuit reversed.  A ruling that the

8  term IDC connector must be given its plain meaning of,"a

9  connector that displaces insulation surrounding an insulated

10  conductor to make electrical contact with the conductor."

11          The court found that nothing in the specification

12  or prosecution history required departure from the plain and

13  ordinary meaning.

14          Now, the court confirmed that claim terms must be

15  given their plain and ordinary meanings unless the

16  specification and prosecution history compel a departure from

17  the plain meanings.

18          The court said the specification and prosecution

19  history only compel departure from the plain meaning in two

20  instances, lexicography and disavowal.  And then it goes on

21  to explain these a little bit more.

22          It says, the standards for finding lexicography and

23  disavowal are exacting.

24          It further said to act as its own lexicographer, a

25  patentee must clearly set forth the definition of the

1   disputed term and clearly express an intent to define the

2   term.

3          Similarly disavowal requires that the specification

4   or prosecution history make clear that the invention does not

5   include a particular future.

6          In GE Lighting, the Federal Circuit determined that

7   no lexicography or disavowal apply, and that the claim term

8   must be given its plain and ordinary meaning.

9          It said it was error to import structural

10  limitations of preferred embodiments and the structural

11  limitations of dependent claims into the term IDC connector.

12  So the claim term is to be given its plain and ordinary

13  meaning except where a patentee clearly sets forth and

14  intends to set forth a different definition; or where a

15  patentee, or where a particular meaning has been clearly

16  disavowed in the patents or prosecution history by the

17  patentee.

18         Now to give the court an example of lexicography in

19  a patent, we conducted a quick search and we located a patent

20  that just issued this past Tuesday.  This patent is not

21  relevant to our case at all.  It is to merely to show the

22  court an example of lexicography.

23         This is a slide though that the defendants have

24  objected to.  It is for the limited purpose of just showing

25  an example of a case where the term was specifically defined

27

1  in the specification.

2          THE COURT:  Mr. Burnside, you're noting your

3  objection?

4          MR. BURNSIDE:  Yes, your Honor.  If I could take a

5  moment to elaborate.  Much like I think your Honor found with

6  respect to the Wilson case, that snippet from that case was

7  not entirely an accurate depiction of what's relevant today.

8  I suspect the same here.  I don't think we have seen this

9  before and I would like an opportunity to address it.

10  Obviously, I wouldn't do that today.

11          But what I would propose, your Honor, is that we'll

12  find this patent or maybe the plaintiffs can produce it and

13  we'll look at it.  If we think we need to address, we'll ask

14  your Honor to opportunity to submit a short letter brief.  If

15  we decide we don't need to address it, we'll let your Honor

16  know as well if that's permissible.

17          THE COURT:  Let's listen carefully.  This is

18  another exemplar, an example.

19          MR. NORMAN:  Yes.

20          THE COURT:  Okay.

21          MR. NORMAN:  So in the patent, in column 7,

22  beginning on line 1, you see that there's a section that says

23  definition.  This is a section of the patent's specification

24  and it actually says definitions, and then it specifically

25  explicitly sets forth definitions of terms that are used in

28

1  the patent.  I have highlighted a lot of these terms in

2  yellow.  I have specifically highlighted some terms in green

3  just to show how a claim term, how a term can be defined in a

4  way that is going to be a special meaning.  It's not going to

5  be its ordinary meaning, because the patentee can act as his

6  own lexicographer to define a claim.

7          It says similarly when we refer to a vehicle, we

8  meaning and then list a lot of things, including pedestrians,

9  pets, livestock, wild animals.

10         I show this only to show that if a patentee wants

11  to define a term and given a meaning different from its

12  ordinary meaning, it can do so by explicitly setting it forth

13  in the patent specifications.  Something that did not occur

14  in connection with the patent in suit.

15         And I think most people would agree that the

16  ordinary meaning of vehicle, for example, would not include

17  pets, livestock, wild animals.  And then it lists other terms

18  as well.

19         THE COURT:  Okay.

20         MR. NORMAN:  So in connection with the '445 Patent,

21  no term was explicitly defined, so no lexicography occurred.

22  No term, the meaning of no term what was disavowed by the

23  patentee, experts -- both sides had experts that had

24  submitted declarations and where deposed in this case.  The

25  experts did not identify any of the disputed terms as terms

1   of art.

2           Applying the Federal Circuit principle set forth in

3   GE Lighting, because there's no lexicography or disavowal in

4   present case, the definitions of the disputed terms cannot

5   depart from their ordinary meanings.

6           And because none of the disputed terms are terms of

7   art, they have the same meaning to a lay person as they do to

8   a person of ordinary skill in the art.  All right.

9           Finally we are getting to the first term in the

10  first disputed term in the claims.

11          First term is direct delivery applicator.  The term

12  direct delivery applicator occurs only in the preamble of the

13  claim.

14          Now the preamble of the claim, your Honor, is going

15  to be all the words occurring before confining, at least in

16  this particular example.

17          The body of the claim is going to be the sub

18  paragraphs A, B, C, D, E, and then the wherein clause in

19  connection with Claim 1.

20          Now the Federal Circuit has said that terms used

21  only in the preamble are not given patentable weight and need

22  not be construed.

23          Then we've got some citations to that.  That is

24  going to be in Intell-A-Check Corp. v. Autoscribe Corp. And

25  this case is cited in our briefs.

1          The term direct delivery applicator does not occur

2  at all in the body of the claims.  The term direct delivery

3  applicator is merely the name of the apparatus given in the

4  claims.  Because the term is used only in the preamble, it

5  has no patentable weight and the scope of the claim would be

6  no different if the term direct delivery applicator were

7  replaced with the word apparatus, device or anything.

8  Because the patent is set forth in the body of the claims.

9          Now defendants argue -- I guess my point is, the

10  court need not construe this claim term at all.

11          Defendants argue that the term direct delivery

12  applicator should be given an uncommon non ordinary

13  definition.

14          Defendants define it as a device comprised of a

15  chamber made of rubber, an applicator base, an applicator

16  head, a internal channel, at least three prongs wherein such

17  prongs must be in contact with the animal skin as solution is

18  pushed from a removable cartridge through the internal

19  channel of the prongs by asserting pressure on the rubber and

20  secreted through the prongs directly on to said skin.

21          So the words that we have are direct delivery

22  applicator.  One would think ordinary meaning of these

23  English words is going to be something in the realm of an

24  applicator that directly delivers something.  Just look at

25  that those terms.  Those are going to be ordinary meaning of

1   those terms.

2            If you look at defendants' definition of them,

3   though they have all sorts of limitations that you are never

4   going to see any dictionary definition for these terms.  And

5   I recognize the phrase of course direct delivery applicator

6   as a phrase would not occur in any dictionary.  But certainly

7   all three of these terms are.

8            And the term direct delivery applicator was

9   certainly not set forth as a definition anywhere in the

10  patent's specification.

11           We also, as we look at their claim, I mean as we

12  look at their proposed definition, in addition to all of

13  these limitations they have said must be in this direct

14  delivery applicator, of course they include a lot of

15  limitations that aren't even set forth in the claim itself.

16           For example, it says it has to have at least three

17  prongs.  And then it says, it adds a method of use to this

18  apparatus claim, which is certainly improper, it says wherein

19  such prongs must be in contact with the animal skin as

20  solution is push from removal cartridge through the internal

21  channels of the prongs by asserting pressure on the rubber.

22           This phrase, wherein said prongs must be in contact

23  with the animal's skin as this is happening, I mean it's

24  defining a device only at the time that it is being in use

25  used.  Of course any type of an applicator that is going to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  be able to dispense some type of a fluid, it doesn't have to

2  be pushed against anything in particular in order to dispense

3  fluid.

4        Now the purpose of the device might certainly be to

5  dispense it on to an animal's skin.  It certainly can't be

6  that if a -- that if it dispenses it just on the person, that

7  it somehow no longer a direct delivery applicator.  That

8  would really make no sense.

9        Now next slide.  So as I mentioned earlier, it's

10 improper to give a term a definition other than an ordinary

11 meaning unless there's lexicography or disavowal, for

12 lexicography to occur where clear expression of intent to

13 define the term must be present, no clear expression of

14 intent to define the term direct delivery applicator is

15 anywhere in the patent.  The ordinary meaning of direct

16 delivery applicator is an applicator for delivering something

17 directly.  But, as we said in our briefs, the court does not

18 need to construe the term direct delivery applicator because

19 it has no patentable weight.  Thank you.

20        THE COURT:  Mr. Burnside, do want to address that

21 argument?  Thank you.

22        MR. BURNSIDE:  Thank you, your Honor.  Your Honor,

23 let me start by discussing some of the elemental case law.

24 And I would note in the discussion we just heard, a couple of

25 things, a couple of very basic things were left out.  And I

33

1  would like to start by focusing on that.

2          As we have briefed, one of the fundamental concepts

3  of claim construction is that the construction should stay

4  true to the claim language and most naturally align with the

5  inventor's description of the invention.

6          Further, the claim language is to be interpreted to

7  serve the inventor's purpose.  Those are both cited in our

8  briefs, in our opening brief and our responsive brief.  So

9  that leads me to what's the essential purpose of this

10  invention.

11          Now, the patent itself, the application, the

12  prosecution history is replete with descriptions of an

13  accurate and clean delivery on to an animal's skin.  It's

14  supposed to be an improvement of the then existing conditions

15  where people were applying this medicant, this flea and tick

16  solution and getting on their hands and on the coat of the

17  dog and not getting on the skin the dog.  So it's supposed to

18  be vastly improved direct and accurate and clean delivery.

19          In order to accomplish that, again this is replete

20  throughout the patent and the prosecution history, the

21  inventor's own documents, the hair has to be dispersed.  It

22  has to be separate.  In order to do that, a comb like

23  structure is being used.  Several teeth and several prongs,

24  teeth and prongs are par equivalent according to the inventor

25  in deposition testimony.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          So the applicator is supposed to have a number of

2    prongs or teeth at the very end to get into and separate the

3    hair so that direct delivery could be made with contact on

4    the skin of the dog.  Between the applicator and the dog's

5    skin.  And there are multiple references throughout the

6    patent with respect to contact with the skin.

7          I would just point out column 2 line 63, for

8    example, "substantially contacts the animal's skin."

9          I wouldn't go through all the numerous references.

10   There are at least a half dozen supporting references which

11   make clear that the prongs or the teeth have to make

12   substantial contact with the skin, because that's the

13   inventor's essential purpose of this invention.

14         So when we hear arguments that a preferred

15   embodiment should not be construed in defining a claim term,

16   or that we have to look at the inventor's understanding of

17   ordinary words and the ordinary definitions of applied to

18   those words, we have to be mindful that the Federal Circuit

19   made clear all these claim terms have to be construed to be

20   consistent with the essential purpose of the invention.

21         With that in mind, let me turn to the direct

22   delivery applicator.

23         Now, we've already heard that term used in just

24   general argument and discussion by the plaintiffs on a number

25   of occasions.  It's used constantly in connection with issues

1    that are before the magistrate currently and in the past.

2    And it's going to be used extensively at the trial.  Even

3    though it is not in an actual claim, we also can't ignore

4    it.  Because the plaintiffs are going to argue that direct

5    delivery applicator is an  all-encompassing thing.

6              In fact, if you look at figure 1a of the patent,

7    figure 1a of the patent just below the figure period 1a has a

8    10 with an arrow pointing to the overall diagram.  And that

9    10 is defined as or characterized as the direct delivery

10   applicator.

11             So the direct delivery applicator includes all of

12   these different fundamental aspects that are, that appear in

13   figure 1a.  Which is why we have defined the term as already

14   presented because it takes into account all of these

15   different features toward the essential functional element of

16   this invention, to deliver the medicant directly to the dog's

17   skin by parting the hair with multiple the prongs or multiple

18   teeth.

19             THE COURT:  What do we do about the placement of

20   those three words in preamble as opposed to within the

21   claims?

22             MR. BURNSIDE:  I understand it's in the preamble.

23   I concede that.  I further concede it is not in any of the

24   claims.  My point is it doesn't mean you ignore it because

25   it's going to be used and it's going to be a source of

1   disagreement if this court doesn't somehow doesn't define

2   that particular claim term -- term I should say.

3          Now I would add, the parties had long ago agreed,

4   when we did our submissions pursuant to local patent rules,

5   that this was a term that needed to be defined.  And in fact,

6   the plaintiffs provided their own definition in their opening

7   Markman brief.  And that definition is not a simple,  oh,

8   it's an apparatus.  It says words to the effect, a direct

9   delivery applicator includes -- and I'll have much to say

10  about the word includes later on. -- an applicator for

11  receiving a cartridge for delivery of solution to an animal's

12  skin.

13         Now, granted the defendants' definition is somewhat

14  longer than that.  The point of the matter is that even they

15  felt this had to be defined.  Suddenly they have changed

16  their mind.  I am sure litigation strategy or something

17  perhaps developed in this case since they agreed it should be

18  defined.  Initially they did agree.  Because it's been used

19  so often in this case and will be used so often, my

20  suggestion or request to your Honor, we can't simply ignore

21  it because that will create problems at trial, summary

22  judgments motions, and so forth.  Because it is used

23  consistently and  it's used in a very broad sense.  And that

24  is the problem I have.  If they are going to use it in a

25  broad sense, then it needs to be defined so that you, the

37

1  jury, the magistrate, even myself and my worthy adversaries

2  are all on the same page as to what that term means.

3          THE COURT:  All right.  It's a practical argument

4  that you are making and I understand it.  Okay.  Let's move

5  on.

6          MR. BURNSIDE:  Thank you, your Honor.

7          THE COURT:  Okay.

8          MR. NORMAN:  May I respond, your Honor?

9          THE COURT:  No.  Let's go on.

10          MR. NORMAN:  Your Honor, the next term is

11  applicator base.  One thing I would like to mention though,

12  if I may, and that is, the defendants in their brief made, in

13  their reply brief that is going to be document 116 on page

14  14, defendants said, and it was repeated just now by Mr.

15  Burnside, the Federal Circuit has observed that claim terms

16  should be interpreted so as to serve the inventor's

17  purposes.  And he sites the Bausch & Lomb case.  The Bausch &

18  Lomb case does not at all say that.  Claim terms are not to

19  be construed, are not to be construed to serve the inventor's

20  purpose.  And that is not what the Bausch & Lomb case said.

21  That would make it contrary to what the Federal Circuit has

22  said in the Phillips decision.  Of course this was -- the

23  Bausch & Lomb case was a 1986 case.

24          Katie, will you pull that up.

25          The Bausch & Lomb case was a 1986 case.  In that

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  case it didn't say you construe or interpret a claim term to

2  serve the inventor's purpose.  Rather, the Federal Circuit

3  said, it was looking at a particular term, a relative term.

4  The relative term that was being addressed in that case was

5  smooth.  The term smooth.

6           Now the Federal Circuit said, look, a term like

7  smooth, you have to construe in a particular context.

8  Because smooth could have different meanings.  If you are

9  talking about the grass was cut smooth.  Or smooth peanut

10 butter on bread.  Or smooth surface of a contact lens.  Or a

11 smooth surface on a semi conductor waiver, which is going to

12 have to be polished much more smoothly than a mirror.

13          Now the particular product at issue in the Bausch &

14 Lomb case was of course a contact lens.  So it doesn't say --

15 here's where they get the quote from.  But the quote isn't

16 saying you interpret a claim, that you must interpret a claim

17 to serve the inventor's purpose.  It was just saying in this

18 particular case, looking at the word smooth, we hold that

19 smooth means smooth enough to serve the inventor's purpose,

20 i.e., something that was stated in the patents, i.e., not to

21 inflame or irritate the eye lid of the wearer will be

22 perceive by him at all when in place.

23          So this is not a principle, there's no principle of

24 patent law that is stated in Bausch & Lomb to the effect that

25 the court must, the terms must be construed to serve the

1  inventor's purpose.  Rather claim terms are to be given their

2  plain and ordinary meaning.  That was repeated in the

3  Phillips decision, the En Banc 2005 decision, and it's been

4  stated in scores, maybe hundreds of Federal Circuit cases

5  since.  Plain and ordinary meaning except in two exceptions,

6  neither of which are an applicable here.

7         Now with respect to the claim terms also, your

8  Honor.  We are going to have applicator base.  We are going

9  to have different terms.  And the terms that we are going to

10  be looking at, these are looking at the meaning of these

11  terms.  This is not the same thing as saying that we are

12  going to have to ignore everything else in the claim.

13         In order for the plaintiff to establish

14  infringement in this case, we have the burden of proofing

15  that the accused product includes every requirement set forth

16  in Claim 1.  Not merely the presence of the disputed terms.

17         The question is going to be, what do these disputed

18  terms add.  So we look at the term applicator base though.

19         As for the term applicator base, we see that it

20  occurs two times.  First as an applicator base, having a

21  chamber comprising a top surface with a first opening.  And

22  then in sub paragraph D, in the context it says, said chamber

23  of said applicator base being composed of a flexible

24  deformable material said chamber of said applicator base.

25         Now defendants assert that applicator base be

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1 defined as the bottom portion of the chamber made of flexible

2 deformable material.

3          Defendants' proposed definition, moving to the next

4 slide.  Okay.  So defendants' definition is inconsistent with

5 the claim language itself.  The defendants asserted that the

6 applicator based is the bottom portion of the chamber, where

7 Claim 1 says the applicator base has a chamber.  The chamber

8 is a region of the applicator base, not vice versa, as

9 proposed by defendants.

10          Defendants' definition right there conflicts with

11 the claim language itself which must therefore be incorrect.

12          Now defendants' definition also says that an

13 applicator base must be made of a flexible deformable

14 material.

15          Now the definition of applicator base though does

16 not require a particular material.

17          Now the claim has different requirements.  But the

18 question is solely what is the meaning of applicator base.

19 If applicator based was -- if applicator by definition was

20 required to have certain characteristics, then it would be

21 unnecessary to include those characteristics in the claim

22 language itself.

23          In the Phillips case itself, the term at issue was

24 baffles.  The Federal Circuit said, you can look at the claim

25 language itself to determine the meaning of a term, or at

1    least to help you a bit.  In that case it said, look, if you

2    look at it in context, the claim requires steel baffles,

3    which means that -- the Fed Circuit said, which means that

4    because it had steel in the claim, that means baffles is not

5    inherently made of steel.  Baffles are not inherently made of

6    steel.

7            Likewise here, there's claim language that talks in

8    terms of flexible deformable material.

9            But because the claim specifically requires

10   flexible deformable material, that means the term applicator

11   base does not inherently -- it is not inherently required to

12   be a flexible deformable material.

13           Next slide.

14           So defendants' definition is contrary to the use of

15   applicator base in the patent.  Defendants' definition is

16   certainly not an ordinary meaning of the term applicator

17   base.  Plaintiffs' proposed construction is a body having a

18   chamber that receives a cartridge or solution packets.

19   Plaintiffs' construction is consistent with the plain and

20   ordinary meaning in the context of the '445 Patent, and

21   therefore we ask that the court reject plaintiffs' proposed

22   construction and adopt -- I'm sorry.  Let me rephrase that.

23   I want to make sure I get that right.

24           So we request that the court adopt plaintiffs'

25   construction and reject defendants' construction.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          THE COURT:  I can construe those two terms

2    plaintiff and defendant pretty well.

3          MR. BURNSIDE:  Your Honor, I understood that we

4    weren't going to have replies and sur replies.  I'll make

5    this brief since it was raised.

6          This concept, this fundamental concept, and I am

7    not going to belabor this point.  Your Honor is familiar with

8    fundamental concepts that you need to construe claim terms

9    consistent with the purpose of the invention is set forth in

10   Phillips case, among others, so I wouldn't argue about length

11   Bausch & Lomb.  I will point out it was in our opening brief

12   and could have been responded to long before today.

13         Turning to applicator base.  I listened intently to

14   the comments that the defendants' proposed definition is not

15   the ordinary meaning of the term applicator base.  Yet

16   somehow the definition, "includes an applicator body having a

17   chamber that receives a cartridge or solution packet," is the

18   ordinary meaning of applicator base.

19         Now, let's think about the word base for a moment.

20   Basis foundation.  Something that everybody can identify.  A

21   basement of a house.  It's the lowest level.  It's the

22   foundational concept.

23         The plaintiffs have said that, well, an applicator

24   base includes certain things, such as a chamber.  If we are

25   going to say it includes, then we should be all inclusive and

43

1  make clear that it's a chamber made of flexible deformable

2  material as specifically set forth in Claim 1d which also

3  contains the phrase applicator base.

4          Now, when you look further at the plaintiffs'

5  construction of this term, there is a couple of fundamental

6  problems, which affects many of the terms or the definitions

7  of the terms that the plaintiffs have come up with.

8          First off, in many terms and in one included, they

9  use words liken includes.  And other terms they use words

10  like essential, open ended, vague and ambiguous.  That cannot

11  be part of any definition of any claim term, includes or

12  essentially is.

13          Further, in order to define applicator base, they

14  use the words applicator.  You can't define a term by using

15  all or a portion of the term itself.  So the plaintiffs'

16  proposed definition is replete with problems.  Number one,

17  it's not the ordinary meaning itself.  Number two, it's sort

18  of over reaching, ambiguous and open-ended by the use of the

19  words includes.  Tries to define itself by reference to

20  itself by the use of the word applicator.

21          But we do agree on one thing.  That we need to make

22  reference to the chamber.  Because in the patent itself, the

23  inventor has stated that the applicator base, having a

24  chamber.  And then further, the applicator base having a

25  chamber that is made of flexible deformable material.  We are

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

44

1   simply attempting to come up with a definition that is clear

2   and that is consistent with not only the patent but also the

3   inventor's intention.  Thank you, your Honor.

4           THE COURT:  Thank you, Mr. Burnside.  Okay, let's

5   take a break.  A short one.

6           (Off the record).

7           THE COURT:  Back on the record.

8           THE COURT:  All right.  Thank you.  Next term.

9           MR. NORMAN:  Yes.

10          (Recess taken).

11          THE COURT:  I think we were talking about canal.

12          MR. NORMAN:  Yes, your Honor.  The term canal

13  occurs twice.  First in paragraph A, it says, an applicator

14  base having a chamber comprising a top surface with a first

15  opening, a bottom surface traversing into a canal.

16          And then in paragraph B, it says, an applicator

17  having an applicator orifice and being aligned with said

18  canal of said chamber.

19          What we could see by the claim language itself is

20  that the canal is going to be a portion of the chamber.

21          Now, in this particular case, all we know right now

22  from the reading of the claims is that the canal is a region

23  of the chamber.

24          In this case there -- with respect to the term

25  canal, the term canal was not explicitly defined in the

1  patent, so Lexicography doesn't apply and there was no

2  disavowal with respect to the term canal.

3          The ordinary meaning of the term canal is a

4  passageway or narrowing.  The defendants' asserted definition

5  is contrary to the claim language.  Defendants assert that

6  canal is a channel which begins in the chamber of the

7  applicator, continues through the applicator head ends at the

8  prongs and secures the solution bearing cartridge to permit

9  travel of the solution from the cartridge to the prongs.

10          First of all, that term right there is not an

11  ordinary meaning of the term canal.  Not by any stretch of

12  the imagination.

13          So also defendants' proposed definition of canal is

14  contrary to the claim language.  The claim language, as I

15  read earlier, indicates that a canal is a region of the

16  chamber.  So defendants -- so because no Lexicography or

17  disavowal of the term canal exists, plaintiffs' construction

18  is consistent with the ordinary meaning.  Defendants'

19  definition conflicts with the claim language itself and is

20  inconsistent with the ordinary meaning of the term canal.

21          THE COURT:  Mr. Burnside.

22          MR. BURNSIDE:  Yes.

23          THE COURT:  Would you address in the proposed

24  definition by the defendants, or construction, you use terms

25  like secures; the beginning and ending are set forth.  How

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  are these additions not confusing or adding new stuff that

2  could be objected to?  That's my main concern.

3          MR. BURNSIDE:  I'll definitely address that, your

4  Honor. That's my main argument.  But let me give you a couple

5  of quick pointers here about their definition.

6          First off, as I mentioned before, they are now

7  using the word essential, saying essentially means.  I don't

8  know what essentially means.  It's broad and open ended,

9  ambiguous to say the least.

10          I would also point out that they use the term tube,

11   duct or passageway to define the word canal.  I believe

12  they are looking at the free dictionary available on the

13  Internet.  As I always tell my children nothing on the

14  Internet is accurate, believable or true.  I would make the

15  same suggestion here. I have never even heard of the free

16  dictionary until this case.

17          Next.  Let's look at the word tube, duct and

18  passageway.  The ordinary meaning of a tube is something that

19  round or close to being round and closed.  Same with duct .

20  I can give your Honor an example, air duct.

21          Passageway does not have to be enclosed.  It

22  doesn't have to be round.  It suggests something a lot

23  bigger.  And interestingly what they do not have in

24  definition is the word channel.

25          If you look at figure 1a of the patent, the canal

47

1   is number 17, which at least, according to the directional

2   instruction of number 17, is pointing to that part of the

3   canal which is an adjacent to the applicator head.

4          Within the applicator head is something called

5   internal channel, which is number 21.  Again, in keeping with

6   the essential element or the essential element of the

7   invention here, the direct convenient and clean delivery of

8   medicant, you would think that the canal, the internal

9   channel would have to be at least connected if not one in the

10  same.

11         So why not we are now defining the word canal as a

12  channel, which is certainly much more descriptive relevantly

13  so than a passageway is a question that once again, I think,

14  influences litigation strategy and infringement arguments

15  down the road.

16         If we are going to call it a tube, a duct or a

17  passageway, it should certainly be deemed a channel.  If

18  anything a channel and canal are one in the same at that

19  point of the invention.

20         Let me get to the point your Honor raised.  The

21  patent makes clear that one purpose of the canal is to keep

22  the tube in a stationary position.  In other words, to secure

23  the cartridge.  That's an  essential part of this invention,

24  the clean and accurate delivery of a medicant.

25         If you look at column 6, lines 5 through 7, that's

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   exactly what the inventor said.  She said as follows.

2         MR. NORMAN:  I'm sorry.

3         MR. BURNSIDE:  Column 6 beginning at line 5.  It

4   makes reference to the cartridge which traverses and rests in

5   the canal.  And this is now the important language:  Keeping

6   the tube in a stationary position while being used and

7   applied to the animal.

8         In answer to your Honor's question.  An essential

9   function of this canal is to keep the cartridge, which is

10  also referenced as a solution compartment, securely in place

11  so that the medicant will safely conveniently, in a clean

12  fashion, traverse through the canal, traverse through the

13  channel, through the applicator head and through the prongs

14  and directly onto the skin of the animal.

15        Your Honor, if I have addressed that question

16  sufficiently, that's all I have.

17        THE COURT:  Okay.  Thank you, Mr. Burnside.

18        MR. BURNSIDE:  Thank you.

19        MR. NORMAN:  Your Honor, we certainly have no

20  problems with adding the term channel to the ordinary

21  meaning.  But we are looking at what the ordinary meaning.

22  There's not any particular dictionary definition that is

23  going to necessarily apply.  But it's going to be the

24  ordinary meaning.  Certainly not going to be inconsistent

25  with dictionary definitions.

49

1            The language we are proposing for ordinary meaning,

2    there's nothing magical about it.  We're trying to propose

3    definitions that are going to be consistent with the language

4    of the patent specification.  But the critical element is

5    that the terms have to be given in their ordinary meaning.

6            And when one references the patent specification,

7    the term channel is not used contrary to its ordinary meaning

8    in the specification, even though the recitation to the

9    specification that was made in this column 6.  Nowhere does

10   it say a channel as used herein, is something that secures.

11   It's not in there.

12           Moving to the next term.

13           MR. BURNSIDE:  Your Honor, if I could be heard on a

14   point of procedure.  I understood you wanted to hear from

15   counsel and me and then move.  If you're going to entertain

16   surrebuttal, I would like an opportunity as well.  I suspect

17   that is not what you want.

18           THE COURT:  I understand.  To the extent that there

19   is apparent willingness to incorporate your definition along

20   with theirs, then that was important for me to hear.  Let's

21   move on to the next.

22           MR. NORMAN:  The next is applicator head.  The term

23   applicator head occurs three times.  First in paragraph, sub

24   paragraph B of Claim 1.  And the second two times are in sub

25   paragraph C.  An applicator head having an applicator orifice

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   and being aligned with said head and said chamber.

2           The term applicator head is not explicitly

3   defined.  And the defendants are not going to be able to show

4   you anywhere in the patent's specification where the term

5   applicator head is explicitly defined.  The fact that the

6   term is used in connection with the specification in a

7   discussion of the preferred embodiment, doesn't mean that

8   term is being used in the definition, unless explicitly

9   defined is to be given again its ordinary meaning.

10          I would caution the Court as to any reference to

11  that specification that is not pointing to a definition

12  should be rejected as being a definition.

13          The plaintiffs' proposed definition of applicator

14  head is the front or forward section.  Defendants' defined

15  applicator head as a hollow portion of the applicator that is

16  narrower than and protrudes from the chamber and contains a

17  canal which secures the solution bearing cartridge to permit

18  travel of the solution from the cartridge to the prongs.

19          The ordinary meaning of the term head in the

20  context of the claims are going to be the working end of a

21  tool or implement.

22          Of course, a dictionary is a compilation of

23  ordinary meanings of English words.  So the term head, of

24  course, has many different plain and ordinary meanings.  It's

25  going to be the context of the claim that is going to dictate

1   which of those plain and ordinary meanings apply.

2          So a head might mean, of course, a person's head.

3   Or in the context, if I would say the head of a pin, it would

4   have a very different context.  But one of the common

5   definitions of head is going to be the working end of a

6   tool.

7          And by the way, we did use the term applicator.

8   Defendants, I note, did use the term applicator in their

9   definition of applicator head.  Despite the fact that Mr.

10  Burnside told you that that's not a proper thing to do, well

11  Mr. Burnside is incorrect for that statement.  I don't have

12  any problem with the use of the word applicator in the

13  definition because the Federal Circuit does not prohibit the

14  use of a word in a definition.  I am not aware of any Federal

15  Circuit case law to that effect.

16         As a matter of fact, the Federal Circuit can choose

17  to not define a term even if it's a term in dispute if the

18  court believes that the jury is going to understand the term

19  itself more than any definition.

20         So, for example, if the parties disputed the term

21  water, and we're proposing complex names or even just talking

22  about it, you know, H2O, or spelling that out, the court

23  doesn't have to define the term water.  The court could

24  choose -- the jury will understand this term more than it

25  will other terms.  So I am not aware of any Federal Circuit

1  principle that says you can't use the term in a definition.

2          Anyway, the ordinary meaning of the term head is

3  the working end of a tool or implement.  The plaintiffs'

4  proposed construction is consistent with the ordinary

5  meaning.  Defendants' definition is not.

6          Maybe some discussion again of the specification,

7  but again unless it's definitional, the term applicator head

8  must be given its plain and ordinary meaning.  So because

9  plaintiffs' proposed instruction is consistent with that

10  ordinary meaning, the court should adopt our definition.

11          THE COURT:  Okay, thank you.  Mr. Burnside.

12          MR. BURNSIDE:  Your Honor, a jury is going to have

13  to determine at the end of the day -- perhaps not.  Perhaps

14  your Honor will decide on the motion.  But assuming your

15  Honor doesn't decide some of these on motion, the jury is

16  going to have to decide whether there is infringement. A

17  jury, not the Federal Circuit is going to have to understand

18  the claim terms.

19          It just strikes me, when you use the most operative

20  part of a claim term to define itself, that just creates

21  confusion for the future.  Notwithstanding federal circuit

22  precedent, it strikes me as so fundamental.  I didn't even

23  bother with federal circuit precedent.  I am happy to do so

24  now.

25          Defining the applicator head by saying it's the

1   head, it's going to create more confusion.  Or perhaps why

2   even define it if it's so obvious it's that that is the head

3   and not so obvious and here is why.

4            Again, we have the word includes, open ended,

5   ambiguous as well.  But here's the issue.  If you look at

6   figure 1a again, you'll see that the applicator head is

7   number 18.  It clearly protrudes from the applicator body.

8   And that is one of the things that we wanted to point out in

9   our definition, that the applicator head protrudes and is

10  certainly not part of the applicator body.

11           And unfortunately, your Honor, and I don't really

12  want to get too much into this, because it violates my

13  fundamental objection.  But if you recall from, I believe,

14  page 3 or 4, when I objected to the descriptions or the

15  titles that they were giving to my client's product, they

16  have given the title applicator head a very, very improper

17  and wide meaning, so this is going to be a very big issue at

18  the trial and therefore we need to make sure that the jury

19  understand that the applicator head protrudes from the body

20  of the applicator itself.

21           Otherwise, your Honor, everything else I would have

22  to say is set forth in extensive briefing that we have done

23  and I am not going to reiterate that.  Certainly your Honor

24  has read or will read all of those papers.  Unless your Honor

25  has a question.

1            THE COURT:  No.  You can continue.

2            MR. BURNSIDE:  Thank you.

3            MR. NORMAN:  Your Honor, the next disputed term is

4   aligned.  As you used in the claim, aligned means in line

5   with.  If you look at -- there are three occurrence of the

6   term aligned in Claim 1.  The first is in sub paragraph B, an

7   applicator head having an applicator orifice and being

8   aligned with said canal of said chamber.

9            THE COURT:  What I will ask you to do, Mr. Norman,

10  if you look at the competing definitions.  They are really

11  very short.  So how is in line with different from lined up

12  with?

13           MR. NORMAN:  Okay.

14           THE COURT:  And how is position orientation better

15  than connected to?

16           MR. NORMAN:  Okay.  So the defendants' suggestion

17  of lined up is consistent with the with the ordinary

18  meaning.  I don't believe there's any difference with lined

19  up or in line with.  I just think those are different ways to

20  phrase things. We don't have any problem with that.  We

21  certainly believe that lined up with would be consistent with

22  the ordinary meaning.

23           The difference is connected.  Now the term aligned,

24  the ordinary meaning of an aligned does not mean connected.

25  Now something might be aligned and it might be connected.

1    Something might be connected without being aligned and it

2    might be aligned without being connected.  If something is

3    both aligned and connected, it's going to required both those

4    English words to describe that relationship.

5           Now the term aligned was not explicitly defined in

6    the patent specification and certainly the word aligned does

7    not mean in -- does not mean connected with.

8           And now I do want to point out that with respect to

9    the term aligned, as with all the other terms that have been

10   discussed so far, defendants keep referring to the preferred

11   embodiment.  And I would again direct the court's attention

12   to the GE Lighting case where the Federal Circuit rejected

13   the approach of taking limitations that were found in the

14   preferred embodiment and somehow jamming them into the claim

15   by doing so by defining a term.

16          And the Federal Circuit said you cannot do that.

17   You must define a term to be given its plain and ordinary

18   meaning.  And the plain and ordinary meaning of aligned, it

19   absolutely does not require the word connected.

20          THE COURT:  Okay.  Let's hear from Mr. Burnside.

21          Just talk to me about the connection issue.

22          MR. BURNSIDE:  I will, your Honor.  In that context

23   if I could make a brief comment about this notion about the

24   preferred embodiment that we just heard about in connection

25   with the word connected.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

56

1          You know, the judges in this district have been

2    very clear simply because an  inventor decides to devote 70

3    or 80 or 90 percent of her or his or its patent to a section

4    called preferred embodiment, doesn't mean everything in that

5    section preferred embodiment, particularly looking for words

6    to make clear that it's a preferred embodiment over the

7    essential claims itself.

8          Just because page is 4 5, 6, 7 and 8 and part of 9

9    comes under the captioned preferred embodiment doesn't mean

10   everything in that there is a preferred embodiment.

11         Again, I will just remind your Honor about the

12   Phillips case.  These claims terms being construed with the

13   inventor's purpose which is set forth in that section called

14   preferred embodiment.

15         THE COURT:  Well stick to the point that aligned

16   does not necessarily mean connected.

17         MR. BURNSIDE:  Okay.  Your Honor, if you look again

18   at figure 1a, and in particular then if you also can look at

19   that and also look at the description of the various

20   components of 1a, in particular column 6.  What it says is

21   that the applicator head, which is number 18, is in line and

22   connected to number 19, which is applicator orifice.

23         It also goes on to say cartridge aperture in 31 in

24   line and connected with the applicator head.  That's why we

25   come with what I consider to be a very logical meaning that


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   it's in line with and connected to.

2          Again, if you look at the essential invention here,

3   it is the easy clean flow of medicant from one component to

4   the next component until we get to the dog's skin.

5          So I don't even see how this should even be a big

6   dispute.

7          I would suggest, your Honor, in line with what

8   counsel said, that I think I omitted the word with from lined

9   up and connected in, it should say to be grammatically lined

10  up with and connected to.  So I think I omitted the word with

11  from my definition, which counsel made clear in his comments

12  a couple of moments ago.

13         THE COURT:  Okay.  I'll make a note of that.  All

14  right.

15         MR. BURNSIDE:  Unless your Honor has any questions,

16  I have nothing further.

17         THE COURT:  You can move on.

18         MR. BURNSIDE:  Thank you.

19         MR. NORMAN:  Yes.

20         THE COURT:  I think we are coming to the fight, the

21  prong or prongs?

22         MR. NORMAN:  Yes, your Honor.  I guess what I could

23  do is--

24         MR. BURNSIDE:  Your Honor, I notice this-- it's one

25  o'clock and this is going to take substantial time. Maybe


                    U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

58

1  it's the best time to break.

2          THE COURT:  You're probably right.  We'll adjourn

3  right now and be ready to roll right at two o'clock.

4          (LUNCH RECESS TAKEN).

5          THE COURT:  Good afternoon.  Okay, let's go.

6          MR. GARLOCK:  Your Honor, the procedural standpoint

7  it seems, during the morning session, a number of times, we

8  would appreciate an opportunity to rebut.  And the structure

9  is such as, you know, we go and then they go and we prove to

10  them, either we carve out an opportunity to respond to rebut

11  what they say in their remarks perhaps, or we have confine

12  terms and about to do five more.  That perhaps they would go

13  first in, you know, the second five so that we'll be able to

14  respond to what they say it and that way create a fairness

15  that might benefit the Court.

16          MR. BURNSIDE:  Your Honor, with regard to the

17  latter suggestion, I note we are approaching the more

18  material terms and it is the burden of the plaintiffs to deal

19  with in terms of their own patent at the outset and I would

20  decline that invitation.

21          THE COURT:  Let me just say.  To me, the real nub

22  of this, and I use that term meaningfully, is this prong

23  single, multiple, and so on.  This is where we had the motion

24  to amend and this is where we have what appears to be, from

25  the way the briefs are written, the issue that is of most

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   urgency to the parties.  So I don't care who goes first.  I

2   just want to hear both sides.  And whomever goes first is

3   going to have a chance to rebut whomever goes second.  And

4   you know we'll just do ping pong back and forth so I could

5   hear both sides both as objectively and affirmatively and

6   then rebutting.

7          I think if we spend the rest of our time together

8   really focusing on that issue, whatever we have not covered

9   we'll throw on at the end.  Why don't we get right to in

10  terms of the motion to amend.  That really is wrapped up in

11  the meaning of prong or prongs.  So let's hear from the

12  plaintiff on that and let's hear from the defendant and here

13  back from the plaintiff and here back from the defendant and

14  then I'll call a halt.

15         MR. GARLOCK:  Thank you, your Honor.

16         MR. NORMAN:  Thank you.

17         THE COURT:  Thank you.

18         MR. NORMAN:  The next term is prong member just

19  from although we hit it in claim construction, what we

20  presently have up is going to be the Power Point, which is

21  much shorter Power Point that we given the Court with respect

22  to the motion to correct.

23         THE COURT:  And it seems to me that the law is

24  pretty straight forward what I can and cannot do and I have

25  had law from both sides about district court judges who stray

1   into the dangerous territory of fixing things.  I don't think

2   you have got to give me the law again, give me your argument

3   on why this is so straight forward a mistake as it were that

4   I should be able to do something with my magic wand.  Okay.

5         MR. NORMAN:  Yes, your Honor.  Okay.  So the term

6   prong in some form of the word or form of the phrase occurs 4

7   times in Claim 1.  The first time is.

8         THE COURT:  It appears elsewhere throughout too as

9   well, right?

10        MR. NORMAN:  Yes, your Honor.  But the key, the key

11  to be decided here is is there an error in the claim.  That's

12  going to be the key.

13        THE COURT:  Yes.

14        MR. NORMAN:  So the first occurrence at least one

15  prong member.  Now, the second three occurrences are all

16  prefaced with the word said.  Move to the next slide.  The

17  use of the word said in a claim refers to an earlier-- to an

18  earlier use of the term in the claim.  That is the Intamin

19  Ltd. v. Magnetar Technologies Corp. 483 F.3d 1328 and 2007,

20  Fed Circuit.  And again the first occurrence is the-- at

21  least one prong member having an internal channel therein.

22        The second occurrence is said prong member, by use

23  of the word said we know that there must have been a previous

24  reference in the claim to the term prong member.  And we see

25  it, so the second occurrence, said prong member is

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   necessarily referring back to the at least one prong member.

2          We also see some other words surrounding that.

3   Where it says said delivery and aperture.  This is second

4   occurrence said delivery and aperture of said internal

5   channel of said prong member.  Those are two other terms then

6   it is going to have been previously used.  The delivery and

7   aperture, the said delivery and aperture, and said internal

8   channel are both features of the at least one prong member.

9   So that's the first occurrence.  If we look at the third

10  occurrence there is said prongs plural.

11         Now, the use of the word said tells the reader

12  that, and according to Federal Circuit case law, that the

13  term must have been previously used in the claims.  But we

14  don't see prongs plural anywhere.  So let's-- now a normal

15  reading of that would be the closest thing to said prongs

16  going to be said prong member.  Or at least one prong

17  member.  So right now it tells the reader, well, it is

18  probably an error and it's probably going to be that prior,

19  that earlier use of the at least one prong member.

20         Let's look at the fourth occurrence.  The fourth

21  occurrence is said prong.  Prongs in the singular.  And it's

22  the prong-- it's not prong members.  But it says said

23  solution to travel through said internal channel of said

24  prong.  Well, the only internal channel that has been

25  mentioned anywhere in the claim is the internal channel of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1    the at lease one prong member.

2            So it is clear that the fourth occurrence is

3    directed to the at least one prong member.  From a reading of

4    the claim then it is going to be clear that the said prongs

5    necessarily referring to the same item.  The at least one

6    prong member.

7            THE COURT:  Now that's inherent though is that term

8    prong member morphed into the term prong, correct?  Or not?

9            MR. NORMAN:  And that is something I'm going to

10   point out.  I will show the Court that this, the patent

11   specification and also in the prosecution history the terms

12   prong and prong member are used interchangeably throughout

13   the patent, and in the patents prosecution history as well.

14           THE COURT:  Just a yes or no.  Do the defendants

15   agree that these terms are used interchangeable?  In the

16   patent-- just a yes or no.

17           MR. BURNSIDE:  No.

18           THE COURT:  Thank you.  Go ahead.

19           MR. NORMAN:  I will direct the Court's attention to

20   the summary of the invention of the '445 patent and that

21   occurs in column 2 lines 51 to 67.  And this is a discussion

22   of the present invention, not in the context of the preferred

23   embodiments, but rather the present invention.  And the claim

24   says at least one prong member having a internal channel and

25   prong/delivery and aperture is constructed within the direct

1   delivery applicator.  The prong, and this is prong not prong

2   member.  And the term prong has not yet occurred anywhere in

3   this summary of the invention either.  It says the prongs

4   constructed having appropriate lengths, so that the prongs

5   delivery, now that is prongs, but that is a prong's

6   apostrophe S.  Again looking at prong singularly, the prong

7   delivery and aperture substantially contact the animal's

8   skin.  So if we look at the-- where it is the delivery and

9   aperture, the delivery and aperture is going to be the at

10  least one prong member.  So we see in the summary of

11  invention the term prong member and prongs is used

12  interchangeably.

13          Now, one other thing, if the Court would look to

14  column 6, and I don't have this up on a slide.  But column 6

15  line 17 of the '445 patent says.  At least one prong member

16  20.  So talking in connection with the preferred embodiments

17  that going to be column 6.  I'll just read it.  It says at

18  least one prong member 20.  And then it goes on to say

19  preferred embodiments, there are a plurality-- that is not

20  what is up on the screen what I was just read is column 6.

21          THE COURT:  Yes.

22          MR. NORMAN:  What is shown in the drawings of the

23  preferred embodiment all of them have a plurality of prongs

24  or a plurality of prong members same elements.  And by the

25  way elements reference numeral 20 sometimes in the patent

1  refers to prong member.  And sometimes it refers to prong.

2  Or sometimes, because it's talking about a preferred

3  embodiment that has multiple prongs that figure 1 A we have

4  shown the Court already.  That is as I pointed out does have

5  multiple prong members.  Sometimes it refers to those prong

6  members as prong members 20 and sometimes prongs 20.  So

7  there are interchangeably with respect to the numeral 20

8  itself.  And that is by referencing a-- by referring to a--

9  by reference number we know that we're talking about the very

10  same elements.

11        Now I'll direct the Court's attention to column 8

12  of the patent.  And this is going to be the last few

13  paragraphs of the patent specification before the claims.

14  And again in this section here the patent is not talking

15  about preferred embodiments where the Fed Circuit says, you

16  are absolutely not to incorporate or add limitations from the

17  preferred embodiment into the claims.  Here this particular

18  section of the patent is talking about the invention--

19  present invention and this language is a little bit

20  different.  Beginning on line 29 of column 8.  Significant

21  advantages are realized by practice of the present invention

22  the key future of the direct delivery applicator and

23  advantages derived include in the combination the features

24  and advantages set forth below and list some items.  Item 3

25  says, at least one prong member.  And preferably a plurality

1   of prong members.  Each of which has an internal channel

2   therein with a fine delivery and aperture associated and

3   aligned with the applicator orifice.

4            The defendants are going to argue that the patent

5   specifications says that preferably the direct delivery

6   applicator has at least three prongs.  That's true.  The

7   patent specifications does say that preferably you have three

8   prongs.  But right here we have in the column-- in the claim

9   at least one prong and that language is crystal clear.  Here

10  this is again talking about the invention and it says, at

11  least 1 and preferably a plurality of prong members.  The

12  writer here could not have been clearer that the invention is

13  not limited a plurality of prongs.

14           Next slide please.  Now, in the turning to the

15  prosecution history.  In the prosecution history of the

16  patent, this was an amendment, this was an amendment that was

17  filed in connection.  And in here there's another statement

18  concerning the present invention.  Here it says, the present

19  invention-- I won't read the whole thing I'll skip to the

20  third sentence it says.  At least one prong member having a

21  internal channel and prong/delivery and aperture is

22  constructed within the direct delivery applicator.  The

23  prongs constructed having an appropriate length so that the

24  prong delivery and aperture substantially contact the

25  animal's skin being the fur.

1        So I will note that you have at least one making it

2   clear that this is in the-- this is in the amendments were

3   the plurality.  I should say where the plural word prongs was

4   accidently included in the claim.  Now they're talking about

5   the present invention and we see at least one prong, all

6   singular here when talking about the invention.  And although

7   it yet still uses the term prong.  So some places are using

8   prong member, but now using prong in the singular.  But, I

9   mean, I should say that in all cases using the singular in

10  this particular paragraph.  But you see that prong member and

11  prong are used interchangeably.

12       One other thing that defendants do in their

13  opposition and what plaintiffs' argue in their opposition is

14  they direct the Court to laboratory notebooks produced by

15  plaintiff Marni Markell Hurwitz.  Well, the only problem with

16  that is that laboratory notebooks are not part of the test

17  for determining whether an error occurs in the claims.  If we

18  go back to the case, yes, this says district courts can

19  correct the patent if the correction is not subject to

20  reasonable debate based on consideration of the claim

21  language and the specification.  And, two, the prosecution

22  history does not suggest a different interpretation of the

23  claims.  So I've gone through the entire patent, which would

24  be the correction reasonably based on consideration of the

25  claim language and the specification.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          Now I do note that the reasonable debate must be

2    limited to the language of the patent itself.  The item two

3    that's not the prosecution history cannot come up with a

4    debate.  Look at, does the prosecution history suggest a

5    different interpretation-- that's not even part of the

6    reasonable debate prong.  But then also those are the only

7    things to consider.  There's the test that has to be based on

8    the record.  Just as we could not use any type of extrinsic

9    evidence testimony of the inventor or lab notebooks to show

10   some other intent, because that's not what the test is based

11   on.  The test has to be based on the patent itself.  And the

12   Court can then consider the prosecution history for this

13   other limited purpose.

14          That is my argument.

15          THE COURT:  Thank you.  Mr. Burnside.

16          MR. BURNSIDE:  Your Honor, I would note that the

17   reasonable debate we are engaging in now already lasted close

18   to 30 minutes and I'll probably double that time.

19          THE COURT:  That is not a good way to start.

20          MR. BURNSIDE:  A reasonable debate.

21          THE COURT:  I understand, but I would never tell

22   the Judge you would take twice as long.

23          MR. BURNSIDE:  I am not going to your Honor I am

24   not going to take twice as long.

25          THE COURT:  Okay.

 1            MR. BURNSIDE:  Let me start with the motion.

 2            THE COURT:  Well, let's start with why reasonable

 3   minds can disagree.  Okay.

 4            MR. BURNSIDE:  Okay.  Sure.  There are 53

 5   references, either pictorially or in writing to prongs in the

 6   plural in this patent.

 7            THE COURT:  Now, when you say pictorial you mean

 8   they have little numbers that use the word prong?

 9            MR. BURNSIDE:  Schematic and/or the written

10   material itself.

11            THE COURT:  And the word says prong or prong

12   member?

13            MR. BURNSIDE:  Either shows more than one prong or

14   specifically says prong or prong members.

15            THE COURT:  Stick to the prong or prong members,

16   because we're not being asked to amend drawings we are asked

17   to amend--

18            MR. BURNSIDE:  Roughly 49 references to prongs or

19   prongs members plurally in the plural.  I am not repeating

20   this, your Honor has read it and we made references to lab

21   books and schematics.  There are many, many references to

22   prongs and prong members throughout all material, your Honor,

23   given and including the material being given and cited today.

24            THE COURT:  Off the top of your head, if they are

25   interchangeable, if they are not interchangeable why aren't

1  they interchangeable?  And what does the prong refer to that

2  the prong member doesn't refer to and vice versa.

3           MR. BURNSIDE:  I want to be clear when I said no

4  before.  I thought the question was does the word prong and

5  prong members is the same.  We agree that prong and prong

6  member is the same.  Or prong and prong members.

7           Maybe I misunderstood your question before.

8           THE COURT:  Yes.  What comes to my mind is

9  something from grammar school.  All insects are bugs, but not

10  all bugs are insects.  And I remember sitting for two years

11  of time trying to figure out how that worked.

12           So all prongs are prong members and all-- every

13  prong is a prong member for purposes of this case?  Yes?

14           MR. BURNSIDE:  Yes.

15           THE COURT:  All right.

16           MR. BURNSIDE:  I would add the use of the word

17  member implies plural even when you say prong member, if

18  there's not more than one prong-- it is like me making

19  reference to that I am a member of the Bar Association and

20  clearly the Bar Association compromises of more than one.

21  Otherwise there's no need to say a member of something.  By

22  saying prong member you are suggesting if not saying there's

23  more than one member there's more than one.  Otherwise you

24  wouldn't need to say prong member to begin with.

25           I would also point out that this so-called simple

1  mistake was not caught for the four years that the patent has

2  been issued and for the three years this litigation been

3  pending throughout the patent submissions to this Court and

4  through the first rounds of briefing and throughout the

5  amended Markman briefs provided by-- it wasn't until the

6  Markman brief and all of a sudden this obvious error became

7  apparent to even the plaintiffs and all of the attorneys

8  representing the plaintiff.  Or plaintiffs, excuse me.

9          I would also suggest to your Honor that as I

10 started at the very outset when talking about the first claim

11 the essential invention here is for this device at its end

12 point to touch the skin and to separate the hairs to further

13 allow the skin to be touched by this device, to allow the

14 clean and accurate and convenient disbursal of the medicant

15 to the body of the dog.  That's the essential invention

16 here.  One prong doesn't accomplish that.  Three prongs does,

17 six prongs even better.

18         So if we're going to look at the essential

19 invention here, which is to make sure this device gets right

20 to the skin and separates the hair of the dog to allow that

21 that to happen, once again one prong will not do it, which

22 further supports that intent of this entire invention has

23 always been multiple prongs.  As we cited so many times in

24 the patent itself.

25         Now, you could take all of what I said and agree or

1  disagree and take all what the plaintiffs said and agree or

2  disagree with it, but clearly in light of all of the briefing

3  and clearly in light of all of the evidence presented on both

4  sides it a reasonable debate.  And it is not your Honor's job

5  to decide who is right.  It's your Honor's job to decide is

6  there a reasonable debate.  And clearly there is here.

7  Otherwise we wouldn't have spent all this time and effort to

8  get to correctly point out that one of the key terms in the

9  patent prong and prong members.

10          I would also like to address this said issue.  Now

11  I didn't have a chance to submit a surreply and that's why we

12  haven't respond and I will respond now.  And it is very clear

13  the importance of the word said.  Let me direct your Honor's

14  attention to claims 67 and 68 of the patents.

15          THE COURT:  Okay.

16          MR. BURNSIDE:  Now, let me read from number 6, a

17  direct delivery applicator as recited by Claim 1.

18          Right then and there they are referring back to

19  Claim 1, as it has to because it's a dependent claim.  And

20  they want to say, wherein each of said pronged member --

21  clearly that's a mistake.  It should be prong members.  And

22  that's confirmed by number 7 wherein said prong members,

23  again referring to Claim 1.  And then Claim 8 says once

24  again, wherein said prong members, again referring to Claim

25  1.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          So not only do we have the use of prong members in

2     Claim 1, but we also have it in the use by the words said in

3     Claim 6, 7 and 8.  Which basically raises the following

4     simple issue, which should really address the motion very

5     easily, and that is, which is right?  The four references to

6     prong members or prongs that I just pointed out?  Or the

7     three references to prong that the plaintiffs have pointed

8     out.  I'm not sure what the answer is.  I know in my heart

9     what the answer is.  But from the point of view of the

10    standard that governs this motion, is there reasonable

11    debate?

12         I would argue to your Honor that the mistake here

13    is the use of the words prong.  Not the use of the word

14    prongs or prong members.  At a minimum, there is a critical

15    debate here, which automatically removes this from the

16    province of your Honor and puts it in the lap of the PTO.

17         So let me turn if I could, your Honor, to the

18    actual definition.  As you could imagine, I have a few

19    comments about that as well.  Let me start by pointing out

20    once again that the words essentially and includes are used

21    by the plaintiffs in  their definition which inherently is

22    ambiguous and open ended.  At a minimum those have to be

23    removed from any definition.

24         I would also point out this.  They claim that the

25    definition of prong member is any projecting part.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          Well, if you look at figure 1a, any projecting part

2     would also include the applicator head, which is a separate

3     component, if you will, of this invention.  That's number

4     18.  It would include the internal channel, number 21 from

5     that figure because that also protrudes from the body of the

6     applicator.

7          It would include the shield which is number 25,

8     which also protrudes from the applicator body.  It would

9     include the applicator orifice, which is number 19, as well

10    as flap on a different claim.  But nonetheless-- but these

11    are all things that protrude from the applicator body

12    itself.  And therefore by saying the prong member is anything

13    that protrudes that, now you are defining prong member to

14    essentially include applicator head, internal channel shield,

15    applicator orifice, etc. And if I remember correctly from

16    earlier arguments today, anytime the defendants wanted to

17    define something by what it included, they objected.  So they

18    can't have it both ways.

19          You can't explain a claim term when it pleases you

20    and limit a claim term when it pleases you.

21          The use of the word projecting part in their

22    definition is completely inappropriate.

23          Now one final comment, your Honor.  Again, I am not

24    going to repeat everything that's in our briefs.  I would

25    make this one final comment.  Unfortunately I refer back to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

74

1   the motion for this one very brief comment.

2            I carefully listened to counsel, and he said this

3   twice, "probably an error." If it's probably an error in his

4   mind, that's not something that is so obvious that could not

5   have been missed.  Even he thinks it's probable, but that

6   doesn't mean definitively is.  And certainly it doesn't

7   suggest a simpler error that the record overlooked and

8   therefore it needs to go back to where it belongs, which is

9   the PTO.

10           Thank you, your Honor.

11           THE COURT:  Okay.  Thank you.

12           MR. NORMAN:  Your Honor, I guess I'll address this

13   last point first.  When I said probably an error, I was

14   looking solely at the third item itself in Claim 1.  Turn to

15   Claim 1.  As I said, upon the reading merely of the third

16   occurrence -- I'm sorry.  What I told the Court is, the third

17   occurrence-- just this reading of the third occurrence said

18   prongs.  That one reading the claim would say that's probably

19   an error.  Because there is no reference to any plural

20   prongs.  And then I said once you get to the fourth

21   occurrence, just looking at the claim language, and I do note

22   Mr. Burnside did not address Claim 1 at all.

23           The fourth occurrence said prong confirms there's

24   going to be an error, because now we see that the term prong

25   member and prong starts to give us a better feel that this is

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  a term that is used interchangeably.  The patent

2  specification confirms that the terms prong and prong member

3  are used interchangeably.  Therefore, the said prongs, that

4  third occurrence, must be referring to at least one prong

5  member first occurrence.

6          What I am saying is, a review of the patent Claim

7  1, we are going to be more than pretty sure, we're going to

8  be fairly confident that there was an error and what that

9  error was.  A reference to the patent specification, where

10  the patent specification talks in terms of the invention as

11  being at least one prong member confirms that there is no

12  reasonable debate.

13          Now, whether there are errors in others.  Let's

14  pull up some of these other claims.  Whether there are errors

15  in claims -- I forget the claims that they were looking at,

16  Claims 7, 8 and 9.

17          THE COURT:  I think it was the second line of six,

18  wherein each of said prong member comprises--

19          MR. NORMAN:  Well--

20          THE COURT:  I think Mr. Burnside said probably each

21  of said prong members.  Am I right about that?

22          MR. BURNSIDE:  Yes, your Honor.

23          THE COURT:  Yes.

24          MR. NORMAN:  And that 6 looks like there is an

25  error in 6.  We are not asking the Court to correct any error

1  in Claim 6.  And whether there are errors in these other

2  claims that's not really the issue.  The issue is going to

3  be-- let's look at Claim 4, if we are going to be looking at

4  dependent claims.  Claim 4 says a direct delivery applicator

5  as recited by Claim 1 comprising of at least three prong

6  members.

7          Now Claim 4 requires at least three prong members,

8  this is a dependent claim; a dependent claim recites all of

9  the limitations of the independent claim and necessarily

10  limits the scope of the claim.

11          The additional limitation with Claim 4 is that

12  there will be at least three prong members.  Which also

13  requires that Claim 1 does not require the presence of at

14  least three prong members as Mr. Burnside asserts.  So I mean

15  Claim 4 is going to further confirm what the language of

16  Claim 1 is.  But I do note, Mr. Burnside could not address

17  Claim 1 itself.  And look at the internal inconsistencies of

18  Claim 1 with respect to that term.  And so we know that there

19  was an error in Claim 1.  And we know what that solution

20  was.

21          With respect to Mr. Burnside's argument that, well,

22  because our error wasn't found, well then it can't be an

23  error.  Well under that type of a test there could never be

24  an error in a patent in order for there to be an error that

25  the Court can correct.  The error necessarily wasn't caught

1   beforehand.

2          Also, Mr. Burnside argues that because he presents

3   an argument, then the argument must be a reasonable debate.

4   Now the case that we cited originally, the CBT Clint Partners

5   (ph), that was argued at the district court level.  And not

6   only was it argued at the district court level, it was argued

7   at appeal.  I am guessing there was more argument applied to

8   that since it went both at the district court level and up to

9   the Court of Appeals, that the defendant in that case was

10  making an argument.

11         Now the fact that they make an argument still does

12  not mean that it is a reasonable argument, that it's subject

13  to reasonable debate.  Again, I will encourage the Court to

14  consider the claim language.

15         With respect to the particular definitions.  We are

16  perfectly comfortable as to any of the definitions that have,

17  that preface with essentially or including.  Those do not

18  need to be in the definitions.  I would even say they don't,

19  they shouldn't be in the definitions.  And we really haven't

20  argued -- I shouldn't say we really haven't, we absolutely

21  have not argued for those words to be included.  And I don't

22  believe it is in any of the briefs since our-- since our

23  amended opening brief.

24         And then with respect to the definition of prong,

25  that it should be a projecting part.  That is the definition

1   of a prong.  A prong is a projecting part.

2           We are certainly not saying that the claim requires

3   or covers any projecting part.  The claim has specific

4   requirements in it.  With respect to this prong.  Not

5   definitional, but rather requirements that are in the claim

6   that we will have to prove.  For example, it's going to be at

7   least one prong member having an internal channel therein.

8           The prongs going to have an internal channel.  But

9   that's not a definitional-- the internal channel is not what

10  defines prongs.  We apply the ordinary meaning for the term

11  prong.  Or the term prong member.

12          So although this particular claim requires the at

13  least one prong member to have an internal channel that's

14  still not the definition.  That will be something we are

15  going to have to prove.  Of course, the accused product does

16  have a prong member with an internal channel therein.  And

17  it's going to have the delivery of it.

18          Not that I mean to be talking now -- I'm just

19  saying that's not going to be an argument that we -- we're

20  not going to be making any type of an argument that for us to

21  prove infringement that we're going to be disregarding the

22  internal channel or the delivery of it.  Of course, there are

23  requirements.  But as far as prong it only means projecting

24  parts.

25          THE COURT:  Okay.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

79

```
 1              MR. BURNSIDE:  Very briefly, your Honor?

 2              THE COURT:  Very brief.

 3              MR. BURNSIDE:  Your Honor, I think that counsel has

 4    sort of misstated my argument.  One part of it.  We're not

 5    saying that simply because something has not been caught for

 6    years that there can be no possibility of an error.  The

 7    point of the matter is that they went to great lengths in

 8    their briefs to say that this is that obvious. Well, it's not

 9    that obvious otherwise it would have been caught a lot

10    sooner.

11              Given all that's happened with this application and

12    the prosecution history and the lab books and so on and so

13    forth, and if what they're saying now is that they will agree

14    to delete any projected part, yes, they'll indicate that the

15    prong however you define or prong members-- however you

16    define it does protrude-- we're fine with that.  But as it

17    was submitted we're not fine with that.

18              Let me make my one final point.  Demonstrating that

19    Mr. Slocum is more than worthy to handle some of these other

20    material terms on his own later on.  He pointed out to me

21    that said prong members is referring to either Claim 1 or

22    claims--

23              THE COURT:  Let me stop you.  You're suggesting

24    that Mr. Norman, when he was talking about taking out

25    language essentially etc, etc, or taking his arguments as a
```

1  whole made these shifting positions to one that is now

2  espoused in the brief-- taking a less defined position?   Is

3  that what the position is? What position did you hear him

4  espouse just now that you can live with?

5       MR. BURNSIDE:  Well, your Honor, to back up a

6  moment to make it clear.  And to make sure that we all

7  understand each other.  I don't want to say something that is

8  not accurate, or attribute to something that's not accurate

9  to counsel.

10       I thought that he said that the use of the word

11  includes essentially should not be in there.  And the problem

12  by having it say includes any projecting part, it suggests

13  that prong members includes some of those other components

14  that I mentioned before.  If he's now saying, which I heard

15  and again I'll stand corrected if I've misstated it.

16       If he's saying that a prong member itself is a

17  projecting part from something, either the applicator head or

18  from the applicator body then I would agree with that. That

19  part at least.  I still take issue with the other parts we've

20  been arguing about plural and so forth. But what I think what

21  he's saying is now is that it doesn't cover any projecting

22  part, but that the prong member is a projecting part-- which

23  I agree.

24       MR. NORMAN:  Yes, I am certainly-- I am certainly

25  saying that we do not need to say essentially any projecting

81

1   part.  I am saying a prong member is-- by definition is a

2   projecting part.

3           THE COURT:  Okay.

4           MR. BURNSIDE:  All right.

5           THE COURT:  Okay.

6           MR. BURNSIDE:  Finally, your Honor, let me just go

7   back to claim 6.  It says, "each of said prong member."

8           Now we all recognize that that's a clear error

9   because it should say prong members, regardless of how you

10  view the rest of it.  Just by simple grammar.  That's an

11  example of a very simple a mistake-- which your Honor could

12  correct in a heart beat, regardless of the passage of time.

13          But now let's go to 7 and 8, and as Mr. Slocum

14  pointed out to me as I sat down 11, 12, 13, 14, 15 and 19,

15  which all make reference to either Claim 1 or a dependent

16  claim which also refers to Claim 1-- each one of these says

17  prong members.  So throughout the dependent claims the

18  inventor is clearly referring back to Claim 1, indicating

19  that it's in the plural not the singular.

20          Thank you.

21          THE COURT:  Now, it is still your position-- all

22  though you said in your heart of hearts really you think it

23  is really the other way than plaintiffs say. You're not

24  arguing that it's the other way.  You're saying it's not

25  capable, it being the claim language is not capable of

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   correction by me to turn the plural into the singular?

2            MR. BURNSIDE:  That's part of it.

3            THE COURT:  Where does it appear and where it has

4   been challenged?

5            MR. BURNSIDE:  Correct. And then I would go on to

6   say that prong, prongs or prongs members has to be more than

7   one.

8            Now, Mr. Norman made reference to Claim 4 and said

9   that has to have three prong members because it has to be

10  more of a limitation than Claim 1.  So that maybe in

11  retrospect Claim 1 should be more than one prong member or a

12  series of prong members which therefore allow it to be two,

13  which better accomplishes the essential invention than one

14  single prong.  Because at least two has a better chance of

15  separating the hair to allow the medicant to be delivered

16  directly to the skin, which is what this invention is all

17  about.

18           THE COURT:  Is the prong member and the description

19  in the referral back and some of the claim language talking

20  about the as it were impregnated prong member delivering the

21  medicant, may be accompanied by other prong members that

22  don't have the medicine in them?  Is that essentially what

23  we're talking about? Not to use a bad word like essentially,

24  but is that the part of the essence of the device? Part of

25  the essence of the device?  You could have a lot of prongs

1   but at least one has to have medicine in it?

2           MR. BURNSIDE:  That's a very interesting thought,

3   your Honor.  Candidly I hadn't given that thought.  But on my

4   feet I'll be happy to.  If what you're suggesting is multiple

5   prong members, one of which delivers the flea and tick

6   ointment.

7           THE COURT: The at least one of which.

8           MR. BURNSIDE:  And then there's others in addition

9   to that that helps separate the hairs.  I think that that

10  does accomplish the essential invention of at least

11  disbursing the hairs to let those prongs that do deliver the

12  flea and tick treatment to actually get to the skin.

13          THE COURT:  And could that also be like you've got

14  Tylenol, and got really strong Tylenol, and you have really,

15  really very strong Tylenol.  The flexibility to have one

16  prong member or maybe two or three because you're really

17  whacking the animal with a lot of medicine?  So this is the

18  extra strength version.  Is that something else, that's not

19  so much covered but a possibility of the within the

20  invention?

21          MR. BURNSIDE:  Well--

22          THE COURT:  I'm just saying that there are a lot of

23  ways of practically looking at why this language is the way

24  it is and what the aim of the invention is-- which kind of

25  further confuses the issue, because the more ways that you

1  could read this the more obvious the argument that you're

2  making is-- which is you can't know.

3        MR. BURNSIDE:  Your Honor, that's a practical

4  observation, your Honor.  Unfortunately if you look at all of

5  the evidence, the lab books, the diagrams, the patent itself

6  and the prosecution history, the amendment to the patent,

7  there is really nothing to suggest that in the inventor's

8  mind-- at least that she was looking to do sort of the extra

9  strength Tylenol analogy that you're pointing out.  So really

10  it's hard to say.  And I agree with you that it does make it

11  more complicated and more confusing.  So I'm not sure if

12  that's an answer for you.

13        THE COURT:  No, just going back to the simple

14  problem of whether or not one prong as opposed to at least

15  three prongs.

16        MR. BURNSIDE:  Or two prongs.  That still works.

17  So it is either one prong or a series, the series could be

18  two under Claim 1.  Three, under Claim 4 and so forth.  And

19  again that's very consistent with essential intent of this

20  invention.

21        THE COURT:  And you reject the idea that it can be

22  one prong with the potential for more than one prong?

23        MR. BURNSIDE:  I do.  Because that doesn't

24  accomplish what the improvement over the then currently

25  existing coverage.

1          THE COURT:  Okay. I think that we've pronged that

2  to death and so let's move on.

3          MR. NORMAN:  Very brief.

4          THE COURT:  Very, very brief.  Based only on my

5  last colloquy.

6          MR. NORMAN:  Okay.  Well, the reason that can't be

7  the case, your Honor, that you cannot have a scenario-- you

8  cannot read the claim to be meaning a series of prongs only

9  one of which has the type of internal channel, is because in

10 one occurrence where prongs are mentioned in the plural in

11 the claim, the claim specifically says, to facilitate release

12 of said solution from said cartridge and through said

13 prongs.  You can't have a prong that doesn't have solution

14 going through it in that claim language.  The solution is,

15 and there's-- that's discussed in the claim as going through,

16 required to go through only one prong member.  Because

17 there's only one internal channel that's discussed anywhere

18 in the claim.  Only one internal channel.  So that's not a

19 possibility.  And there's no place in the specification that

20 suggests a prong that does not have an internal channel for

21 release.  With the rest of it, your Honor, we'll rely on our

22 brief.

23          Our brief talks about an alternative motion-- an

24 alternative just the claim construction.  Claim construction

25 doesn't require a reasonable debate.  That's going to be what

1   one of ordinary skill in the art.  Reading this language.

2   Reading the Claim 1, ordinary skill in the art, would

3   understand that prongs in that case is also prong member

4   singular.

5           Thank you, your Honor.

6           THE COURT:  Okay.  So we've talked about what prong

7   member and what prong members mean and the fact that they can

8   be interchangeable and I think we've captured the parties'

9   argument.

10          Let me just clarify what you just said, Mr.

11  Norman.  Are you saying that every prong in this invention

12  has to have medicine running through it?

13          MR. NORMAN:  Your Honor, I'm not saying that the

14  claim requires the absence of a prong through which no

15  medicine passes.  It doesn't require that absence of such a

16  prong.  What I am saying is the specification never mentions

17  a prong through which-- in this sense, a prong or prong

18  members that doesn't have an internal channel.  And that the

19  third occurrence of claim-- the third occurrence of prongs in

20  Claim 3 wouldn't lend to that requirement.

21          THE COURT:  Got it.

22          MR. NORMAN:  The claim is an open ended claim.  So

23  if someone could get around the patent by having a single

24  prong along with some prongs that have no medicine going

25  through it.  I mean, the addition of a dead prong isn't going

87

1   to get someone away from the scope of the claim.

2           THE COURT:  Got it.

3           MR. NORMAN:  That's what I'm saying.

4           THE COURT:  Okay.  What else do we have to cover,

5   gentlemen?

6           MR. NORMAN:  The next term, your Honor, is delivery

7   aperture.  This is in slide 4.  The term delivery of aperture

8   occurs twice.  In the context of Claim 1.  The delivery

9   aperture is the discharge and of the internal channel of the

10  prong member.  That's the prong member that we've been

11  talking about. It talks about the internal channel and the

12  delivery aperture.

13          Plaintiff's propose that delivery aperture is an

14  opening such as a hole, gap or split for delivery of

15  something.  So just plaintiff's definition is going to be

16  consistent with that ordinary meaning.

17          Defendant's definition is the term-- defined the

18  term as delivery aperture as a small opening at the end of

19  the multiple prongs and protruding from the channel.  Well,

20  the first point is the word delivery aperture, there's

21  nothing that requires it to be small.  Of course, I mean,

22  it's small but small relative to what?  Small is a relative

23  term.  And there's nothing about small that's mentioned in

24  the patent.  So that seems to me that's a term by including

25  small is just going to add confusion.  Small compared to

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1   what.

2           The second requirement that defendants impose is

3   that the opening must be located at the end of multiple

4   prongs.  Well, number one, prongs is not going to be in the

5   ordinary meaning of the terms and certainly it talks about a,

6   a small opening-- singular.  So you have a singular opening

7   at the end of multiple prongs is not disclosed anywhere in

8   the patent.  There's no embodiment that has a opening-- an

9   opening at the end of multiple prongs.  This is a opening.

10  It's singular.  Because it's at least one prong member.

11          The third is, the opening must extend from the

12  multiple prongs.  The context of the claim, the opening as at

13  the end, and that opening doesn't protrude from anything.

14  The channel may extend it through the prong of course, but

15  the opening is going to be at the end of that channel.

16          Thank you, your Honor.

17          THE COURT:  Okay Mr. Burnside.

18          How do you address or why is small there?  Why is

19  the end versus the beginning-- where do the multiple prongs

20  come from etc.?

21          MR. BURNSIDE:  Okay.  Thank you, your Honor.

22          Your Honor, if you look at figure 1a, as an example

23  to illustrate exactly where the delivery aperture relative to

24  the nearby component is, you will see that the delivery

25  aperture which is number 22 is at the end of the prongs.  Or

1  if your Honor were to ultimately disagree with us the prong

2  as the case may be.  But it is clearly at the end of the

3  prongs from what this patent says.  And, moreover, in her

4  deposition testimony Ms. Markell made clear that they are

5  small openings.  Now perhaps it should say, smaller opening

6  relative to a channel or the canal, or something like that,

7  which I certainly would be open to.  Because we do want to

8  get this correct.  And I would further add that I think

9  perhaps through some inartful definition on our part, I think

10  counsel may have misunderstood our proposed construction.  It

11  almost seems, again if I'm misstating it it's not

12  intentional.

13         I think what Mr. Norman was saying that the small

14  opening had to be at the end of multiple prongs.  Perhaps

15  what it should say is that the small openings at the end of

16  each prong. We're not suggesting it is one opening and that

17  somehow all of the prongs merge into-- that each prong would

18  have an opening.

19         So if you look at figure 1a, the four prongs that

20  were depicted there each one would have the small opening or

21  perhaps better stated.  A smaller opening as compared to

22  something else.  The tube, the canal, the channel, the

23  applicator head, what have you.  So it is a small opening at

24  the end of each prong as further to be defined by your

25  Honor.  And that's clearly what is intended by Ms. Markell.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

90

1   And that might even address the question you posed at the end

2   of the discussion about prongs.

3            Unless you have any other questions I don't think I

4   have anything further to add other than what's in our

5   briefing.

6            THE COURT:  Okay.  Thank you.

7            MR. BURNSIDE:  Thank you.

8            MR. NORMAN:  Briefly, your Honor.

9            THE COURT:  Yes.

10           MR. NORMAN:  For the internal channel at the end of

11  multiple prongs, so to say that would mean that that would be

12  an internal channel at the end of the multiple prongs would

13  require that there will be-- or I should say delivery

14  aperture.  The claim requires only one internal channel.  And

15  the claim requires only one delivery aperture.  And if

16  there's only one delivery aperture then there's no way that

17  the delivery aperture could be construed as requiring

18  multiple delivery apertures as Mr. Burnside is currently

19  arguing.  There has to be only one internal channel, only one

20  delivery aperture, because the claim requires only one prong

21  member.

22           Thank you, your Honor.

23           THE COURT:  Thank you.

24           MR. NORMAN:  Your Honor, the next term is flexible

25  deformable material.  Now the phrase flexible deformable

1   material occurs twice.  One is going to be said chamber of

2   said applicator base being composed of a flexible deformable

3   material.  And then said flexible deformable material being

4   composed of rubber etc, etc.

5           So the question is what is the meaning of flexible

6   deformable material.  Now, flexible, let's go back to that

7   language.  If we look just in the claim itself, we look,

8   okay, these are commonly used words.  Flexible deformable and

9   material.  Flexible means able to be flexed.  That's the very

10  meaning.  Deformable means able to be deformed.  Well

11  deformable and flexible are the same thing.  So it is really

12  a little bit redundant. But flexible deformable material is

13  going to be a material that is capable of being flexed.

14  That's the ordinary meaning of the term.

15          Now, in connection with the term flexible

16  deformable material, the term was not explicitly defined

17  anywhere in the patent or the patent specification.  No

18  Lexicography referred to as flexible deformable material so

19  it must be given as a ordinary meaning.  And there's no

20  disavowal with respect to flexible deformable material.

21          Plaintiffs propose that flexible deformable

22  material is material that can be flexed.  Defendants define

23  the term flexible deformable material as rubber having a

24  thickness of 1/32 of an inch to 3/32's of an inch.  The claim

25  is going to require the rubber limitation of course, but

1   rubber having a thickness of 1/32 of an inch to 3/32 of an

2   inch is certainly an ordinary meaning of an ordinary

3   definition of flexible deformable material.  The patent was

4   never defined to interpret flexible deformable material in

5   this manner.  Neither expert said the term flexible

6   deformable material means rubber having a thickness of 1/32's

7   of an inch to 3/32's of an inch.  As a matter of fact talking

8   about, rubber have a thickness of 1/32 to 3/32's of an inch,

9   you're providing really no meaning to flexible deformable

10  material.

11          So for at least these reasons defendants'

12  definition is not the plain and ordinary meaning.  And so we

13  would request that the Court adopt plaintiffs' proposed

14  definition and reject defendants' proposed definition.

15          Thank you.

16          THE COURT:  Okay.  Mr. Burnside or Mr. Slocum?

17          MR. BURNSIDE:  Yes, your Honor, Mr. Slocum will

18  handle this.

19          THE COURT:  All right.

20          MR. SLOCUM:  Thank you, your Honor.

21          Your Honor, the defendants' definition of flexible

22  deformable material goes back to a piece of the story-- let's

23  put it this way, which is an oblique reference to it and no

24  one has focused on it just yet. And that's what actually

25  happened before the USPTO, your Honor.

1          So when the plaintiffs and the patentee first

2     applied for this patent to the USPTO, what's now being said--

3     and this is all set out in our papers, Judge, and it is

4     highlight here.  What was now Claim 1 was smaller.  It was

5     only subsections A, B and C.  That claimed the direct

6     delivery applicator.  They claim the prongs.  They claimed

7     various other components of the device.  But it made

8     absolutely no reference to material composition of any

9     portion of the device.  That was all reserved to dependent

10    claims.  And effectively the USPTO said absolutely not.

11         It said, looking at the prior art, there are two

12    references in particular that we mentioned in our brief.

13    Looking at the prior art you don't get this patent.  In fact,

14    the only way that you get this patent is if you limit the

15    material composition of the chamber of the base to flexible

16    deformable material.  And, in fact, the USPTO jumped over

17    flexible deformable material and went straight to rubber.

18    And said because of a function of the way the dependent

19    claims are drafted it had to incorporate dependent claim

20    three.  Because the PTO wanted to take defendant claim 4

21    rubber, and rubber is 1/32 of an inch and 3/32's of an inch

22    and said, if you make that material composition part of your

23    patent, part of the independent claims then you get this

24    patent.  And the patentee and the plaintiff were happy to

25    accept that limitation at the time in order to be allowed

1   issuance of their patent, your Honor.

2           So by that simple act, by that acceptance of the

3   USPTO's limitation that creates the preclusion and disavowal

4   of any definition of flexible deformable material other than

5   what the claim now reads it to say.  It says, the chamber of

6   the basis made up of a flexible deformable material, and that

7   flexible material more specifically is and only is rubber of

8   a thickness of 1/32 of an inch to 3/32's of an inch.

9           And, your Honor, the defendants put to the Court

10  that it is a distinction without a difference to say that the

11  flexible deformable material is not defined as rubber having

12  that particular thickness, but rather is only-- can only be

13  that rubber with that particular thickness, your Honor. And

14  that's what the patent says.  The patent says, the chamber of

15  the base is flexible deformable material, which when it comes

16  to this patent the only material that is flexible deformable

17  material is rubber of a particular thickness.

18          Now, there were experts that talked about it,

19  certainly, your Honor, there are many, many other materials

20  that are flexible deformable that are not rubber.  But for

21  the terms of this patent flexible deformable material means

22  rubber having a thickness of 1/32 of an inch to 3/32's of an

23  inch.

24          Unless your Honor has any further questions,

25  pending or whatever Mr. Norman may say on rebuttal.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          THE COURT:  Okay. How do you rebut that because you

2     didn't talk about the prosecution history?

3          MR. NORMAN:  I think, your Honor-- first of all,

4     Mr. Slocum certainly overstates the prosecution history.  The

5     examiner did reject the claims and no attempt was made to

6     persuade the examiner.  The claims were amended.

7          Now, a limitation was put in to the claim.  That is

8     a claim limitation.  That is now in Claim 1.  So the fact

9     that-- the fact that the claim requires the rubber having a

10    particular thickness range-- we are certainly not denying

11    that.  That is going to be a claim requirement that we will

12    have to prove.  The question is though is that in the

13    definition of flexible deformable material.

14         MR. JINKINS:  Point out that the rubber is 1/32 and

15    3/32 in the claim.

16         MR. NORMAN:  It is in the claim, right.  But the

17    fact that rubber is in the claim it will be a requirement

18    that we have to prove exists.  We have to prove that the--

19    that every single claim limitation is present in the accused

20    device.  But that still is not defining what is flexible

21    deformable material.

22         Now, with respect to-- to the prosecution history

23    though.  I would direct the Court's attention to the case of

24    Salazar v Proctor & Gamble, 414 F.3d, 1342, Fed Circuit

25    2005.  Mr. Slocum said that because of the prosecution

1   history and what statements the examiner said that that

2   somehow constitutes a disavowal of claim terminology.  That

3   is absolutely incorrect.

4           As stated in Salazar v Proctor case, the examiner's

5   statement of reasons for allowance do not limit a claim.  And

6   the particular arguments that Mr. Slocum is referencing were

7   found in the examiner's statement of reasons for allowance,

8   but disavowal.  What the Court also says in the Salazar is

9   that disavowal must be a statement of the patentee not of the

10  examiner.  So that's going to be-- how that happens is in the

11  prosecution history the examiner rejects claims or whatever

12  he does.  The examiner issues some type of an office action

13  and sends that to the patent owner's attorney.  The patent

14  attorney then will present arguments.  The arguments of

15  course of the patent attorney are arguments of the patentee.

16  And a disavowal can occur in the arguments that are going to

17  be made by-- on behalf of the patentee by the patentee's

18  lawyer.

19          And what the Fed Circuit said in the Salazar case

20  is that there's no disavowal based on the statements only of

21  the examiner.  It's going to require some action.  Some

22  statement by-- by the patentee.  And that that statement has

23  to be a clear disavowal.  Consistent with the Salazar case,

24  which is going to be consistent with the GE Lighting case,

25  and consistent with the Phillips decision.


U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1           That's all I have your Honor.

2           THE COURT:  All right.  Do you want to rebut and

3    what Mr. Norman just said-- don't repeat the argument.

4           MR. SLOCUM:  Specifically, your Honor, thank you.

5           With respect to the distinction between statements

6    made by the examiner versus statements made by the

7    applicant.  In light of the rejection the applicant patentee

8    did make an amendment and as part of the amendment, again, I

9    believe it's in the papers that I submitted on the ECF docket

10   117, Exhibit C to my declaration.  At least in one place

11   where the prosecution history exists.  That's page 38.

12          In view of the indication by the examiner that the

13   patent would be disallowed but for this limitation,

14   applicant's amended Claim 1 to require that-- simply, your

15   Honor, in the amendment the applicant did say that in view of

16   the indication by the examiner that being the rejection if

17   not-- that claim 4 was not made independent.

18          The applicant never amended Claim 1 to require that

19   the chamber of the applicator base is composed of flexible

20   deformable material... two.  And two, the flexible deformable

21   material is composed of rubber of the specified thickness,

22   your Honor.  So there it is not solely by the USPTO.

23          THE COURT:  Mr. Norman, this is a yes or no from

24   you on behalf of the plaintiff.

25          Is it disputed that but for the change to specify

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  rubber of a specific thickness this claim would have been, or

2  this patent would not have been issued?  In other words, I

3  think the defendant is saying that this is a do or die.

4  Either you put this specification in or you will not get your

5  patent.  Is that agreed as factual?

6          MR. NORMAN:  No, that's not factual.  The answer is

7  no.  But the amendment was added so we can't ignore it.  The

8  limitation was added to the claim, but we certainly can't say

9  it was required for the application to be allowed.  Now we

10  can say that it was made and by making it of course it would

11  be allowed.  But that's-- I mean that's a nuance difference

12  perhaps-- but no.

13          THE COURT:  Okay.

14          MR. SLOCUM:  May I respond very briefly, your

15  Honor?

16          THE COURT:  Yes.

17          MR. SLOCUM:  Simply, your Honor, the defense

18  doesn't believe that it needs to be conceded by plaintiff at

19  all. The prosecution history speaks for it itself as to what

20  the USPTO said in its rejection of the initial application.

21  Thank you.

22          THE COURT:  Okay.  Next term.

23          MR. NORMAN:  The next term, your Honor, is rubber.

24          Now, the term rubber occurs once and that is going

25  to be-- we already read that and so I guess I wouldn't read

1  it again.

2          MR. BURNSIDE:  Your Honor, I don't want to

3  interrupt Mr. Norman.  I will step out.  There seems to be

4  some confusion about my 3:30 call and so I will step out.  I

5  may come back.  I will be very quiet when I do.

6          THE COURT:  Okay.  Thank you.  Go ahead.

7          MR. BURNSIDE:  Thank you.

8          MR. NORMAN:  In the context of the '445 patent, the

9  plain and ordinary meaning of rubber is material natural or

10  synthetic capable of being flexed.  The defendants argue

11  rubber means a non rigid, non plastic material, made either

12  from the sap of rubber trees or synthetically to mimic same

13  with a pronounced and intended degree of flexibility.

14          Now the defendants' definition is not the plain and

15  ordinary meaning of flexible deformable.  It's not the plain

16  and ordinary meaning of rubber.  The specification of the

17  '445 patent does not define rubber or include any indication

18  that the inventor intended to act as her own Lexicographer,

19  and defendants can point to know disavowal with respect to

20  the term flexible deformable material-- sorry, with respect

21  to the term rubber.

22          Defendants incorrectly add-- first, I should say

23  both parties, your Honor, acknowledge that rubber can be a

24  material that is natural or synthetic.

25          THE COURT:  Right.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          MR. NORMAN:  Both parties also acknowledge that

2    rubber is a material being flexed.  Defendants however had

3    four additional limitations to the definition of rubber that

4    are not part of the plain ordinary meaning.  The first one is

5    non rigid.  The second is non plastic.  The third mimic.  And

6    the fourth intended degree of flexibility.

7              Now with respect to non rigid.  I guess I would

8    acknowledge that a rubber is going to be non rigid.  But both

9    parties have already acknowledged that rubber has to be

10   flexible.  And now stating it in the positive makes more

11   sense than stating it in the negative.

12             Now we've already-- both parties' definitions

13   already include a requirement of flexible.  So I'm not sure

14   what adding non rigid to the definition would do other than

15   confuse the jury.  What does it mean to be both flexible and

16   non rigid.  As to non plastic.  Non plastic is incorrect

17   because all rubbers are plastics.  Defendants' expert said, I

18   mean defendants non plastic limitation is actually

19   contradicted by defendants own expert.

20             Now defendants' expert Mr. Driscoll is an expert in

21   polymers.  And he actually wrote a chapter of a book.  And in

22   that chapter in his book he said that polymers, resins and

23   plastics are synonymous.  And so in deposition he was asked

24   about that.  And referencing to his book it says, in the last

25   sentence of third paragraph, which is the last paragraph

1  under basic concepts.  It says, however, the terms polymers,

2  resins and plastics are synonymous.  Do you see that?

3           Answer:  Yes, sir.

4           Question:  Do you agree with that?

5           Answer:  Yes, sir.

6           Question:  Is rubber a polymer?

7           Answer: Yes, sir.

8           So if we look at this, Mr. Driscoll specifically

9  says that rubber is a polymer and that polymers and plastics

10  are synonyms.  So if-- if all rubbers are polymers and

11  polymers and plastics are the same thing that means logically

12  all rubbers are plastics.  As such, the non plastic

13  requirements in defendants' proposed definition is

14  necessarily incorrect.

15           There are some other statements concerning rubber

16  that Mr. Driscoll testified about.  Mr. Driscoll, and we have

17  this cited in our-- we have this cited in our brief as well.

18  These are going to be on pages, well, I mean I'll just direct

19  the Court to that.  But what Mr. Driscoll said is, his

20  testimony was that these terms, that the term rubber is a

21  broad term.  He said it is an ambiguous term.  It's a, you

22  know, a broad term and it's not limiting.  He doesn't know

23  what kind of a material that specifies.  In other words, what

24  he is saying is, although we may talk in terms of ambiguous,

25  what he really means by that is that the term rubber is a

1  fairly encompassing material.  I mean, a fairly encompassing

2  definition.

3           So it will encompass polymers that are capable of

4  flexing and actually are made-- it is going to be elastic

5  type of a material.  I mean a flexible plastic would be one

6  that's going to be-- it springs back to its original shape.

7  It is going to have that elasticity.  As opposed to saying a

8  plastic bag that, you know, you bunch it up and it doesn't

9  spring back to its shape.  Or to a rigid plastic that is not

10 going to deform.

11          As far as the particular rigidity that's being

12 referenced here.  To the extent anybody tries to make the

13 argument that flexibility-- everything is flexible to some

14 extent.  Well, the patent claim specifies the type of

15 flexibility that's going to be required.  Because the claim--

16 can we pull up the claim.  So in Section D it says that,

17 chamber of said applicator base being composed of a flexible

18 deformable material so that said chamber can be squeezed to

19 apply enhanced pressure on said solution compartment of said

20 cartridge to facilitate release of said solution from said

21 cartridge and through said prongs.  So, I mean, this is

22 talking about somebody using this with their hand, and a user

23 is going to squeeze this compartment and not an infinitesimal

24 amount, but sufficiently squeezing it so that it's going to

25 increase the pressure within the chamber, which will cause

1   the medicine that's in the cartridge to squeeze out of that,

2   and then pass through the channel of the prong member.

3           So we are certainly not saying, nor would a clear

4   reading of the claim make it indefinite as to what is meant

5   by, you know, when we say rubber has to be flexible to what

6   extent.  Because the claim provides enough guidance to the

7   reader to understand that.

8           THE COURT:  We'll take a ten minute recess.

9           (RECESS TAKEN).

10          THE COURT: Back on the record.  I believe there is

11  a couple more issues; but you want a rebuttal or the response

12  on the rubber?

13          MR. SLOCUM:  Yes, your Honor.  Thank you.

14          Your Honor, if I may begin with respect to rubber.

15  There are two points that the defendants would like to make

16  specific to plaintiffs' proposed definition which is

17  materials natural and/or synthetic capable of being flexed.

18          I will remind the Court of plaintiffs' definition,

19  proposed definition as to flexible deformable material, which

20  is materials that can be flexed.

21          And essentially, your Honor, those two proposed

22  definitions are identical.  Flexible deformable material is

23  materials that can be flexed.  And rubber, which the patent

24  says is a specification, a subset of flexible deformable

25  material, if rubber is also any material that can be flexed.

1  The inclusion of rubber adds nothing and it would be

2  surplusage.  And for that reasonably alone, plaintiffs'

3  proposed definition of rubber should be rejected by the

4  Court.

5          Second, your Honor, it is clearly, one would say

6  facially is over broad.  One does not need to be a polymer

7  scientist to know that there are materials capable of being

8  flexed that are not rubber.  But fortunately in this case,

9  your Honor, we have polymer scientists who have told us that

10  in the definition, including plaintiffs' expert and Dr.

11  Iezzi's deposition was provided to your Honor.  I believe his

12  declaration as well acknowledges that many materials can be

13  flexed, not all of them are rubber.  There's wood.  Types of

14  metal that could be flexed.  Indeed any material of certain

15  potentially -- any material of certain thickness or other

16  physical attributes can be flexed.

17          Your Honor, so for that reason alone, the

18  plaintiffs' definition of rubber is simply unworkable.

19          With respect to defendants' proposed definitions.

20  And again, your Honor, much of what I'm saying is not new,

21  it's in our brief and I won't belabor the point.

22          The four limitations that plaintiffs spent a lot of

23  time refuting were two non ridged and non plastic.  You know,

24  defendants don't make that out of air.  We get those from the

25  patent itself and from the prosecution history.  And also

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  from the plain ordinary meaning of the term rubber.

2  Specifically, with respect to rigidity, your Honor.  The

3  column 5 of the patent, this is all part of the preferred

4  embodiment that we were talking about.

5          The invention at line 50 says, chamber of

6  applicator base may be composed of a ridged material, or

7  alternatively, may be composed of a flexible deformable

8  material.

9          Now, that that option for ridged material was

10  before the USPTO rejected the application and made them

11  incorporate the dependent claim of flexible deformable

12  material into the independent claim.  But that distinction

13  that the patent itself draws between ridged materials and

14  flexible deformable materials, rubber as we know the patent

15  tells us is a subset or an extension of a flexible deformable

16  material-- therefore it's not ridged.  Because the patent

17  says if you have ridged materials, you also have flexible

18  deformable materials.  They are alternative to each other.

19          Further, your Honor, within the prosecution

20  history, when the USPTO was distinguishing the prior art and

21  saying the reason why we'll not allow claim 4 as an

22  independent claim is because it is different to the two prior

23  references.  One, the Dovergne, D-O-V-E-R-G-N-E, that

24  reference does not disclose or suggest rubber, only plastic,

25  your Honor.  And so USPTO has drawn a very distinct line of

1   demarkation between rubber and plastic.

2           THE COURT:  Let me stop you for just a minute.

3   Thank you.

4           (PAUSE).

5           THE COURT:  Okay.  Back on the record.  Continue.

6   Thank you.

7           MR. SLOCUM:  Thank you, your Honor.  So the USPTO

8   also drew the line between rubber as a term that is used in

9   the patent and a ridged plastic.

10          As I stated, your Honor, the Dovergne reference,

11  the USPTO says at docket number 117, page 45, that Dovergne

12  does not disclose or suggest rubber as a flexible deformable

13  material only plastic.  Again, drawing a line between rubber

14  and plastic.

15          And further, the USPTO says Robinson, the other

16  piece of prior art, actually teaches away from rubber by

17  disclosing a ridged plastic.  If the rubber -- however, the

18  Court decides to define rubber in this patent.

19          And another point I am not sure any party has

20  noted, your Honor.  The Court is not bound to select A or B.

21  The Court could fashion its own definition composite of the

22  two or reject both.  But, however the Court defines rubber,

23  the defendants put it that if it does not include a non

24  ridged, non plastic component then the '445 patent never

25  would have issued.  Because that's what the USPTO required.

1            Finally, your Honor, looking at the expert

2    testimony.  Both sides agree, your Honor, as Mr. Norman said

3    early on no one is arguing any term in this dispute as a term

4    of art.  And for those reasons, the expert testimony does

5    actually very little help to the Court.  And with respect to

6    the deposition citation to defendants' expert, Mr. Driscoll,

7    plaintiffs' slide 49 ended the quotation at line 1076.

8            Further, on the same page, your Honor, the question

9    put to Mr. Driscoll:  Would that mean that that rubber and

10   resins and plastics are synonymous in some areas of the

11   industry?

12           Answer: No, sir.

13           Question: Why not?

14           Onto page 108.

15           Because rubber is still an ill defined term.

16           What does ill defined mean?

17           It's ambiguous, your Honor.

18           So simply stated, your Honor.  That's at docket

19   119-5, page 5 of 8 from the defendants' responsive papers.

20   That excerpt from the deposition-- it's not clear.  I think

21   it's inaccurate to say that defense expert agreed that all

22   plastics are rubber, all rubbers are plastic.  Like your

23   Honor said not all bugs are insects.  Some insects aren't

24   bugs.  This factor is no more starkly put on display than

25   plaintiffs' expert deposition where when shown an object,

1   which I brought your Honor is D-56, which is a Bic pen, under

2   plaintiffs' definition this object is rubber.

3        In closing, your Honor, simply the common ordinary

4   understanding of rubber does not include a Bic pen.

5        Thank you.

6        THE COURT:  Thank you.  Moving on from rubber, move

7   on from rubber.  Rubber.

8        MR. NORMAN:  Our primary term, the last term, the

9   defendants didn't even propose a definition.

10       May I make a brief comment about rubber?

11       THE COURT:  Very brief.

12       MR. NORMAN:  Counsel talked about -- first of all,

13  as we said in our brief all rubbers are polymers.  All

14  rubbers are plastics.  We did not say that rubber and plastic

15  are synonymous.  We never said that all plastics are

16  rubbers.  So we did ask Mr. Driscoll are all rubbers

17  plastics?  I should say are rubbers and plastics synonymous?

18  He wasn't willing to say that.  And we're not disagreeing

19  with that conclusion.  As a matter of fact, as I said

20  earlier, rubbers are elastic polymers as opposed to ridged

21  polymers or ridged plastics.

22       If we look at the prosecution history, the same

23  section that Mr. Slocum was talking about, what we really see

24  is that the examiner was distinguishing rubbers not from

25  plastics, but rubber from ridged plastic.

1           With respect to the Dovergne reference.  The
2    examiner was saying that all that is disclosed by Dovergne
3    was plastic.  It didn't specify the type of plastic.  And for
4    an examiner to reject the claim, the examiner would have to
5    establish that there was a rubber that was going to be
6    disclosed in that prior art reference.

7           The examiner said that Dovergne does not disclose
8    or suggest rubber as a flexible deformable material only
9    plastics.  So it disclosed only plastics.  The Dovergne
10   reference didn't disclose a flexible plastic.  So it didn't
11   disclose rubber.

12          With respect to Robinson.  The examiner said,
13   Robinson discloses a thickness measurement, but it does not
14   disclose rubber as a material, and actually teaches away from
15   rubber by disclosing a ridged plastic handle.

16          The examiner is not saying that plastic is
17   something different from rubber.  And even if the examiner
18   did, which he didn't, but additionally, the examiner cannot
19   change the meaning of a term.  Can't do it.

20          And that I will direct the Court again to the
21   Salazar v Proctor and Gamble case, 414 F.3d, 1342.  That
22   examiner's statement for the reasons for allowance do not
23   limit a claim.  And the Salazar case also says that an
24   examiner can't change the meaning of the words.

25          So there was no disavowal in connection with the

1  term rubber.  Defendants -- I mean, the patentee did not

2  change the meaning of the term rubber in any respect.  And

3  rubber, we're not saying rubber is synonymous with polymers.

4  We are certainly not saying rubber is any flexible material.

5  But rather is -- rubber is going to be an elastic polymer.

6  Or an elastic, you know, which is also going to be consistent

7  with what we have presented in our arguments.

8         So if the Court wants to modify our definition by

9  including the term flexible polymer, or even elastic polymers

10 along with the flexible deformable material so it may be a

11 polymeric, something like -- none of these words are

12 magical.  But an elastic polymer, natural or synthetic,

13 capable of being flexed.  So if the Court wants to add

14 elastic polymer we would certainly be comfortable with that.

15        MR. NORMAN:  Thank you.

16        THE COURT:  Thank you.  And polymer material.

17        MR. NORMAN:  Yes.  And then the term polymer.  As I

18 indicated earlier polymer is going to be synonymous with

19 plastic.  So the ordinary meaning of polymeric is of or

20 related to a polymer.  Defendants provide no definition of

21 the term, arguing that the term is indefinite.  But the term

22 is a broad term.  There's no question polymeric, just like

23 plastic would be a broad term, but being broad does not make

24 a term indefinite.  It just makes the term broad.  Polymeric

25 material is simply a material that is a polymer or contains a

1   polymer.

2           The defendants assert that Mr. Driscoll is an

3   expert skilled in the art of polymers.  And I will note for

4   the record that defendants have not proposed any definition

5   for the term polymeric material.  They say it's incapable of

6   being defined.  I will note that Mr. Driscoll is an expert

7   skilled in the art of polymers.

8           Now Mr. Driscoll stated in his declaration that

9   polymeric material would generally refer to any material that

10  is a polymer and includes wide families of products such as

11  adhesives, coatings, composites, elastomers, fibers, glues,

12  plastics and reenforced plastics.  All of these are

13  classified as polymers.

14          All right.  So this is what Mr. Driscoll stated in

15  his declaration.  Mr. Driscoll was obviously able to define

16  polymeric material.  But then in his deposition he was just

17  arguing, well, it's a broad term and therefore I don't know

18  what specific material is being required by the claim.  But

19  no particular polymeric material -- the claim requires that

20  the polymeric material would be a light weight polymeric

21  material.

22          But in any event, the claim doesn't specify any

23  type of -- what the specific type of polymeric material is,

24  but that just makes the claim limitation broad.  It doesn't

25  make it indefinite.

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1          The fact that Mr. Driscoll knows what a polymeric

2   material is, the assertion by the defendants that the term

3   polymeric is indefinite, lacks creditability.  And as far as

4   some of these other things that polymeric material can mean

5   liquids and all of that type of stuff.  Well, no, it really

6   can't.  Because in the context of the claim, the claim says

7   that the direct delivery applicator compromises of a light

8   weight polymeric material.  It can't be liquid.

9          Even though it can be a polymeric material, we

10   already know that there are going to be limitations in Claim

11   1.  Claim 16 requires all of the limitations of Claim 1.  And

12   all of these limitations that are in Claim 1 we are certainly

13   going to have to prove.

14          I cannot envision a scenario where a product could

15   be encompassed by Claim 1 and Claim 16 with the polymeric

16   material being a liquid.  Nevertheless, the definition of

17   polymeric material itself is a broad term.

18          Thank you, your Honor.

19          THE COURT:  Thank you.

20          MR. SLOCUM:  Thank you, your Honor.  Your Honor,

21   very briefly on polymeric material.

22          As Mr. Norman stated all of the claims, Claim 16

23   requires that all the limitations of Claim 1 also be proven

24   and applied for Claim 16 to apply.  Simply stated, your

25   Honor, if the defendants are correct and that rubber is a

1   particular subset of polymers distinct from plastic and that

2   the chamber of the base has to be rubber as we read Claim 1,

3   then Claim 16 in effect would expand Claim 1, wherein the

4   entire applicator in Claim 16 reading, a direct delivery

5   applicator as recited by Claim 1, being composed of a light

6   weight polymeric material.  That would mean all components of

7   the applicator are composed of any polymeric material.  Not

8   rubber.

9           So, your Honor, if defendants are correct and that

10  the applicator base has to be rubber and rubber is different

11  from plastic and rubber is only one of a number of many types

12  of polymers then 16 is contradictory and expand Claim 1, and

13  it makes no sense and therefore it can't mean what it would

14  seem to mean, which would mean any polymeric material.

15  Legally and specific speaking and that's why we argue it is

16  indefinite.

17          The second point, your Honor, is one of the

18  definitions for indefinite as set forth in the case Nautilus

19  Incorporated case (ph) by the Supreme Court, is that read in

20  light of the specification and the prosecution history it

21  fails to inform with reasonable certainty the scope of the

22  invention.  That's what Mr. Driscoll said in his declaration

23  and deposition.  Just looking at it, he didn't know what they

24  were referring to.

25          So unless your Honor has any specific questions,

U.S. DISTRICT COURT, NEWARK, NEW JERSEY 07101

1  the defense has nothing further.

2          THE COURT:  I've got it.

3          MR. NORMAN:  Your Honor, one minor comment.  And

4  that only indefiniteness is not an issue to be addressed

5  now.  Indefiniteness is going to be something that defendants

6  are going to bear the burden of proof by clear and convincing

7  evidence.  The defendants can make whatever argument they

8  want about indefiniteness after the claim construes the

9  claim, but just as the Court is not supposed to consider

10 issues of-- consider the infringement issues at this point--

11 neither is it supposed to consider the validity issues.

12 Thank you.

13         THE COURT:  Okay.  Thank you.  Counsel, I don't

14 think there are any other issues that oral argument need

15 address.  Part of what I wanted to get accomplished today I

16 certainly did.  That was to have an opportunity to ask

17 questions and to kind of listen to the arguments that are

18 made on the papers.  I can't stress enough, I wish we had to

19 do more oral argument.  Even if all you did was to

20 robotically recite your arguments, which you didn't do, you

21 gave them life and spunk, it's just important, especially in

22 a technical area like this and where it could be overlooked

23 by just reading briefs what the essential differences are

24 between and among your positions.

25         So I thank you very much for that.  I intend to

1  issue a written decision.  And we're going to try to get it

2  out within the next -- I would say four to five weeks no more

3  than that.  I will keep to my schedule and you will keep to

4  yours.

5          Thank you very much.  Safe travel to those who came

6  from far away.

7          MR. NORMAN:  Thank you.

8          MR. SLOCUM:  Thank you, your Honor.

9          THE COURT:  Thank you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25