**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NITE GLOW INDUSTRIES, INC., I DID IT, INC., and MARNI MARKELL HURWITZ, | |
| *Plaintiffs,* | Civil Action No. 12-4047 (KSH) (CLW) |
| v. | |
| CENTRAL GARDEN & PET COMPANY and FOUR PAWS PET COMPANY, D/B/A FOUR PAWS PRODUCTS, LTD., | **OPINION** |
| *Defendants.* | |

**I.    Introduction**

Plaintiffs asserted in this case that plaintiff Marni Markell Hurwitz ("Markell") invented an applicator for flea and tick medication for animals and presented it to defendants, subject to a confidentiality agreement (the "Agreement"), in hopes that defendants would license it from her and develop the product as they had with prior inventions she brought to them.  Defendants' representative expressed great enthusiasm, took her materials, including her prototype, drawings, and patent application, and had them sent to the appropriate person or entity within defendants for further development.  The head of that team told Markell they were moving forward.  But instead, defendants proceeded to steal her idea, develop their own product (called the Smart Shield applicator), and cut Markell out—something she found out when she discovered her product at defendants' booth at a 2012 pet expo in Orlando.  Defendants vigorously disputed this version of events and denied in full plaintiffs' claims, which, by the time the case went to the jury, consisted of misappropriation, breach of contract, and patent infringement.

After six years of hard-fought litigation culminated in a three-week trial featuring 17 witnesses and several hundred exhibits, a jury awarded plaintiffs $12,656,900, consisting of $825,450 as reasonable royalties for infringement of claim 1 of U.S. Patent No. 8,057,445 (the '445 patent), $825,450 for breach of the Agreement, and $11,006,000 for misappropriation, plus prejudgment interest in an amount to be determined upon motion by plaintiffs. The parties subsequently filed and briefed several post-trial motions, three of which were orally argued at length on March 19, 2019: (1) defendants' motion to vacate the judgment and for judgment as a matter of law, a new trial, and/or remittitur (D.E. 400); (2) plaintiffs' motion to amend the judgment (D.E. 401); and (3) plaintiffs' motion to amend the judgment by awarding enhanced damages for willful infringement (D.E. 404).

For the reasons set forth below, the Court rejects defendants' challenges to the jury's finding of liability on the misappropriation and breach of contract claims.  However, because a legal error underpinned the verdict with respect to the patent infringement claim, judgment as a matter of law will be entered in defendants' favor on that claim, and because the breach of contract damages are duplicative of the misappropriation damages, the judgment will be modified.

With respect to remedies, plaintiffs' requests to add language to the judgement and for an elevated ongoing royalty are denied in view of the Court's ruling on the patent infringement claim. The Court also declines to require assignment to plaintiffs of defendants' design patents and utility patent application. Prejudgment and post-judgment interest will be awarded as set forth herein.

Because plaintiffs' motion seeking enhanced damages (D.E. 404) and their motion for attorneys' fees and expenses (D.E. 405) are predicated on the success of the patent infringement claim, they will be denied.[1]

## II.     The Parties' Motions

Defendants attack the verdict from essentially every angle: they challenge liability and damages on each count, on multiple grounds.  Plaintiffs defend the verdict in its entirety, and seek additional relief on all claims.

### A.  Defendants' Motion for Judgment as a Matter of Law, Remittitur, or a New Trial (D.E. 400)

Defendants have sought to modify the judgment with respect to both liability and damages (*see* D.E. 400-1, Defs.' JMOL Moving Br.).  As to liability on the misappropriation claim, they argue that the claim was barred by the economic loss doctrine and that plaintiffs offered insufficient evidence of novelty, confidentiality, and use.  As to the contract claim, defendants contend that plaintiffs failed to establish non-performance, and, alternatively, that the Court erred in declining to allow the jury to consider whether defendants' obligations ceased when the patent application was published.

As to the patent infringement claim, defendants argue that there was insufficient evidence to support the finding of contributory infringement because plaintiffs offered no evidence to show that defendants' products meet the "rubber" limitation of 1 of the '445 patent, properly

---

[1] In December 2019, plaintiffs also filed an informal letter application seeking an emergency order assigning them U.S. Patent Application No. 14/821,554, which they have contended should be assigned as part of the remedy for defendants' breach of contract.  (*See* D.E. 401-1 at 11-14; D.E. 441.)  The Court declined to grant that relief on an emergent basis.  (D.E. 446, 447.)  With respect to plaintiffs' request in the same submission for further enhancement of infringement damages beyond what is requested in their post-trial motions (D.E. 401, 404), which was not presented as an emergent request, the Court deferred consideration to its ruling on those motions. In light of the Court's ruling here, the request for enhanced damages is denied as moot.

construed. They also challenge the sufficiency of the evidence of (i) infringement with respect to the Zodiac products sold in Canada, (ii) contributory infringement, based on the "prong" limitation of claim 1 of the '445 patent, and (iii) willful infringement. Defendants further contend that the Court should hold that claim 1 of the '445 patent is invalid as indefinite. Alternatively, defendants seek a new trial on patent infringement because, they contend, the jury was allegedly allowed to resolve competing definitions of a claim term, the Court provided an incorrect response to a jury question, and the Court erred in admitting evidence that the U.S. Patent and Trademark Office rejected defendants' utility patent application based on the '445 patent.

With respect to damages, defendants argue that the jury's award was duplicative and must be modified to eliminate the duplication, or else the Court should order remittitur or a new trial. They also contend that the award for misappropriation is excessive, including because net profits, rather than net sales, were allegedly awarded and the Court did not require apportionment. Defendants also challenge the award for breach of contract on apportionment and sufficiency grounds. Likewise, defendants argue that a new trial should be granted on patent damages for failure to apportion.

### B. Plaintiffs' Motion to Alter or Amend the Judgment (D.E. 401)

Plaintiffs have moved pursuant to Fed. R. Civ. P. 59(e) to alter or amend the judgment. They seek (1) amendment of the judgment language to incorporate language from the verdict sheet regarding contributory infringement, infringement under 35 U.S.C. § 271(f), and willful infringement; (2) award of an elevated ongoing royalty; (3) assignment to plaintiffs of three design patents and one utility patent application held by defendants; (4) prejudgment interest on the award for each claim; and (5) post-judgment interest on the entire award.

### C.  Plaintiffs' Motion for Enhanced Damages (D.E. 404)

Plaintiffs have also separately moved for an award of enhanced damages under 35 U.S.C.

§ 284 and *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923 (2016).  They argue that the jury's

finding of willful infringement, governing law, and the need for deterrence warrant enhancement.

## III.    Legal Standards

### A.  Motions for Judgment as a Matter of Law under Rule 50(b)

Judgment as a matter of law is properly granted where "the court finds that a reasonable

jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed.

R. Civ. P. 50(a)(1).  If the Court denies a motion for judgment as a matter of law before the case

is submitted to the jury, the movant may renew the motion following entry of judgment.  Fed. R.

Civ. P. 50(b).  The scope of a Rule 50(b) motion is limited to issues raised in the Rule 50(a)

motion.  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1172-73 (3d Cir. 1993).[2]

Entering judgment as a matter of law is only appropriate if "viewing the evidence in the

light most favorable to the nonmovant and giving it the advantage of every fair and reasonable

inference, there is insufficient evidence from which a jury reasonably could find liability."

*LePage's Inc. v. 3M*, 324 F.3d 141, 145-46 (3d Cir. 2003) (en banc) (quoting *Lightning Lube*, 4

F.3d at 1166).  The jury's verdict will not be overturned "'unless the record is critically deficient

of that quantum of evidence from which a jury could have rationally reached its verdict.'" *ZF*

*Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 268 (3d Cir. 2012) (quoting *Swineford v. Snyder*

*Cnty.*, 15 F.3d 1258, 1265 (3d Cir. 1994)).

---

[2] Although this case concerns, in part, issues of patent liability and damages, regional circuit law
applies to procedural issues generally, and Federal Circuit law governs substantive and
procedural patent law issues.  *Mondis Tech. Ltd v. LG Elecs., Inc.*, 407 F. Supp. 3d 482, 488
(D.N.J. 2019) (Chesler, J.) (quoting *Wordtech Sys. v. Integrated Networks Sols., Inc.*, 609 F.3d
1308, 1318 (Fed. Cir. 2010)).

**B.  Motions for New Trial and to Alter or Amend Judgment under Rule 59**

The court's power to grant a new trial under Fed. R. Civ. P. 59 is "limited to those circumstances where a miscarriage of justice would result if the verdict were to stand." *Olefins Trading v. Han Yang Chem. Corp.*, 9 F.3d 282, 290 (3d Cir. 1993) (citation and internal quotation marks omitted). *See also Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) ("While a court may grant a new trial under Rule 59 'for any reason for which a new trial has heretofore been granted in an action at law in federal court,' Fed. R. Civ. P. 59(a)(1)(A), it should do so only when 'the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand.'" (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).  The Court's authority to grant a new trial is closely circumscribed to ensure that it "'does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury.'"  *Leonard*, 834 F.3d at 386 (quoting *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 201 (3d Cir. 1996)).  "The decision to grant a new trial is within the sound discretion of the trial court, and such requests are disfavored."  *Ponzini v. Monroe Cnty.*, 789 F. App'x 313, 315 (3d Cir. 2019).

To the extent a motion seeking a new trial is based on evidentiary rulings or jury instructions, matters within the Court's discretion, the inquiry is first, whether an error was made in the course of the trial, and second, whether that error "was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice."  *Orion Drilling Co., LLC v. EQT Prod. Co.*, 2019 U.S. Dist. LEXIS 154305, at *38 (W.D. Pa. Sept. 10, 2019) (citations and quotation marks omitted); *see also Ponzini v. Monroe Cnty.*, 789 F. App'x 313, 315-16 (3d Cir. 2019) ("In evaluating a motion for a new trial, we must first determine whether an error was in fact made, and then decide 'whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice.'" (citation omitted)).

6

Motions under Rule 59(e) to alter or amend the judgment must point to (1) an intervening change in controlling law; (2) the availability of new evidence that was not available previously; or (3) the need to correct a clear error of law or prevent manifest injustice. *Max's Seafood Cafe by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

## IV.   Analysis

### A. Defendants' Motion for Judgment as a Matter of Law, Remittitur, or a New Trial (D.E. 400)

#### 1.   Misappropriation Claim

##### a.   Economic Loss Doctrine

Defendants contend that the misappropriation claim was barred by the economic loss doctrine because, they argue, plaintiffs relied on the same conduct to support both their misappropriation and their breach of contract claims.  (*See* Defs.' JMOL Moving Br. 10-11.)  As plaintiffs observe, the Court previously rejected this argument, holding prior to the case's submission to the jury that the breach of contract claim was directed to conduct separate from the conduct supporting the misappropriation claim: the breach of contract claim was based on the failure to disclose and assign inventions to plaintiffs as required by the parties' Agreement, which was a separate right held by plaintiffs and a separate obligation upon defendants from defendants' common law obligation not to misappropriate and wrongly use plaintiffs' applicator idea. (*See* D.E. 416, Pls.' JMOL Opp. Br. 26-27; *see also* 6/26/18 Tr. at 38:12-40:5.)  This is consistent with New Jersey law, which holds that the essence of the economic loss doctrine is that "a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law." *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 316 (2002).  More fundamentally, the doctrine aims to "draw[] a clear line between remedies available in tort and contract." *Dean v. Barrett Homes, Inc.*, 204 N.J. 286, 305 (2010).  The story presented to the jury here amply justified

plaintiffs' entitlement to claim tort remedies for misappropriation as well as contract damages for breach of the Agreement.[3]  Defendants' motion is denied insofar as it seeks judgment as a matter of law on the misappropriation claim on the basis of the economic loss doctrine.[4]

### b.  Novelty and Use

Defendants contend that they are entitled to judgment as a matter of law or, alternatively, a new trial, on the misappropriation claim because the information was not novel at the time they allegedly misappropriated it, and because there was no evidence that they actually used the information. (Defs.' JMOL Moving Br. 14-25.)  The trial record is to the contrary.

Defendants argue that for the novelty element to be satisfied, the information must be novel when it is used; in other words, use after the information is disclosed to the public is insufficient. (*See id.* at 15-18.)  Because plaintiffs' applicator idea was published in a patent application on April 8, 2010, and, defendants claim, there was no evidence presented of use before that date, plaintiffs failed to establish novelty.  (*Id.*)  They similarly claim that there was no evidence, only speculation, concerning their use of plaintiffs' idea at all, arguing that instead there was overwhelming evidence of independent development.  (*Id.* at 22.)

As plaintiffs have argued, there is ample record evidence from which the jury could rationally conclude that defendants made use of plaintiffs' idea, and that they did so before the

---

[3] *Trico Equip., Inc. v. Manor*, 2011 U.S. Dist. LEXIS 17936 (D.N.J. Feb. 22, 2011), where the same conduct was alleged to give rise to the contract and tort claims, including a misappropriation claim, thus remains distinguishable.

[4] The Court rejects declines plaintiffs' invitation to sidestep the issue on the basis that the doctrine does not apply to intentional torts.  (Pls.' JMOL Opp. Br. 26.)  *Saltiel* calls for a more nuanced approach that, as noted, examines the source of the duty, not the cause of action's label as intentional or not. *See also, e.g.*, *State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*, 646 F. Supp. 2d 668, 676 (D.N.J. 2009) (Wolfson, J.) (whether doctrine bars tort claim depends on whether tortious conduct is extrinsic to parties' contract).

publication of plaintiffs' patent application.  Among other evidence, plaintiffs cite Markell's testimony about her meeting with defendants in May 2009, to which she brought prototypes, drawings, and other materials laying out her applicator idea.  (Pls.' JMOL Opp. Br. 21.)  Markell testified to the enthusiastic reaction from Allen Simon and Barry Askin, then the president and vice president, respectively, of Four Paws; that Allen left to contact someone with Central and upon his return told her she had a deal; that Haley Birk, the office manager, was told to box up Markell's materials and send them to Central; and that Markell was told to contact Rick Blomquist of Central and that she ultimately did speak to him, confirming that he received the materials. (6/7/18 Tr. 54:15-55:22, 56:20-59:16; *see also* 6/8/18 Tr. 56:15-20, 66:1-67:5 (Townsend confirming contact with Blomquist); 6/15/18 Tr. 51:2-6 (Blomquist testifying about calls with Markell and Townsend).)  Birk confirmed that she sent materials supplied by Markell to Blomquist at Central.  (6/8/18 Tr. 107:17-108:16.)  And although Simon testified he had no interest in the product shown to him, he confirmed that he told Birk to send it along.  (6/22/18 Tr. 80:3-8.)

Markell further testified that later in 2009, Blomquist had scheduled a meeting with her in Atlanta, but ultimately cancelled it and she could not reach him.  (6/7/18 Tr. 61:2-62:4; *see also* Pls.' Ex. 15.)  Around the same time Markell was communicating with Blomquist about development of her applicator, Blomquist signed a consulting agreement with the company that helped develop the accused products.  (Pls.' Ex. 27.)  He admitted to attending meetings on the project and was involved strategically; indeed, in a November 20, 2009 email—two days after emailing Markell that the Atlanta meeting would "continue discussions about [her] applicator" (Pls.' Ex. 15)—Blomquist described himself to the consultant and others as "champion and facilitator" for Central on the project.  (Pls.' Ex. 29; 6/15/18 Tr. 22:1-7.)  Plaintiffs also point to Blomquist's involvement in early 2010, including his attendance at an innovation workshop in

February 2010, and to a drawing produced by the consultant in March 2010 that, they contend, was "substantially similar" to plaintiffs' prototype, which Blomquist received. (*See* Pl.'s Ex. 30, 31; 6/15/18 Tr. 24:7-17; 6/19/18 Tr. 80:8-12; Pls.' JMOL Opp. Br. 23.)  Moreover, there was testimony that attendees were invited to provide their ideas, and that if Blomquist had an idea, he would have been encouraged to put it up on the wall at the meeting.  (6/19/18 Tr. 81:3-82:5 (testimony of John Hartman).)  By late March 2010, the list was reduced to 20.  (6/19/18 Tr. 39:18-41:14 (Hartman testimony); Defs.' Ex. 40.)  Defendants, in conjunction with their consultant, then narrowed the list to about five or six by May, and proceeded to prototyping.  (6/19/19 Tr. 45:5-21, 53:2-24; Defs.' Ex. 201.) By August 2010, the design was essentially finalized, subject to some refinements.  (6/19/19 Tr. 56:16-59:4; Defs.' Ex. 206.)  There was also testimony that defendants had been exploring improved delivery methods for their flea and tick products since around 2004, efforts that did not bear fruit until 2009 into 2010 – temporally, after Markell left her materials with Simon and they were sent to Blomquist.  (*See, e.g.*, 6/14/18 Tr. 54:20-69:25.)

Plaintiffs further elicited testimony challenging whether the inventors listed on the patents and patent applications relating to the accused products were the actual inventors, including testimony from one of the named inventors that he was told that Markell designed the applicator. (6/19/18 Tr. 87:18-89:25; 6/14/18 Tr. 164:21-167:20.)  Moreover, the trial record contains exhibits and testimony concerning the asserted similarity of the accused products to Markell's presentation materials and the overlap between Markell's tagline or catchphrase and defendants' marketing materials' use of the same phrase, and Simon's email conceding the truth of Markell's factual contentions.  (*See, e.g.*, Pls.' Ex. 5, 10, 16, 54, 118; 6/7/18 Tr. 22:21-23:3, 52:3-53:4, 63:13-16, 85:21-86:12 (Markell testimony); 6/11/18 Tr. 23:17-24:3 (Parnas expert testimony); *see also* 6/21/18 Tr. 124:7-19 (Court reading parties' stipulation that Central had a patent application

rejected in view of Markell's patent application, though its continuation application was not so rejected and remained pending).)

This evidence, viewed in the light most favorable to plaintiffs and with the benefit of "every fair and reasonable inference" drawn in plaintiffs' favor, *LePage's Inc.*, 324 F.3d at 145-46, unquestionably supplied a legally sufficient basis for the jury to have found for plaintiffs on the novelty and use elements, and no miscarriage of justice would result if its verdict is permitted to stand. The jury could rationally conclude that Markell supplied defendants with key materials concerning her applicator idea at the May 5, 2009 meeting, and that while communicating to her their interest, enthusiasm, and intent to develop it, defendants actually used it to develop their own products beginning at least as early as their engagement of the consultant in November 2009 and idea meeting in February 2010—before plaintiffs' patent application published in April 2010— with Blomquist serving as the link between Markell's materials and the consultant's work.

In seeking to disturb the jury's verdict, defendants argue that they presented a compelling case of independent development, defeating the use element, and that the absence of any use until at least after April 2010 defeats the novelty element. (Defs.' JMOL Moving Br. 14-25.) First, the jury was not required to credit defendants' version of events over plaintiffs' version, and it was permitted to rely on circumstantial evidence to draw reasonable inferences from the evidence in accepting the latter. *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *see also* 6/26/18 Tr. 46:8-21, 50:19-24 (instructions to jury concerning circumstantial evidence and drawing inferences). For example, defendants point to testimony from their witnesses about efforts and research dating back to 2004 to improve delivery methods for flea and tick medication, and their efforts culminating in 2009 and 2010 with Project Speed's efforts and the ultimate design and marketing of their products. (*See* Defs.' JMOL Moving Br. 20-21.) But defendants ignore that

11

the timeline from the same testimony also demonstrates that defendants only succeeded in their efforts *after* Markell's invention was submitted to them.  Similarly, defendants point to testimony from a designer with the consultant that he was not provided with Markell's ideas or prototype. (*Id.* at 21.)  But the jury could have rationally concluded that Blomquist offered an idea with its genesis in Markell's materials at one of the meetings he attended, without attributing it to Markell. Put succinctly, the jury was entitled to credit plaintiffs' interpretation of the evidence, and to find defendants' explanation and the witness testimony through which they presented it not credible.

Additionally, defendants' reliance on *Ahlert v. Hasbro, Inc.*, 325 F. Supp. 2d 509 (D.N.J. 2004) (Irenas, J.), a summary judgment ruling, is misplaced. In *Ahlert*, the court concluded that the plaintiff's allegations of use were "pure speculation" because all the plaintiff offered in that regard was his belief that the president of the company to which he submitted his idea "must have" transmitted it to the designer with which the company worked.  *Id.* at 514.  He pointed to no meetings at all that were attended by the president and the designer, "much less a specific meeting or meetings at which" his submission was discussed.  *Id.*  It was on that foundation that the court observed that "mere proximity" is insufficient.  Moreover, the plaintiff offered effectively nothing to counter defendants' presentation concerning independent development. *Id.* at 515. Here, Blomquist did attend meetings with the consultant and others involved in the accused products' development, and did so at the same time the team was working on this very project.  That evidence, in combination with the testimony and circumstances discussed above, painted a starkly different picture than the "pure speculation" offered by the *Ahlert* plaintiff.

Second, while acknowledging that their development efforts began in 2009, defendants ignore those efforts in arguing that the novelty element was not met; indeed, they argue that novelty is not determined at the time of disclosure or possession, but at the time of use.  (Defs.' JMOL

Moving Br. 18, 20-21.)  This argument is, at best, a red herring; it is the use beginning around late 2009 that plaintiffs took issue with, not simply defendants' possession of the information. Moreover, defendants supply no authority for the proposition that "use" only begins with design (which defendants contend began around May 2010) or marketing (which they contend began in 2012).  (*Id.* at 14-15.)

Because there was sufficient evidence for the jury to have reached its conclusion, defendants' request for judgment as a matter of law or, alternatively, a new trial on this ground is denied.[5]

### c.  Damages

Defendants challenge the jury's award of $11,006,000 in damages to plaintiffs for misappropriation as (1) impermissibly based on sales, rather than profits, and (2) the result of a failure to apportion the amount of damages attributable to plaintiffs' contribution.  Defendants also contend that this award and the breach of contract award are duplicative,[6] and that the misappropriation award is excessive.  These arguments are addressed below, with the exception of whether the breach of contract award is duplicative of the misappropriation award, which is addressed in the context of the contract claim, *infra*.

As to the first argument, defendants cite the term "total infringing sales" in the verdict sheet.  (Defs.' JMOL Moving Br. 26.)  But this term appears in question 4, which asked the jury to determine the reasonable royalty damages on the patent infringement claim.  (D.E. 375 at 2.)

---

[5] For the avoidance of any doubt, the Court's ruling, *infra*, that the patent infringement verdict will be vacated based on the composition material of defendants' products does not undermine any basis on which the misappropriation claim rests.

[6] Defendants also assert that the misappropriation award is duplicative of the patent infringement award, but the Court's grant of judgment as a matter of law in their favor on the infringement claim renders that argument moot.

13

The jury determined total infringing sales in that context to be $11,006,000, and used that figure to calculate their award of reasonable royalties.  (*Id.*)  Defendants speculate that because the amount the jury awarded on the misappropriation claim was also $11,006,000 (*id.* at 4), the jury must have used net sales, rather than net profits, to derive that figure.

Defendants acknowledge that the jury was instructed as follows:

If Marni Markell has established the elements for a misappropriation of an idea claim, she is entitled to an award of compensatory damages that may include the actual loss to Marni Markell caused by the misappropriation and the unjust enrichment to Central caused by the misappropriation that is not taken into account in computing actual loss. Unjust enrichment is the value of the benefit, **net profits** or advantage gained by the defendant from misappropriating the idea.

(6/26/18 Tr. 67:10-18 (emphasis added).)  Thus, the jury was instructed to use net profits, not net sales in calculating damages for misappropriation.  Defendants do not take issue with the instruction itself, and "absent extraordinary circumstances, jurors are presumed to follow the instructions given them by the court."  *Glenn v. Wynder*, 743 F.3d 402, 407 (3d Cir. 2014).  If the verdict is supported in the record, the Court cannot upset it based on speculation about the jury's methodology.  *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1228 (10th Cir. 2000); *Grant Heilman Photography, Inc. v. McGraw-Hill Cos.*, 115 F. Supp. 3d 518, 536 (E.D. Pa. 2015); *Ateliers De La Haute-Garonne v. Broetje Automation-USA Inc.*, 85 F. Supp. 3d 768, 780 (D. Del. 2015).

*United Phosphorus* is instructive.  There, the court recognized that a trademark infringement plaintiff cannot recover both its lost profits and the infringer's profits but upheld a damages award that equaled the sum of the lost profits and defendant's profits to which plaintiff's expert testified.  205 F.3d at 1228.  The defendant argued that the award must have constituted an impermissible double recovery of plaintiff's lost profits and defendant's profits, but the Court of

Appeals agreed with the district court that accepting that argument would require it to "speculate as to the jury's deliberations and calculations." *Id.* While defendant's explanation was "persuasive," it was not the only one: "However slight the chance, the jury could have arrived at the figure coincidentally, or more likely, picked the number from plaintiff's exhibits 'because it was within the range of the evidence and the jury was somehow attracted to it regardless of the [type of damages] to which it was associated on the exhibits.'" *Id.* (citations omitted; alteration in original). At trial, evidence of damages exceeding \$4 million was presented, and the jury's award of \$761,866 was "well within the range of proof." *Id.* Accordingly, the court "refuse[d] to characterize the jury's verdict as an impermissible double recovery," and affirmed the denial of judgment as a matter of law. *Id.*

Here, plaintiffs' expert, Neil Beaton, testified to \$60,248,959 in net sales and \$33,212,268 in profits. (6/13/18 Tr. 41:5-42:16, 43:13-17.) The \$11,006,000 figure was within the range of the evidence presented to the jury, and will not be disturbed based on defendants' speculation that the jury disregarded the instructions given to it. Defendants also cite the jury's question during deliberations whether total infringing sales referred to gross or net sales. (D.E. 372, 373.) The Court specifically probed whether the jury was inquiring about the term "total infringing sales" as it appeared in question 4 of the verdict sheet, which pertained to patent infringement damages. (*Id.*) The jury answered affirmatively, and the Court responded that the answer was "net sales." (*Id.*) This exchange makes clear that the jury's question about the use of that term was expressly limited to how it was used in question 4 of the verdict sheet.

Defendants also challenge the award as excessive for failure to apportion, which they contend was "required by law," citing a series of cases addressing apportionment in the patent infringement context and arguing that misappropriation damages can be or should be determined

by reference to the same principles. At oral argument, defendants more clearly framed their apportionment challenge as a causation issue; in other words, the jury must have ignored or misunderstood the instructions because it awarded a number that allegedly represented sales, rather than profits, and included components plaintiffs didn't invent. (3/19/19 Tr. 9:25-11:4.)

The jury was explicitly instructed on the causation requirement for the misappropriation claim: that if plaintiffs had established the elements of their misappropriation claim they were "entitled to an award of compensatory damages that may include the actual loss to [them] *caused by* the misappropriation and the unjust enrichment to Central *caused by* the misappropriation that is not taken into account in computing actual loss." (6/26/18 Tr. 67:10-15 (emphases added).) Defendants again use the jury's verdict on a different claim to speculate that the jury disregarded the legal requirements on which it was instructed, but, once again, the jury is presumed to follow the court's instructions, and there is record evidence that would have allowed it to properly reach its award. This includes Mr. Beaton's testimony as to defendants' profits, discussed earlier, Dr. Parnas's testimony concerning the operation of the accused products (*e.g.*, 6/11/18 Tr. 16:19-20:21:1), as well as Beaton's testimony on apportionment and his conclusion why it was not appropriate here (6/13/18 Tr. 71:16-76:11, 77:7-13.)[7]  Additionally, defendants' expert, Dr. Einhorn, testified extensively to his disagreement with Beaton's apportionment, and explained his

---

[7] The following exchange is instructive:

> Q. So did you make a determination here that the applicator drove the demand of the flea and tick product?

> [Beaton]. Yes. Based upon all of the information I provided to the jury regarding Central's position on this product, it would appear to me, as well as the subsequent studies that were performed, that the applicator was in fact the driver of the sales.

(6/13/18 Tr. 74:13-19.)

16

view that components other than plaintiffs' applicator, including defendants' existing treatment solution that they had sold for many years, should have been excluded from the calculation.  (*See, e.g.*, 6/21/18 Tr. 155:11-157:4, 170:17-171:9.)  He also testified to how apportionment would be calculated generally, stated that he calculated an apportionment figure of 5 to 10 percent, and explained how he came up with that range. (6/22/19 Tr. 29:14-31:18, 32:23-34:5.)  The jury ultimately awarded an amount that was approximately one-third of the total profits to which plaintiffs' expert testified, suggesting that it did not necessarily accept Beaton's 100% apportionment position.  That is hardly grounds to conclude that the jury must have disregarded the causation instruction.  On this record, the Court declines to conclude that the misappropriation award "is so grossly excessive as to shock the judicial conscience," as would be required for a new trial, or that plaintiffs' evidence failed to justify the award, such that remittitur would be necessary. *William A. Graham Co. v. Haughey*, 646 F.3d 138, 142 (3d Cir. 2011); *see also Smith v. Katz*, 696 F. App'x 582, 591 (3d Cir. 2017) (trial judge may employ remittitur when jury's decision is "'clearly unsupported and/or excessive'" (citation omitted)).[8]

## 2.  Breach of Contract Claim

### a.  Liability

Defendants contend that judgment as a matter of law or a new trial is warranted because the Court erred in rejecting their argument that their contractual obligations ceased upon

---

[8] Defendants' remaining, conclusory arguments for why the misappropriation award was excessive are also rejected.  (*See* Defs.' JMOL Moving Br. 33-34.) Briefly: Defendants' disagreement with plaintiffs' experts net profit calculations is not a basis to have required the jury to credit their expert over plaintiffs'. That defendants sold the treatment solution prior to the applicator's introduction is simply their apportionment argument stated differently, and in any event was factual information presented to the jury for its consideration. As discussed above, the jury could permissibly have inferred use, and for the proposition that only "head start" damages were proper, defendants cite no record evidence and one Federal Circuit case interpreting Texas misappropriation law.

publication of plaintiffs' patent application and in rejecting a jury instruction that would have adopted defendants' proposed construction of the Agreement. (Defs.' JMOL Moving Br. 36-39; D.E. 427, Defs.' JMOL Reply Br. 15-17.)

The Court declines defendants' invitation to revisit its prior rulings on the proper interpretation of the Agreement or the proposed jury instruction, which defendants have failed to show were in error. Defendants' argument that their obligations ceased upon publication continues to rely on a single passage from the Agreement, to the exclusion of the context in which it appears. It is well-established under New Jersey law that contracts are to be "read as a whole, without artificial emphasis on one section, with a consequent disregard for others." *Borough of Princeton v. Bd. of Chosen Freeholders of Cnty. of Mercer*, 333 N.J. Super. 310, 325 (App. Div. 2000), *aff'd*, 169 N.J. 135 (2001); *see also id.* ("'"In construing a contract, a court must not focus on an isolated phrase but should read the contract as a whole as well as considering the surrounding circumstances.'" (quoting *Wheatly v. Sook Suh*, 217 N.J. Super. 233, 239 (App. Div. 1987)). As plaintiffs pointed out, the Agreement expressly contemplated that patents would be sought, a process that foreseeably would result in publication. (6/22/18 Tr. 230:12-24; *see* Pls.' Ex. 12 ¶ 3C.) Even aside from that provision, however, the very same paragraph defendants rely on also required 30 days' advance notice of intent to disclose. (6/22/18 Tr. 230:25-231:10; Pls.' Ex. 12 ¶ 9.)

Defendants have also argued that even if they remained bound by the Agreement, there was no evidence of breach. (Defs.' JMOL Moving Br. 37-38.) As set forth above, there is sufficient circumstantial evidence from which the jury could have concluded that defendants used plaintiffs' confidential information, both before and after plaintiffs' patent application published.

Moreover, it is undisputed that defendants did not disclose their use of plaintiffs' information, nor did they assign any intellectual property to plaintiffs.

### b.  Damages

Defendants challenge the jury's breach of contract damages on several grounds, including lack of apportionment and an absence of causation.  They also contend, persuasively, that the award is duplicative of the misappropriation award.

Plaintiffs' contract claim is based on defendants' failure to disclose their use of plaintiffs' information and to assign it to plaintiffs, as the Agreement required.  On the issue of damages for this breach, the jury was instructed in relevant part as follows:

> If Central breached the confidentiality agreement by failing to disclose and assign, the appropriate measure of damages is compensatory damages. You may calculate damages either based on an expectation damages theory or a restitution theory. You should measure damages beginning from the time of the breach.

> Under an expectation of damages theory, you can award Marni Markell what you find she would have received had Central not breached the agreement. Under the restitution theory, you would award Marni Markell the value of the property conveyed to Central.

(6/26/18 Tr. 66:11-21.)  Plaintiffs cite no evidence of the amount they would have received absent the specific breach giving rise to this cause of action, *i.e.*, defendants' failure to disclose. With respect to the restitution theory, plaintiffs proceeded to the jury on a theory that the value of the property conveyed to defendants was the entire amount of their net profits on products using plaintiffs' information and invention.  Plaintiffs were already awarded that amount on their misappropriation claim.  Notably, in the proposed judgment plaintiffs submitted to the Court following the verdict, they acknowledged this possibility, and limited their damages to $11,006,000. (D.E. 377-1 ¶ 6.)  The judgment will be modified accordingly under Fed. R. Civ. P. 59(e).

19

### 3.  Patent Infringement Claim

Defendants challenge the verdict in favor of plaintiffs on the patent infringement claim on multiple grounds. Their first argument – that plaintiffs offered insufficient evidence to support a finding of contributory infringement because they offered no evidence that defendants' products met the "rubber" limitation as properly construed – encompasses both an attack on the legal underpinning of the plaintiffs' case on this claim and the sufficiency of the evidence.  The Court agrees with defendants' position, and concludes that the infringement verdict cannot stand.

#### a.  Rubber Limitation

Defendants first argue that they should be granted judgment as a matter of law because in denying summary judgment immediately before the trial the Court allegedly endorsed a claim construction based on an erroneous or misleading representation by plaintiffs about the '445 patent's prosecution history.  (Defs.' JMOL Moving Br. 41-43.)  They contend that based on the proper claim construction—*i.e.*, the definition in the Court's *Markman* opinion, which required the "flexible deformable material" of claim 1 to be rubber—there was insufficient evidence from which a rational jury could have found contributory infringement.  Plaintiffs effectively ignore the legal issue embedded in defendants' argument, contending that sufficient evidence supported the jury's verdict and that if defendants disagreed with the Court's claim construction, they should have sought reconsideration of the *Markman* ruling.  They do not address on their erroneous recitation of the patent prosecution history to the Court.[9]

Although the Court's review of the parties' arguments on this issue has been complicated by their failure to directly meet each other's contentions, counsel more clearly staked out their sharply contrasting positions at oral argument, and after careful consideration of the issue at the

---

[9] At oral argument, plaintiffs' counsel conceded reciting the incorrect dependent claim number, but adhered to the substance of their argument.  (*See* 3/19/19 Tr. 102:1-11.)

heart of this particular dispute—claim scope—the Court concludes that defendants have the better argument.  The Court's *Markman* opinion explicitly held, based on the prosecution history of the '445 patent, that the term "rubber" of the specified thickness was added as a limitation in claim 1 to differentiate from plastic and to overcome an obviousness rejection from the patent examiner. (D.E. 155 at 20-22.)  In other words, the Court concluded that plaintiffs had excluded plastic from the scope of claim 1 with the requisite clarity.  *See, e.g.*, *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094-95 (Fed. Cir. 2013) (discussing prosecution history disclaimer, including that qualifying statements "can take the form of either amendment or argument").  The Court then construed the relevant claim terms, including "flexible deformable material," defined as "rubber that is malleable and capable of being squeezed," and "rubber," defined as "[a]n elastic polymer capable of being flexed, natural and/or synthetically made."  (*Id.* at 22, 23.)

Although the jury was instructed consistently with these constructions (6/26/18 Tr. 53:23-24, 54:3-4), and plaintiffs' expert Dr. Parnas initially testified to how defendants' products met each of the claim limitations in accordance with these constructions, including as to the limitation that the "flexible deformable material" must be rubber (6/11/18 Tr. 37:14-43:6, 54:9-57:3), on redirect, Dr. Parnas equated rubber with plastic (6/11/18 Tr. 169:8-25.)  Plaintiffs thus waded directly into the territory the Court had previously ruled was not covered by claim 1, and this was consequential: Dr. Parnas also conceded that defendants' applicators (all of which evaluated, including the Zodiac applicators (6/11/18 Tr. 13:2-10, 50:25-51:1)) are made of plastic. (*Id.* at 110:12-113:5, 120:18-23, 170:21-171:5.)  In other words, his testimony revealed the accused products are made of a material that is not within the scope of the claims. Aside from the jury's ability to evaluate samples of the accused products, which is discussed below, Dr. Parnas's testimony is the only evidence plaintiffs rely on for their argument that sufficient evidence of

infringement was presented to the jury.  (Pls.' JMOL Opp. Br. 7-8.)[10]  Judgment as a matter of

law, rather than a new trial, is appropriate under the circumstances.  *Eon Corp. IP Holdings LLC*

*v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320-23 (Fed. Cir. 2016) (remand for new trial

unnecessary where, under permissible claim construction, no reasonable jury could have found

infringement); *accord Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302,

1309 (Fed. Cir. 2017).

 The jury's ability to evaluate samples of the accused products during deliberations (*see*

Pls.' JMOL Opp Br. 7-8) does not change this calculus. Although making the accused device

available to the jury can supply evidence in support of an infringement verdict, *see, e.g.*, *Teleflex,*

*Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1329 (Fed. Cir. 2002), plaintiffs, as noted above,

elicited testimony that plastic and rubber were the same, and successfully resisted defendants'

efforts to inform the jury about plaintiffs' disclaimer of plastic during prosecution of the '445

patent.  (*See* 6/26/18 Tr. 12:11-13:1.)[11]  Accepting plaintiffs' argument that the jurors' ability to

---

[10] Although at oral argument plaintiffs also noted what they framed as analogous testimony by
one of defendants' experts, that testimony, even if it could be viewed in the manner plaintiffs
invoked it (*cf.* 3/19/19 Tr. 117:3-23 (defense rebuttal)), actually supports the result here.

[11] Although plaintiffs contend that the infringement verdict cannot be disturbed on the basis of
claim constructions not presented to the jury (Pls.' JMOL Opp. Br. 5), the jury was in fact
instructed on the claim constructions in the Court's *Markman* opinion. To the extent plaintiffs'
argument is that the Court cannot disturb the verdict because jury instructions did not mention
the disavowal of plastic (which would be counter to plaintiffs' opposition throughout the trial to
any such instruction), an erroneous jury instruction would, if prejudicial, be grounds for a new
trial, not for leaving intact a verdict based on an improper foundation.  *See Cytologix Corp. v.*
*Ventana Med. Sys.*, 424 F.3d 1168, 1174 (Fed. Cir. 2005); *Komis v. Sec'y of U.S. Dep't of Labor*,
918 F.3d 289, 297 (3d Cir. 2019) (prejudicial jury instruction is grounds for new trial). Because,
as noted earlier, no reasonable juror could have found infringement under the proper
construction, judgment as a matter of law, rather than a new trial, is the appropriate course.
Plaintiffs cite cases making clear that a verdict cannot be tested after the fact based on new claim
constructions, but the constructions here were not new.  Review of the facts in the cited cases
shows the distinction.  In *Comcast*, the defendant had not requested, prior to post-trial motion
practice, that the Court issue *any* construction of a particular term, and the jury had been
instructed to apply its plain meaning.  850 F.3d at 1311-12. Similarly, in *Synthon IP, Inc. v.*

examine the products provided sufficient evidence of infringement would be tantamount to concluding that the jury could have permissibly concluded that plastic compositions were within the claim's scope.  That result would amount to an improper delegation of claim construction to the jury.  *See Eon Corp.*, 815 F.3d at 1319 (resolution of disputes about claim scope are for the court, not the jury, to resolve).

Judgment will be entered in defendants' favor on the patent infringement claim.[12]

### b.  Validity

Although the patent infringement judgment and attendant damages award will be vacated on the grounds discussed above, the Court briefly addresses defendants' invalidity argument and rejects it as an alternative basis for the result it reaches.  Defendants argue that claim 1 of the '445 patent is invalid for indefiniteness under 35 U.S.C. § 112(b), which requires the patent specification to "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor . . . regards as the invention."[13]  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The requirement aims to strike a balance between affording clear notice of the claims and accounting

---

*Pfizer Inc.*, 2007 WL 1075194, at *1 (E.D. Va. Apr. 6, 2007), the plaintiff offered an alternative claim construction for the first time post-trial. *Green Mountain Glass LLC v. Saint-Gobain Containers, Inc.*, 300 F. Supp. 3d 610, 624 (D. Del. 2018), *aff'd*, 773 F. App'x 619 (Fed. Cir. 2019), rejected a post-trial request for reconsideration of a claim construction order.  In *Wi-Lan, Inc. v. Apple, Inc.*, 811 F.3d 455, 465 (Fed. Cir. 2016), the district court had expanded a claim construction to include a feature, with the result that the jury's invalidity determination had been upset.

[12] The Court's holding renders it unnecessary to reach defendants' remaining arguments for vacating the infringement verdict.

[13] Although the § 112 was amended in 2011, after plaintiffs filed the application that became the '445 patent, the changes were minor and not relevant here; as such the current version and language of the statute are cited.

for "the inherent limitations of language." *Id.* at 909; *see also id.* at 910 (definiteness requirement, as construed by the Supreme Court, "mandates clarity, while recognizing that absolute precision is unattainable.").

The Court remains satisfied that a person skilled in the art would be informed with reasonable certainty of the scope of claim 1 of the '445 patent, as evidenced by Dr. Parnas's testimony. Section 112(b), as construed in *Nautilus*, does not demand the perfection or "absolute precision" inherent in defendants' position.

### B.  Plaintiffs' Motion to Alter or Amend the Judgment (D.E. 401)

Plaintiffs' motion to alter or amend the judgment seeks to incorporate into the judgment language purportedly necessary for the judgment to be consistent with the jury's findings. Because the language plaintiffs seek to add pertains exclusively to the patent infringement claim, this request will be denied as moot in view of the Court's ruling herein.

The remainder of the motion seeks to amplify the verdict, in the form of (i) an elevated ongoing royalty; (ii) assignment of three design patents and a utility patent application held by defendants; and (iii) prejudgment and post-judgment interest. Again, because judgment as a matter of law will be entered in defendants' favor on plaintiffs' patent infringement claim, plaintiffs' requests for an elevated ongoing royalty and for pre- and post-judgment interest on the patent infringement verdict are denied as moot.

The Court will also deny plaintiffs' request that specific performance of the Agreement be ordered in the form of requiring assignment to plaintiffs of three design patents and a utility patent application held by defendants. As the Court observed in its ruling denying this relief when it was sought on an emergent basis, plaintiffs adduced insufficient evidence that these specific patents and patent applications bear the required nexus to activities under the confidentiality agreement. (D.E. 446 at 5-6.)

24

With respect to prejudgment interest on the only remaining damages award, for misappropriation, state law governs. *Jarvis v. Johnson*, 668 F.2d 740, 746 (3d Cir. 1982); *Condus v. Howard Bank*, 999 F. Supp. 594, 597 (D.N.J. 1998).  Under New Jersey Court Rule 4:42-11(b), the Court, except as otherwise provided by law, "shall . . . include in the judgment simple interest . . . from the date of institution of the action or from a date 6 months after the date the cause of action arises, whichever is later, provided that in exceptional cases the court may suspend the running of such prejudgment interest. Prejudgment interest shall not, however, be allowed on any recovery for future economic losses."  Simple interest is calculated by multiplying the principal amount of the award by the rate of interest and by the appropriate period of time in years.  *Salvatore v. Viking Sport Cruisers, Inc.*, 2012 WL 6112072, at *2 (D.N.J. Dec. 10, 2012) (Hillman, J.).

Rule 4:42-11(a)(ii)-(iii) supplies the rate for calculating the interest due, which, in this case, distills to the annual rate of interest equaling the average rate of return, to the nearest whole or one-half percent, for the corresponding preceding fiscal year terminating on June 30, of the State of New Jersey Case Management Fund, plus 2% per annum.

Plaintiffs calculate prejudgment interest on their misappropriation claim as $1,350,034 using the above formula, beginning in July 2012, shortly after the action was filed.  Defendants argue that prejudgment interest is discretionary, rather than mandatory, because the disgorgement remedy is equitable, and, under New Jersey law, the award of prejudgment interest on equitable and contract claims is discretionary.  *See Cnty. of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 61 (2006).  Even if that is the case, however, the Court exercises its discretion – as the trial court did in *First Union*, and as the New Jersey Supreme Court agreed was appropriate – to award prejudgment interest on this award.  Defendants had use of the funds it earned and to

which plaintiffs have been determined to be entitled, *see id.*, which is the purpose of prejudgment

interest.  *See Litton Industries, Inc. v. IMO Industries, Inc.*, 200 N.J. 372, 390 (2009) ("primary

consideration in awarding prejudgment interest is that 'the defendant has had the use, and the

plaintiff has not, of the amount in question'" (quoting *Rova Farms Resort, Inc. v. Investors Ins.

Co.*, 65 N.J. 474, 506 (1974)).[14]

     Defendants also claim that the amount sought is excessive and punitive because the

underlying award was improperly based on net sales, rather than net profits.  As explained *supra*

in the context of the misappropriation award itself, the Court has rejected the predicate to that

argument.  Their contention that an August 2012 start date should be used is also rejected; Rule

4:42-11(b) affixes the start date as the later of the filing date or six months from accrual; as also

discussed *supra*, the jury could permissibly infer use at least as early as 2010, making the suit's

filing date the proper trigger.

     Pointing to the rule's prohibition on the award of prejudgment interest for future

economic losses, defendants also argue that plaintiffs disregard that the profits forming the basis

for the misappropriation award accrued over the course of years, not all at the outset of the case.

They suggest that the Court use "some point in the middle of the period between the filing of the

case and trial" or, alternatively, "some other allocation approach that tailors the interest

calculation to when the disgorgement benefits were obtained" (D.E. 418, Defs.' Opp. Br. 21), but

offer no calculations.  Not only do defendants fail to provide any guidance as to the "other

allocation approach" they would view as appropriate, they ignore plaintiffs' effort to avoid

---

[14] Although defendants argue that this purpose is not implicated in disgorgement cases, *First Union*, which defendants cited repeatedly in their briefs and at oral argument, reinstated a trial court's prejudgment interest award on a disgorgement claim. 186 N.J. at 61-62.  Its rationale and that result are equally appropriate here.

frontloading by evenly distributing pro-rata profit shares over the entire period of time.  (*See* D.E. 402, Beaton Decl. ¶ 6 & Schedules 1 & 4; D.E. 428, Pls.' Reply Br. 10-11.) Plaintiffs will be awarded $1,350,034 in prejudgment interest. *See Munich Reinsurance Am., Inc. v. Am. Nat'l Ins. Co.*, 999 F. Supp. 2d 690, 761 (D.N.J. 2014) (Wolfson, J.) (noting, in setting prejudgment interest amount, that "'the sundry rules for measuring damages are subordinate to the ultimate aim of making good the injury done or loss suffered and hence [t]he answer rests in good sense rather than in a mechanical application of a single formula'" (quoting *N.J. Power & Light Co. v. Mabee*, 41 N.J. 439, 441 (1964)).

Post-judgment interest is mandatory on money judgments in civil cases pursuant to 28 U.S.C. § 1961(a). Defendants argue that it should not be awarded on impermissibly duplicative damages, but the foregoing ruling has addressed that issue. Post-judgment interest will be awarded pursuant to § 1961, until the date of payment.

## V.    Conclusion

For the reasons set forth above, defendants' motion to vacate or amend the judgment is granted in part and denied in part.  Plaintiffs' motion to amend the judgment is granted in part and denied in part.  Plaintiffs' motions for enhanced damages and for attorneys' fees are denied. An appropriate order and an amended judgment will issue.


         s/Katharine S. Hayden
Dated: June 1, 2020        Katharine S. Hayden, U.S.D.J.