NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**NITE GLOW INDUSTRIES INC., I DID IT, INC., MARNI MARKELL HURWITZ,**

*Plaintiffs-Cross-Appellants*

**v.**

**CENTRAL GARDEN & PET COMPANY, FOUR PAWS PET COMPANY, DBA FOUR PAWS PRODUCTS, LTD.,**

*Defendants-Appellants*

———————————

2020-1897, 2020-1983

———————————

Appeals from the United States District Court for the District of New Jersey in No. 2:12-cv-04047-KSH-CLW, Judge Katharine S. Hayden.

———————————

Decided: July 14, 2021

———————————

ALAN H. NORMAN, Thompson Coburn LLP, St. Louis, MO, argued for plaintiffs-cross-appellants. Also represented by KATHERINE E. COLVIN, STEVEN E. GARLOCK, DAVID B. JINKINS.

MELANIE L. BOSTWICK, Orrick, Herrington & Sutcliffe LLP, Washington, DC, argued for defendants-appellants.

Also represented by ABIGAIL COLELLA, New York, NY;
MICHAEL HARRIS FREEMAN, LINDA GERARD HARVEY, Green-
berg Dauber Epstein & Tucker, Newark, NJ; STEVEN JAY
GROSSMAN, Grossman Tucker Perreault & Pfleger, PLLC,
Manchester, NH.

---

Before MOORE, *Chief Judge*, LOURIE and DYK, *Circuit
Judges*.

DYK, *Circuit Judge*.

Central Garden & Pet Company ("Central") and Four
Paws Pet Company, d/b/a Four Paws Products, Ltd. ("Four
Paws," and collectively, "defendants") appeal from a judg-
ment of the United States District Court for the District of
New Jersey awarding damages to Nite Glow Industries,
Inc. ("Nite Glow"), I Did It, Inc., and Marni Markell Hur-
witz (collectively, "plaintiffs") for misappropriation of idea,
a common law tort under New Jersey law. Judgment was
also entered in favor of plaintiffs for their breach of con-
tract claim against defendants, but the district court did
not award additional damages to plaintiffs and denied
plaintiffs injunctive relief on that claim. The judgment also
determined that defendants had not infringed claim 1 of
U.S. Patent No. 8,057,445 ("the '445 patent").

On appeal, with respect to the misappropriation claim,
defendants challenge the district court's denial of defend-
ants' motion for judgment as a matter of law, as well as the
district court's denial of defendants' motion for a new trial
on damages. We affirm the district court's denial of defend-
ants' motion for judgment as a matter of law on the misap-
propriation claim, but we reverse as to the denial of the
motion for a new trial on damages, vacate the award of
damages, and remand for a new trial for damages for mis-
appropriation.

For the breach of contract claim, defendants challenge
the district court's denial of their motion for judgment as a

matter of law on that claim. Plaintiffs cross-appeal the district court's denial of plaintiffs' request for specific performance. We affirm the district court's denial of plaintiffs' request for specific performance; we need not reach defendants' appeal of the motion for judgment as a matter of law on the breach of contract claim because we affirm the district court's decision to award no relief on that claim.

Plaintiffs also cross-appeal the judgment of non-infringement of claim 1 of the '445 patent. We affirm the judgment of non-infringement.

BACKGROUND

We describe the facts in the light most favorable to the party that won the jury verdict (here, the plaintiffs). Marni Markell Hurwitz ("Ms. Markell") is an inventor who does not manufacture her own products but presents her ideas to companies for them to manufacture and sell. I Did It, Inc. and its d/b/a entity Nite Glow are the companies through which Ms. Markell does business. Defendant Central is a distributor and manufacturer of pet and garden products, including flea and tick products. Defendant Four Paws, a subsidiary of Central, sells products for cats and dogs.

In May 2009, Ms. Markell met with the then-president (Allen Simon) and other representatives of Four Paws to share her idea for an applicator for the administration of flea and tick medicine directly to an animal's skin. At the beginning of the meeting, Ms. Markell and Mr. Simon entered into a confidentiality agreement governed by New Jersey law and dated May 5, 2009, with Ms. Markell identified as the "Owner" of the confidential information and Mr. Simon as president of Four Paws identified as the

"Recipient."[1]  J.A. 20,899.  Ms. Markell then presented her idea for the applicator, including drawings and a prototype.

Ms. Markell testified at trial that Mr. Simon and other representatives of Four Paws were "very excited" by her presentation.  *Id.* at 14,349.  Mr. Simon instructed his assistant to send Ms. Markell's presentation materials to Central's then-head of Life Sciences, Rick Blomquist.  Ms. Markell and Mr. Blomquist discussed Ms. Markell's idea and materials in telephone conversations over a period of approximately five months.  On November 18, 2009, Mr. Blomquist emailed Ms. Markell about a future meeting in Atlanta to discuss Ms. Markell's applicator idea, but Mr. Blomquist cancelled the meeting.  The parties did not enter into a licensing agreement for Ms. Markell's applicator idea.

Meanwhile, Central had pursued a project called Project Speed, which began in spring of 2009 and ultimately focused on designing a new applicator.  There was a kick-off meeting for the project in November 2009 that focused on "a treatment dispensing system" with long-term focus on "potential solutions for spot on application."  *Id.* at 22,940.  Mr. Blomquist participated in Project Speed, including by attending a two-day brainstorming session in February 2010.  The project resulted in the selection of a new applicator design by August 2010.

In parallel with her discussions with defendants, Ms. Markell had applied for a patent for her applicator

---

[1]    Ms. Markell and Mr. Simon executed a second, substantially similar agreement also dated May 5, 2009, governed under "Delaware and/or Kentucky" law.  J.A. 20,908.  The parties do not dispute that New Jersey law governs the claims at issue or that the obligations under each agreement were substantially the same.  Defendants do not dispute that they are bound by the agreements.

idea. On October 2, 2008, Ms. Markell filed the application that led to the '445 patent. The patent application was published on April 8, 2010, thereby disclosing Ms. Markell's applicator to the public. The '445 patent was granted on November 15, 2011.

In approximately March 2012, Central launched its Smart Shield products—applicators for flea and tick medicine—based on the August 2010 design. Central attended the Global Pet Expo in Orlando, Florida, which ran from late February to early March 2012, and where Central first sold its Smart Shield products. Ms. Markell was also in attendance and, upon seeing the Smart Shield products, concluded that Central had "stole[n]" her idea for an applicator. *Id.* at 14,357.

Plaintiffs thereafter filed a complaint in United States District Court for the District of New Jersey on June 29, 2012. Plaintiffs asserted claims for misappropriation of confidential information (misappropriation of idea), breach of the confidentiality agreement, and infringement of claim 1 of the '445 patent. After trial, the jury found for plaintiffs on all three claims and awarded $11,006,000 in damages for misappropriation of Ms. Markell's idea, $825,450 in damages for breach of contract, and $825,450 in damages for infringement.

Defendants filed post-trial motions for judgment as a matter of law, as well as a motion for a new trial for damages. Defendants also requested elimination of the damages for breach of contract as duplicative of the damages awarded for misappropriation. The district court granted defendants' motion to eliminate the damages for breach of contract as duplicative. The district court also granted judgment of non-infringement. The district court denied defendants' motions in all other aspects.

Plaintiffs filed a post-trial motion requesting specific performance of the provisions of the confidentiality agreement providing that defendants would assign intellectual

property to plaintiffs arising out of defendants' activities under the agreement. The district court denied plaintiffs' request for specific performance.

Defendants appeal, and plaintiffs cross-appeal. We have jurisdiction over the appeal and cross-appeal under 28 U.S.C. § 1295(a)(1).

Discussion

I. The Misappropriation Claim

We first address defendants' appeal of the district court's denial of judgment as a matter of law under Federal Rule of Civil Procedure 50(b) on the misappropriation claim and its denial of a new trial on damages for misappropriation under Federal Rule of Civil Procedure 59. "Our review of the district court's denial of the Rule 50(b) motion is plenary." *Warren ex rel. Good v. Reading Sch. Dist.*, 278 F.3d 163, 168 (3d Cir. 2002). "Such a motion should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993). "The district court's refusal to grant a new trial is reviewed for abuse of discretion." *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 63 F.3d 262, 277 (3d Cir. 1995).

A

Defendants first argue that plaintiffs should not have been allowed to present the misappropriation of idea claim to the jury as a matter of law because of the economic loss doctrine. Many courts recognize some form of an economic loss doctrine. The Restatement (Third) of Torts's formulation of the economic loss doctrine is that, generally, "there is no liability in tort for economic loss caused by negligence in the performance or negotiation of a contract between the parties." Restatement (Third) of Torts: Liab. for Econ. Harm § 3 (Am. L. Inst. 2020).

New Jersey's version of the economic loss doctrine likewise bars tort recovery under certain circumstances where the parties have entered into an express contract. The scope of the doctrine is unclear, and the Third Circuit has described the area of law as a "morass." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 144 (3d Cir. 2001), *abrogated on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Emps.*, 571 U.S. 177 (2014).[2]

The doctrine was first developed in the products liability context "in conjunction with strict liability theories." *Dean v. Barrett Homes, Inc.*, 8 A.3d 766, 771 (N.J. 2010). As originally formulated by the New Jersey Supreme Court, the doctrine stood for the principle that "a commercial buyer seeking damages for economic loss resulting from the purchase of defective goods may recover from an immediate seller and a remote supplier in a distributive chain for breach of warranty under the [Uniform Commercial Code], but not in strict liability or negligence." *Spring Motors Distribs., Inc. v. Ford Motor Co.*, 489 A.2d 660, 663 (N.J. 1985). The New Jersey Supreme Court's reasoning was that, "[i]nsofar as a commercial buyer [was] concerned, strict liability [was] not an appropriate basis of a claim for economic loss. The policy considerations underlying both strict liability and the [Uniform Commercial Code] favor[ed] restricting a commercial buyer to an action for breach of warranty when seeking economic damages." *Id.*

_____

[2] District courts in New Jersey have also acknowledged "the ambiguous status of the law in this area." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002); *see also Touristic Enters. Co. v. Trane Inc.*, No. 09-02732, 2009 WL 3818087, at *2 (D.N.J. Nov. 13, 2009) ("[T]he exact parameters of the economic loss doctrine are both complex and troublesome.").

at 671.  *Dean* rephrased the economic loss rule as "bar[ring] tort remedies in strict liability or negligence when the only claim is for damage to the product itself."  8 A.3d at 771.[3]

The application of New Jersey's economic loss doctrine outside of its traditional context of products liability is unsettled.  In *Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268 (N.J. 2002), the New Jersey Supreme Court rephrased the doctrine in more general terms as, "[u]nder New Jersey law, a tort remedy does not arise from a contractual relationship unless the breaching party owes an independent duty imposed by law."  *Id.* at 280.  *Saltiel* itself was a case about a contract "to design and prepare specifications for . . . turfgrass."  *Id.* at 269.  The court held that no relief could be had for negligent preparation of the specifications, only for the failure to comply with the contract's requirements.  *See id.* at 269, 280–81.  Relying on *Saltiel*, defendants contend that, under New Jersey law, the economic loss doctrine bars a claim for misappropriation of idea where there is a confidentiality agreement governing the idea, giving rise to a breach of contract claim.

To understand the defendants' arguments, a brief explanation of the legal basis of a misappropriation of idea claim is necessary.  The leading New Jersey case is *Flemming v. Ronson Corporation*, 258 A.2d 153 (N.J. Super. Ct. Law Div. 1969), *aff'd*, 275 A.2d 759 (N.J. Super. Ct. App. Div. 1971) (mem.), which recognized that

> where a person communicates a novel idea to another with the intention that the latter may use the

---

[3]    As recognized in *Dean*, New Jersey has codified the economic loss rule in its Products Liability Act in the definition of "harm."  *See* 8 A.3d at 772–73 (citing N.J. Stat. Ann. § 2A:58C-1(b)(2)); *see also* N.J. Stat. Ann. § 2A:58C-1(b)(2) (defining "[h]arm" as, inter alia, "physical damage to property, other than to the product itself").

> idea and compensate him for such use, the other
> party is liable for such use and must pay compen-
> sation if he actually appropriates the idea and em-
> ploys it in connection with his own activities.

*Id.* at 156–57. "A plaintiff is required to establish as a pre-
requisite to relief that (1) the idea was novel[,] (2) it was
made in confidence, and (3) it was adopted and made use
of." *Id.* at 157.

Defendants argue that with respect to the second and
third elements of the misappropriation claim, "the re-
strictions on Central's use of [Ms. Markell's] idea stemmed
entirely from the confidentiality agreement," Defs.' Open-
ing Br. 37, and "[i]f there had been no alleged breach of
these duties in the confidentiality agreement, plaintiffs
would have no misappropriation claim," *id.* at 37–38. De-
fendants argue that the economic loss doctrine accordingly
"should have prevented plaintiffs' misappropriation claim
from ever reaching the jury." *Id.* at 36.

We are aware of no New Jersey state court cases apply-
ing the economic loss rule to misappropriation of idea
claims, and the parties cite none. In resolving issues of
state law that have not been addressed by the New Jersey
Supreme Court, we must determine how the New Jersey
Supreme Court would resolve this case. *See Travelers In-
dem. Co. v. Dammann & Co.*, 594 F.3d 238, 243–44 (3d Cir.
2010). In ascertaining state law, federal courts look to the
application of Restatements of Law if there is reason to
think the state courts would look to the Restatements in
developing their own law. *See, e.g., Jones & Laughlin Steel
Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280, 285 (3d
Cir. 1980) (Illinois law); *TLS Mgmt. & Mktg. Servs., LLC
v. Rodríguez-Toledo*, 966 F.3d 46, 52–53 (1st Cir. 2020)
(Puerto Rico law).

The New Jersey Supreme Court has followed the Re-
statement (First) of Torts, published in 1939, in its cases in

defining trade secrets.[4]  In later cases, the Appellate Division has similarly looked to the definition of trade secrets in the Restatement (Third) of Unfair Competition, published in 1993, which superseded the Restatement (First) of Torts in this respect.[5]  *See Commc'ns Workers of Am. v. Rousseau*, 9 A.3d 1064, 1076 (N.J. Super. Ct. App. Div. 2010) (citing Restatement (Third) of Unfair Competition § 39).  We see no reason why the New Jersey Supreme Court would depart from the Restatements here.

The Restatements of Torts and Unfair Competition establish two relevant principles.  First, the principles governing misappropriation of trade secrets claims are applicable to misappropriation of idea claims, as the two claims are closely related.  As concluded in the Restatement (Third) of Unfair Competition, "[t]he rules in this Restatement relating to the protection of trade secrets are . . . applicable, either directly or by analogy, to claims in tort alleging the appropriation of ideas."  Restatement (Third) of Unfair Competition § 39 cmt. h.  This is not a point of contention between the parties.  Plaintiffs agree that

--------------------------------

[4]    *See Hammock ex. rel. Hammock v. Hoffmann-LaRoche, Inc.*, 662 A.2d 546, 560 (N.J. 1995) (citing Restatement (First) of Torts § 757 cmt. b (Am. L. Inst. 1939)); *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 893 (N.J. 1988) (citing Restatement (First) of Torts § 757 cmt. b); *Sun Dial Corp. v. Rideout*, 108 A.2d 442, 445 (N.J. 1954) (citing Restatement (First) of Torts § 757).

[5]    Unfair competition (including misappropriation of trade secrets) had been addressed the original Restatement of Torts, but "it was eventually decided that the law of unfair competition had evolved to the point that it was no longer appropriate to treat it as a subcategory of the law of Torts," leading to the publication of the Restatement (Third) of Unfair Competition.  Restatement (Third) of Unfair Competition, foreword (Am. L. Inst. 1993).

analysis of idea misappropriation is "fundamentally indistinguishable from the rules governing trade secrets," Pls.' Br. 23 (quoting Restatement (Third) of Unfair Competition § 39 cmt. h), and defendants likewise rely on authority regarding trade secrets, *see, e.g.*, Defs.' Opening Br. 61–63.

Second, under the Restatement (Third) of Unfair Competition, "[t]he existence of an express or implied-in-fact contract protecting trade secrets does not preclude a separate cause of action in tort." Restatement (Third) of Unfair Competition § 40 cmt. a. This approach is also consistent with the Restatement (First) of Torts.[6]

We conclude that the New Jersey Supreme Court would follow the Restatements and not bar the misappropriation of idea claim under the economic loss rule where there is a confidentiality agreement protecting the idea.[7]

_____

[6]   The Restatement (First) of Torts provides:

A breach of confidence under the rule stated . . . may also be a breach of contract which subjects the actor to liability under the rules stated in the Restatement of Contracts. But whether or not there is a breach of contract, the rule stated in this Section subjects the actor to liability if his disclosure or use of another's trade secret is a breach of the confidence reposed in him by the other in disclosing the secret to him.

Restatement (First) of Torts § 757 cmt. j.

[7]   Defendants cite two unpublished cases from the District of New Jersey that appear to reject the view of the Restatements in this respect by barring claims for misappropriation of trade secrets under the economic loss doctrine. *Trico Equip., Inc. v. Manor*, No. 08-5561, 2011 WL 705703, at *3 (D.N.J. Feb. 22, 2011); *Howmedica Osteonics Corp. v. Zimmer, Inc.*, No. 11-1857, 2012 WL 5554543, at *10 (D.N.J. Nov. 14, 2012). Both cases acknowledged that

The economic loss doctrine does not bar the plaintiffs' misappropriation claim.

B

Defendants also argue that, under *Flemming*, the tort of misappropriation of an idea cannot co-exist where, as here, there is an express contract governing the same conduct. Defendants argue that, in *Flemming*, the theory of relief was "by reason of a quasi-contractual obligation based on the doctrine of unjust enrichment," Defs.' Opening Br. 38 (quoting *Flemming*, 258 A.2d at 156), and a quasi-contractual theory is not permissible if there is an express contract "governing the same relationship," *id.* at 34.

Although *Flemming* described the misappropriation of idea claim as a "quasi-contractual obligation," 258 A.2d at 156, we agree with the Third Circuit that "[t]he cause of action of 'misappropriation' is based on tort principles rather than on contract law," *Baer v. Chase*, 392 F.3d 609, 627 (3d Cir. 2004) (applying New Jersey law). "The purpose of a tort duty of care is to protect society's interest in freedom from harm, i.e., the duty arises from policy considerations formed without reference to any agreement between the parties." *Spring Motors*, 489 A.2d at 672.[8] We

---

New Jersey courts have favorably cited the definition of trade secrets in the Restatement (First) of Torts § 757, but neither discussed the Restatement's rule that a breach of contract claim can be maintained with a claim for misappropriation of trade secrets. *See Trico*, 2011 WL 705703, at *3; *Howmedica*, 2012 WL 5554543, at *3–4, *9–10; Restatement (First) of Torts § 757 cmt. j.

[8]    Defendants rely on *Moser v. Milner Hotels*, 78 A.2d 393 (N.J. 1951) (per curiam), in which there was an express contract providing that the defendant would pay the plaintiff to "paper" rooms for $14 per room, but the plaintiff argued that he was entitled to $28 per room under a theory

reject defendants' theory that a claim for misappropriation of idea rests on a quasi-contract theory.

## C

Defendants further argue that the district court erred in denying defendants' Rule 50(b) motion on the misappropriation claim because any purported use of Ms. Markell's idea (the third element of a misappropriation of idea claim) "did not happen until well after that design was disclosed to the public," Defs.' Opening Br. 48, at which point the idea was no longer protected (discussed further below). The district court determined that "there [was] ample record evidence from which the jury could rationally conclude that defendants made use of [Ms. Markell's] idea, and that they did so before the publication of plaintiffs' patent application." J.A. 21–22.

As the district court summarized, there was evidence at trial showing that, before the patent application become public, Ms. Markell had presented her applicator idea to Four Paws' then-president and vice president, who reacted with enthusiasm; that Four Paws' president had Ms. Markell's presentation materials sent to Central's Rick Blomquist; that Mr. Blomquist had received the materials and talked with Ms. Markell about them over the telephone; that Mr. Blomquist was involved with Central's project to develop the accused products, Project Speed, and called himself a "champion and facilitator" for Central on the project, *id.* at 20,981; and that defendants' efforts to

––––––––––––––––––––

of quantum meruit. *Id.* at 393–94. The court rejected the argument, holding that "[a]n implied contract cannot exist when there is an existing express contract about the identical subject." *Id.* at 394 (citations omitted). *Moser* is not controlling here because a claim for misappropriation of idea is not inconsistent with the parties' confidentiality agreement.

improve delivery methods for their tick and flea products "did not bear fruit until 2009 into 2010—temporally, after [Ms.] Markell left her materials with [Mr.] Simon and they were sent to [Mr.] Blomquist," *id.* at 22–23.

The trial record also contained "exhibits and testimony concerning the asserted similarity of the accused products to [Ms. Markell's] presentation materials" (including what was later embodied in her patent). *Id.* at 23. "[W]here the issue is whether one's idea has in fact been used by another, similarities between the submission and the ultimate product may justify the factual inference that one was copied from the other." *Flemming*, 258 A.2d at 157. The record also includes an email from Mr. Simon, Four Paws' then-president, conceding that "[e]verything" in an email from Ms. Markell's attorney "[wa]s true," including that Central's applicator "was invented by Marni Markell and was initially presented to Four Paws by her." J.A. 20,940, 20,957–58.

We conclude that there is ample evidence from which a jury reasonably could find liability, and the district did not err in denying judgment as a matter of law on this ground.

## D

Although we affirm the district court's denial of defendants' Rule 50(b) motion with respect to the misappropriation of idea claim, we must still consider the district court's denial of defendants' motion for a new trial on damages under Rule 59.

Defendants contend that, because Ms. Markell's idea became publicly known when the patent application was published on April 8, 2010, it was no longer confidential as of that date. This being so, defendants contend that damages could only be awarded for a "head start" that defendants received over competitors because of their use of Ms. Markell's idea before it became public, and that

plaintiffs did not establish entitlement to damages for a head-start period.

We conclude that, where, as here, there is a claim for misappropriation of idea and the idea at issue becomes public after it has been misappropriated through no fault of the defendant, the New Jersey Supreme Court would restrict damages to the "head start" period, at least where defendants' actions did not prevent plaintiffs from entering the market.[9] The head-start period is "the period in which information is entitled to protection" as a novel idea, "plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation." *See* Restatement (Third) of Unfair Competition § 45, reporter's note cmt. h (quoting Uniform Trade Secrets Act § 3 cmt. (Unif. L. Comm'n 1985)).

We look again to the Restatement (Third) of Unfair Competition and its treatment of trade secrets for the guiding principles. The Restatement (Third) of Unfair Competition makes clear that "information that is disclosed in a patent or contained in published materials reasonably accessible to competitors does not qualify for protection" as a trade secret. *Id.* § 39 cmt. f. "The issuance of a patent or other public disclosure renders the disclosed information ineligible for continued protection as a trade secret." *Id.* § 44 cmt. f. Misappropriation of idea requires that the idea

---

[9]     Plaintiffs rely on *Kilbarr Corp. v. Bus. Sys. Inc.*, 679 F. Supp. 422 (D.N.J. 1988), *aff'd*, 869 F.2d 589 (3d Cir. 1989) (unpublished table decision). As the Restatement recognizes, in *Kilbarr*, "limitation of damages to the head start period was not appropriate when the defendant's appropriation effectively preempted the market." Restatement (Third) of Unfair Competition § 45, reporter's note cmt. h (describing *Kilbarr*); *see also Kilbarr*, 679 F. Supp. at 427. There is no showing here of preemption of the market.

be novel, and we conclude, as the Third Circuit has, that
"the New Jersey Supreme Court, if addressed with the is-
sue, would hold that ideas lose their novelty if they are in
the domain of public knowledge before use." *Baer*, 392 F.3d
at 629.

The Restatement (Third) of Unfair Competition pro-
vides that "injunctive relief should ordinarily continue only
until the defendant could have acquired the information by
proper means. Injunctions extending beyond this period
are justified only when necessary to deprive the defendant
of a head start or other unjust advantage that is attributa-
ble to the appropriation." Restatement (Third) of Unfair
Competition § 44 cmt. f (1995).[10]

New Jersey courts have applied a similar principle in
enforcing provisions of restrictive covenants to protect an
employer's trade secrets, holding that "injunctive relief
should be granted for a period equal to the time that would
be required for the former employees independently to de-
velop the same process." *Raven v. A. Klein & Co.*, 478 A.2d
1208, 1212 (N.J. Super. Ct. App. Div. 1984). Likewise, the
Third Circuit has "endorse[d] the current trend toward so-
called 'lead time' injunctions, whereby the trade secret in-
junction lasts only so long as is necessary to negate the

---

[10]    The New Jersey Trade Secrets Act provides essen-
tially the same rule as the Restatement (Third) of Unfair
Competition: "[A]n injunction shall be terminated when
the trade secret has ceased to exist, but the injunction may
be continued for an additional reasonable period of time in
order to eliminate commercial advantage that otherwise
would be derived from the misappropriation." N.J. Stat.
Ann. § 56:15-3(a). The Act does not apply here because it
applies only to alleged misappropriation occurring on or af-
ter the effective date of the Act, January 5, 2012. *See* New
Jersey Trade Secrets Act, 2011 NJ Sess. Law Serv. ch. 161
(West).

advantage the misappropriator would otherwise obtain by foregoing independent development." *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1266 (3d Cir. 1985) (citations omitted, applying Pennsylvania law). The Third Circuit has applied that approach in cases decided under New Jersey law. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 F. App'x 273, 280–81 (3d Cir. 2019).

The Restatement applies the same rule for damages as for injunctive relief. Damages for trade secret misappropriation can only be awarded for the unfair advantage that defendants enjoyed before Ms. Markell's idea entered the public domain. "Monetary remedies, whether measured by the loss to the plaintiff or the gain to the defendant, are appropriate only for the period of time that the information would have remained unavailable to the defendant in the absence of the appropriation." Restatement (Third) of Unfair Competition § 45 cmt. h. "Like injunctive relief, a monetary recovery for trade secret misappropriation is appropriate only for the period in which information is entitled to protection as a trade secret, plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation." *Id.* § 45, reporter's note cmt. h (quoting Uniform Trade Secrets Act § 3 cmt. (Unif. L. Comm'n 1985)).

Plaintiffs argue that the New Jersey Supreme Court would not require damages to be attributable to a head start period, relying on *Adolph Gottscho, Inc. v. American Marking Corp.*, 114 A.2d 438 (N.J. 1955), but that case is entirely consistent with the Restatement. In *Adolph Gottscho*, a former employee was accused of misappropriating trade secrets from his former employer. *Id.* at 438–39. While the action was pending, some of the trade secrets were disclosed in patents issued to the employer. *Id.* at 440–41. The employee argued that "the patents constituted public disclosures which automatically terminated [t]he plaintiff's pre-existing cause of action against him and [the employee's new company] to the extent that it related

to secrets disclosed by the patents." *Id.* at 440. The court rejected that argument, holding that the court "kn[ew] of no persuasive reason for depriving the plaintiff of the benefits of its accrued cause of action because some of its secrets were later disclosed by the issuance of protective patents during the pendency of its action." *Id.* at 442. We conclude that *Adolph Gottscho* only held that later disclosure does not bar a misappropriation claim.[11] It does not suggest that damages are not limited to a head-start period. We conclude that they are so limited.[12]

Plaintiffs do not dispute that the publication of the patent application in April 8, 2010, disclosed Ms. Markell's idea to the public, nor do plaintiffs assert that they made any effort to tie their damages request to a head start period. Plaintiffs instead argue that it was defendants' burden to present evidence of head-start damages as a defense,

---

[11] *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424 (3d Cir. 1982), similarly relied on *Adolph Gottscho* in noting that publication of a trade secret in a patent "did not deprive plaintiff of his pre-existing cause of action or of his right to complete injunctive and monetary relief against the wrongdoer." *Id.* at 434.

[12] Plaintiffs argue that defendants forfeited their ability to argue for head-start damages by failing to seek a jury instruction on the issue. Defendants raised the issue in a post-trial motion for a new trial, and the district court addressed head-start damages in its decision. No such instruction was required. *See Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1317–18 (Fed. Cir. 2018) (vacating the jury's monetary award for misappropriation of trade secrets because "evidence supporting [the] claim to monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period, and that omission [could not] be deemed harmless").

relying on language in a New Jersey district court case that described head-start damages as a "defense." Pls.' Br. 46–47 (citing *Kilbarr Corp. v. Bus. Sys., Inc.*, 679 F. Supp. 422, 427–38 (D.N.J. 1988), *aff'd*, 869 F.2d 589 (3d Cir. 1989) (unpublished table decision).

Defendants would only bear the burden of proof if head-start damages were an affirmative defense. Courts have recognized that defenses that are denials of "matters that must be proven by [the plaintiff] at trial" are distinct from "affirmative defenses upon which [the defendant] has the burden of proof." *See* 5 Charles Alan Wright et al., *Federal Practice and Procedure* § 1278 (3d ed. 2021) (quoting *Dynasty Apparel Indus. Inc. v. Rentz*, 206 F.R.D. 603, 607 (S.D. Ohio 2002)) (alterations in original); *see also id.* § 1270 (denials or negative defenses are distinct from affirmative defenses). Determination of head start damages was part of plaintiffs' burden of proof, not an affirmative defense as to which defendants would bear the burden of proof. *See, e.g.*, *Reichert v. Vegholm*, 840 A.2d 942, 945 (N.J. Super. Ct. App. Div. 2004) ("[T]he general rule is that 'the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.'") (quoting Restatement (Second) of Torts, § 433B(1) (Am. L. Inst. 1965)).

Although it was plaintiffs' burden to prove damages arising from the misappropriation of Ms. Markell's idea,[13] plaintiffs made no effort to tie their damages case to the advantage defendants would have received from a head start resulting from the misappropriation. The time period of the sales plaintiffs relied on to establish disgorgement of defendants' profits was from March 22, 2012, after defendants' accused products launched (almost two years after

---

[13]   *See* Restatement (Third) of Unfair Competition § 45 cmt. b ("The plaintiff bears the burden of proving the fact and cause of any loss for which recovery is sought.").

Ms. Markell's idea became public in April 2010), through
May 31, 2018, more than eight years after Ms. Markell's
idea became public. There is no showing that this lengthy
period was an appropriate measure of a head-start period.

Plaintiffs indeed concede in their briefing that neither
party in this case "presented evidence and argument at
trial regarding 'head start' calculations." Pls.' Br. 46. Nev-
ertheless, plaintiffs suggest that "[t]he jury's $11 million
dollar figure might well have been calculated by taking
Central's total profit and adjusting downward to account
for the head-start period." *Id.* at 48. Here, plaintiffs pro-
vided no evidence of a head-start period, and "it may not be
presumed that the jury found facts on which there is no
evidence." *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757,
767–68 (Fed. Cir. 1988).

We conclude that, as a matter of law, plaintiffs are lim-
ited to head-start damages and did not provide evidence
that would support the damages award of over $11 million.
We reverse the district court's denial of defendants' motion
for a new damages trial, vacate the jury award of damages
for misappropriation, and remand for a new trial of dam-
ages for misappropriation, which damages must be at-
tributable to the head-start period. In view of the remand,
we need not reach defendants' other challenges to the dam-
ages award for misappropriation.

## II. The Contract Claim

### A

We next address the issue of specific performance with
respect to the contract claim that is the subject of plaintiffs'
cross-appeal. Plaintiffs contend that they are entitled to
specific performance of the provision of the confidentiality
agreement requiring defendants to disclose and assign to
Ms. Markell inventions and discoveries "resulting from or
arising out of [defendants'] activities hereunder [i.e.,

related to the disclosures Ms. Markell made]."
J.A. 20,899–900; *see also id.* at 20,906–07.

Specific performance is an equitable remedy left to the discretion of the trial court. *See Barry M. Dechtman, Inc. v. Sidpaul Corp.*, 446 A.2d 518, 521 (N.J. 1982). In the district court, plaintiffs sought assignment of three design patents and a utility patent application. The district court denied the request in a post-trial decision. The district court determined that, with respect to the design patents and the patent application, "plaintiffs adduced insufficient evidence that these specific patents and patent application[] bear the required nexus to activities under the confidentiality agreement." J.A. 37.

On appeal, plaintiffs argue that because there was evidence that defendants used Ms. Markell's idea to develop their products, and because defendants' products embody defendants' design patents and utility patent application, it follows that defendants used Ms. Markell's idea to develop defendants' patents and patent application. This does not follow logically. Plaintiffs' evidence that Ms. Markell's idea was used to develop defendants' products does not establish that Ms. Markell's idea was used to develop defendants' patents and patent application.

Plaintiffs also note that Central marked Smart Shield products with its design patent numbers. Defendants do not dispute that the products are marked but argue that marking does not indicate that the design patents arose from Ms. Markell's idea. We agree.

Finally, plaintiffs argue that, "[b]ecause the jury found Central breached the agreement and awarded compensatory damages, it accordingly found that Central breached the confidentiality agreement by 'failing to disclose and assign' its patents and patent application[] resulting from Ms. Markell's confidential information." Pls.' Br. 81.

The jury verdict did not indicate that the jury found breach based on a failure to disclose and assign the specific design patents and utility patent application. The jury instructions only required the jury to determine that "Central did not do what the contract required Central to do or took actions prohibited by the contract" in order to find "a breach of contract." J.A. 71. The jury was not instructed that it could only find a breach for failure to assign the design patents and utility patent application. The verdict indicates only that the jury answered "yes" to the question, "Did Marni Markell prove that Central breached the Confidentiality Agreement?" *Id.* at 90. As the district court determined, the award of damages on the contract claim could not have been based on the failure to assign the patents and application. *See id.* at 32. The jury verdict that the contract was breached does not translate to a jury determination that the contract was breached by a failure to assign the patents and patent application.

We conclude that the district court did not abuse its discretion in denying assignment of the three design patents and utility patent application for lack of nexus to activities under the contract. We affirm the district court's denial of plaintiffs' request for specific performance.

## B

Defendants argue that the district court erred in denying judgment as a matter of law on the breach of contract claim. As discussed above, we affirm the district court's denial of plaintiffs' request for specific performance for lack of nexus, and plaintiffs do not appeal the district court's decision to eliminate the monetary damages for breach of contract as duplicative of the misappropriation damages.

As it is clear that—even assuming there was breach of contract—plaintiffs have secured no relief on a contract theory and cannot secure any future relief on a contract

theory, we need not reach the issue of liability for breach.[14] *See Castle v. United States*, 301 F.3d 1328, 1341 (Fed. Cir. 2002) ("Because we find that [the plaintiffs] are entitled to no damages, we decline to reach the issue of whether the Court of Federal Claims properly granted summary judgment of government liability for the alleged breach."); *see also Kellogg Brown & Root Servs., Inc. v. Sec'y of the Army*, 973 F.3d 1366, 1370 (Fed. Cir. 2020) ("We need not reach the issue of whether the government breached the contract . . . because . . . [the] claimed costs were not shown to be reasonable (a prerequisite to its requested relief).").

## III. The Infringement Claim

Lastly, we address plaintiffs' cross-appeal of the district court's judgment of non-infringement of claim 1 of the '445 patent as a matter of law. Claim 1 requires that the chamber of the claimed applicator's base be made of rubber. *See* '445 patent, col. 9 ll. 35–42. The district court determined that plaintiffs had disavowed plastic from the scope of the claim. Plaintiffs contend that there was no disavowal or, in the alternative, that the scope of the disavowal was not as to all plastics.

As relevant here, Claim 1 of the '445 patent claims

---

[14] Although the district court's judgment states that "judgment is entered in favor of plaintiffs and against defendants as and for both the claims for breach of the confidentiality agreement and misappropriation in the amount of $11,006,000.00," J.A. 10, the jury verdict makes clear that the damages award of $11,006,000 was for the misappropriation claim, *see id.* at 46, as does the district court's post-trial opinion, which referred to "the only remaining damages award[] for misappropriation" in deciding prejudgment interest, *see id.* at 38. Neither party argues that the award of over $11 million rested on a contract remedy theory.

> [a] direct delivery applicator for delivering a solu-
> tion to an animal's skin, comprising:  a. an applica-
> tor base having a chamber[,] . . . d. said chamber of
> said applicator base being composed of a flexible
> deformable material so that said chamber can be
> squeezed[,]  . . . ;  and e. said flexible deformable
> material being composed of <u>rubber</u> having a thick-
> ness in the range of 1/32 inch to 3/32 inch . . . .

'445 patent, col. 9 ll. 16–46 (emphasis added).

The district court's jury instruction construed "rubber"
as used in subsection e of claim 1 as "[a]n elastic polymer
capable of being flexed, natural and/or synthetically made."
J.A. 60; *see also id.* at 2509 (claim construction order).  The
district court was "persuaded by the prosecution history
that the only way in which [Marni Markell] Hurwitz was
granted the '445 Patent [was] by specifying rubber of a cer-
tain thickness to differentiate the material from plastic"
and that "subsection e of claim 1 . . . holds plaintiffs to this
requirement."  *Id.* at 2507.  The jury, nonetheless, found
that the defendants had infringed.

On defendants' post-trial Rule 50 motion, the district
court determined that "plaintiffs had excluded plastic from
the scope of claim 1 with the requisite clarity" during the
prosecution of the '445 patent.  *Id.* at 34.  The district court
acknowledged that the "jury instructions did not mention
the disavowal of plastic," but "no reasonable juror could
have found infringement under the proper construction"
(because it was undisputed that defendants' product were
made of plastic).  *Id.* at 35 n.10; *see also id.* at 34, 14,880.

"[W]hen the patentee unequivocally and unambigu-
ously disavows a certain meaning to obtain a patent, the
doctrine of prosecution history disclaimer narrows the
meaning of the claim consistent with the scope of the claim
surrendered."  *Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
713 F.3d 1090, 1095 (Fed. Cir. 2013).  Here, the district
court's interpretation of the prosecution history involves

only intrinsic evidence (and we find the plaintiffs' extrinsic evidence irrelevant). *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc). The district court's determination of disclaimer is therefore subject to de novo review. *See Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015).

We agree with the district court that plaintiffs disavowed plastic in restricting the "flexible deformable material" of the applicator base's chamber to rubber. As submitted to the Patent and Trademark Office, original independent claim 1 claimed "[a] direct delivery applicator for delivering a solution to an animal's skin," and original claim 3 claimed, as relevant here, "[a] direct delivery applicator as recited by claim 1, wherein said chamber of said applicator base is composed of <u>a flexible deformable material</u> so that said chamber can be squeezed." J.A. 1537–38 (emphasis added). Original claims 1 and 3 were rejected by the examiner as obvious over U.S. Patent No. 7,000,618 ("Dovergne") and U.S. Patent No. 5,183,006 ("Robinson"). Dovergne disclosed an applicator base with a chamber made of "a flexible deformable material." J.A. 1494.

Original claim 4 depended from claim 3 and claimed "wherein said flexible deformable material is composed of <u>rubber</u> having a thickness in the range of 1/32 inch to 3/32 inch." *Id.* at 1538 (emphasis added). The examiner objected to original claim 4 as being dependent on rejected claims (1 and 3) but noted that original claim 4 would be allowable if rewritten in independent form. The examiner provided the following explanation for allowing original claim 4:

> The closest prior art of record, Dovergne alone or in combination with Robinson, does not disclose or suggest rubber as a flexible deformable material, only plastic. . . . Robinson discloses a thickness measurement but does not disclose rubber as a material and actually teaches away from rubber by

disclosing a rigid plastic handle. Therefore, it would not be obvious to first modify the device of Dovergne such that the chamber of the applicator base is made of rubber and then modify the resulting device such that the thickness is specifically within the claimed range.

*Id.* at 1500.

The applicant accordingly amended claim 1 to read as it does currently, specifying an applicator base with a chamber made of rubber. It is clear that there was a disavowal of plastic.

Plaintiffs argue that there was no disavowal because the applicant "made no argument concerning the meaning of the terms rubber, polymer, plastic, or any other term." Pls.' Br. 69–70. It is well established by Supreme Court cases that disclaimer can be determined from the applicant's amendment or cancellation of claims—not just from statements made by the applicant. *See Schriber-Schroth Co. v. Cleveland Tr. Co.*, 311 U.S. 211, 218 (1940); *I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 444 (1926) (quoting *Weber Elec. Co. v. E.H. Freeman Elec. Co.*, 256 U.S. 668, 677–78 (1921)); *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733–34 (2002).

Plaintiffs argue that the applicant did not "mak[e] substantive amendments to claim 1" and instead "plac[ed] claim 4 into independent form." Pls.' Br. 70. "[A] narrowing amendment may occur when either (1) a preexisting claim limitation is narrowed by amendment or (2) a new claim limitation is added by amendment." *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1140 (Fed. Cir. 2004) (en banc). There is no "legally significant difference between canceling a claim having a broad limitation and replacing it with a claim having a narrower limitation, and amending a claim to narrow a limitation." *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1319–20 (Fed. Cir. 2001), *vacated*, 535 U.S. 1109 (2002),

*remanded to* 91 F. App'x 666, 668 (Fed. Cir. 2004) (recognizing that the Supreme Court's decision in *Festo* did not change the rule that "cancellation of claims for reasons related to patentability in favor of claims with a narrower literal scope has the same presumptive effect on claim limitations as amending the claims directly").

Here, the applicant cancelled original claims 3 and 4 and amended original claim 1 to restrict its applicator base's chamber to be made of rubber, and not plastic, as taught by Dovergne. This was a disclaimer of plastic.

Plaintiffs nonetheless argue "[b]ecause all rubbers are polymers, and because polymers and plastics are synonyms, all rubbers are plastic." Pls.' Reply Br. 4. Thus, plaintiffs argue there could not have been disclaimer of plastic from the scope of claim 1. The trial testimony relied upon by plaintiffs does not establish that a person of ordinary skill in the art would agree that all rubbers are plastics, only that the terms polymers and plastics "are used synonymously by many, many people" in some contexts, such as in a textbook edited by defendants' expert. J.A. 14,879.

Plaintiffs do not argue that, even if there was disclaimer as the district court determined, the accused products nevertheless infringe. We therefore affirm the district court's grant of judgment of non-infringement as a matter of law in favor of defendants.

## Conclusion

We affirm the district court's denial of defendants' motion for judgment as a matter of law on the misappropriation of idea claim, but we reverse the district court's denial of defendants' motion for a new trial on misappropriation damages and vacate and remand for a new trial on head-start damages for misappropriation. We affirm the district court's denial of plaintiffs' request for specific performance.

We also affirm the district court's grant of defendants' motion for judgment as a matter of law of non-infringement.

**AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED-IN-PART, AND REMANDED**

Costs

No costs.