**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NITE GLOW INDUSTRIES, INC., I DID IT, INC., and MARNI MARKELL HURWITZ, | |
| *Plaintiffs,* | Civil Action No. 12-4047 (KSH) (CLW) |
| v. | |
| CENTRAL GARDEN & PET COMPANY and FOUR PAWS PET COMPANY, D/B/A FOUR PAWS PRODUCTS, LTD., | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| *Defendants.* | |

**Katharine S. Hayden, U.S.D.J.**

## Table of Contents

I.   **Introduction** ........................................................................................................................2

II.  **Background** .........................................................................................................................2

III. **Facts** ....................................................................................................................................4

   A.  **What Central's Development Process Was for the Smart Shield Applicator** ..........5

   B.  **What Central's Sales of Smart Shield Applicator Products Were** ...........................18

   C.  **What the Experts Proposed as Monetary Remedies** ................................................23

     1.  **Plaintiffs' Proposed Remedy** ...............................................................................24

       a.  Summary ..............................................................................................................24

       b.  Truman ................................................................................................................24

         i.   Truman's background and experience .........................................................24

         ii.  The Head Start Period...................................................................................27

         iii. The Development Process..............................................................................28

         iv.  Central's Development Process and Benefits on Launch ..............................29

         v.   Continuing Advantage .................................................................................37

       c.  Beaton .................................................................................................................39

     2.  **Defendants' Rebuttal and Alternative Proposal** ................................................43

     a.    Summary ............................................................................................... 43

     b.    Ball ....................................................................................................... 43

     c.    Dr. Endris ............................................................................................ 54

     d.    Schwartz .............................................................................................. 57

     e.    Hall ...................................................................................................... 59

       i.    Rebuttal Opinions ............................................................................ 59

      ii.    Affirmative Opinions ....................................................................... 65

**IV.   Conclusions of Law** ...................................................................................... 70

  **A.   Legal Standard** ......................................................................................... 70

  **B.   The Head Start Period and How to Value It** ......................................... 73

    **1.  Duration of the Head Start** .................................................................. 73

    **2.  Value of The Head Start** ..................................................................... 79

  **C.   The Royalty and Avoided Costs Approaches Undervalue the Idea and Fail to Engage with the Factual Record** ......................................................... 86

  **D.   Prejudgment Interest** ............................................................................... 92

**V.  Conclusion** ...................................................................................................... 92

## I.    Introduction

Plaintiffs Marni Markell Hurwitz and her company, I Did It, Inc., doing business as Nite Glow Industries, Inc. secured a jury verdict that defendants Central Garden & Pet Company and its subsidiary, Four Paws Pet Company, doing business as Four Paws Products, Ltd. misappropriated Markell's idea for a flea-and-tick medicine applicator for pets with Central's Smart Shield applicators, which it began selling in 2012. The Federal Circuit affirmed as to misappropriation liability, while remanding for a new trial on damages on that claim. Having presided over a bench trial on remand of this damages issue, this Court now issues its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## II.    Background

The factual and procedural lead-up to this point is familiar to the parties. The basic party lineup was summarized by the Federal Circuit:

> [Markell] is an inventor who does not manufacture her own products but presents her ideas to companies for them to manufacture and sell. I Did It, Inc. and its d/b/a entity Nite Glow are the companies through which Ms. Markell does business. Defendant Central is a distributor and manufacturer of pet and garden products, including flea and tick products. Defendant Four Paws, a subsidiary of Central, sells products for dogs and cats.

2021 WL 2945556, at *1.

In June 2018, a jury awarded plaintiffs $11,006,000 in damages on its finding that Central, with the Smart Shield applicator products it launched in 2012, had misappropriated Markell's novel idea for an applicator to apply flea and tick medicine to the skin of pet dogs and cats. This Court declined to disturb that liability finding or the associated monetary award on post-trial motion practice. In July 2021, the Federal Circuit issued its opinion affirming the jury's liability verdict on the misappropriation claim but vacating its award, remanding for a new trial on that issue. *Nite Glow Indus. Inc. v. Central Garden & Pet Co.*, 2021 WL 2945556 (Fed. Cir. July 14, 2021).[1] The panel predicted that on these facts, where the idea became public (here, through the publication of Markell's patent application) after defendants misappropriated it, the New Jersey Supreme Court would limit damages to "the advantage defendants would have received from a head start resulting from the misappropriation." *Id.* at *6, 8.[2] Because plaintiffs' proofs in the first trial did not support a damages award of over $11 million on a head-start theory, a new trial on damages, which "must be attributable to the head-start period," was

---

[1] The panel did not disturb this Court's judgment as to the other two claims tried to the jury, neither of which resulted in an additional monetary award to plaintiffs. Those claims (breach of contract and patent infringement) are not at issue on remand.

[2] There is no dispute that New Jersey substantive law applies, and as reflected in the Federal Circuit's opinion, this case involves a common law misappropriation claim because Central's tortious conduct predated the effective date of the New Jersey Trade Secrets Act. *Id.* at *7 n.10. To procedural issues and other non-patent law issues, regional circuit law applies. *ams-Osram USA Inc. v. Renesas Elecs. Am.*, 133 F.4th 1337, 1346 (Fed. Cir. 2025).

3

necessary. *Id.* at *8. The "head-start period" would be "'the period in which information is entitled to protection' as a novel idea, 'plus the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation.'" 2021 WL 2945556, at *6 (quoting Restatement (Third) of Unfair Competition § 45, reporters' note cmt. h).

The parties agreed the remand trial would be to the bench and undertook discovery over an extended period, culminating in 11 motions *in limine* and a final pretrial order. Among the Court's *in limine* rulings was that attorneys' fees and punitive damages are unavailable to plaintiffs. (D.E. 579, 580.) Trial went forward with what the Court considers commendable professionalism on counsel's part. This opinion decides the remanded issue: what monetary relief plaintiffs are entitled to, calculated under a head start framework, for Central's adjudicated misappropriation.[3]

## III.    Facts

Thirteen witnesses (7 fact, 6 expert) testified, offered either live or by way of read-in testimony (from depositions or from testimony at the first trial). Plaintiffs relied on five to make their case: Markell, the individual plaintiff and inventor of the idea defendants misappropriated; Patrick Roy Brown, Central's director of engineering at the relevant times; James McFadden, Central's director of regulatory affairs at the relevant times; Bruce Truman, offered as an expert on product development; and Neil Beaton, offered as an expert on damages. Markell, Truman,

---

[3] There was discussion pre-trial and at trial whether the post-remand award had to be considerably lower than the original award. The Federal Circuit's opinion does not textually require that result. The evidence adduced at the remand trial does, nevertheless, end up supporting a smaller amount than what the jury awarded the first time around.

and Beaton testified live; Brown's and McFadden's deposition testimony was read into the record.

Defendants sought to rebut plaintiffs' case with eight witnesses: James Phillip Lankford, Central's director of marketing research; John Hartman, who worked for design firm Herbst Lazar Bell ("HLB"); Nathan Wright, Central's sales/finance director; Cristina Weekes, who worked at Central in multiple roles, including as general manager of the health and wellness unit and as head of mergers and acquisitions for the pet business; Alan Ball, offered as an expert in industrial design and product development; Dr. Richard Endris, offered as an expert on the scientific and regulatory aspects of flea and tick products; Donald Schwartz, offered as an expert on the animal health industry, and specifically the flea and tick industry; and Dawn Hall, offered as an expert on economic accounting and financial matters related to damages. Lankford's, Hartman's, and Wright's deposition and prior testimony was read in; the remaining witnesses testified live.

### A.    What Central's Development Process Was for the Smart Shield Applicator

The Federal Circuit concluded that the record contained "ample evidence" to permit the finding that Central made use of Markell's idea before her patent application published in April 2010. *Nite Glow*, 2021 WL 2945556, at *6. The question for the remand trial was how to ascribe a value to that use by examining what advantage Central got and how long it persisted.

In undertaking to answer that question, the testimony of the fact witnesses focused on how Central developed the Smart Shield applicator and brought it to market. What became apparent is that Markell had shown her idea to a company poised to seize on its potential—not to pull ahead of a competitor doing the same thing, as many trade secret cases involve, but as a way to solve in one swoop several existing problems. It could offer consumers an innovative,

improved way to apply flea and tick medicine—a conundrum it had long tried to resolve without success—while piquing the interest of retailers enough to accomplish its corporate goals of increasing pricing and distribution.  The results show its success: Central's gross sales in topicals went from around $19.7 million in fiscal year 2010 and fiscal year $18.8 million in 2011, both pre-launch years, to $26.3 million in fiscal year 2012, with $20.8 million of that in applicator and refill sales.  (DR-25.)  Also clear from the fact testimony is that not all of these sales can be ascribed to the idea's contribution standing alone.  Central paired the launch with a robust and expensive advertising campaign, albeit one that showcased the applicator delivering an effective medicine, and when it pulled back advertising sales declined.  What Central gained must reflect this combination of increased price and broadened distribution, while accounting for Central's investment to get there.

Central's development process was largely presented through the read-in witnesses. These witnesses, Roy Brown,[4] McFadden, Lankford, and Hartman, explained the development timeline for the Smart Shield applicators and Central's objectives in the timeframe surrounding May 2009, when, as Markell testified, she met with Allen Simon of Central's subsidiary Four Paws and showed him her materials, which she characterized as "quite a bit of information." (Trial Tr. 466:25-467:9.)[5]  Wright, another read-in witness, supplied financial information about

---

[4] Brown's full name is Patrick Roy Brown, but he goes by Roy Brown.  (Trial Tr. 8:15-16.)  He is to be distinguished from Bill Brown, the Central executive mentioned in Cristina Weekes's testimony discussed *infra*.

[5] References to the trial transcript are from the following docketed transcripts:
Trial day 1 (2/13/24): D.E. 609 (Trial Tr. 1-174)
Trial day 2 (2/14/24): D.E. 610 (Trial Tr. 175-439)
Trial day 3 (2/15/24): D.E. 611 (Trial Tr. 440-709)
Trial day 4 (2/16/24): D.E. 612 (Trial Tr. 710-872)
Trial day 5 (2/28/24): D.E. 613 (Trial Tr. 873-1134)
Trial day 6 (closings) (3/4/24): D.E. 614 (Trial Tr. 1135-1359)

Central's sales of Smart Shield applicator products over time and testified about how he generated that information.  Weekes's live testimony filled in why Central made certain decisions on timing and the launch, and about the Smart Shield product's intended arc at the company.

Brown, Lankford, and McFadden all worked for Central and were involved in Project Speed.  According to Brown, the engineering director, Project Speed "was a name . . . for a project that came through marketing. . . .  [I]t was a project to develop an applicator.  Well, I take it back.  It was a project to change how we apply products to animals."  (Trial Tr. 9:9-14.)  Lankford, the marketing research director, testified that Central switched the active ingredient in its flea and tick medicine formula to etofenprox sometime in 2008-2009, which led to a greasier, more voluminous formula, so "[W]e started thinking about the best way to address that."  (Trial Tr. 73:15-74:24.)  Central also had "previous research" that there was "white space out there" offering an opportunity to "make an improved flea and tick control process."  (Trial Tr. 75:4-7.)  "And so we established a formal initiative where we would see what we could build to improve the process and effect some of these things that we were aware of at the time."  (Trial Tr. 75:11-13.)  This became Project Speed, which began in the spring of 2009 with a search for an industrial design firm.  (Trial Tr. 75:18-76:4.)  Discussions began with HLB, the design firm, to develop a "treatment dispensing system that is easy and obvious" and "gives us a competitive advantage."  (Trial Tr. 76:20-77:18.)  Central ultimately "had an understanding that we would be signing an agreement with HLB.  And so we began sharing some documents with them, including this previous research we looked at."  (Trial Tr. 81:18-21, 82:8-11.)

Around the same time Central established Project Speed, Markell met with Simon, of Four Paws.  She testified that well before 2009, she had an idea for an applicator for flea and tick medicine that would "be able to deliver the medicament in a better way," and that after refining

her idea she met with Simon.  (Trial Tr. 465:15-466:1, 469:5-6.)  In May 2009, after the parties had signed an NDA, Markell disclosed her applicator idea, and provided a copy of her patent application, a brochure, a prototype, and CAD drawings.  (Trial Tr. 466:20-467:8.)

Markell understood Simon to be "[v]ery excited" about her idea.  (Trial Tr. 467:12-16.) He told her, "This is it" and that Central "had been working on this idea for ten years . . . [and] this was the answer."  (Trial Tr. 467:14-16.)  Markell said that Simon bundled up all of the materials she had brought and had them sent to Central personnel, directing his assistant to "get this out as soon as possible."  (Trial Tr. 467:17-21.)  Through subsequent conversations with Rick Blomquist of Central, Markell understood that she had a deal.  (Trial Tr. 467:25-468:5, 468:24-470:1.)  But after mid-November 2009, and an email from Blomquist telling her that there was a meeting in Atlanta at which discussions about her applicator would continue, she heard nothing from Central.  (Trial Tr. 470:19-471:6.)

In 2012, however, Markell went to a Global Pet Expo and saw her applicator idea embodied and "being displayed all over" as the Smart Shield applicator.  (Trial Tr. 471:7-18.) She was "devastated" and immediately contacted Simon, who told her to have her attorney write Central.  (Trial Tr. 471:12-25, 474:10-14.)  As is apparent, those efforts to resolve Markell's claim that Central had misappropriated her applicator design were unsuccessful.

Markell's inventing process involved "a lot of hours" on "a product that was necessary . . . in the industry.  It was something that I struggled with with my dogs, and the application for the medicament to be applied correctly, and it needed a vehicle."  (Trial Tr. 488:18-25.)  She expounded on this in cross-examination:

> The purpose was to drop the cartridge into the applicator, into the belly, so it could distribute the medicament . . . more properly . . . [and] more evenly on the dog's back.  Because before that, you needed a lot of different tools.  You needed a comb.  You needed

> gloves. You needed three hands. You needed things that would help you hold the dog, and typically you couldn't reach the dog the way you needed to. So you couldn't do it. You couldn't do it with your cartridge alone, not properly.

(Trial Tr. 494:1-11.)

Although Markell stopped hearing from Central after mid-November 2009, Central was pushing forward with Project Speed and, ultimately, the Smart Shield applicators. Per Lankford, Central signed a contract with HLB in October 2009. Per Brown, at that point "the goal was to quickly get to market something that, you know, we could meet consumer needs." (Trial Tr. 9:19-20.) Brown was first contacted about Project Speed in January 2010 and initially helped with "the ideation." (Trial Tr. 10:6-7, 10:24-25.) That ideation process, Brown explained, was so Central could "chang[e] with the consumer, how they interact with the animal, how they interact with our active ingredients and coming up with different ideas to deliver the same product or the same efficacy, but doing it and also solving some problems that they were having of getting product on their hands or rolling around with the dogs and things like that." (Trial Tr. 11:14-20.)

Hartman described the impetus of the project as "tak[ing] and add[ing] human-centered design to make what they offered in the marketplace even more compelling . . . . Project Speed was all about redesigning the spot-on experience." (Trial Tr. 85:3-15, 85:24-86:18.) Hartman worked at HLB. He denied his company got materials from Central or Markell, contending it was better to employ "divergent thinking" and research "unmet user needs" without being "tainted by someone else's thinking process." (Trial Tr. 87:7-90:23; 91:12-13; 92:21.) The result was a workshop session that resulted in some 200 ideas. (Trial Tr. 92:15-19.)

This "divergent thinking" and abundance of ideas, however, had to confront the reality of Central's business goals. Per Brown, the engineering director, ideation was one of the first

phases of the development in Project Speed and took several months.  (Trial Tr. 12:7-9.)  By June 2010, Project Speed's purpose, according to a project summary, had become a February 2011 launch of its Smart Shield products, flea and tick medicine for dogs and cats that would feature "a new, innovative topical applicator for use with modified thermoform tubes."  (Trial Tr. 14:12-23.)  This 2011 launch date required the sprawling ideation phase from 2009 into early 2010 to take a more concrete approach.  At the end of May 2010, for example, Steve LeVeau, a Central executive in marketing, had emailed Brown about the need for Project Speed to get, in a word, speedier.  (Trial Tr. 13:7-13.)  To that Brown responded, "Holy cow, give me a buzz, we need a miracle."  (Trial Tr. 13:16-18.)

Central wanted to move quickly, and there was a concern, confirmed by Cristina Weekes's testimony (discussed further below), that absent innovation, it would slip into irrelevance with retailers.  Central needed to do something to set itself apart from competitors in the flea and tick space.  (Trial Tr. 831:8-832:12.)  To move forward, regulatory approvals were needed.  McFadden, the regulatory director, testified that he told Central a February 2011 launch was impossible.  "The EPA requires registration of all pesticide products."  (Trial Tr. 35:17-18.)  McFadden's job was to support new product submissions and the maintenance of existing products (Trial Tr. 35:20-21); he became involved in Project Speed in late 2009, when it reached "team development stage where multifunctional groups, scientists, began work on the project" (Trial Tr. 36:17-19).

McFadden's role in the initiative was "to manage the regulatory development of the final product and the submission itself [to the EPA] and any other follow-up activities."  (Trial Tr. 37:3-5.)  While Central obtained fast-track approval for Smart Shield because the pesticide itself was not new, there still were outstanding approvals that would make a February 2011 launch

difficult given Project Speed's plan to submit basic steps and instructions for use of Smart Shield to the EPA by mid-July 2010.  (Trial Tr. 49:20-50:13.)

Ultimately, McFadden testified, a new timeline was developed.  (Trial Tr. 40:1-41:7, 50:10-17.)  The overall testimony established that Central pursued the steps of the regulatory process diligently and that even with the launch pushed off a year until 2012, the process took enough time that Central launched before it got final approval from several straggler states.  In the end, McFadden received a promotion, and Weekes described the Smart Shield dog and cat products as "creative, high-margin pieces for business for Central," which McFadden agreed with.  (Trial Tr. 65:18-23, 66:2-4.)

The development timeline also had to incorporate volumetric and marketing planning. Weekes, who came to Central in July 2010 and was there for the next nine years, testified that on her arrival neither was ready.  She holds master's degrees in business administration and pharmacology and has had an extensive career in consumer packaged goods.  (Trial Tr. 761:11-14, 762:14-15.)  That experience was why she was hired; Central's "founder, Bill Brown, was interested in bringing in people who had more consumer packaged goods experience" and several people were hired along with Weekes "to do just that."  (Trial Tr. 763:21-764:2.)

When Weekes started at Central, she was the general manager of the health and wellness division; in time, she added mergers and acquisitions for the pet side of the business.  (Trial Tr. 762:5-12.)  She dove into Project Speed "[i]mmediately upon hire."  Even before starting at the company she had been given "a giant box" of documents with "all of the industrial design work, the consumer research that had been done, some ethnographies, all of the historical attitude and usage studies so I could be up to speed on the flea and tick category."  (Trial Tr. 763:12-20.)

11

The product design was near complete by that point, and Central was pivoting to developing a market strategy and still aiming for a 2011 Smart Shield launch.  (Trial Tr. 764:5-12.)  But Weekes soon realized there wasn't a volumetric plan (how much product to produce) or a marketing plan. (Trial Tr. 764:12-15, 765:17-18.)

She moved quickly with a marketing plan to launch with both Central topical brands: Adams, which sold to food, drug, and mass market, and Bio Spot, the company's pet specialty brand.  (Trial Tr. 766:23-767:2.)  She pushed the launch to February 2012, in time for the flea and tick season that year.  (Trial Tr. 766:20-22.)  Weekes "immediately"—around September or October 2010, although elsewhere she testified to December 2010—engaged the media research company Nielsen, which she described as the gold standard, to help with the volumetric assessment.  (Trial Tr. 767:6-7, 768:6-8, 769:2-5, 843:6-9.)  The testing Nielsen conducted involved Adams and Bio Spot products for "both food, drug, mass [markets], and for the pet specialty business," and the goal was to assess price elasticities and advertising elasticities— essentially, where to price the product to maximize sales and returns, and how much to spend on advertising it.  From that, a volumetric, or production, plan could be developed.  (Trial Tr. 769:6-8, 767:8-768:2.)

The Nielsen testing showed Weekes that the marketing plan for Smart Shield was attributable to "a plus 21 percent in volume" estimate for the Adams brand and "20 points of growth" for Bio Spot.  (Trial Tr. 770:5-14, 771:10-11.)  The concept alone accounted for only a slight growth in volume among specialty buyers; consumers had less interest in the Central brand attributable to the applicator by one point.  In other words, it was the combination of the marketing *with* the applicator itself that drove interest.  (Trial Tr. 770:15-16, 771:11-14.)  These results were the company's "marching orders" for the Smart Shield launch.  Weekes hired an

12

advertising agency and tested various media (television, radio, and print) in making a marketing plan.  (Trial Tr. 769:22, 771:15-19.)

Weekes summarized the Nielsen findings in a February 2012 email to Bill Brown, the head of Central, citing the results of the ads she had tested "on persuasion," or how persuasive they were.  (Trial Tr. 772:24-25, 774:10-16.)  What consumers showed in purchase interest before, and then after, seeing the ads, she told him, "kind of blew it out of the ballpark on our first try."  (Trial Tr. 774:17-20.)  "[T]he norm is about six points of persuasion . . . .  But we got 9.6 percent of people persuaded to buy the Smart Shield after seeing the two ads that we were planning to run."  (Trial Tr. 775:4-10.)

Weekes testified that she would not have launched the applicator with the low concept scores reflected in the Nielsen testing except for how much Central had already spent on HLB plus her opinion that marketing was "an important factor in flea and tick."  (Trial Tr. 772:5-13.) Central's competitors were spending "$20 to 15 million every year." (Trial Tr. 772:11-12.)

With the benefit of the advertising, Weekes went on to explain, the Smart Shield applicator allowed Central to accomplish two other significant goals: increasing pricing and expanding distribution.  (Trial Tr. 775:12-16, 776:6-21.)  Although part of the price increase was attributable to higher production costs and advertising spend, Central also viewed itself as "underpriced versus the competition" at the time.  Price and distribution were "key metrics" the company tracked "on everything we did."  (Trial Tr. 775:14-20, 776:11-12, 776:22-24.) Customers like Walmart or PetSmart would be willing to accept the price increase because "they knew we were going to be doing traffic generation for them, driving consumers into their doors." (Trial Tr. 775:21-776:2.)  Weekes told Brown, to whom price and distribution were "especially

important," that the Smart Shield launch plan allowed them to "accomplish[] both." (Trial Tr. 776:11-21.)

Weekes went on to tell Brown that "[w]e may recommend discontinuing . . . [the Smart Shield product] in a couple of years [as] a cost-saving measure as it will have served the brands well in those two core goals." (Trial Tr. 776:25-777:4.) At trial, she was unwavering on this: "I knew with certainty we were going to discontinue [the applicator]." (Trial Tr. 777:7.) She reasoned that "[i]t wasn't bringing anything to the party, and if we could get momentum going with the advertising, we could do the cost savings and take the Smart Shield out." (Trial Tr. 777:8-11.) Ultimately, the Nielsen data on the applicator's impact factor turned out to be "[a]lmost precisely spot on." (Trial Tr. 778:5-8.) And as planned, Central did phase out the applicator. (Trial Tr. 778:16-17.)

The testimony turned to Central's expanded distribution. In the past, Central's distribution channels were primarily food and mass market retailers, and in pet specialty it sold to Petco and PetSmart. (Trial Tr. 797:4-8.) With the launch, Weekes testified, "We took it everywhere." (Trial Tr. 797:12.) Central was "hoping to expand all channels of distribution," including "club," meaning Costco, Sam's, and BJ's, as well as "drug," meaning CVS, Walgreen's, and Rite-Aid, and "home and garden," meaning Lowe's and Home Depot. (Trial Tr. 797:12-798:3.) For the "farm" channel, Central was also trying to get back Tractor Supply Company and was "looking at other small farm chains." (Trial Tr. 798:4-7.)

In the 2010 to 2012 time frame, Central's key customers were Walmart ("by far, number one") and PetSmart and Petco. (Trial Tr. 798:8-10.) In 2012, the company earned tests in new accounts and had new distribution with and without the applicator. (Trial Tr. 798:11-14.) A "huge new retailer" in 2012 was Costco. (Trial Tr. 798:16.) Costco, which Weekes described as

"one of the best retailers out there in terms of the consumer proposition being the best value," did not take the applicator, which it saw as "an unnecessary add to the package"; instead it took Central's etofenprox product in six doses and sold it under the Kirkland label.  (Trial Tr. 798:17-18, 804:13-16, 805:1-3.)

Because Central tick and flea products were not the biggest seller in the market, it was "a constant struggle" every year to make sure it had shelf space in retailers like Walmart, PetSmart, and Petco.  (Trial Tr. 806:16-24.)  Weekes explained that Petco had implemented a new forecasting model in 2011 that "worked great for businesses like dog food and dog bones that sell all year round.  But for something like flea and tick that is highly seasonal in a four-month period of time, it wasn't really working for us.  We were getting numbers to produce from them, and we were always off."  (Trial Tr. 810:18-811:4.)  The Smart Shield changed this.  Petco viewed it as an innovation in the flea and tick business and along with PetSmart considered the applicator as differentiating Central from its competitors.  (Trial Tr. 834:14-22.)

Similarly, Walmart, Central's biggest retailer in 2011, was very excited about the innovation:

> Q.  [I]t became a big deal for you all at Walmart in 2012.  Is that fair?
>
> A.  As I explained about how we got it to be a big deal, we got action alley and drove a lot of value as an advertiser.

(Trial Tr. 836:5-8.)

In the summer of 2011, Central marketers showed working samples of the applicators to Walmart buyers and customers.  (Trial Tr. 833:24-834:3.)  The positive reaction made 2012 "a huge year" for Central with an over 50% increase in sales.  (Trial Tr. 837:14-19.)  The Adams brand that Walmart sold included a yard spray, a home spray, and shampoos and dips to remove

fleas and ticks.  (Trial Tr. 838:7-19.)  After what had always been "a hard no," Walmart took the Adams cat topicals.  (Trial Tr. 840:10-24.)

Additionally, Lowe's took the Smart Shield and removed Frontline, and Central got its products back into Tractor Supply Company.  (Trial Tr. 839:14-840:2.)  It turned out the applicator's success at Lowe's was temporary; Central had to buy back Smart Shield product from Lowe's in 2014 and distribution of the applicator there was not "permanent" as Central had hoped.  (Trial Tr. 825:21-826:10.)

In 2011, Central's main competitors in the flea and tick topicals were Sergeant's and Hartz.  (Trial Tr. 840:25-841:2.)  Central's market share in flea and tick topicals increased from 2011 to 2012, and the introduction of the Smart Shield applicator improved its competitive position for those products.  (Trial Tr. 841:3-5, 10-17.)  Those gains applied across Central's brands as well.  From Weekes's testimony:

> Q. And is it fair to say that the success in 2012 of the Smart Shield applicator helped the overall brands, meaning the other products within Bio Spot and Adams?
>
> A. To help overall brands?
>
> Q. Yes.
>
> A. We did a lot of advertising.  So as a master brand, there were a lot of eyeballs on our ad copy.  Yes.
>
> . . .
>
> Q. And so, . . . 'overall brands' mean the whole array of products within the brand, not just the Smart Shield.  Right?
>
> A. Yeah. . . . So the way it works is the ad runs, people come to the shelf, they see everything that's there.
>
> . . .

> Q.   But my question is:  the overall brand, in terms of market share, increased from year to year between 2011 to 2012?
>
> A.   Driven by topicals.  Yup.

(Trial Tr. 841:19-842:8, 842:23-843:1.)

The Smart Shield applicator won several awards, including a Product of the Year award. (Trial Tr. 852:3-7.)  While Weekes specified that the award required Central to pay to be considered, she conceded that actual customers vote on the award and that Central was able to put the accolade on the package and make it part of the future marketing plan.  (Trial Tr. 852:3-853:15.)

Central invested approximately $8.8 million in marketing for the Adams and BioSpot flea and tick products in fiscal year 2012, the vast majority of which was focused on Smart Shield products.  (Trial Tr. 779:18-780:7, 786:5-9.)  Almost all of the advertising components in television and print advertising were focused on the Smart Shield products.  (Trial Tr. 779:22-24, 782:7-784:3.)  During Weekes's testimony, three ads were shown touting the Smart Shield. These ads, representative of the television and video ads that promoted the Smart Shield launch, aired during the flea and tick season of 2012.  (Trial Tr. 789:20-791:21, 792:2-5.)  Central also ran videos on its websites and did "direct response" television for the Adams brand.  (Trial Tr. 791:24-25.)  The response that first year was "great.  Advertising worked hard.  We got everything that we planned on getting in the first year."  (Trial Tr. 792:8-9.)

In 2013, marketing "started to move away from ad spend -- we had other things going on within Central that we needed to reallocate some money for -- we saw the results in the top line drop down with the ad spend.  So we removed some ad spend, our sales dropped."  (Trial Tr. 792:10-16.)  The total marketing expenses for 2013 was "[j]ust shy of $4.5 million."  (Trial Tr.

793:15-19.)  In 2014 it was $8.7 million.  (Trial Tr. 796:2-5.)  The bulk of this spending was to promote the Smart Shield products.

The decline in sales when ad spending decreased highlighted the role the ad strategy had played in prompting sales.  Weekes explained that "we just were not getting the repeat business."  (Trial Tr. 867:19-20.)  "[W]e did not get the loyalty that we needed to sustain the applicator."  (Trial Tr. 867:21-22.)  As Central pulled marketing support for the applicator "[i]n lockstep, the sales declined."  (Trial Tr. 868:19-22.)

> [T]he retailers were interested in our support plan and the integration, and we were able to maximize our placements as a result.  But eventually the product has to sustain itself, has to prove itself in the market, and that did not happen, which ties back to the [Nielsen] concept scores and the bases.

(Trial Tr. 868:13-18.)  As noted earlier, Central discontinued the applicator, consistent with Weekes's plan to use the launch to accomplish other goals and then phase it out because it wouldn't be needed after the "momentum" got going.  (Trial Tr. 777:8-11.)

### B.  What Central's Sales of Smart Shield Applicator Products Were

Nathan Wright was responsible for the financial information of Central's health and wellness division, which includes various animal health products—flea and tick, behavioral, deworming, and others.  He worked with sales and revenue figures.  (Trial Tr. 99:12-23.)  The parties stipulated Wright "is currently the sales finance director and was previously the director of finance for the health and wellness business unit."  (Trial Tr. 173:2-5.)  They also stipulated, in connection with his testimony, that Central's fiscal year runs from October to September; that Central uses SAP and Enterprise Resource Planning System to manage its transactions, which includes inventory transactions, sales order transactions, accounts receivable and accounts payable; that Wright can go into SAP and look at invoices for particular expenses; that Central

18

uses Cognos, a separate database that can pull data out of SAP; and that Central sells different forms of flea and tick products including spot-on, topicals, sprays, shampoos, foggers, and collars.  (Trial Tr. 173:6-16.)

As part of his job, Wright calculates profits and is responsible for the financial information ("financial planning and analysis") for Central's health and wellness products— "anything that involves numbers that's part of our division."  He is responsible for "reporting it, making sure it's accurate, [and] reporting . . . up to the corporate offices on how the business is performing."  (Trial Tr. 100:4-15.)  Wright's read-in testimony came from his testimony at the first trial, deposition testimony he gave before that trial, and deposition testimony given in discovery for the remand trial.  On each occasion, Wright testified about how he reports financial information.

The key document he was examined on was admitted, in its most updated form, as DR-25.  The exhibit is a spreadsheet containing what Wright described as income statements for each Central spot-on brand (Adams, BioSpot, etc.), for each year reflected, beginning with 2010. (Trial Tr. 104:22-25.)

Beginning with the fiscal year 2012 numbers,[6] the exhibit breaks down the categories further, to reflect income from each spot-on product by brand, and then by its status as a legacy spot-on ("Spot On" on the exhibit), a spot-on product contained in an applicator ("App"), or a refill product that fits into an applicator ("Refill").  (Trial Tr. 114:6-115:25, 149:1-150:4; Ex. DR-

---

[6] Wright's testimony about numbers in any given year referred to Central's *fiscal* year, rather than the calendar year.  (*See* Trial Tr. 144:12-16, 173:6.)  This, and that DR-25 reflected fiscal year numbers, became clear upon review of plaintiffs' trial exhibit PR-35B, which Beaton discussed in his testimony and which reflects month-by-month sales figures, and defendants' trial exhibit DR-489, which reflected Hall's 12-month rebuttal disgorgement calculation and showed that calendar year 2012's sales came in both fiscal year 2012 (January to September 2012 and October to December 2012).

25.)  For 2018 through 2022, the numbers are broken down into "App" and "Refill" only.  (Ex. DR-25.)  Plaintiffs' damages expert, Neil Beaton, and defendants' damages expert, Dawn Hall, undertook analysis and calculations based on the numbers generated by Wright.

Wright testified that DR-25 reflects the way he regularly maintains his records and is not something he did "just for litigation" (Trial Tr. 113:17-19), though the spreadsheet itself was prepared for the litigation between Markell and Central going back to before the jury trial, modified since and last updated in June 2022 (Trial Tr. 148:1-20, 152:8-10.)  Per Wright, there is no routine way Central maintains its records that would capture what was sought—the net profits gained by Central from its sales of the applicator and refills that began in 2012, at a SKU level as opposed to a brand level.  (Trial Tr. 152:14-153:4, 155:23-156:1.)

The profit and loss statements used by Central in the ordinary course of business are generally "rolled into a group of profit centers that we refer to as 'business units.'"  (Trial Tr. 151:2-6.)  Wright elaborated:

> Health and wellness is a business unit.  They manage probably seven or eight profit centers.  And a profit center is, in our case -- in our case of health and wellness, it is designed to group like products together.  So like flea and tick.  Adams flea and tick has a profit center.  And there has been seven or eight of them, ten, it depends. Over the years it changes as products get added or dropped and those are rolled up as a business unit.  So the financial statements are generally produced internally at a business unit level.  And then from there you can drill down into profit center income statements. They're not as precise – I shouldn't say – they are precise; they just don't represent the whole business unit.  It is just a subsection of the business unit.  It's complex.

(Trial Tr. 151:12-152:2.)

So Wright ran what ultimately became known as Exhibit DR-25 for this litigation as an "ad hoc" analysis on "a group of SKUs that exist with a brand" whereas in the "general course of business, we would do brand P&Ls and business unit P&Ls."  (Trial Tr. 152:15-23.)

Focusing on fiscal year 2012, the year of the Smart Shield launch, Wright's calculations reduced the gross invoice sales figure for the Smart Shield applicator and refills, which was $20,830,000, to a net profit of $1,295,000.  The expense deductions included "direct," or itemized, product-specific expenses, which are per-SKU, as well as "brand expenses," which are allocated to specific products using a percentage-of-sales method.  (Trial Tr. 106:6, 128:7-129:20.)  Direct expenses related to the applicator and refills included discounts and returns, EPA registration costs, a mill tax associated with California sales, cost of goods sold, and an allocation for delivery costs which reduced 2012's $20,830,000 in gross invoice sales to $9,677,000.  (Trial Tr. 104:22-106:6, 129:12-18, 131:19-132:3, DR-25.)  That line is identified on the spreadsheet as "product contribution," which Wright defined as a subtotal of gross profits less direct expenses.  (Trial Tr. 106:3-6.)

Below the product contribution line are expenses that fall into the brand expenses group, which Wright described as "marketing and Adams brand expenses that are . . . then allocated to these products based on a percentage of sales."  (Trial Tr. 127:18-128:9, 129:3-11.)

At his 2022 deposition, Wright was closely questioned about his "percentage of sales" formula.  (Trial Tr. 159:1-163:23.)  For advertising costs, he said that he pulled numbers from the P&L profit center for the Adams and Bio Spot brands.  (Trial Tr. 158:25-159:5.)  Pressed for clarification, Wright testified about his numbers for brand spending attributed to the Adams and Bio Spot products.  (Trial Tr. 160:9-163:23.)

> Q.  [I]f, for instance, we look at, in 2012 . . . under the Adams column Q, and we're over under advertising where it says Print, and there's a number that says 13.  Is that $13,000?
>
> A.  Yes.

Q. Okay.  And is it your testimony that to arrive at that number, you took the total print spend for the Adams brand and multiplied it by some percentage?

A. Yes.  I multiplied it by the percentage of the sales that that column represents of the total brand.

(Trial Tr. 162:19-163:4)

Applying his method, DR-25 reflects that for fiscal year 2012, Wright deducted $1,258,000 as the costs of radio, print, and digital advertising from the $9,677,000 product contribution attributable to the applicator/refills (product contribution, again, being gross sales minus direct expenses).  Those same costs for *all* topicals were $1,528,000.  Wright said that, based on conversations with marketing (Trial Tr. 159:12-18), he offset $1,379,000 in television advertising expenses against applicator sales and $760,000 against refill sales, adding up to a $2,139,000 reduction in profits for television advertising of those products.  The television advertising spend for *all* topicals that year was $2,244,000.  Another expense line called "tv production" for all topicals is $964,000; $919,000 of that is deducted from the 2012 app/refill sales.  From 2012 sales of all topicals, Wright deducted $290,000 for "creative," $237,000 of which was expensed against the app/refill sales.  In all, the subcategories grouped as brand advertising for applicator and refills add up to $5,523,000, reducing the $9,677,000 profit after direct expenses to $4,155,000.

Finally, from that $4,155,000, Wright deducted $2,860,000 across four expense categories:  $1,219,000 as other marketing support ("the people that manage the brands and the

products . . . primarily salaries" (Trial Tr. 165:17-23)[7]), $383,000 in supply chain expenses,[8] $725,000 in selling expenses,[9] and $533,000 in administrative expenses,[10] leaving $1,295,000 as the remaining net profit on 2012 applicator and refill sales.

Wright testified that in calculating, he pulled data from brand expense categories but did not look at underlying invoices, and that administrative expenses, selling expenses, and supply chain expenses are not product-specific in DR-25.  (Trial Tr. 133:25-135:3.)

### C.  What the Experts Proposed as Monetary Remedies

To translate defendants' development and marketing efforts and sales figures into a monetary remedy, plaintiffs' experts at the remand trial (Truman on product development and Beaton on damages) offered a disgorgement-of-profits analysis that sought $19,429,411. Defendants' experts were offered to rebut Truman's and Beaton's methodology and conclusions on disgorgement and to support alternative calculations which resulted in a variety of awards: $19,025 based on reasonable-royalty; or $322,911, on an avoided-cost methodology using a subset of HLB invoices as a proxy; or $100,500, using an estimate of what Central would have

---

[7] "It costs us money to go to trade show[s], and we're there with all of our products, and that's a cost to our marketing department."  (Trial Tr. 166:1-3.)

[8] "[I]n order to take an order from a customer and ship a product out so we can get sales, people have to touch the order . . . prepare shipments for sale . . . fill orders and stuff."  (Trial Tr. 166:16-20.)  Those expenses are included in the category:

> Q. So does the supply chain expense . . . reflect salaries of Central
>    employees as well?
> A. Yes.
> Q. Is there anything else other than the salaries of Central employees
>    contained in supply chain expense?
> A. Yes. . . .  Supplies . . . pencil and paper . . . [p]acking tape.  (Trial
>    Tr. 166:22-167:9.)

[9] "That is our sales force and their expenses [including salaries]. . . .  [T]he sales team and their expense.  So again, supplies, travel and entertainment, we call it T&E, to go visit customers and et cetera."  (Trial Tr. 167:13-23.)

[10] "That would be our administrative department. . . .  Finance people, accounting people, general managers."  (Trial Tr. 167:24-168:5.)

paid Markell as a consultant. Hall (economic accounting/financial matters relating to damages) and to a limited extent Schwartz testified about these alternative methods. Ball (industrial design and product development), Dr. Endris (regulatory), and Schwartz (animal health industry) challenged aspects of plaintiffs' experts' factual assumptions.

### 1. Plaintiffs' Proposed Remedy

#### a. *Summary*

On disgorgement, Truman opined that the relevant period of time was an 11-month secrecy period (May 2009 disclosure to Four Paws to April 2010 patent application publication), plus a 36-month development period, such that a good faith competitor would not have launched until around April 2013. He considered 36 months to be the length of Central's development period for the Smart Shield applicator and concluded that a good-faith competitor without early access to the idea would take that same amount of time.

Truman attributed all sales/profits of Smart Shield products and refills in year 1 following launch to Central's misappropriation and created a formula to measure a trailing benefit for the ensuing years (reducing the percentage attributable to the applicator's contribution by, for example, 50% in the second year due to competitive pressures), up to five years post-launch. Beaton put numbers to Truman's theory, using Wright's sales data, and concluded that a disgorgement figure of $19,429,411 would be an appropriate award.

#### b. *Truman*

##### i. **Truman's background and experience**

Truman testified as an expert in product development, specifically in the animal health area, and more specifically with respect to flea and tick products. (Trial Tr. 188:16-19; 188:23-189:8.) His 30-plus year career in animal health began in drug company sales of one of the first

24

topical flea and tick products on the market.  (Trial Tr. 182:8-15.)  He now runs a consulting firm focusing on emerging pet technology and has worked with companies in developing and launching topical flea and tick products.  (Trial Tr. 181:1-18, 188:11-14.)

Truman has worked at various companies in the industry:  Merial, as a product manager on Frontline, a flea and tick topical; Pfizer, on new product discovery and on a flea and tick topical called Revolution; Hartz, where he managed the animal health strategic business unit, which was composed mostly of flea and tick products; then a Hartz spin-off, Summit VetPharm; and to VetStreet, a "software as a service" start-up focused on a product for veterinary practices. (Trial Tr. 182:17-22, 184:2-9, 184:13-20, 187:11-23, 188:3-14.)

In managing Frontline, Truman was in charge of "everything related to that product," that is, "any of the sales support materials, product development."  (Trial Tr. 182:25-183:2.)  This included initiatives to expand a three-dose package to a six-dose package, and to develop child-resistant packaging.  Both were multiple-year projects because they "expanded an entire product line with six or seven different . . . selling units."  (Trial Tr. 183:3-17.)  At the time, Frontline was sold only in the veterinary channel.  (Trial Tr. 270:24-271:6.)

At Hartz, where Truman worked from 2003 to 2006, the animal health unit he managed was large, "around a hundred million dollar unit," and it was again "composed mostly of flea and tick products.  And the leading products were also topical flea and tick products which I worked on."  (Trial Tr. 184:15-22.)  Central was a competitor, but Hartz was "number 1 in the category for a number of years in the different retailers such as mass merchants; Walmart, Target, K-Mart. The Central products were there in the set, but they were smaller products in the set and

considered lower tier or a lower price point in the set." (Trial Tr. 185:1-13.)[11] Hartz had offices near those retailers, where he would attend buyer meetings; as to Walmart, Hartz was "category captain," which meant its products "had done well enough that they were responsible, not just for their products in their set, but they were also responsible for all products in the set." (Trial Tr. 185:18-186:4.) Truman's team, as category captain, would meet with the Walmart buyer "and be making recommendations on what products they should choose for their set; so active ingredients, packaging, the number of SKUs . . . the brand manager in particular at Walmart would be looking for this guidance." (Trial Tr. 186:5-10.)

One of Truman's teams managed "inline product development," meaning the "current portfolio of . . . flea and tick products, and what expansion" could happen within the team, and another was a "cross-functional team . . . where we developed innovation." (Trial Tr. 186:20-25.) The latter team worked on a product called Vectra, which was applicator-focused and was ultimately spun off and commercialized (with Summit VetPharm). (Trial Tr. 186:25-187:1, 190:10-13, 190:21-23.)

Truman applied his experience in the field, particularly with Vectra, in reaching his opinions in this case. Vectra involved "the identical timeline, the identical work that needed to be done," and was "focused on an applicator." (Trial Tr. 190:8-13.) It aimed to address issues in the market at the time (not getting down to the skin, needing scissors to open the package, and the risk of spills), and it was different from the Smart Shield applicator because it was a whole new product—with a new active ingredient for topical application—rather than an add-on to an existing product. (Trial Tr. 274:7-276:18.) The active ingredient in the Bio Spot and Adams-

---

[11] A "set" means "a retail set when you would walk by a grocery store aisle or a Walmart aisle where you would see the products located." (Trial Tr. 185:13-15.)

branded Smart Shield applicators, on the other hand, incorporated an active ingredient that Central had been selling before the applicator was developed.  (Trial Tr. 288:10-21.) Nevertheless, he considered Vectra to be a useful comparator, particularly its 48-month development timeline (running from after an active ingredient had been identified).  (Trial Tr. 288:22-289:2.)

### ii.    The Head Start Period

As noted earlier, Truman's head start period has two parts totaling 47 months, plus an additional period of trailing benefit after the hypothetical good faith competitor would launch its product.  First is the 11 months from May 5, 2009, when Markell made her disclosure to Four Paws, to April 8, 2010, the publication date of Markell's patent application. This 11 months is the period when plaintiffs' idea was entitled to protection as a novel idea.

Second is 36 months, which is Truman's opinion of how long defendants retained an advantage over good faith competitors due to their misappropriation.  The 36-month period corresponds to Central's "actual development time" for the Smart Shield product.  (Trial Tr. 191:17-192:21.)  This assumed Central began developing Smart Shield on May 5, 2009, and that its development period ended in May 2012 when Central had regulatory approval in all 50 states (which discounts pre-full approval sales starting earlier in 2012).  (Trial Tr. 193:3-194:1, 217:6-8, 287:20-288:5.)  This further assumed that a good faith competitor would have been able to "start their development work" on the day the patent application published (April 8, 2010) and would have taken the same 36 months Central did.  (Trial Tr. 193:1-7.)  As a "proxy," Truman used the 48-month development period for Vectra.   (Trial Tr. 192:22-25, 187:11-16, 190:9-13.)

Putting together the pieces, Central "got just about a year head start."  (Trial Tr. 194:2-8; 194:25-195:4.)  The 11 months when Central had early access to the idea would essentially be

carried forward, explaining the "about a year head start." Thus, where Central launched (fully) in May 2012 with the benefit of Markell's idea, a good faith competitor would not have launched before April 2013.

In terms of the retained advantage, Truman cited documents and emails in which Central employees discussed buyer meetings they achieved because of the innovation, where "they were never able to meet with these buyers previously," and that "they were able to bring in additional products to a set" because they were able to get in front of those buyers. (Trial Tr. 194:12-22.) He acknowledged that the benefits did not continue indefinitely, reducing it for the following year by 50% based on "market dynamics" and using a formula he created, which is discussed further *infra*, to measure the benefit after that. (Trial Tr. 195:6-19.)

### iii.    The Development Process

Truman's opinion was informed by his experience developing flea and tick products, which involves "many steps" and, at large corporations, "a lot of decision-makers and entities." (Trial Tr. 197:10-15.) He explained the process would typically begin with an idea based on "market dynamics" from someone familiar with the playing field: "So experts that know the category and know what are the deficiencies in a current applicator tip." (Trial Tr. 197:16-20.) Then ideas are generated, leading to a "solution set" and hiring a design firm. (Trial Tr. 197:21-23.) Hiring is lengthy, given the expense and protocols such as requests for proposals and nondisclosure agreements. (Trial Tr. 197:24-198:3.) Work with the design firm would include in-home testing, prototype development, and meetings. (Trial Tr. 198:4-6.) Products requiring regulatory approval involve an application to the federal EPA that could take up to a year for a response, addressing any follow up requirements, and seeking approvals state by state, some of which add delays of "six months to a year." (Trial Tr. 198:7-21.) This overview is based on

28

Truman's experience with the two Frontline projects at Merial (increasing the dosages per package and developing child-resistant packaging) and with the Vectra development he oversaw at Hartz.  (Trial Tr. 199:3-7.)

In that latter regard, Truman oversaw the Vectra product development, which began at Hartz and spun off with Summit VetPharm "once we had a commercial plan," due to his "deep understanding" of the active ingredients and his success with retail buyers, including Walmart. (Trial Tr. 200:3-5, 187:11-23; Trial Tr. 200:16-22.)  Development began in late 2003 (after the active ingredient had already been identified) and the product launched about four years later in September 2007.  (Trial Tr. 201:3-12.)  First was ideation, or coming up with solutions based on a known issue; next was hiring a design firm.  (Trial Tr. 212:18-25.)  The next step, once the universe of ideas is narrowed to those that may be commercially viable, is further testing to "make sure that your idea works," which in Vectra's case meant:

> did the length of the tube get it down to the fur on an average dog?  Was the tip of the applicator smooth so that it wouldn't injure the skin on the dog?  Did the applicator pierce the tube of liquid with one -- one finger or pulse?  That was why that interesting-looking head was on this device.
>
> So you would test all of these concepts in order to figure out what would be the best choice amongst perhaps several different prototypes to bring to market.

(Trial Tr. 216:14-22.)  Next would be engineering, for "final specifications and acquiring dies and molds that would make the plastic that you needed."  (Trial Tr. 216:23-217:1.)

### iv.    Central's Development Process and Benefits on Launch

Truman viewed Central's development of the Smart Shield applicator as beginning with Markell's May 2009 disclosure to Allen Simon because Simon told her "You've got a deal," and then passed on the information to Central's Blomquist.  (Trial Tr. 217:18-23.)  Central had been looking for a design firm, and "shortly after that" -- appearing to refer to Markell's disclosure --

Central "received an additional couple of proposals for design firms and ultimately settled on HLB as their design firm after about a six-month period of evaluating these design firms." (Trial Tr. 218:2-6.) Truman was shown an exhibit described as Central's contract with HLB, dated October 23, 2009 and signed by Blomquist on November 13, 2009, roughly six months after Markell's disclosure to Simon. (Trial Tr. 219:4-14.) About a week later, Blomquist, "the gentleman who was given the idea," emailed his team about Project Speed and "assigned himself the role of champion and facilitator." (Trial Tr. 224:22-225:2.)

Between December 2009 and January 2010, Central's design process took the form of user testing and "user acceptability." (Trial Tr. 225:5-12.) Then Central held an ideation session and meetings, during which, according to Truman's interpretation of the resulting materials, Markell's idea, or an idea very similar to it, appeared among concepts or ideas discussed. (Trial Tr. 225:20-22, 226:12-24, 228:13-18.) Central's exploration of multiple concepts did not slow development of the Smart Shield applicator; instead, per Truman, "[i]t was what one would expect in a development process." (Trial Tr. 228:8-12.)

In fact, on cross-examination, Truman seized an opportunity to explain how Markell's idea came to Central at a particularly opportune time, and that its exploration with HLB of many additional ideas was neither inefficient nor unexpected under the circumstances. Central, along with "[t]he entire industry," was looking for applicator ideas well before 2009, given the "deficiencies in the current way the products were applied to the skin of animals," although Markell's specific way of doing it came from her. (Trial Tr. 303:19-25, 307:15-17.) Although nothing Truman reviewed in the HLB materials or proposals from other design firms specifically talked about Markell's idea, and HLB's ideation process generated around 200 ideas following field research about how people applied existing spot-on products to their animals (Trial Tr.

30

304:22-305:5; 307:24-308:5), a robust process could be expected even when starting with a specific idea:

> Q.  [G]oing back to Central's development, it's your view that even if a company had Ms. Markell's idea in hand and wanted to develop it, they still looked at 199 other ideas?
>
> A.  At least.
>
> Q.  And they'd look at hundreds of concepts even if they knew that was the idea that they wanted to pursue and bring to a commercial product?
>
> A.  Yes.
>
> Q.  You don't see that as inefficient?
>
> A.  I see that as due diligence and wise.  Because everyone is reporting into a CEO of a company.  And we all have obligations to spend money effectively and be successful in our roles.
>
> Q.  So if a . . . good faith competitor, starting on April 8, 2010, had Ms. Markell's idea, it is your view that they would still go out and look at 200 ideas before moving forward?
>
> A.  Absolutely they would.
>
> Q.  So if that's the case, then, Mr. Truman, do you agree with me that having that starting idea doesn't have much value, then, if you still need to go out and pursue 200 ideas to figure out where you end up?
>
> A.  No, I don't agree with you.  It has tremendous value.  Because no one had been able to solve this problem up to Ms. Markell's idea.  And once you get that idea, whether it be in the case where a nondisclosure was signed and the idea was given or you see a patent which contains drawings, you are still going to go out and . . . do your due diligence before you spend millions of dollars, or $200,000 on a design firm.  Those pictures and images in a patent could have a variety of issues that you discover through the due diligence process on developing these products.
>
> Q.  So it is your view if a good faith competitor would still spend the time to go look at 200 completely unrelated ideas when what they have in hand . . . is the idea that you knew was new and innovative and something you wanted to move forward on?
>
> A.  Yes.  And that is exactly what Central did.  So our best proxy here is what Central did.

(Trial Tr. 313:15-315:5.)

Merial, in contrast, "would have taken much longer to do this," because it was a pharmaceutical company that was "extremely methodical in how they do things." (Trial Tr. 321:24-322:3.)

In June 2010, Central conducted "preferences testing," which involves showing the designs and potentially prototypes to users and soliciting feedback. (Trial Tr. 228:23-229:9.) Here, the testing involved application to fake fur on a chair, letting Central "see things such as misapplication to the surface of the hair instead of the skin, leakage of the product post application. So this type of testing is critically important to make sure you end up with an end product that is successful and meets the pain points in the market." (Trial Tr. 229:14-21.) Truman agreed that the records show that by August 2010, the Smart Shield concept was finalized. (Trial Tr. 229:22-24.) After that the design went to engineering for "the necessary steps to prepare that for manufacture." (Trial Tr. 230:15-17.)

The market landscape at the time, around July 2010, was "very competitive" with "undifferentiated brands . . . fighting for consumer dollars and retail space," and brands that were traditionally sold only through veterinary practices becoming sufficiently popular that retailers were demanding to sell them. (Trial Tr. 232:1-12.) Brands' shelf space with retailers was at risk. (Trial Tr. 232:11-13.) Generics were also entering the market, and against this broad competitive landscape, "brands that don't offer innovation or new ways" risked irrelevance. (Trial Tr. 232:14-20.) Central's documents reflected an awareness that items would be discontinued or cut to accommodate the veterinary brands and the generics, and that some key retailers "may cut entire brands to simplify the shelf." (Trial Tr. 232:21-233:3.) It also reflected concerns the company had; volume had suffered at key retailers, including PetSmart and Petco, and Central

gave them "special access" to the research and development work of Project Speed. (Trial Tr. 233:21-234:1.) Truman interpreted this effort, and the language of the July 2010 document, thus:

> A. So Project Speed is what they are using to get in with buyers. Innovation is what buyers want. So they highlight Bio Spot innovation, keeps us in the game. And this can extend beyond [Central Life Sciences] to Central pet, meaning beyond just the smaller portfolio flea and tick to other portfolio items they may have within the larger organization. And they highlight this potential loss of the Bio Spot business at PetSmart because of this corporate initiative to reduce brands and create these brand blocks on shelf.
>
> Q. What does that mean?
>
> A. A brand block on shelf would mean the idea of a family of products on the shelf. So when you meet with buyers for these large mass merchants, they want to create a look and feel when you are walking down the aisle that is consistent. So if you have a block or a family of brands that may include topical flea and tick products, sprays, collars, other items, you would want them in a family, because it looks good going down the shelf and helps with sales.

(Trial Tr. 234:1-20.) Asked about an April 2010 Central document that discussed business planning and growth strategies, Truman testified that it reflected other pressures Central faced:

> A. So as I previously mentioned, there was this risk of rationalization or delisting of products. So products removed from the retail shelf, there was this risk. And so this highlights the situation that PetSmart, Petco, and Walmart were consolidating vendors and brands and that the retailers want to support the big brands to simplify this shopping experience with this clean block to drive category growth. Their issue that they are highlighting here is that Life Sciences -- so Central -- is at risk with the current fragmented portfolio of brands versus companies like Hartz Sergeant's and Nutri-Vet. So the implication here is that they need an umbrella brand to achieve significant growth and remove competition from the shelf, or they are going to face these significant distribution losses and sales decline can occur.

(Trial Tr. 241:21-242:2, 242:13-243:3.)

The July 2010 document reflected consumers' enthusiasm for the applicators Central was testing and that Central did validation studies to confirm that "it is getting down on the skin, it is keeping your hands clean, it is less mess, it is easy to dispense, more control during application."

(Trial Tr. 233:6-13.)

Truman testified about the seasonality of the product Central was releasing, when asked about references in the July 2010 document to a "backup" plan if the applicator was not ready to launch by February 2011.  (Trial Tr. 235:1-6.)  Essentially, a launch after June 2012 would have meant Central missing the entire season; "flea and tick products," he explained, "you want into the pipeline to go to retailers in the late part of the year, into the first part of the year," so that when spring comes, stores can put the product on the shelf.  (Trial Tr. 235:5-12.)  Once the retailer, particularly a large one like Walmart, sets its planogram, with shelves planned down to the millimeter, it would not accommodate a late entrant.  (Trial Tr. 235:14-25.)

Central's decision to push its launch to early 2012, with "aggressive[]" efforts to have a working model by a June 2011 national sales meeting, made sense because "[y]ou would want your sales people armed with whatever tools they would need to sell in to the retailers in what -- I call that midyear. . . .  You would want your sales team armed with the tools to go in and meet with buyers."  (Trial Tr. 236:7-20.)  And Central did "continu[e] to work diligently" between July 2010 and January 2011 to make that happen.  (Trial Tr. 237:2-10.)

By November 2011, Central began producing the applicator.  (Trial Tr. 237:11-19; Pls.' Trial Ex. PR-17.)  Truman opined that the applicator was not ready to launch then because regulatory approvals were outstanding.  (Trial Tr. 237:20-25.)

Ultimately, the Smart Shield applicator began shipping in February 2012. Truman considered the development timeline to continue until May 2012, when the cat applicator was approved in all 50 states.  (Trial Tr. 238:3-6, 238:13-14.)  This assumed a good faith competitor would not launch before securing all regulatory approvals, or "at risk." (Trial Tr. 238:15-239:19.) Truman conceded, however, that Central itself chose to proceed at risk, rather than waiting for all approvals.  (Trial Tr. 286:23-288:5.)

Truman was asked about a July 2011 email chain in which Central was discussing the Adams applicator launch at Walmart. The content noted a commitment from the buyer to make it "big," and that it was projected to be "our most impactful initiative in 2012." (Trial Tr. 243:7-25.) The email attributed to the buyer statements about needing to get out with flea and tick early, in February, and planning to "fight for action alley," which Truman described as follows:

> So action alley, in a Walmart, is when you walk in the front of the store, and in every store that I've been in you look left, and there's a long aisle that goes down all of the aisles. So there is a long aisle to your left, and then that goes down, on your left, to the back of the store. If you're a manufacturer, you want your products in action alley. And the way you get your products in action alley is innovation. Something new; something exciting.

(Trial Tr. 244:9-21.) "End cap," or the end of an aisle, would have been the fallback, and "You want your products on that end of the aisle because you get all of the traffic . . . and it drives more business." (Trial Tr. 244:22-25, 244:11-12.)

Asked about statements in an August 2011 Central meeting report that captured Walmart's reaction to the Smart Shield applicator, Truman testified that, based on his review, "They reacted quite positively to it. And here it highlights additional opportunity." (Trial Tr. 245:1-8.) He was referring to the opportunity that manufacturers have to bring in other products when an innovative one like the Smart Shield applicator is offered; in this case, Central had the chance to present a cat shampoo, a cat mist, and a cat collar to the Walmart cat buyer enthusiastic about the cat Smart Shield. (Trial Tr. 245:9-17.) Subsequently, the applicator was "approved for March in action alley," with a "half pallet position in about 2,240 stores nationwide." (Trial Tr. 246:8-18.) The response was so positive that Central had to "order a second mold for the dog applicator" (molds being based on the demand forecast) "because they couldn't keep up with the demand from retailers and consumers." (Trial Tr. 246:19-247:2.)

35

Seasonality plays a role "because it's logical you would not put a flea and tick product in action alley in the middle of the winter," but would "wait until the spring and place that during the spring and summer seasons when you need flea and tick control"; the placement decision, however, is being made by big retailers like Walmart the previous year, which was in September or October 2011.  (Trial Tr. 247:3-14.)

Truman highlighted a significant opportunity created by introduction of the Smart Shield applicator: a price increase.

> Q.  And is it your understanding, from the review of the records, that the Smart Shield applicator enabled a price increase at Walmart for Central?
>
> A.  That's correct.  And price increases at Walmart are unheard of.  So the Smart Shield applicator innovation allowed them to increase price.  And they benefited from that price increase years going forward.

(Trial Tr. 245:18-24.)  Subsequent documents, Truman confirmed, reflect "[h]uge success" and a "home run" in terms of the breadth of the Smart Shield applicator's distribution, including a 39% increase at Walmart over then-current levels.  (Trial Tr. 248:2-15.)  He further opined, based on Central documents and his conversations with the Petco buyer, that the applicator "saved the business at Petco," though he walked back the breadth of that characterization somewhat on cross-examination. (Trial Tr. 251:17-254:1, 357:8-12.)

By December 2011, Central employees were internally touting the results at Petco, which Truman summarized as:

> [A]ll good news for Central with the Smart Shield, and this is yet another example where the innovation got them in front of buyers, and now we have several products that have been reactivated for 2012.  That happens when you're able to meet with the buyers.

(Trial Tr. 254:8-24.)  Truman opined that Central's advantage from its misappropriation continued, citing a November 2012 Central email noting a 41% increase in its 2012 sales at

Petco over the prior year, and the expanded role the products would have the next year, including better shelf placement. (Trial Tr. 255:18-256:16.) Also, Petco took on additional Central products beyond the Smart Shield applicator. (Trial Tr. 256:18-257:1.)

Truman also testified to his understanding, from a December 2011 Central email, that Central achieved "wins" in other retailers, specifically Lowe's, where Central achieved "topical exclusivity" to the exclusion of Frontline, and PetSmart, where Central picked up hundreds of additional stores and doubled its shelf space. (Trial Tr. 257:7-258:11.)[12]  In K-Mart, Central used the product to "establish a footprint" in a retailer where it was previously "off the radar" and only Hartz was sold. (Trial Tr. 259:1-20.)

### v.    Continuing Advantage

Against this qualitative background, Truman returned to the head start period and how long Central's undue advantage continued:

Q. [Y]ou previously opined that a portion of Central's post-2013 sales of the Smart Shield applicator are attributable to the misappropriation. How did you determine the portion of sales that are attributable to those advantages?

A. For the ongoing advantages, I took a look at the development period for Central, which was 36 months. And then as another proxy or data point, I used my own experiences in the market, both with the Frontline product when I had done packaging changes, or childproof work, child resistant packaging work. But also most relevant is the work that I did with Vectra and the applicator. And I looked at all of those to determine that if a competitor had entered the market they would not have been able to do so until that patent application was disclosed. Then it would take them 36 months, at a minimum, to develop this product. So, therefore, Central got into the market at 11 months early. From the moment that idea was disclosed to them, they got in that market early. But a new competitor that entered the market would face new competitive pressures. So the generic fipronils were entering the market. The veterinary brands were bleeding over into the market. So, therefore, I reduced the amount of those sales by 50 percent to highlight the fact that there were new competitive pressures.

---

[12] On cross-examination, defense counsel elicited that Bio Spot was already in PetSmart stores and suggested that the expanded shelf space had to do with adding Central's Zodiac products, which were not sold with an applicator. (Trial Tr. 360:9-362:4.)

(Trial Tr. 260:21-261:21.)  The 50 percent figure for the reduction in sales "seemed like a reasonable number," although it "could have been an even more severe impact on the market; meaning that another competitor could have entered with an innovation that would have made this absolutely not worth while at all.  So it could have been worse."  (Trial Tr. 261:24-262:4.)

Truman created a formula reflecting his opinion on how to quantify Central's continuing advantage, including the 50 percent reduction.  This formula is reflected in plaintiffs' trial exhibit PR-6B (*see* Trial Tr. 262:17-19), and is reproduced below:

| Year | Actual Sales | Approximate Sales But for Misappropriation | Economic Advantage |
|------|--------------|---------------------------------------------|--------------------|
| 1 | A | F=0 | A-F |
| 2 | B | G=0.5*A | B-G |
| 3 | C | H=(B/A)*G | C-H |
| 4 | D | I=(C/B)*H | D-I |
| 5 | E | J=(D/C)*I | E-J |

This formula attributes all of year one's sales to Central's misappropriation; in year two, the market dynamics discussed above would mean that a good faith competitor entering the market at that point would have had lower sales due to competitive pressures; Truman opined that those sales would have been half of what Central actually made in year one.  (Trial Tr. 262:21-263:5.)  The formula continues year by year incorporating Central's actual sales figures, "in order to be equitable," thus, "further reductions -- or if they had sales increases, there could have been sales increases" -- are taken into account to reflect the effects of the misappropriation. (Trial Tr. 263:6-13; PR-6B.)  For each year, the difference between what Central actually made in sales ("Actual sales") and what a good faith competitor would have made in sales ("Approximate Sales But for Misappropriation") is what, in Truman's opinion (and as elaborated

38

further in Beaton's testimony) Central should disgorge as its "Economic Advantage" attributable to misappropriation.

On cross-examination, certain of Truman's assumptions for this formula broke down. He conceded Central would still have had sales of its spot-on flea and tick products in 2012 if it hadn't launched the Smart Shield applicator, although it "would not have had the sales that they had," and was apparently at risk of being delisted "at certain retail locations." (Trial Tr. 325:10-326:12; *see also* Trial Tr. 330:1-7, 331:25-4.) He did not attempt to quantify what those lower sales would have been. (Trial Tr. 327:3-13.)

Instead, "[t]he scenario that we looked at was that if a good faith competitor had been able to develop this based off of the date of the patent application being disclosed, what would have timeline have been; and then what would the sales after that period have been," which is represented in PR-6B. (Trial Tr. 327:13-18.) Truman was also not aware of applicators being sold alone, without the medicinal cartridges, and asked if there would have been such sales if the product was offered that way, he responded, "That was not the scenario that happened here." (Trial Tr. 336:21-337:6.)

To summarize, Truman characterized the head start period as 47 months long – 11 months of secrecy plus 36 months of development – and further theorized that there is a period beyond that that Central retained head start benefits. That time is a "taper down," a period of lasting benefit to Central attributable to the innovation, and on his table that extends out five years. (Trial Tr. 371:9-372:19.)

### c. Beaton

Beaton, offered as a financial and damages expert, measured unjust enrichment damages attributable to Central's head start. (Trial Tr. 392:11, 17-24.) He chose that methodology, and

specifically disgorgement of profits, because "we have a situation where Central had been adjudicated as having misappropriated Ms. Markell's idea," and the remedy is to take the benefits Central got from doing that and return them to plaintiffs. (Trial Tr. 393:1-16.) His figure of $19,429,411 represented $16,119,848 for the period of time (January 1, 2012 to April 5, 2013) Central was selling the products before a good faith competitor would have entered the market, and $3,309,927 for the period (April 6, 2013 to April 5, 2018) that Central would retain an advantage over a good faith competitor once the latter entered the market. (Trial Tr. 422:17-423:6; PR-36B.) The April 6, 2013 entry date for the hypothetical competitor came from Truman's calculation of a 47-month head start period running from May 5, 2009 (11 months of secrecy plus 36 months of development). (Trial Tr. 424:17-22.)

Beaton began with Central's financial data (which, as noted earlier, was presented at trial by Wright) on applicator products and refills. (Trial Tr. 437:12-13.) Beaton pulled into a spreadsheet the data on Smart Shield gross sales, net sales ("The net sales would be inclusive of returns. There's some promotional items. . . . The net sales are a little smaller than gross sales."), cost of goods sold (COGs), and subtracted COGs from net sales to get a figure called "invoice profit." (Trial Tr. 397:23-398:6, 399:12-24, 400:19-401:8.) What that looked like is reflected in the following excerpt from plaintiffs' trial exhibit PR-35B:

| Fiscal Year | Month | Adams | | | | BioEcct | | | | Vet Kem Ovitrol | | | | Zodiac | | | | All Brands Combined | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Gross Sales | Net Sales | COGS | Invoice Profit | Gross Sales | Net Sales | COGS | Invoice Profit | Gross Sales | Net Sales | COGS | Invoice Profit | Gross Sales | Net Sales | COGS | Invoice Profit | Gross Sales | Net Sales | COGS | Invoice Profit |
| 2012 | Jan | $410,617 | $410,617 | $206,433 | $204,184 | | | | $0 | | | | | | | | $0 | $410,617 | $410,617 | $206,433 | $204,184 |
| | Feb | $2,056,967 | $2,054,536 | $368,753 | $685,785 | $957,738 | $946,054 | $378,934 | $567,119 | | | | $0 | | | | $0 | $2,314,706 | $2,000,592 | $747,687 | $1,252,905 |
| | Mar | $3,770,952 | $3,759,903 | $2,068,400 | $1,691,502 | $219,659 | $217,827 | $84,448 | $133,381 | | | | $0 | | | | $0 | $3,989,661 | $3,977,729 | $2,152,896 | $1,824,862 |
| | Apr | $3,021,765 | $2,988,339 | $1,069,858 | $1,918,481 | $1,913,246 | $1,894,578 | $678,936 | $1,125,642 | | | | $0 | | | | $0 | $4,935,011 | $4,792,917 | $1,748,794 | $3,044,123 |
| Pro-Rated Apr 1 thru 5 | | $503,628 | $498,056 | $178,310 | $319,747 | $318,874 | $300,763 | $113,156 | $187,607 | $0 | $0 | $0 | $0 | | | | $0 | $822,502 | $798,820 | $291,466 | $507,354 |
| Pro-Rated Apr 6 thru 30 | | $2,538,138 | $2,490,282 | $891,548 | $1,598,734 | $1,594,371 | $1,593,815 | $565,780 | $938,035 | $0 | $0 | $0 | $0 | | | | $0 | $4,112,509 | $3,994,098 | $1,457,328 | $2,536,769 |
| | May | $1,694,658 | $1,690,763 | $607,762 | $1,083,001 | $1,877,657 | $1,796,367 | $650,534 | $1,145,833 | | | | $0 | | | | $0 | $3,572,315 | $3,487,160 | $1,258,296 | $2,228,864 |
| | Jun | $1,060,070 | $1,058,579 | $407,696 | $650,883 | $959,145 | $920,803 | $371,104 | $549,699 | | | | $0 | | | | $0 | $2,019,215 | $1,979,383 | $778,801 | $1,200,582 |
| | Jul | $1,440,854 | $1,432,983 | $509,798 | $923,185 | $549,631 | $523,565 | $192,318 | $331,247 | | | | $0 | | | | $0 | $1,990,485 | $1,956,548 | $702,115 | $1,254,433 |
| | Aug | $625,412 | $623,376 | $222,931 | $400,446 | $477,777 | $459,399 | $167,768 | $291,630 | | | | $0 | | | | $0 | $1,103,189 | $1,082,775 | $390,699 | $692,076 |
| | Sep | $323,732 | $313,980 | $178,382 | $135,598 | $470,560 | $441,001 | $164,972 | $276,029 | | | | $0 | | | | $0 | $794,291 | $754,981 | $343,354 | $411,627 |
| 2012 Total | | $13,404,128 | $13,333,107 | $5,640,012 | $7,693,095 | $7,425,383 | $7,199,594 | $2,689,013 | $4,420,581 | $0 | $0 | $0 | $0 | | | | $0 | $20,829,511 | $20,442,701 | $8,329,625 | $12,113,676 |

In reaching the invoice profit, Beaton did not deduct expenses other than COGs from net sales, a decision made because he did not have underlying documentation that showed a sufficiently direct relationship between an expense and the profits generated from Smart Shield

products.  (Trial Tr. 413:20-414:6.)  This included registrations and mill tax, due to an absence of any documentation.  (Trial Tr. 419:7-420:1.)   Wright's allocation of other costs (including coupons, advertising and promotion, selling expense marketing support, supply chain, delivery, and administrative costs) used a percentage-of-sales-by-brand rule.  This Beaton rejected as "having nothing to do with the applicators and the refills," and came from the orientation that "[plaintiffs] prove sales.  Defendants' burden is to prove the costs.  And I don't believe they provided me with enough information."  (Trial Tr. 414:12-415:18.)  On cross-examination, Beaton conceded that Wright had testified that TV advertising expenses were all attributable to Smart Shield, and that there was no percentage-of-sales allocation applied to them.  (Trial Tr. 455:16-22.)

Beaton denied that his approach led to an inflated disgorgement number because if Central had provided information on "legitimate expenses that should be deducted," the number would be lower; essentially, in Beaton's view, any inflation of the number should count against Central because it had that information and didn't provide it.  (Trial Tr. 415:23-416:21, 418:25-419:6, 420:2-5.)

Based on discussions with Truman, Beaton distilled the figures on gross and net sales and his calculated invoice profit into a schedule, trial exhibit PR-36B, reproduced in part below:

| Period | Economic Advantage (Gross Sales) | | | Economic Advantage (Invoice Profit) | | |
|---|---|---|---|---|---|---|
| | a | b | a - b | a | b | a - b |
| | Actual Sales | Estimated Sales But-For Misappropriation | Economic Advantage | Actual Invoice Profit | Estimated Invoice Profit But-For Misappropriation | Economic Advantage |
| 1 Jan 1 2012 - Apr 5 2013 | $27,360,647 | $0 | $27,360,647 | $16,119,484 | $0 | $16,119,484 |
| 2 Apr 6 2013 - Apr 5 2014 | $12,684,669 | $10,061,571 | $2,623,098 | $7,251,007 | $6,165,079 | $1,085,928 |
| 3 Apr 6 2014 - Apr 5 2015 | $6,809,623 | $6,342,334 | $467,289 | $3,880,177 | $3,625,504 | $254,674 |
| 4 Apr 6 2015 - Apr 5 2016 | $6,690,494 | $3,404,812 | $3,285,682 | $3,165,790 | $1,940,089 | $1,225,701 |
| 5 Apr 6 2016 - Apr 5 2017 | $4,481,244 | $3,345,247 | $1,135,997 | $1,978,499 | $1,582,895 | $395,604 |
| 6 Apr 6 2017 - Apr 5 2018 | $2,847,858 | $2,240,622 | $607,236 | $1,337,270 | $989,249 | $348,020 |
| | | | $ 35,479,949 | | | $ 19,429,411 |

Consistent with Truman's theory, Beaton attributed all sales of the Smart Shield products from January 1, 2012 to April 5, 2013 ("Period 1") to Central's misappropriation. He concluded that the advantage had "dissipated" by 2018, when "[s]ales were diminishing quickly," and ended his calculations there. (Trial Tr. 402:20-25.) Periods 2 through 6 reflected what he called an "offset," or "what a good faith competitor would have generated both in sales and profits had they taken the same 36-month period that Central had for developing that product, launched that product in 2013." (Trial Tr. 402:10-19, 403:1-7.) Beaton purported to have come up with the offset figures using Truman's formula, though he also testified that his "but for" (*i.e.*, offset) sales and profit numbers were an across-the-board 50% reduction from the prior year's sales or profits, respectively, which PR-36 mostly reflects. (Trial Tr. 403:3-404:23, 406:23-406:13.)[13]

Beaton did not independently evaluate either causation (whether the sales were attributable to Central's misappropriation) or the development timeline for Central or a good faith competitor. (Trial Tr. 428:5-432:13.) He did not conduct any studies or independent analysis of what specifically was driving sales, and he rejected the notion of a "direct correlation between marketing spend and sales." (Trial Tr. 434:1-436:16.)

Beaton rejected the reasonable royalty approach as an appropriate methodology here. He reasoned that an unjust enrichment/disgorgement analysis was "superior" and that, contrary to a scenario with a patent, it is difficult to protect an idea or trade secret in a way that a license could

---

[13] The numbers on PR-36 do not align neatly with Beaton's explanation of them. The reason why became clear in the testimony of defense expert Dawn Hall, who examined it in preparing her rebuttal opinions. She explained: "So the period one is 15 months, so it is not 12 months. So when you get down to – this chart is very confusing. It took us a while to figure out exactly what was going on – but the first period is 15 months. The second period is 12 months. And what Mr. Beaton does is take 50 percent of on the first – 50 percent of the 12 months instead of 50 percent of the entire period." (Trial Tr. 1039:3-9.) She continued: "If you take 50 percent of the entire first period, you are automatically negative after your second year, so there is no ongoing benefit." (Trial Tr. 1039:10-12.)

capture. (Trial Tr. 420:6-24.) Moreover, he rejected the artifice of using a negotiation-based method of calculation for a scenario in which the premise is that one party stole from the other:

> And, again, I think it is difficult, from my perspective as a damages expert, to say I could utilize a royalty rate, have a negotiation, when I basically misappropriated the idea. Oh, now I'm going to negotiate with you.
>
> It just didn't make sense to me, and I opted to go with unjust enrichment and disgorgement of profits.

(Trial Tr. 420:25-421:6.) He also did not directly look at Central's avoided costs, opting instead to focus on its increased profitability. (Trial Tr. 421:7-19.)

### 2. Defendants' Rebuttal and Alternative Proposal

#### a. Summary

Defendants' position on the remedy came, as plaintiffs' did, through their experts. Ball opined that Central had at most a three-to-four week head start, while also theorizing that the good faith competitor could have caught up, such that Central had literally no head start. Hall, relying on this theory and the factual background set out by Dr. Endris and Schwartz, opined that a reasonable royalty of $19,025 would be an appropriate remedy for Central's misappropriation, plus "avoided costs" that she calculated as $322,911.[14] She disagreed with plaintiffs' experts' disgorgement theory as a whole, but offered a disgorgement figure of $2,176,271 that reflected her correction for what she viewed as errors in plaintiffs' analysis.

#### b. Ball

Alan Ball, an industrial designer and product design/development consultant, helps clients develop products and "orchestrate[s] teams to do mechanical engineering in

---

[14] Defendants, including in their closing and demonstratives, use $322,911. Hall's testimony uses $322,000 as a shorthand. The difference is ultimately immaterial given the Court's conclusions, *infra*.

manufacturing, so those industrial design solutions are brought to market." (Trial Tr. 502:1-3, 8-18.) As a product developer, "once we have an industrial design, we have to, like, do all of the work necessary to make that a product that can be sold in -- in mass quantities. So it would be engineering and manufacturing; putting together teams to do that." (Trial Tr. 502:21-25.)

Ball has designed hundreds of consumer products of various types and holds close to 70 patents. (Trial Tr. 505:5-11.) He has designed products that can be called applicators, including products manufactured by injection molding. (Trial Tr. 506:6-507:3.) "[H]ad Central come to [him] with the idea of developing a flea and tick applicator," the Smart Shield would be the type of product he would be comfortable with. (Trial Tr. 507:23-508:2.)

Ball's task was responding to Truman's head start period. (Trial Tr. 511:8-14.) After reviewing Central's product development process for the Smart Shield applicator, the applicator itself, Markell's idea, and Truman's testimony, Ball "created scenarios . . . which [] relied on a good faith competitor starting a product design and development effort at the time that the idea was made public in the published patent application." (Trial Tr. 511:15-512:4.) Ball denied there is a playbook for calculating head start damages. He examined what, from the "starting point" of the patent application, a good faith competitor would "need to do to arrive at a final product." (Trial Tr. 512:13-513:2.)

Ball's conclusion based on the two scenarios he created was that Central had a three-to-four-week advantage over a good faith competitor who didn't have early access to Markell's idea. (Trial Tr. 513:16-514:1.) That is, Central, with early access to the idea, launched and began selling product in January 2012. A good faith competitor without early access would have launched in February 2012, three to four weeks after Central did. (Trial Tr. 514:2-13.) This assumed the competitor would undertake a 22-month development period (beginning with the

April 8, 2010 patent application publication and ending in February 2012), even though Central took 33 months for development (beginning with Markell's May 5, 2009 disclosure and ending in January 2012 with the launch). (Trial Tr. 514:9-515:6.)

Fundamental to Ball's opinion is that taking the patent application's disclosure to market would involve "a different development process to the development process that happened with Project Speed." (Trial Tr. 515:11-14.)

> Project Speed had a different scope. It was a very diverse and wide-ranging and research-based process. And it would not be the kind of development process that I would do if I was starting off with the published patent disclosure and wanted to bring that to market as quickly as possible.

(Trial Tr. 515:15-19.)

Ball, contrasting himself to Truman, said he sought to understand the "value" that Markell's idea would be bringing to the good faith competitor scenario. To him, that meant figuring out how long it would take to bring an idea disclosed on a piece of paper, which is not a final product, to the point of being a marketable item. (Trial Tr. 516:16-518:22.) Ball considered Markell's disclosure to Four Paws in 2009 as the "starting point" of an idea that required "refinement" as to design and engineering. (Trial Tr. 519:2-5; 523:7-12, 13-15.) In short, Ball's theory related to how much development effort had to be expended to turn an idea into "a commercializable product." (Trial Tr. 523:16-23.)

Ball concluded that HLB's process with Central involved "a lot of effort that was very divergent and basically very different than what Ms. Markell's idea was." (Trial Tr. 524:17-18.)

> There was a lot of research that was being done. There was talking to pet owners and whatnot, and then coming out of that there were a lot of very divergent concepts, very different concepts.

> And it suggests to me that this process -- this project was doing a lot more than just simply developing one idea for -- for market.

(Trial Tr. 524:19-25.)  That Ball was overlooking the jury's verdict that during that same period Central misappropriated Markell's idea was evident, as Central's next question to him reflected:

> Q.  [J]ust to be clear, Mr. Ball:  You understand there was a prior finding from this court that Central Garden had used Ms. Markell's idea.  Correct?
>
> A.  Oh, yes.
>
> Q.  And you accepted that and relied on that in forming your opinions.  Is that correct?
>
> A.  Yes.

(Trial Tr. 525:4-11.)

Ball acknowledged defendants' efforts in 2009 and earlier to come up with an applicator, which he deemed useful as a frame of reference for "the value of Ms. Markell's idea" and what Project Speed was doing.  (Trial Tr. 526:8-527:5.)  He noted that as of spring 2009 Central was seeking a design firm to "do some product development around new solutions for flea and tick medicine or flea and tick control with their users."  (Trial Tr. 527:2-5.)  Central was soliciting proposals and received HLB's in late July 2009, hiring it in the fall.  (Trial Tr. 527:13-25, 528:15-529:19.)  Other proposals had also been submitted and reviewed.  (Trial Tr. 528:15-529:19.)  Ball concluded Central was engaged in "a broad strategic approach . . . looking at the user and identifying user needs and then coming up with product solutions."  (Trial Tr. 530:3-7.)

> And it's an open-ended, wide-ranging kind of development effort where maybe there's not a preconceived notion going in, but they're just looking to answer user needs with a product, you know, basically looking for opportunities for innovation.

(Trial Tr. 530:8-12.)

According to Ball, none of the outside firms saw Markell's idea in connection with the proposals they submitted to Central.  (Trial Tr. 531:11-15.)  All this informed his conclusion that Central's development process was "intermittent" (Trial Tr. 531:10), and greatly exceeded how long he would have taken to find and engage a design firm.  (Trial Tr. 531:2-7.)  "At HLB," he

said, "we would write proposals over a weekend." (Trial Tr. 531:5-6.) According to Ball, there

was little evidence of use or value of use gained by Central between May and November of 2009

leading to his rejection of Truman's testimony that Central benefitted from her idea in 2009 prior

to the start of Project Speed. (Trial Tr. 531:17-24.) Central's counsel explained:

> [H]e's responding to Mr. Truman, who says, Just pick it up and move it forward. . .
> . You actually have to look at what went on in the project to understand: Is that
> time really reflective of a good faith competitor, or was Central doing other things
> that a good faith competitor, starting with Ms. Markell's idea on April 8, 2010,
> wouldn't do. . . . So he looks at what specifically Central is doing to say why that's
> not a proxy for a good faith competitor[.]

(Trial Tr. 533:8-18, 22-23.)

During an extended colloquy with the Court over the Federal Circuit's definition of head

start damages, Central's explanation was that Ball was positing that a good faith competitor

wouldn't "have taken as long [as Central did to develop the applicator] if they were more

singularly focused on one idea." (Trial Tr. 536:3-5.) In short, Ball did not use Central's process

as a baseline or proxy. He hypothesized what a good faith competitor would do if they picked up

the Markell published application in April 2010 and sought out a design firm to develop the

applicator from the patent. (Trial Tr. 536:11-16.)

This colloquy occasioned plaintiffs' attorney's objection that a critical premise was being

ignored: that defendants had already been adjudicated as having misappropriated (used) the idea.

(Trial Tr. 536:23-538:6.) The discussion ultimately led to Central's attorney's clarification that

there were two "stakes in the ground" prior to the patent application publication, the events of

November 2009 when evidence showed Central's keen interest in Markell's idea and

conversations with her about how they intended to use it, and February of 2010 when there was

clear evidence that Project Speed had her idea in the mix. (Trial Tr. 538:13-539:5.)

The Court put the question to Ball: "What value did Central have prior to April of 2010, recognizing none of us knows what they were doing?" (Trial Tr. 539:7-8.) He replied, "I think the value was they -- they could have just done a very tactical design development process just focused on that disclosure and racing to market with that. But instead they did this very wide ranging, research-based concept where 200 ideas were considered, and that's different th[a]n racing to the finish line with the disclosure." (Trial Tr. 539:9-16.)

Ball distinguished strategic approaches from tactical ones. (Trial Tr. 539:7-18.) "Strategic" would mean no "preconceived thoughts" and creating "lots . . . of very wide-ranging concepts," even "crazy" ones, while "tactical" means "great idea, let's run with it." And in reaching his head start opinions, he assumed the good faith competitor would be using a "tactical" approach. (Trial Tr. 540:19-25; 542:21-23; 543:9-14.)

On that premise Ball testified about his two scenarios. Scenario one asked what a good faith competitor would have to do to bring to market what was disclosed in the patent. (Trial Tr. 552:3-7.) In scenario two, created to check his findings as to the first scenario, Ball determined what a good faith competitor who was engaged in the same kind of program as Project Speed would do if the patent disclosure were "injected into their process, and . . . how would that affect a Project Speed-like development effort in regards to when a product would be on the market." (Trial Tr. 552:8-14.) He compared these head start scenarios to what happened in Project Speed and he "tried to understand what a good faith competitor would have to do that was in Project Speed and what aspects of Project Speed . . . wouldn't be relevant to a good faith competitor focused on tactically developing the disclosed idea to market." (Trial Tr. 552:21-553:1.) Ball's conclusion was that "Central basically got a three-to-four week advantage over those hypothetical scenarios of a good faith competitor." (Trial Tr. 552:15-18.)

To get there, Ball eliminated from those phases he deemed unnecessary to the process of getting what was disclosed in the Markell patent application to market.  The research phase when Central explored what pet owners wanted by way of flea and tick management, and what their needs, met and unmet were, he deemed unnecessary to "a tactical project of executing a single concept."  (Trial Tr. 553:19-554:9.)  The time spent when concepts from the research were brainstormed and 200 of them were put up on the wall would not be necessary "if you were focused on developing a single idea."  (Trial Tr. 554:16-21.)  Looking at multiple concepts through preference research was unnecessary – at most, Ball opined, there would be validation rather than preference research undertaken, if at all.  (Trial Tr. 554:22-555:5.)  He theorized that good faith competitor intent on getting the patent disclosure to market would sign up a design or product development firm, which would take one month; then one week for "kick off and immersion" (Trial Tr. 559:11-14); then one month for a "technical feasibility and concept exploration phase" (Trial Tr. 567:25-568:7) followed by a buffer week (Trial Tr. 572:11-21), and then concept refinement over a three week period (Trial Tr. 572:22-573:8).  His timeline allows three weeks for "preference research" where narrowed down concepts would be shown to potential customers (Trial Tr. 574:21-575:23), then five weeks for concept finalization (Trial Tr. 577:19-578:13), when "you finalize [the design you validated] into a final industrial design solution that can be handed off . . . for engineering and then ultimately manufacturing."  (Trial Tr. 577:22-578:3.)

In scenario one ("tactical") that last phase of concept finalization would occur between August 7, 2010 and September 10, 2010.  (Trial Tr. 578:6-13.)  Ball's examination of Project Speed showed him that the final phase concept finalization for the Smart Shield applicator occurred during July 12 and August 18, 2010, when Central handed off a single design to

engineering.  (Trial Tr. 578:11-15.)  Thus the three-to-four-week advantage fell directly into the scenario where a good faith competitor would tactically get the disclosed idea to a final design for engineering three to four weeks after Central did in real life.  The three to four weeks derives exclusively from comparing a tactical approach -- *i.e.*, the patent disclosure reveals a great idea and let's run with it -- to the work of Project Speed before engineering took over.  And Ball's analysis involved *only* the development process, because he assumed the good faith competitor would take the same amount of time, 22 months, that it took Central to get to market after the hand-off to engineering.  (Trial Tr. 580:11-24.)  Put another way, head start advantage in Ball's opinion relates exclusively to getting the applicator idea off the page into a design ready for engineering and production.

Again, the effect of Central's three-to-four-week temporal advantage during the development phase was that the good faith competitor would launch in February 2012, three to four weeks later than Central did.  (Trial Tr. 588:12-18.)  Asked why, Ball explained that he "did not make any assumptions that a good faith competitor would change the duration of the engineering and manufacturing from what actually happened in Project Speed."  (Trial Tr. 588:19-25.)  His opinions about timing, therefore, pertained to the portion of the process that invoked his particular expertise – industrial design and the other pre-handoff steps before engineering, manufacturing, and marketing teams take over.

Ball also opined that there were ways the good faith competitor could actually have made up the three-to-four-week delay by tightening up the phases in the development process he hypothesized.  (Trial Tr. 589:5-11; 592:8-20.)  He assumed this could happen from what he learned Central's engineering director Roy Brown, who explained that he was given a target ship

date of January 2012.  That drove  the manufacturing process, which might otherwise have been sped up.  (Trial Tr. 592:14-20.)

> I just think if I look at a product of this level of complexity, it's three simple plastic pieces snapped together.  It's no more complicated than a lot of the toys I see in a dollar store. . . .  [I]n my experience, if I were to quote this from a blank sheet of paper, I don't think I would have expected it to take quite so long to engineer and manufacture.  It's such a simple device.

(Trial Tr. 593:13-20.)

Ball's second scenario, as he explained, was created to double check the first.  Here, the good faith competitor would have been engaged in exactly the process that Project Speed did from November to April, when Markell's patent application was published.  At that point, the concept exploration and technical feasibility phase was underway, and "real concepts are starting to be generated by the design team."  (Trial Tr. 596:11-12.)

> And, you know, about halfway through that phase corresponds to when that patent was published.

> So I'm imagining that somebody gets that patent and brings it to the attention of the design team and says, Hey, guys, I know we are working on this, but, you know, stop the press for a second.  Look what's come in.

(Trial Tr. 596:12-18.)

In this scenario, assuming someone saw the patent as "a super valuable idea," the concept exploration and technical feasibility phase would be "restarted," and the design team would lose about four weeks.  (Trial Tr. 597:8-598:1.)  The subsequent phases would be similarly pushed back, and the final crucial phase that led to the handoff to engineering would end in September, the same time as the hypothetical handoff in scenario one.  (Trial Tr. 598:1-599:9.)  And just as he did there, Ball imputed the same time frames for engineering and manufacturing as Central took so that the good faith competitor in scenario two would launch in February 2012.  (Trial Tr.

599:14-600:1.)  In this version of hypothetical events, the idea Central had improper early access to would have actually been *detrimental* to the development process.

As a wrap up explanation for both scenarios, Ball's good faith competitor was no more than three to four weeks behind Centralprimarily due to the shortened time needed for the earlier stages of the development process.  (Trial Tr. 600:2-15.)  "I think the best way to understand it is it's a different task.  It's a reduced scope.  And a reduced scope . . . requires less time."  (Trial Tr. 600:19-21.)

Ball's conclusion, of course, was in stark contrast to Truman's that Central enjoyed a head start advantage of 36 months.  He agreed that the conclusions were conceptual: "like how did it advantage someone.  So I don't naturally think in those terms, so I'm trying really hard."  (Trial Tr. 601:20-603:8.)  Ball had not previously done a head start analysis in a dispute like this, nor was he familiar with any head start analysis done by another.  (Trial Tr. 547:8-19; 603:11-604:11.)  He had been involved with royalty disputes and a trade secret case but the concept of a head start period had not explicitly come up in those cases.  (Trial Tr. 547:17-22.)

On cross examination, Ball was reminded that after Markell's disclosure in May 2009, Central's Blomquist headed up a group of employees who spent six months interviewing and getting proposals from three design firms before they got the go-ahead from senior management to contract with HLB.  (Trial Tr. 651:18-655:8.)  Ball replied that this could have been completed in a month.  (Trial Tr. 655:24-656:10.)  He noted that HLB submitted a proposal to Central in June 2009, and "I don't understand why that wasn't acted on."  (Trial Tr. 658:10-11.)  He did not recall the details of memos and correspondence dealing with corporate decision-making and approvals between June 2009 and when the kickoff period began at Central in November 2009.  (Trial Tr. 658:12-18.)

Ball also rejected as unnecessary what Central did in the following months – exploring how customers were applying flea and tick medicine and what they wanted, *i.e.*, "going out and talking to people and saying, Hey, what problems do you have giving medicine to your dog?" (Trial Tr. 660:15-661:9.)  He did not believe a good faith competitor would need to do that to bring the disclosed product to market.  (Trial Tr. 661:18-662:12.)  He rejected "an open-ended, exploratory, conceptual, ethnographic research phase" (Trial Tr. 663:19-22), because his hypothesis is that "you are developing a disclosed idea" (Trial Tr. 663:23-664:1).  This was despite the value of understanding customer needs and despite that Central itself saw that information as necessary:

> Q.  So, generally speaking, a good way to design a successful product is to develop a product that meets your customer's needs, isn't it?
>
> A.  Sure.
>
> Q.  And companies have processes in place to make sure their products meet consumer needs; don't they?
>
> A.  Some do; some don't.
>
> Q.  All right.  I mean, you're going to want to release a product that -- you would want to make sure your customers trust you at the end of all that.  Right?
>
> A.  Okay.
>
> Q.  Okay.  And so for this litigation, you're proposing that Central eliminate surveys, testing, market research.  Correct?
>
> A.  No.
>
> Q.  Or severely cut it down?
>
> A.  Sure.  Because the scope is different.

(Trial Tr. 667:9-24.)  That a good faith competitor would have been more focused than Central was, Beaton said, is "one way of saying it."  (Trial Tr. 671:2-6.)

The 11 months (May 2009 to April 2010) that Central had the idea, the model, the patent application, and the CAD drawings before anyone else were subsumed into Ball's conclusion

that a good faith competitor could almost catch up with Central's launch date by means of a tactical approach to finalizing a design concept and putting that into the hands of engineering and manufacturing.  (Trial Tr. 672:4-18.)  He expressed some dismay that Central didn't act upon the idea Markell disclosed in May 2009 particularly when the facts showed Central met with HLB the following month.  (Trial Tr. 672:22-674:19.)

### c.  Dr. Endris

Dr. Endris's expertise is medical veterinary entomology and the development of related products, to address the regulatory timeline component of their analysis.  (Trial Tr. 677:16-17; 679:12-15.)  He was offered as an expert in the "scientific and regulatory aspects of flea and tick products."  (Trial Tr. 683:13-15.)

Dr. Endris holds a Ph.D. in medical veterinary entomology and has had a long career in the field, including in research and development of flea and tick products; he is currently a consultant for animal health companies that develop pharmaceutical products.  (Trial. Tr. 679:22-680:24.)  His roles involved teams closely interacting with the EPA, and he personally interacted with the agency on "many occasions."  (Trial Tr. 681:10-23.)

Addressing Truman's head start period, Dr. Endris disagreed with Truman's assumption that Central needed across-the-board regulatory approval—federal and state, cat and dog— before it could launch its Smart Shield product.  (Trial Tr. 685:1-16.)  He also challenged whether the entry of certain generics around the time of Smart Shield's release had any impact on Central's head start because they came out first (Trial Tr. 685:19-23, 720:8-11) and posited that Truman had erred in failing to consider the safety and efficacy of the active ingredient as a sales driver, as shown by Truman's attribution of all sales to the applicator (Trial Tr. 686:1-5, 713:19-714:8).  Because Beaton's opinion relied on Truman's, Dr. Endris concluded that Beaton's was

also affected by these issues.  (Trial Tr. 686:11-14.)  On cross-examination, Dr. Endris acknowledged that Central had sold etofenprox spot-on products before 2012 (so, before Smart Shield's launch), and that its competitors also used that active ingredient in products contemporaneously to the launch.  (Trial Tr. 739:17-740:9.)  Thus, the medicine itself was not a differentiator between Smart Shield and pre-Smart Shield products.  (Trial Tr. 741:2-7.)

Dr. Endris explained how companies come to have active ingredients for their flea and tick products (in-house research or licenses from insecticide companies), with varying regulatory pathways based on what else (research, studies, testing) is needed. (Trial Tr. 693:18-695:18.)  A new molecule could require millions of dollars and four to seven years for approval, while a device that uses an already-approved formulation could be reviewed in a little over three months. (Trial Tr. 715:6-11.)  All the regulatory approval work (with the attendant time, studies, and the like) has "[n]othing" to do with the applicator.  (Trial Tr. 716:17.)

Central got conditional EPA approval for its Smart Shield dog applicator on March 9, 2011, which allowed it to start the state registration process.  (Trial Tr. 726:1-14.) It submitted the cat approval application to the EPA in May 2011, receiving approval on December 2, 2011, and began submitting the dog applicator state registrations in September 2011, later than it could have but, in Dr. Endris's opinion a logical time to do so because it wouldn't be selling in 2011 and some states only open applications in September.  (Trial Tr. 727:11-729:13.)  State registration for the cat applicator stated in January 2012.  (729:18-22.)  By the end of that month, Central had state approval in all 50 states for the dog applicator.  (Trial Tr. 731:6-13.)  When it formally launched the applicator at the February 2012 pet expo in Orlando, it had approval for the cat applicator in every state except New York.  (Trial Tr. 731:18-25.)  This, Dr. Endris opined, did not impede the launch, because the risk was "extremely minor."  (Trial Tr. 732:1-11.)  The

risk could be mitigated by warning stickers on shipped product; in any event, by May 2012 New York had approved the cat applicator.  (Trial Tr. 733:1-16.)

Dr. Endris acknowledged that there were toxicity issues around an older active ingredient that culminated in EPA action around 2009.  Consistent with the testimony of James Lankford, Central's marketing research director (Trial Tr. 73:15-74:24 (referencing 2008 to 2009 timeframe), Dr. Endris testified that Central had changed its active ingredient before then, based on a Walmart request.  (Trial Tr. 699:2-11.)  He went on to testify at some length about why etofenprox was a superior ingredient, and opined that in his experience, safety and efficacy are significant to consumer purchasing decisions and Central emphasized those things.  (Trial Tr. 701:13-17, 702:3-24.)  He opined, contrary to Weekes's testimony, that a device like Smart Shield would not drive sales because it "doesn't kill fleas or ticks."  (Trial Tr. 714:17-22.)

Dr. Endris theorized that Central still could have gotten its regulatory approvals when it did, and launched when it did, even if it had a four-week delay in the design process, because – contrary to Central's own witnesses said – it was "not in a rush to bring the Smart Shield applicator to market."  (Trial Tr. 720:18-21, 734:18-735:25, 737:7-8.)  That is, using Ball's four-week good faith competitor delay, if the design was completed a month after it actually was the final approvals would still have been achieved in time for Central to have launched when it did. The implication appears to be that Dr. Endris believed regulatory approvals would not have slowed down a good faith competitor that gained access to plaintiffs' idea upon publication of Markell's patent application.

Addressing Truman's opinion that a good faith competitor would wait for all regulatory approvals and not launch at "risk" (moving the competitor's launch from February to May 2013), Dr. Endris disagreed because the risk would have been sufficiently addressed by logistical efforts

to launch in or ship to only approved jurisdictions. (Trial Tr. 736:1-737:3.) He conceded, however, that inadvertent shipments to unapproved states can lead to "significant fines." (Trial Tr. 739:14-16.)

### d. Schwartz

Donald Schwartz testified as an expert on the animal health industry and its flea and tick segment and in rebuttal to Truman. (Trial Tr. 879:8-15, 890:15-17.) His career has included advertising and promotion, including packaging and the regulatory aspects of it. (Trial Tr. 880:21-23.) When he worked at Merial, his role included business development, and many functions reported to him—market research, customer care, veterinary technical solutions. He was in charge of their "leading product," Frontline. (Trial Tr. 882:1- 883:1.) He has negotiated licensing agreements, including in his current role, and when at Merial he made decisions about what products to license and what royalties to negotiate. (Trial Tr. 884:14-17.)

Schwartz disagreed with Truman that it would take 36 months to develop a product like the Smart Shield applicator because it did not require scientific review from the EPA and thus would have a faster and more predictable route to approval. (Trial Tr. 891:22-892:3, 892:22-893:14.) For the same reason, he disagreed with Truman's use of Vectra's development timeline as a proxy. (Trial Tr. 893:15-894:11.) He cited his work on a product called ParaVue, which came from an independent inventor as an undeveloped idea and was a diagnostic product to promote sales of flea and tick product Frontline by detecting infestations. It took under two years to launch despite not being "smooth sailing." (Trial Tr. 894:15-895:11.) The industrial design firm Merial hired for the idea developed a "handful," rather than hundreds, of ideas, and they were "fairly closely linked to the original idea." (Trial Tr. 897:1-14.) Schwartz thus found Ball's 22-month development estimate for a good faith competitor to be "reasonable." (Trial Tr.

897:20-25.)  He conceded, however, that ParaVue was not a product ever sold, but was given to "our very, very best veterinary customers," and did not require EPA approval.  (Trial Tr. 927:7-12.)

Schwartz opined that across-the-board regulatory approval is unnecessary for sales to start and retailers can and do take the product before then.  (Trial Tr. 898:5-21.) He opined that an outstanding cat registration would not hold up dog applicator sales because the dog market is far larger (with cats less commonly going outside, making flea and tick infestation also less common) and in fact some products do not even have a cat equivalent.  (Trial Tr. 901:15-902:13.) That Central did in fact launch in January 2012 with only a dog applicator, he opines, bears this out.  (Trial Tr. 902:17-23.)

Also like Dr. Endris, Schwartz suggested that the applicator is not "anywhere close" to the most important feature; the active ingredient, etofenprox, is.  (Trial Tr. 904:8-13, 16-24; 912:1-14.)  In this "timeframe," which the testimony leaves vague, a predecessor to etofenprox was killing and causing neurological problems in cats, which was national news and prompted a strong EPA response and awareness by retailers and vets.  (Trial Tr. 905:5-906:14.)  Thus, the safer active ingredient, etofenprox, was significant.  Schwartz buttressed this by noting Frontline's barely "adequate" applicator with  Vectra's  "wonderful" one. Nonetheless Frontline was the best-selling product, while Vectra "was not much of a success. " From this he concluded that "the applicator just really doesn't matter that much to pet owners."  (Trial Tr. 913:2-914:19.)

Schwartz views Truman has having characterized Central as a weak player in the market and as needing an innovation that came in the form of Smart Shield; he disagrees by citing Central's presence in retail outlets before and after Smart Shield, its good reputation, and its loyal customers.  (Trial Tr. 906:18-907:19.)  (Central's fact witnesses, however, testified

extensively about why Central needed certain "wins" that it was hoping to achieve with this product.)  He also disagrees that generic entry was a significant factor in Smart Shield's launch, because that market was well established by that time.  (Trial Tr. 911:10-13.)

In terms of remedies, Schwartz opined that a royalty method would be one way to compensate an idea brought to the company.  In coming up with one he would look at the investment to bring the innovation  to market and how much revenue it could generate. He opined  a rate could range anywhere from 0.0005 percent to 1 to 2 percent.  (Trial Tr. 916:5-917:18.)

### e. *Hall*

Dawn Hall's expertise is in "applying finance, accounting, and economic factors to determine damages in various disputes."  (Trial Tr. 935:11-12.)  As a consultant, a role she has performed for 25 years, her client work involves helping clients involved in disputes calculate economic damages.  (Trial Tr. 936:5-10.)  She began in a "forensic and litigation consulting practice" at a large accounting firm, supporting the expert witness, and then over time she became the witness.  (Trial Tr. 936:12-19.)  Central offered her as an expert in "economic accounting and financial matters related to damages."  (Trial Tr. 940:21-22.)

### i.    Rebuttal Opinions

Hall's testimony was offered to respond to Truman's and Beaton's opinions and to offer "an assessment on head-start damages here."  (Trial Tr. 941:4-7, 944:17-20.)  Among her critiques is that Truman did not determine the specific value of Markell's idea or account for Central's contributions (including what it did "to make the idea saleable"); assess causation; or acknowledge that Central could (and did, "before, during, and after," Smart Shield) sell non-applicator products; also, she hadn't "seen any evidence of ongoing benefit beyond the secrecy

period or that residual period" to support Truman's position.  (Trial Tr. 945:1-14, 976:2-7, 979:3-4, 980:3-12.)  She suggests, without elaboration, that Truman and Beaton "failed to acknowledge Central's spot-on product was the genesis for the Markell applicator idea" (Trial Tr. 1059:2-3), and that they "inappropriate[ly] assess[ed] . . . market conditions" by getting the timing of generic fipronil's entry wrong (Trial Tr. 1059:8-11). She challenges Beaton's use of Truman's "untested and unsupported formula for the residual continuing benefit," his assumption that all first year sales were attributable to Smart Shield, his calculation of profits on refill products, and his limited cost deductions.  (Trial Tr. 945:21-946:12, 957:10-11.)  On apportionment, she elaborated that Truman and Beaton

> simply took all of Central's profits for a very long period of time without deducting any directly-related expenses that Central incurred in order to get the product in the hands of the customer and claimed that all as damages.

(Trial Tr. 968:11-15.)  They "ignored that there are other sales drivers of the product," which she understood to be the case from defendants' other experts as well as the testimony of Weekes, "who was a general manager in charge of that product line." (Trial Tr. 968:21-25, 969:22-25, 974:7-19.)  The sales drivers, based on her understanding from the other witnesses, included the active ingredient's safety and efficacy and Central's existing reputation, market share, and brand. (Trial Tr. 975:3-20, 978:9-20.)  "They didn't have zero market share before the Smart Shield product was launched . . . They were known, they had brand names, things of that nature, you know, and you have to assign some sort of value to that."  (Trial Tr. 978:18-22.)  When Costco became a customer in 2012,  it did not sell a product with the Smart Shield applicator, an example of how the applicator was not driving sales.  (Trial Tr. 977:2-6.)  Hall frames Truman's and Beaton's analysis as "unreasonable" in view of this information because it assumes "a good-

faith competitor wouldn't have been on the market and wouldn't have made any of those sales." (Trial Tr. 977:9-13.)

Similarly, their analysis assumes that "a hundred percent of retailers would have delisted Central's products but for Ms. Markell's applicator idea," something Hall rejects. (Trial Tr. 992:6-9.) As a counterpoint, she cites Walmart's trajectory drawn from Central's documents: in July 2010 Walmart wasn't interested in the applicator and Central planned to try again the following year; Walmart took the applicator in 2011 for 2012 but in August 2012 expressed concerns about price and whether the value add was the brand and formula's quality as opposed to the applicator; by February 2013, Central and Walmart were discussing offering the applicator as a free add-on, which Central eventually did. (Trial Tr. 993:8-996:12.) This all signaled to Hall that the applicator "wasn't particularly valuable." (Trial Tr. 996:7.)

At Petsmart, Hall continued, documents showed that by May 2012, unit sales of Smart Shield were down, and though dollars were up, that was due to a price increase. (Trial Tr. 997:2-11.) A September 2012 email reflected that in 2013 Petsmart would be using the applicator as a free or bonus item. (Trial Tr. 999:1-18.) Another retailer, Petco, was interested in the applicator—but this was alongside the significant marketing plan that would accompany it. (Trial Tr. 1001:1-6.) Other retailers either didn't take the applicator or didn't keep ordering it. (Trial Tr. 1001:10-1002:4.) Because "each of the retailers had different facts and circumstances that they were dealing with[, a]nd Central had to repitch or reup and do a line review every year, individually, for each of those retailers," Hall rejected the "arbitrary assumption" that they would all decide the same way; *i.e.*, that the applicator would make or break the order. (Trial Tr. 1004:18-24.)

Hall opined that Truman failed to account for differences between Central's product and what was covered by Markell's patent, such that there had been no infringement (Trial Tr. 980:23-982:12), and for Central's "huge uptick in advertising and marketing spend" in 2012, which when pulled back in 2013 correlated with decreased sales (Trial Tr. 984:16-17, 986:13-23.) Hall understood from Weekes's testimony that an aggressive advertising plan drove the launch—pre-launch research had shown its significance, and "that really bore out in reality." (Trial Tr. 983:2-11, 986:3-5, 987:1-989:14.)

As to first year sales specifically, Hall noted that Truman himself had acknowledged that Central's sales would not have been zero absent Smart Shield, but he just "hasn't calculated what the differential is." (Trial Tr. 954:2-9.) And his 50% reduction for year two, attributed to generics entering the market, was "completely arbitrary," and slight adjustments to that number would make the projected economic benefit disappear entirely; based on Schwartz, she also understood Truman's timing on the generics' entry to be wrong. (Trial Tr. 956:2-20, 990:24-992:1.) Hall also relied on Ball's, Dr. Endris's, and Schwartz's testimony to reach a "relative value" of the idea to Central, and to Central's "extent of use" of the idea. (Trial Tr. 943:23-944:1.) Those concepts, she opined, were "better assessed" by a "reasonable royalty and/or an avoided costs situation," not by disgorgement. (Trial Tr. 960:7-12.)

Ultimately, Hall did quantify some of her criticisms, specifically that Beaton should have deducted "direct costs," which she defined as "expenses that are . . . directly related," to get from gross to net sales. (Trial Tr. 1041:1-3.) "[D]irect costs and expenses that are directly related, that Central had to spend in order to get the product to the customer and sell it, are relevant and should be deducted to get to a true profit value." (Trial Tr. 1041:7-11.) Wright's P&L data, which Beaton relied on to come up with his numbers, used a percentage-of-sales method to

allocate expenses among and within brands, and Hall opined that this was a reliable and typical way of accounting for expenses.  (Trial Tr. 1042:2-10:43-11.)

> Q.  And is it typical to use an allocation like that in order to analyze a company's profits?
>
> A.  Yes. Most companies look at it on an allocation basis or spread their costs on a percentage of sales basis.
>
> Q.  In your experience, is this a reliable and reasonably certain way to measure profits?
>
> A.  Yes.  That is how they keep their financials in the ordinary course of business.

(Trial Tr. 1043:4-11.)  It was important to Hall that Central itself used this method to evaluate profits and make decisions about product lines and the value of products.  (Trial Tr. 1047:21-25, 1049:17-21, 1050:7-11.)  On cross-examination, plaintiffs' counsel pressed Hall for a closer connection between expenses and the applicator products than Central's allocation method allowed for, including whether she looked at actual invoices to confirm that they reflect an expense specifically tied to the applicator.  She repeatedly rejected that approach, reiterating that the allocation method—which captures direct selling expenses at the brand level then allocates them to product lines based on the lines' percentage of sales to determine "relative value"—was appropriate and reasonable because it reflected how Central itself kept its records and understood profitability.  (*See, e.g.*, Trial Tr. 1069:12-1070:9, 1080:20-23, 1075:23-25, 1079:2-3.)  On redirect, Hall added that she understood her task to be calculating damages "to a reasonable degree of certainty, not with exact precision.  And so by Central allocating expenses to various product lines, that is how they view it, and that is how they assign value.  And that is how I've looked at it in this case, and it is typical."  (Trial Tr. 1129:11-16.)

Hall agreed that Beaton had properly deducted discounts and returns and COGs.  (Trial Tr. 1051:9-11, 1043:17.)  However, other categories should have been deducted:  "other

reductions to sales," coupons, delivery, registrations (EPA and state-level), mill tax (required to sell the product in California), direct brand advertising (which included TV, TV production, point of purchase advertising, and mailers, among other things), other marketing support (marketing personnel, trade shows), supply chain expense (supply chain personnel, supplies needed for packaging and shipping the product), and selling expense (the sales function and personnel for selling to the customer) (Trial Tr. 1042:7-13, 1044:9-23, 1044:24-1045:10, 1045:16-25, 1046:1-1049:21.)  She did not, in reaching her rebuttal disgorgement number, deduct inventory write offs for the 4-week period she used to calculate an amount (though if using a longer period, as Beaton used, she might), or deduct administrative expenses.  (Trial Tr. 104323-1044:5, 1049:22-1050:6.)  Those deductions led her to a one-month damages amount of $108,382.  (Trial Tr. 1052:18-20; DR-488.)  She did not offer this as "appropriate damages" but "in response to Mr. Beaton's calculation of disgorgement of profits just adjusted for the deductions, as well as the time period which would assume that the value of Ms. Markell's applicator idea was a hundred percent attributable to the sales and related profits of the product without allocating any attribution to Central's contributions and other factors."  (Trial Tr. 1053:17-25.)  She thinks it is still "too high."  (Trial Tr. 1054:103.)

She used the same analysis to reach a figure based on the first 12 months of sales (January to December 2012): $2,176,271.  (Trial Tr. 1054:13-16, 1055:2-6; DR-489.)  Like the one-month figure, this one reflected "adjustments to Mr. Beaton's methodology" rather than her opinion of a correct damages amount, because it "does not attribute the relative value of Ms. Markell's idea to the product as a whole."  (Trial Tr. 1054:23-1055:1.)[15]

---

[15] Her calculation is reflected in DR-489, which is too large to reproduce in full here but is excerpted *infra* where relevant to the disgorgement calculations.

### ii.    Affirmative Opinions

In formulating her own opinion, Hall began with Ball's theory that a "good-faith competitor would have been unable to start the development of the Smart Shield product until Ms. Markell's idea became public on April 8, 2010," and that the head start period was 22 months and would result in at most a three-to-four week advantage for Central.  (Trial Tr. 942:18-943:15.)  Hall did not independently calculate a head-start period or examine how Beaton got to 22 months and a three-to-four-week head start:  "That's outside my area of expertise.  I'm relying on Mr. Ball for that opinion."  (Trial Tr. 950:9-10.)

To the four-week period, she applied a royalty calculation.  "Central's able to launch four weeks earlier.  So if that brings you into . . . the first month of sales . . . an appropriate way to look at it is really to apply a reasonable royalty to that amount," a method she considered acceptable due to Markell's prior licensing of ideas.  (Trial Tr. 947:9-12, 959:12-13.)  Plaintiffs don't get that month of sales *in toto* because Hall was "trying to value . . . what the benefit was to Central of having that information" early, meaning "the relative value and the apportionment of Ms. Markell's idea relative to the sale of the actual full product."  (Trial Tr. 947:16-21.)  She calculated that value as $19,025.  (Trial Tr. 947:22-25.)  This represented 2% of what Wright's P&L statement had as the net invoice sales on applicators and refills for the one-month period encompassed by Ball's head-start theory  (Trial Tr. 1031:6-1032:15.)  Hall viewed this number as a conservative one because it included both applicator and refill sales.  (Trial Tr. 1032:16-22.)

Hall also testified to what the figure would be if the head start period is either 12 or 15 months, per Truman/Beaton: a 12-month head start in 2012, at 2% of net invoice sales, would translate to approximately $436,000 in royalties, while a 15-month head start would translate to approximately $529,000.  (Trial Tr. 1033:6-1034:18; DR-490.)

To get to her royalty rate and $19,025 figure, Hall looked to the *Universal Computing* case on trade secret misappropriation.[16]  (Trial Tr. 1006:3-10.)  The concept is that "it's a license fee, essentially . . . in exchange for use of IP."  (Trial Tr. 1006:16-19.)   A way to do that is to consider "what would have resulted from a hypothetical negotiation":

> So what that means is, if the two parties had sat down before use was made or disclosed, what would those parties have agreed to fair compensation in exchange for use of that technology.  Understanding that . . . there is a willing licensee/licensor.  So it is forcing the issue for the parties to agree.  And then both parties would know all facts and circumstances. Basically, you are coming in playing poker with your cards face up instead of down.

(Trial Tr. 1007:22-1008:7.)  Delving into the factors she drew from *Universal Computing*, Hall first opined that a lower rate would be appropriate because Central and Markell are not competitors; Markell is merely "an idea person," while Central is a "leader in the industry" that could take the idea (which she viewed as "just an add-on") to market. (Trial Tr. 1010:3-1011:24, 1012:5-6, 1013:1-2.)

On the second factor, there were "no comparable agreements" for Hall to look to for a royalty rate, but Markell's prior licensing of other items suggested that Markell would have expected compensation here in the form of a percentage-of-sales royalty.  (Trial Tr. 1013:11-19.) However, the 10% royalty rate in those other Markell agreements was not the right number here because the technology was different and Central generally paid lower percentages for other products.  (Trial Tr. 1020:9-25.)[17]  For the third factor, looking to the idea's value from plaintiffs' perspective, Hall considered it to point to a lower royalty figure, again because Markell and

---

[16] *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974). She also cited the *Georgia Pacific* factors used in patent infringement cases, but did not discuss them further in her testimony.

[17] Plaintiffs' counsel objected to this line of questioning, and after extensive back and forth, defense counsel conceded that the relevant point was simply that Central and Markell had each done licensing agreements in the past.  (Trial Tr. 1021:6-1028:4.)

Central were not competitors; she would not be, for example, "giving up market share and profits" by licensing the idea. (Trial Tr. 1024:23-1024:14.) Because Markell had not previously licensed a flea and tick product, licensing this one to Central "would have provided [her] with a new revenue stream, essentially," and it was "relevant" that "no other company showed interest in commercializing the Markell applicator idea, which shows relative value." (Trial Tr. 1025:24-1026:3.)

In discussing the fourth factor, the idea's value to defendants, Hall reiterated that that Markell's idea needed work to commercialize; it was an add-on; it "didn't really meaningfully accelerate Central's development" (Trial Tr. 1027:21-23), and that sales increased in 2012, with significant advertising spend, and decreased thereafter (Trial Tr. 1028:1-9.)

Hall also returned to a theory she had discussed earlier: avoided costs. She described her calculation as looking at either the development costs Central avoided having to pay or the compensation Markell lost out on because Central was not paying her for her work. (Trial Tr. 948:7-14.) Putting numbers to these concepts, she cited the approximately $322,000 Central paid to HLB for design work as a proxy for the "relative contribution of Ms. Markell's applicator idea," or as an alternative, $100,500, representing $1500/week (how "Ms. Markell herself valued her time") for 67 weeks (the time it took to finalize the concept beginning with Markell's May 5, 2009 disclosure and ending August 18, 2010). (Trial Tr. 948:17-949:2, 961:9-16, 965:21-25.)[18]

These two figures—offering a "range of what the benefit of [plaintiffs'] technology was"—are independent of whatever the head start period is determined to be. They are not

---

[18] The exhibit Hall was examined on here, DR-98, showed that HLB was paid more than double what Hall proposed awarding plaintiffs here. Hall did not include any of the invoices after August 18, 2010 because she viewed the value Markell contributed as ending "very very early on in the phase" and as limited in scope compared to what HLB did. (Trial Tr. 963:8-964:22.)

cumulative, but "different way[s] to . . . get at the same thing."  (Trial Tr. 949:5-17, 961-:16-17.)  According to Hall, avoided development costs could also be, "in this instance, avoided royalties that Central didn't pay."  (Trial Tr. 958:23-25.)

The two "avoided costs" figures assumed that Markell's idea added value early in the process, which prompted Hall to characterize the $322,000 figure as "conservative" because Markell was only an "idea person" and "HLB did a number of different functions and tasks that Ms. Markell was not providing and didn't do."  (Trial Tr. 964:9-22; *see also* Trial Tr. 1027:10-11.)  She nevertheless believed that what HLB was paid was an appropriate way to estimate the value of what Markell brought to Central.  (Trial Tr. 964:23-965:4.)

The $100,500 figure (what Central would have paid Markell) is the alternative, and both calculations (which she calls a "range") assume that the head start period ended before Central started selling Smart Shield.  (Trial Tr. 967:4-12.)  If the head start did continue until sales started, the reasonable royalty calculation would kick in for that period.  (Trial Tr. 967:12-18.)  Hall saw this as appropriate because Central's and Markell's past practice used royalties to "compensate[] for ideas in IP," and because royalties can accomplish apportionment of value.  (Trial Tr. 967:18-21, 968:4-8.)

Turning back to her discussion of *Universal Computing*, Hall considered it relevant that "Central's misappropriation . . . did not amount to infringement" of Markell's patent, "which means there's something different or there are other features and functionalities."  She continued:

> They are not identical.  Ms. Markell's idea was just one of many concepts that Central evaluated during Project Speed.  We heard the testimony from Mr. Ball that talked about the 200 or so concepts that HLB was tossing around and the research from that.

(Trial Tr. 1029:19:1030:2.)  She also cited Weekes's and Schwartz's testimony about the importance of the active ingredient's safety and efficacy as a factor in "the relative importance of the device."  (Trial Tr. 1030:4-1030:15.)

On cross-examination, Hall was asked about the discrepancy inherent in her reasonable royalty calculations: that the hypothetical negotiation would look at the period immediately before the misappropriation occurred but rely on information that became available afterwards. (Trial Tr. 1110:12-1113:4.)  Examples are Central's sales data, the patent noninfringement ruling, and the market research Weekes relied on in preparing Smart Shield's launch.  Hall responded that the "hypothetical negotiation assumes all parties knew all facts," and that her methodology is not looking at an *actual* negotiation, but, again, a hypothetical one.  (Trial Tr. 1113:21-22, 1111:24-25.)

Plaintiffs' attorney asked if, in that hypothetical negotiation, plaintiffs would be aware that Central was going to misappropriate their idea and litigate against them for (at that point) 12 years without compensation.  (Trial Tr. 1118:16-1119:13.)  Hall said that would not be the case: "The whole construct of a hypothetical negotiation assumes validity and infringement for all intents and purposes of a willing licensee and willing licensor.  Litigation costs and fees are not subsumed within that hypothetical negotiation."  (Trial Tr. 1119:14, 19-24.)  This was based on patent law principles, but in the misappropriation context:

Q.  You are using infringement and validity.  Those are patent terms, aren't they?

A.  Exactly.  So validity, is the idea valid?  And infringement – or switch out infringement as misappropriation.  That is the premises of a hypothetical negotiation.  It assume[s] a willing licensee and a willing licensor.  . . . . there is nothing I have ever done in the course of my career that suggests you factor in litigation costs because it is a willing licensee/willing licensor.  You wouldn't be in litigation.

(Trial Tr. 1120:1-10.)  The analysis, she tacitly conceded, does not account for the intentional wrongdoing that the tort of misappropriation attempts to capture and remedy:

> Q.  And so one of the things you did not consider here was Central's intentional misappropriation of Ms. Markell's idea.  Is that correct?
>
> A.  I take issue with the intentionality.  That is a different set of factors and law.  What we are dealing here is assessing damages and part of that analysis is looking at a willing licensee/willing licensor.  The whole reason why you are going to get into a negotiation and do a license is the intention you are going to use that information or idea.

(Trial Tr. 1120:19-1121:3.)

## IV.    Conclusions of Law

### A.  Legal Standard

The appropriate remedy for trade secret misappropriation depends on the facts of each case, with a notable degree of flexibility.  *See, e.g.*, *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518, 535-39 (5th Cir. 1974) (discussing remedies, including shortcomings in certain methodologies, and concluding that "every case requires a flexible and imaginative approach to the problem of damages . . . each case is controlled by its own peculiar facts and circumstances" (citations omitted)); *Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1243-44 (8th Cir. 1994) (discussing "wide variety of methods to measure damages in trade secrets cases"); *Agilent Techs. v. Kirkland*, 2010 WL 610725, at *27-33 (Del. Ch. Feb. 18, 2010) (fashioning award with compensatory, unjust enrichment, and injunctive relief components based on detailed review of trial evidence and equities); Restatement (Third) of Unfair Competition § 45(2) (listing factors for consideration in determining appropriate monetary award).

All this means that an observation in another trial judge's post-trial bench opinion rings very true: "[d]amages in trade secrets cases are difficult to calculate."  *California Safe Soil, LLC*

70

*v. KDC Agribusiness, LLC*, 2025 WL 98479, at *26 (Del. Ch. Jan. 10, 2025) (quoting *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 387 (6th Cir. 2022)).

The remedy may be based on what the plaintiff lost or on the benefit or gain to the defendant, as reflected in Section 45 of the Restatement (Third) of Unfair Competition, which both sides and the Federal Circuit have cited as a guidepost. *See* Restatement (Third) of Unfair Competition § 45(1)-(2) (1995); *id.*, cmt. a ("Monetary relief may consist of compensatory damages measured by the loss to the plaintiff or restitutionary relief measured by the unjust gain to the defendant"). The same is true under New Jersey law. *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 387-88 (3d Cir. 2016) (in discussing unfair competition claim brought "under a misappropriation theory," observing that New Jersey law permits "recovery under a disgorgement theory" and that plaintiff "could show damages under either a lost profit theory or a disgorgement theory").

Hybrid awards (while ensuring no double counting) can be made where appropriate, and within each category, there are differing ways of ascertaining the loss or gain; a defendant's gain can be quantified, for example, by reference to its profits or to the savings it achieved by having access to the misappropriated information. Restatement (Third) of Unfair Competition § 45 cmt. c, d; *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020) (discussing avoided costs). A third category, reasonable royalty, can "measure either the defendant's savings or the plaintiff's lost revenue" and is the "price that would be agreed upon by a willing buyer and a willing seller for the use made of the trade secret by the defendant." *Id.*, cmt. c, d.[19]

---

[19] The New Jersey Trade Secrets Act's damages provision, N.J.S.A. 56:15-4, and the federal Defend Trade Secrets Act's remedies language, 18 U.S.C. § 1836(b)(3)(B), reflect the same three categories. Cases applying these statutes, as well as other states' analogous enactments of the

The Restatement therefore echoes what the case law says: the facts dictate the appropriate way to ascertain damages.  *See id.*, reporters' note cmt. d. ("Selection of the appropriate method of measuring monetary relief depends on the facts and circumstances of the particular case.")

In many scenarios, the monetary remedy has a temporal or durational dimension.  The Sedona Conference, *Commentary on Monetary Remedies in Trade Secret Litigation*, 24 SEDONA CONF. J. 349, 358 (2023) ("The duration of the trade secret damages period should align with the elimination of defendant's unfair commercial advantage.").  This is so when the defendant could have eventually obtained the misappropriated information by proper means, as by reverse engineering.  *See ams-OSRAM USA Inc. v. Renesas Elecs. Am., Inc.*, 133 F.4th 1337, 1347-49 (Fed. Cir. 2025).

It can also be the case when the information becomes public independently of a defendant's actions, as through publication of a patent application, issuance of a patent, or some other public disclosure.  The Restatement explains: "[T]he issuance of a patent or other public disclosure of the information by the plaintiff or a third person terminates the secrecy necessary to the protection of the trade secret.  Monetary relief based on the defendant's use of the information after the loss of secrecy is therefore appropriate only to the extent necessary to remedy a head start or other unfair advantage attributable to the defendant's prior access to the information."  Restatement (Third) of Unfair Competition § 45, cmt. h.

This head start theory was the focus of the Federal Circuit's decision ordering a new trial on plaintiffs' damages for Central's misappropriation.  As discussed earlier, the Federal Circuit predicted that the New Jersey Supreme Court would apply the Restatement's approach to a

Uniform Trade Secrets Act, are therefore instructive in this case governed by New Jersey common law, and as the ensuing discussion reflects, the Court has looked to that case law to inform the analysis here.

scenario where (as here) an idea that is the subject of a misappropriation claim became public, independently of defendants' actions, after defendants misappropriated it. *Nite Glow*, 2021 WL 2945556, at *6. Under that approach, the "head start" concept would limit plaintiffs' award to the period during which the idea is protected as novel plus "'the additional period, if any, in which a misappropriator retains an advantage over good faith competitors because of misappropriation.'" *Id.* (quoting Restatement (Third) of Unfair Competition § 45 reporters' note cmt. h.) *See also id.* at *8 (ordering new trial on damages, "which damages must be attributable to the head-start period").

This approach requires the Court to determine, on remand, how long Central's head start from having early access to Markell's idea lasted and how to value that head start. *See Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 203 n.13 (3d Cir. 2004) (noting that trial court is to "comply strictly" with the appellate mandate, but "may consider, as a matter of first impression, those issues not expressly or implicitly disposed of by the appellate decision" (cleaned up)); *Bistrian v. Levi*, 2023 WL 6927327, at *5 (E.D. Pa. Oct. 19, 2023) (court must implement appellate mandate in both "letter and spirit").

### B. The Head Start Period and How to Value It

#### 1. Duration of the Head Start

The "head start" inquiry is a "practical [one] focused on ensuring that one who prematurely used secret information gains no unfair advantage in the competitive marketplace-- —no 'head start' on the competition'—from that premature use." *ams-Osram*, 133 F.4th at 1348. As with overall selection of a monetary remedy, the focus here on what is "practical" requires close engagement with the context of the misappropriation.

Central had access to Markell's idea for 11 months before her patent application published. This is not at issue. The dispute is over how long Central's advantage continued beyond that 11-month period of early access. Truman's opinion is that it lasted for 36 months: the 33 months of Central's development plus the three months when it was selling "at risk" (*i.e.*, with some outstanding regulatory approvals), because a good faith competitor would take the same steps and the same amount of time to develop its own version of the product. While Central could start that process on May 5, 2009, the competitor would start on April 8, 2010. Central launched in January 2012,[20] while the competitor would launch in April 2013. Central would have the period of January 2012 to April 2013 to itself in terms of applicator sales, and as the first on the market, it would still have some lingering benefit for up to five years after a competitor launched.

For 33 of the 36 months Truman testified about, his opinion holds up. His assumptions accounted for the corporate hierarchy that Truman was familiar with that require "a lot of decision-makers and entities" and "many steps" to develop a flea and tick product, and this can make even what seem like discrete decisions such as signing up a design firm take time. (Trial Tr. 197:10-15, Trial Tr. 197:24-198:3.) Truman also recognized the corporate and industry context in which Markell's disclosure to Four Paws had been made, and what would happen internally afterwards—why wide-ranging, divergent thinking would still happen, for example. (Trial Tr. 232:1-20, 242:13-243:3, 303:19-25, 307:15-17, 313:15-315:5.) He spoke to the value of testing with potential users and validation studies (Trial Tr. 228:23-229:21, 233:6-13), and

---

[20] The witnesses were inconsistent in describing Smart Shield's launch, with some references to January 2012 and others to February 2012. Central may have formally launched the applicator at the February 2012 trade show where Markell saw it, but its documents reflect sales as early as January 2012. As such, January 2012 is the date the Court uses.

understood how the seasonality of the product being developed would affect the development process and timing, including when retail decisions on shelf space would be made and how Central had to prepare for its conversations with retailers. (Trial Tr. 235:1-25, 236:7-20, 247:3-14.)

Truman also provided context for what Central itself recognized as wins from the launch. For example, he observed that "price increases at Walmart are unheard of," but the applicator's introduction allowed Central to do it. (Trial Tr. 245:18-24, 248:2-15.) Central's relationships with Petco, Lowe's, Petsmart, and Kmart reflected similar wins in distribution and sales.

Truman's opinion that, in substance, Central did what was reasonable and to be expected of those in similar stead was buttressed by his experience with developing the Vectra product, and with managing the Frontline product (*i.e.*, "everything related to that product") during two significant development projects. (Trial Tr. 182:25-183:17.) Vectra's development period was about a year longer but also required more extensive regulatory review for a new active ingredient; otherwise, the key mileposts were in lockstep with what Central did here. (*E.g.*, Trial Tr. 190:8-13, 274:7-276:18, 288:22-289:2.)

The result was that Truman's opinion tracked and supplied context for Central's decisions and timeline, and why a good faith competitor would have to follow the same path. And it gibes with what happened. Brown, Lankford, and McFadden testified to an initial, open-ended phase as Project Speed moved towards its goal, akin to what happened with Vectra. Weekes testified about her discussions with Bill Brown, head of Central; Central's corporate goals; and how the product launch date had to be adjusted to accommodate volumetric and marketing planning that she moved quickly to put in place. Weekes also testified about how critical the marketing plan was for the sales the company ultimately achieved—in other words, why all of the planning and

testing and research was directly connected with the product's success.  Factually and conceptually, Truman's approach matches Weekes's, and insofar as his opinion as to 33 of the 36 months of development time is persuasive, the Court credits it.  *FTC v. Innovative Designs, Inc.*, 2020 WL 758727, at *1 n.2 (W.D. Pa. Feb. 14, 2020) ("In a bench trial, it is the province of the judge sitting as the trier-of-fact to evaluate the credibility of witnesses and weigh the evidence.").

The final three months are different story.  For that time, the only outstanding step was full regulatory approval for the cat applicator.  Central chose to ship "at risk" during this time but Truman opined that a good faith competitor would not do so.  (Trial Tr. 286:23-288:5.)  He does not adequately explain why a good faith competitor would do everything Central did except for that, and other witnesses persuasively explained why this would not be the case.  (Trial Tr. 685:1-16, 731:6-732:1-11, 733:5-7, 736:1-737:3 (Endris)); Trial Tr. 898:5-21, 901:15-902:23 (Schwartz)). Schwartz, in particular, explained that Central was releasing a product that would be relevant for dogs (for which Central already had approval by then), which constituted a far larger market than cats (for which the approval was outstanding).[21]  The Court therefore concludes that the head start period ended in January 2012, not three months later.

The Court also rejects Truman's post-2012 "taper down" period as part of the head start. Truman attributes this persisting benefit to a good faith competitor's entry happening at a time

---

[21] That these three months would be problematic was foreshadowed by a defense motion to strike on the first day of trial, which successfully sought to preclude plaintiffs from using a new demonstrative and a supplemental schedule with their experts' testimony that would, in effect, calculate the head start damages using a 33-month period.  (D.E. 596, 597, 600; D.E. 617 (2/13/24 Mot. Tr.), at 28:19-59:4.)  As the Court ruled, those documents could not be used to define the head start period itself (*i.e.*, as 33 months), though whether Truman could be examined in a way that explored this issue was left as a context-dependent question for trial.  (2/13/24 Mot. Tr. 58:13-16, 23-24.)  And in fact what has ended up happening is what the Court predicted in the motion hearing: the Court itself has done that calculation on its own, based on all of the evidence adduced at trial.  (*See id.* at 39:13.)

when "new competitive pressures," such as generic fipronil entrants and "veterinary brands bleeding over into the market," were also occurring.  (Trial Tr. 261:15-18, 371:9-372:19.)  Other witnesses suggested that Truman had the timing wrong on entry of generics (Trial Tr. 685:19-23, 720:8-11 (Endris); Trial Tr. 911:10-13 (Schwartz)), but even leaving that aside, Truman acknowledges that his reduction is arbitrary, as he explained his 50% figure as "seem[ing] like a reasonable number" that "frankly [he] feel[s] like that number could have been an even more severe impact on the market; meaning that another competitor could have entered with an innovation that would have made this absolutely not worth while at all" for Central.  (Trial Tr. 261:24-262:3.)

Moreover, per Weekes, Central had always planned to jettison the applicator after it served its "two core goals" of accomplishing increased price and distribution (Trial Tr. 776:25-777:7), and when Central reduced its ad spend, as it did in 2013, sales dropped too (Trial Tr. 792:10-16).  The record also shows that Central's successes in year 1 did not persist across the board in subsequent years.  (*See, e.g.*, Trial Tr. 825:21-826:10 (as to retailer Lowe's).)  Given the speculative and unsupported testimony on the "taper down" component of Truman's opinion and the hit-or-miss 50% formula he offered, the Court declines extend the head start period beyond January 2012.

Defendants' head start theory based on Alan Ball's testimony leaves the Court unpersuaded.  In reaching his 22-month head start theory, Ball opines that a good faith competitor would take that amount of time to develop its own version of the Smart Shield applicator starting on the patent application publication date of April 8, 2010 and ending with a launch in February 2012.  Because Central launched in January 2012, Central would have 1 month of sales to itself and no advantage beyond then.

To get this result, Ball rejected Central's process as a proxy for the appropriate development period. So he ignored or dismissed much of what Central actually did, including – critically – the market research that led to a highly successful marketing plan that let Central accomplish its pricing and distribution goals. Ball opined that the hypothetical competitor would undertake a "different development process" from what Central did (Trial Tr. 515:11-14)—it would take a "tactical" approach that aimed to "bring [the idea in the patent application] to market as quickly as possible," as opposed to Central's "strategic" one that was "wide-ranging and research-based." (Trial Tr. 515:15-19, 530:3-12, 539:7-18.) To Ball, the research phase interacting with consumers to assess unmet meets would be unnecessary. (Trial Tr. 553:19-554:9, 660:15-662:12.) The brainstorming of many ideas and concepts would be as well. (Trial Tr. 554:16-21.) Hiring a design firm and expecting the results would take much less time, concluding briskly in "handing off" the finalized design "for engineering and manufacturing." (Trial Tr. 577:22-578:3.)

But Ball does not explain *why* this competitor would have none of the commercial concerns or goals that Central did when it initiated Project Speed. And he does not explain why, if it didn't, it would be interested in expeditiously developing, under the compressed timeline he described, someone else's idea as disclosed in a patent application. He also offers no opinion post-handoff to engineering and does not speak at all to the importance and success of Central's marketing efforts, which as Weekes's testimony made crystal clear, were the driving force for proceeding with the launch of the Smart Shield products.

The limitations of Ball's analysis make sense when the Court considers his orientation. As an industrial designer involved in product development, Ball's role is analogous to HLB's in Project Speed; his focus is design and he "orchestrate[s] teams" for mechanical engineering and

manufacturing.  (Trial Tr. 502:1-25.)  In fact, he used his experience at HLB to justify why a good faith competitor would make decisions faster than Central did.  "At HLB, we would write proposals over a weekend."  (Trial Tr. 531:5-6.)  He testified that he "doesn't understand why [HLB's June 2009 proposal] wasn't acted on" more quickly, when in his opinion the retention of a design firm could have been completed in a single month instead of the six months Central used to solicit proposals from multiple firms and interview them.  (Trial Tr. 651:18-655:8, 655:24-656:10, 658:10-11.)  Ball appeared either unfamiliar or dismissive on the subject of significant engagements like the one Central undertook with HLB, requiring extensive internal discussions before finalizing.  Contrast this with the testimony from Truman, who was more familiar with the whole arc of product development in this area, that "once you get that idea, whether it be in the case where a nondisclosure was signed and the idea was given or you see a patent which contains drawings, you are still going to go out and . . . do your due diligence before you spend millions of dollars or $200,000 on a design firm."  (Trial Tr. 313:16-20.)

Defendants' other experts did not overcome these deficiencies in Ball's analysis. Schwartz's Paravue comparator, which he characterized as involving a similar scenario and product to Smart Shield, took two years for development—but, crucially, was never sold; it was entirely a giveaway.  (Trial Tr. 894:15-895:11, 927:7-12.)  Here, in contrast, the marketing and sales plan was the driving force for the launch.  Ignoring that aspect of the record disregards a critical reason for why Central took the time to develop that plan.

### 2.  Value of The Head Start

The implications of the delta between the parties' head start period theories come into focus here.  With a head start that barely reached beyond the start of sales, defendants' expert Hall calculated a remedy based on 1 month of royalties on sales and so-called "avoided costs"

that looked at the pre-sales period. That amounts to less than $400,000—comparatively, far less than what defendants would owe if their 2012 gross sales of over $20 million is the starting point for the analysis.

Plaintiffs' head start period, which the Court has largely accepted in reaching its 33-month head start ruling, focuses on those sales. In that scenario, Central's retained advantage ended on approximately January 8, 2013, which means the first 12 months of Smart Shield sales are included in the remedies calculation. As discussed further below, a royalty approach to these sales would improperly undervalue the misappropriated idea's value to Central (or, playing along with defendants' "royalty as a proxy" concept, undercount plaintiffs' loss) and give Central a windfall for stealing plaintiffs' idea.

The remedy plaintiffs seek is based on disgorgement, which on these facts does not suffer from the same flaws. Moreover, with the adjustments to the disgorgement calculation that the Court concludes are necessary, this approach properly meets defendants' argument (expressed primarily through the testimony of Hall and to a lesser extent Dr. Endris and Schwartz) that plaintiffs' figure is insufficiently tethered to the value of their idea vis-à-vis the comparative contributions of plaintiffs and Central. In other words, this approach, as adjusted, results in an award that adequately accounts for each side's contribution and ensures an appropriate causal nexus between defendants' adjudicated misappropriation and what they will be required to pay.

As an equitable remedy, disgorgement implicates the Court's authority to "formulat[e] fair and practical remedies appropriate to the specific dispute." *Kaye v. Rosefielde*, 223 N.J. 218, 231 (2015); *see also Johnson v. McClellan*, 468 N.J. Super. 562, 578 (App. Div. 2021). The record here permits calculation of defendants' ill-gotten gains to a reasonable degree of certainty, and as such the Court concludes that plaintiffs are entitled to an award that requires defendants to

80

disgorge their 2012 profits on Smart Shield attributable to the misappropriated idea. *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 308-09 (Law. Div. 1995) (defendant's profits from sales made due to unfair advantage it gained over plaintiff via tortious conduct were "a reliable indication of the value of that unfair advantage" and plaintiff had "supplied evidence sufficient to estimate damages with a reasonable degree of certainty"); *Epic Sys.*, 980 F.3d at 1130 ("[T]here is no single way to measure the benefit conferred on a defendant; the measurement is context dependent. The important considerations are that a judge or jury calculates *the benefit to the defendant*—not the loss to the plaintiff—and that this calculation is done with reasonable certainty." (emphasis added)).

The plaintiff must prove the gross number (sales or profits, as the case may be), while the defendant must prove any costs or other reductions. *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 490 (7th Cir. 2024) (under federal DTSA, "[a] plaintiff's first option is to recover as unjust enrichment the entire amount of the defendant's profits caused by the misappropriation. . . . [O]nce the plaintiff proves the defendant's total profits from the theft, the defendant has an opportunity to seek apportionment by proving how its own efforts contributed to those profits."), *cert. denied*, 145 S. Ct. 1182 (2025); Restatement (Third) of Unfair Competition § 45 cmt. f ("The plaintiff is entitled to recover the defendant's net profits. The plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits."); *id.*, reporters' note cmt. f (same). If the calculation is reasonably certain, as opposed to speculative, that is sufficient, and as defendants are the wrongdoers and also the ones in possession of their own sales and expense information, uncertainties in the calculations are resolved against them rather than against plaintiffs. *Adolph*

*Gottscho, Inc. v. Am. Marking Corp.*, 26 N.J. 229, 239-41 (1958); *Platinum Mgmt.*, 285 N.J. Super. at 309; *Agilent*, 2010 WL 610725, at *25.

Turning to the evidence the parties offered here, in calendar year 2012 Central had gross sales of its applicator and refill products in the amount of $22,275,327.  (DR-489; PR-35B.)  Hall and Beaton both deduct returns/discounts and COGs from this figure.  (Trial Tr. 400:24, 401:4 (Beaton); DR-489.)  Using Hall's calculations, which summarize the 2012 calendar year numbers from Wright's data, returns/discounts are $419,133 and COGs are $8,871,529.  (DR-489.) Beaton went no further with deductions, but defendants, through the testimony of Hall and Wright, adequately supported additional deductions, albeit not all of the ones Hall testified to.

"Other reductions to sales" (totaling $1,214,109) represents, effectively, a "negotiation with customers" that helps in marketing development, such as by helping those customers (which inferentially would be retailers and those in similar stead, who turn around and sell to others) "advertise products on their own accord."  (Trial Tr. 102:16-103:4 (Wright).)  "Coupons" (totaling $453,231) means returning money back to a purchaser who bought the product using that incentive.  (Trial Tr. 103:5-9.)  These categories can properly be viewed as part of Central's marketing efforts.  (Trial Tr. 1043:3 (Hall) (describing these two categories as involving "promotional activities").)  Also part of Central's marketing efforts were direct brand advertising expenses, such as print and digital advertising, in the total amount of $2,589,869.  The columns of DR-489 that reflect these numbers for applications/refills for calendar year 2012 are excerpted below:

**Additional Advertsing**

| | |
|---|---:|
| Print | 623,541 |
| Digital | 282,092 |
| Radio | 385,652 |
| FSI | 343,737 |
| Promotions/PR | 64,612 |
| POP | 231,866 |
| Trade/Trade Shows | 16,837 |
| Direct Mail | - |
| Coop Adv | 344,299 |
| Creative | 237,624 |
| Pkg Design | 59,608 |
| **Total Additional Direct Brand Advertising** | $    2,589,869 |

The foregoing deductions were applied to this set of products (applicators/refills) using a percentage-of-sales allocation method that both Wright and Hall explained at length in their testimony. Essentially, brand-level expenses were allocated to these products (and others in the category) in the same percentage that their sales represented as a component of the brand sales as a whole. For this category of expenses, which all coalesce around the theme of marketing and advertising, using that approach makes sense on the facts here. Weekes explained, and the sales trends showed, that the advertising plan was inextricably linked with the Smart Shield sales generated in 2012. An allocation method purporting to link that spend to those sales is eminently sensible as a result.

As for the remaining group of ad expenses, TV and TV production (totaling $3,136,920), the allocation was different. Instead of a brand-level allocation, these expenses were "assigned entirely to the sales of the Smart Shield essentially," because the allocation was to the spot-on products, not the brand as a whole. (Trial Tr. 1046:8-13.) This is appropriate, given the advertising's success in driving sales. Despite some quibbling at trial over timing, it was apparent that TV advertising was a relative new front for Central (Trial Tr. 789:2-5 (Weekes)), and that when it was used, it had an impact. Central, not plaintiffs, gets to keep the benefit from introducing that aspect of the launch.

Hall also deducted registrations and mill tax (totaling $545,329), both of which are fees required for regulatory approval/sales of the medication used with the applicator, and both are tracked on a basis that is SKU-specific and therefore shown with a sufficient nexus to support deduction here.  (Trial Tr. 1045:1-25 (Hall); DR-489.)

The remaining deductions are characterized as "overhead"—other marketing support, supply-chain expense, and selling expense—and they add up to $2,482,531.  (DR-489.)[22] Delivery expenses, which appear at an earlier line in both Wright's and Hall's calculations, total $386,405.  As with the advertising and other related expenses, these "overhead" and delivery categories were allocated using the brand-level percentage-of-sales method.  (Trial Tr. 1048:1-12, 1074:8-14 (Hall).)  But unlike the advertising and related expenses discussed above, the record does not support a similar conclusion that this approach fairly tags plaintiffs with these expenses.

Wright's explanation of the "overhead," which Hall largely echoed, discusses salaries, entertainment, travel, supplies, and other non-specific expenses as being wrapped up in these figures.  (Trial Tr. 165:17-23, 166:1-167:23.)  Hall reasoned that delivery is an appropriate deduction because the product had to get to the customer to be sold.  That's true, but looked at closely defendants' evidence does not persuasively connect how much of that expense was due to Smart Shield and plaintiffs' counsel elicited that Hall had no evidence that adding the Smart Shield products to the extant deliveries increased any costs.  (Trial Tr. 1076:15-1078:3.)

Some costs of production or of selling included in the foregoing numbers could arguably be appropriate, while others would not.  *See, e.g.*, Restatement (Third) of Unfair Comp. § 45 cmt.

---

[22] Hall agreed that one line item in this group, administrative expenses, should not be deducted. (Trial Tr. 1049:22-1050:5.)

f; id. § 37 cmts. g, h.  And while operational or overhead expenses can be subtracted if appropriate, as when the addition of the new product or the increased sales volume resulting from the tortious conduct also increases those costs, it is up to defendants as the proponent of those deductions to show how and why.  Here that was not done.  *Cf. Platinum Mgmt.*, 285 N.J. Super. at 312 (allowing deduction where "[t]here is evidence from [defendant] that its overhead expenses are not fixed, but vary with sales volume; and that to the extent that the addition of the diverted customers increased general administrative expenses, it is appropriate to deduct a portion of those costs").

Beginning with the calendar year 2012 gross invoice sales of $22,275,327 and subtracting the deductions the Court finds to be sufficiently supported, the resulting 2012 net profit to be disgorged by defendants for their misappropriation is **$5,045,207,** and plaintiffs are awarded that amount.[23]

A final note on this figure.  Defendants' witnesses said specifically and by implication that their allocations were conservative in plaintiffs' favor, as Hall suggested about the inclusion of applicators and refills in discussing a deduction.  (*See, e.g.*, Trial Tr. 1091:3-4.) If anything, the number the Court has reached undercounts plaintiffs' contribution, because even Central's own witnesses acknowledged that Smart Shield led to "wins" for the company that extended beyond the sales of those products.  These real life, but not measured, victories were not captured by Wright's P&L the experts for both sides used in reaching their theories.  Central achieved their much-discussed pricing increases and distribution expansions.  "[O]verall brands" within Bio Spot and Adams benefited, particularly from the Smart Shield advertising, in ways that directly

---

[23] Although the head start period continued another 8 days after 2012 ended, the record before the Court does not permit an 8-day disgorgement calculation to a reasonable degree of certainty.

translated to higher sales.  (Trial Tr. 841:19-842:8, 842:23-843:1 (Weekes).)  There was action alley placement with Walmart, a significant customer.  (Trial Tr. 836:5-8 (Weekes).)[24]  The Court acknowledges this "glow" while not quantifying it other than to emphasize its existence and remind defendants that in assessing what they gained, and basing plaintiffs' award on it, this decision is a conservative one and is rendered based on the Court's charge, and authority, to formulate a "fair and practical" remedy on the facts.  *Kaye*, 223 N.J. at 231.

### C.  The Royalty and Avoided Costs Approaches Undervalue the Idea and Fail to Engage with the Factual Record

Plaintiffs sought to head off the disgorgement versus royalty/avoided costs question entirely in their pretrial motions, objecting to evidence of the latter category being offered at trial.  (*See* D.E. 534, 542, 553.)  In denying this request, the Court cited the fact specific nature of the inquiry into what is appropriate to award as relief for misappropriation. (D.E. 576, Tr. of 11/14/23 Mot. Hrg. 50:7-9; D.E. 577 ¶ 4.)  When plaintiffs renewed their objection at trial, the Court adhered to that ruling (D.E. 613, 2/28/24 Trial Tr. 930:24-934:15), permitting defendants to make their record on royalties and avoided costs.

As it turns out, the concerns plaintiffs expressed pretrial were borne out by the testimony.  As an initial matter, defendants' premise—that the head start ended, at most, a month after sales started—has been rejected.  The consequence is that their expert Hall's royalty calculation, which by her concession is based wholly on Ball's head start opinion, operates on far too short a time period.

---

[24] A useful exercise to demonstrate why action alley loomed large might be a trip to a big box store paying attention to the products flanking the customer on first entering, each vying for attention.  Depending on the eye of the beholder, a consumer product that makes it into action alley can trigger a visceral, emotional appeal that results in a sale.

But even extending the royalty period to 12 or 15 months, as Hall did as an exercise and, perhaps, a hedge (Trial Tr. 1033:6-1034:18), would not cure the fundamental problems with using a royalty approach on the facts that became apparent at trial.  The royalty method assumes that the licensee and licensor come to the negotiating table *willingly*, with the aim of reaching an agreement that they both benefit from.  *See* Restatement (Third) of Unfair Competition § 45 cmt. g.  As Hall conceded, the hypothetical negotiation underpinning her calculation, despite assuming "all parties knew all facts," does not account for the necessity of litigation (here, for more than a decade) to vindicate plaintiffs' rights.  (Trial Tr. 1113:21-22, 1111:24-25, 1118:16-1119:24.)  In fact, Hall acknowledged that the construct is based on the *opposite* assumption:  "It assume[s] a willing licensee and a willing licensor.  . . . . there is nothing I have ever done in the course of my career that suggests you factor in litigation costs because it is a willing licensee/willing licensor.  *You wouldn't be in litigation*."  (Trial Tr. 1120:1-10 (emphasis added).)  It also does not account for intentional wrongdoing, with Hall sidestepping the issue: "That is a different set of factors and law."  (Trial Tr. 1120:22-23.)[25]

The licensing scenario ignores that sitting at the putative bargaining table were defendants who had already put the putative "licensors'" idea to use without their knowledge, made money from it, and accomplished their goals of increasing pricing and expanding distribution (Trial Tr. 775:12-16, 776:6-21 (Weekes)), while the "licensors" remained under the

---

[25] That Hall failed to account for the full context of Central's adjudicated misappropriation is apparent too in her testimony about how she reached her proposed royalty rate.  She opined that in considering the idea's value to plaintiffs, because Markell had not previously licensed a flea and tick product and "no other company showed interest in commercializing the Markell applicator idea," a license with Central would have provided her with "a new revenue stream." (Trial Tr. 1025:24-1026:3.)  But Central led Markell to believe she had a deal; she had no reason to pitch her idea elsewhere and holding it against her that she didn't ignores Central's misappropriation.

impression that the parties had a deal that simply hadn't yet borne fruit. Hall's hypothetical would put defendants in no worse position than if they had acted lawfully and licensed the idea. The Restatement explicitly recognizes this tension, stating that while a royalty may provide compensation to a misappropriation plaintiff for its loss, it "does not necessarily deprive the defendant of the full gain" from the misappropriation. Because "the imposition of a reasonable royalty requires the defendant to pay only the amount it would have paid had it fairly bargained for use of the plaintiff's secret, *it may not adequately discourage the appropriation of trade secrets*." Restatement (Third) of Unfair Competition § 45 cmt. g. And indeed, that would be the result here if Central were required to pay, after a decade-plus of litigation, only what it would have paid had it acted in good faith at the outset.

Hall also frames her royalty analysis as an answer to the problem of how to properly apportion value to what Central got from plaintiffs. This is consistent with how defendants opposed plaintiffs' *in limine* motion. (D.E. 542, at 6 (describing their metric as "royalty-as-a-proxy" for unjust enrichment, as contrasted to "the 'reasonable royalty measure of relief'").) Truman and Beaton's analysis is, to be sure, vulnerable on these grounds. They attribute all sales in year 1 to the applicator, but Truman also conceded that Central still would have had *some* sales of its spot-on treatments in 2012 without the Smart Shield and that he had not tried to quantify that. (Trial Tr. 325:10-326:12, 327:3-13.)

Hall's theory, however, disregards the full scope of the idea's contributions to Central. In the "avoided costs" component of her opinion (discussed further *infra*), she made clear that she viewed Markell's contribution as only pertaining to the design phase and limited to the development phase, as opposed to the marketing and commercialization phases, of the launch. (Trial Tr. 948:7-949:2, 961:9-16, 964:13-22, 965:21-25.) She also emphasized what Central did

to market and commercialize Smart Shield, while failing to acknowledge the idea's (and thus plaintiffs') role in the successful Smart Shield advertisements, or that Central obtained, and ran with, plaintiffs' idea at a time when it wanted to (and used the idea to) up its prices and increase distribution, take advantage of "white space" in the relevant product market, solve problems for consumers that "were having of getting product on their hands or rolling around with the dogs," solve an irrelevance concern vis-à-vis retailers, and move quickly to get all of this done. (Trial Tr. 9:19-20, 11:14-20, 13:7-18 (Brown), 75:4-13 (Lankford), 770:5-771:14, 775:4-20, 776:6-21, 797-98, 831:8-832:12, 834:14-22, 836:5-8, 841:3-17 (Weekes)).

Hall's calculations omit this information, thus attributing all of those successes to Central's efforts and no portion to plaintiffs' contributions. She does not support this conclusion with any reliable analysis, or any analysis at all—she does not even acknowledge how the larger commercial landscape impacts her calculation.[26] *Cf. Univ. Computing*, 504 F.2d at 539, 544 (citing "commercial setting of the injury" and "nature and extent of the use the defendant put the trade secret to after misappropriation," and that "the hypothetical agreement must be modified by the commercial situation" (cleaned up)).

The record is also devoid of other factors that could counsel a royalty metric or at least make it an appropriate component of the monetary remedy. Although Hall theorized that Markell would have expected a percentage-of-sales royalty here because she had previously licensed ideas, she also declared that there were "no comparable agreements" that she could use in calculating a rate and rejected the 10% rate Markell got elsewhere based on vague "differences." (Trial Tr. 1013:11-19, 1020:9-25.) *Cf. Pioneer*, 35 F.3d at 1244 (observing about

---

[26] She does, however, acknowledge commercial considerations where they supply a basis for rebutting Truman's opinion, such as that he had the timing wrong on generic fipronil's market entry. (Trial Tr. 1059:8-11.)

reasonable royalties that "[a]lthough occasionally applied in trade secret cases, this theory is most appropriate when the other theories would result in no recovery or when the parties actually had or contemplated a royalty arrangement" (citations omitted)); *California Safe Soil*, 2025 WL 98479, at *4-5, 27-28 (granting damages based royalty where parties had a prior license).

Nor was Central a misappropriator that came innocently to the idea and invested in it before understanding its provenance, which would suggest any remedy should account for its good faith investment. *See* Restatement (Third) of Unfair Competition § 45 cmt. g & illustration 5 (describing scenario where employee takes idea from old employer to new one, and new one invests in equipment to implement idea before learning of claim). Nor was it unsuccessful in making money on the products that incorporated plaintiffs' idea; its own documents show otherwise. (*See, e.g.*, DR-25.) *Cf.* Restatement (Third) of Unfair Competition § 45 cmt. g (discussing scenario in which "defendant's inefficiency results in little or no profit from the exploitation of the trade secret and the loss to the plaintiff cannot otherwise be established"); *Univ. Computing*, 504 F.2d at 536 (approving use of royalty calculation where "defendants failed in their marketing efforts," such that "no actual profits exist by which to value the worth to the defendants of what they misappropriated").

The case Hall makes for royalties boils down to her criticisms of Truman and Beaton's ostensible failure to apportion and instead and choice instead to attribute all sales to the idea, at least in the initial period. The Restatement recognizes that "in cases in which the defendant's gain from the trade secret is difficult to measure but apparently exceeds the plaintiff's loss, a reasonable royalty may be the best means of approximating the defendant's unjust enrichment." Restatement (Third) of Unfair Competition § 45 cmt. g; *id.*, reporters' note cmt. g ("A reasonable

royalty is most often awarded as compensation for the plaintiff's loss when actual damages cannot be determined more directly.")

Apportionment (or failure to apportion) was a significant theme in Hall's testimony. But that didn't prevent Hall from performing her own disgorgement calculation, though she denied that the resulting figure was an "appropriate" calculation. In that calculation, she endorsed Central's method of calculating deductions from gross sales to get to net profit and accepted certain deductions that plaintiffs' experts had rejected. And indeed, as discussed earlier, this is exactly what the case law addressing a disgorgement remedy for misappropriation contemplates: plaintiffs must establish sales, while it is up to defendant to establish what to deduct from sales. The task, then, is to engage with that process, not to throw it out in favor of a metric that sharply undervalues both the value of plaintiffs' contribution to defendants and plaintiffs' loss from the misappropriation.

Defendants tacitly acknowledged this, as shown by Hall's calculation of "avoided costs" theory as an add-on to her royalty figure. But this "avoided costs" theory avoids the facts. Hall offered $100,500 as the figure Central would have paid Markell for her design contributions during the development phase. She fails to connect this to what the testimony reveals as Central's big picture commercial goals and accomplishments. Her alternative figure of $322,911—a portion of what Central paid HLB—is deficient for the same reason. Moreover, Hall does not explain how this latter amount is an "avoided cost"—she calls it a "proxy" for what Central could have paid Markell instead of HLB, while simultaneously opining that Markell could not have accomplished tasks that HLB undertook. She offered no persuasive nexus, in other words, between her $322,000 figure and the idea's contribution to Central. As with the royalty calculation exercise that calculated 12- and 15-month royalty figures while

simultaneously disagreeing with them and framing them as "conservative" and overly generous to plaintiffs, this HLB theory appears to have been defendants' effort to offer a more palatable, if factually unsupported, figure.

There is no need for such gymnastics. Disgorgement, a common remedy in similar cases and the one plaintiffs seek here, is the appropriate remedy, and as discussed above has the great benefit of factual support in the record.

### D. Prejudgment Interest

Plaintiffs sought prejudgment interest, without offering specific figures or calculations. (Trial Tr. 1146:2-6, 1214:7-20, 1215:4-5.) Ultimately, the issue was reserved. (Trial Tr. 1346:21-1347:5.) Within 14 days, the parties shall each file a letter of no more than 3 pages, single spaced, reflecting how prejudgment interest should be calculated on the sum awarded to plaintiffs. Their submissions shall also append a proposed form of judgment that reflects the principal amount awarded to plaintiffs, the proposed prejudgment interest figure, and that post-judgment interest will be awarded.[27]

### V.     Conclusion

For the reasons set forth above, defendants are liable to plaintiffs in the amount of **$5,045,207** for their adjudicated misappropriation. The parties' submissions on prejudgment interest, as set forth above, shall be filed within 14 days. An appropriate order will issue.

*s/Katharine S. Hayden*

Dated: September 30, 2025

Katharine S. Hayden, U.S.D.J.

---

[27] Post-judgment interest on civil money judgments is mandatory under 28 U.S.C. § 1961.